Consolidated under lead cases
Nos. 435-87C & 589-87C
(No. 91-984C)
(Judge Bruggink)

---

GATEWAY LUMBER CO., *et al.*
and MANKE LUMBER CO., *et al.*
(Mt. Adams Veneer Co.),

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Dennis J. Dunphy, Esq.
*Attorneys for Plaintiffs*

SCHWABE WILLIAMSON & WYATT, P.C.
1420 Fifth Avenue
Suite 3010
Seattle, Washington 98101-2393
Telephone: (206) 622-1711

*Of counsel:*

Steven A. Miller, Esq.
SCHWABE WILLIAMSON & WYATT, P.C.
1420 Fifth Avenue
Suite 3010
Seattle, Washington 98101-2393
Telephone: (206) 622-1711

January 22, 2004

# TABLE OF CONTENTS


**Page**

I. INTRODUCTION ........ 1

II. STATEMENT OF CASE ........ 6

A. The distinguishing characteristics of the Lynx Sale. ........ 6

B. There were sizeable discrepancies between the government appraisal of the Lynx Sale and the prices actually bid at the original Lynx auction. ........ 7

C. Mt. Adams was awarded the contract, but could not perform. ........ 9

D. The government took a year before deciding whether to resell the contract. ........ 9

E. Contract provision B9.4 required the government to conduct a new appraisal consistent with the then-existing standard Forest Service methods. ........ 9

F. The government appraised the timber using out-of-date data when attempting to compute the value of the timber at the time of termination. ........ 10

G. The standard method of appraising damages in cases where timber was not resold required the Forest Service to adjust its basic appraised rates by adding an estimated bid premium computed from comparable sales. ........ 11

H. In computing bid premiums on the Lynx Sale, the government selected four "comparables" for reasons that the contracting officer cannot remember. ........ 13

I. The "comparables" used to compute overbid do not share many of the Lynx Sale's characteristics ........ 14

*1. The government included two salvage sales as "comparables" and this alone artificially inflated damages by nearly two million dollars. ........ 14*

*2. The government also failed to adjust its overbid calculations to reflect the high quality of the timber contained in the Lynx Sale. ........ 15*

*3. The Lynx Sale included four times the volume of timber contained in any of the "comparables." ........ 16*

*4. The Lynx Sale also had a performance period that was twice as long as any of the "comparables," providing for greater scheduling flexibility. ........ 17*

**TABLE OF CONTENTS**

**Page**


5. *The government also failed to take into account the different contract terms contained in the "comparables."* ..... *17*

J. The government then computed damages using data about timber volumes that was apparently never verified for accuracy. ..... 18

III. ARGUMENT ..... 19

A. Summary Judgment Standard. ..... 19

B. Contract provision B9.4 required the government to conduct an appraisal that complied in all material respects with its standard appraisal methods. ..... 20

C. There are factual issues to show that the government did not comply in several material respects with its standard appraisal methods, and resolution of these factual issues requires a trial. ..... 22

1. *There are issues of fact as to whether the Forest Service complied in all material respects with its standard method of conducting a damage appraisal when no resale is conducted.* ..... *22*

2. *The deviations from the government's standard method of conducting a damages appraisal are material to the government's assessment of damages and therefore preclude summary judgment* ..... *24*

IV. CONCLUSION ..... 25

# APPENDIX


| Exhibit No. | | Page No. |
|---|---|---|
| 1 | February 2, 1990, Memo from Jerry J. Brown, Fire/Timber Management Staff, to Regional Forester, Region 6 | 1 |
| 2 | October 6, 1999, Trial Transcript, *Capital Development Co. v. The United States*, U. S. Court of Federal Claims, Cause No. 750-87C | 2-4 |
| 3 | January 2, 1979 Memo from Robert D. Tokarczyk, Forest Supervisor, to District Manager, Randle R.D., with attachments | 5-6 |
| 4 | Timber Sales Action Bid Record for Lynx Sale | 7-14 |
| 5 | September 30, 1981, The Effectiveness of Competition and Appraisals in the Auction Markets for National Forest Timber in the Pacific Northwest, pp. iii, iv, viii, and 209 | 15-20 |
| 6 | July 24, 1984 Letter from George M. Leonard, Director of Timber Management, to Regional Foresters | 21-22 |
| 7 | Selection Portions of Forest Service Manual 2420 10/77 Amend. 109: §§ 2421.4, 2423.2, 2424.25, 2424.3 | 23-37 |
| 8 | April 24, 1990 Appraisal Summary | 38 |
| 9 | Selected Portions of Forest Service Manual 2430 (2/81) Amend. 123: §§ 2433.6, 2435.05 | 39-43 |
| 10 | Selection Portions of Deposition of David E. Note, July 9, 1993, pp. 41, 42, and 43 | 44-49 |
| 11 | FSM 2433.54 5/83 Amend. 129 | 50-56 |
| 12 | April 13, 1990 Memo from Beulah Johnson to David Note, with attachments | 57-63 |
| 13 | February 14, 1990 Memo from Wendall L. Jones, Director of Timber Management, to Regional Attorney | 64 |
| 14 | Forest Service Manual § 2431.23 (12/82) R-6 Supp. No. 296 | 65-66 |

**APPENDIX**


| Exhibit No. | | Page No. |
|---|---|---|
| 15 | Form 2400-17s of Beech 5, Polk 4 Salvage, Beech 4 Salvage, Kraus 7, Schooley 11, Cozy 3, Tumble 4, Holdaway 2, Silver 7, and Polar 2 | 67-86 |
| 16 | October 24, 1979 Lynx Timber Sale Contract, Section A7-Scheduled Rate Redetermination | 87-88 |
| 17 | Report and Appraisal, Gifford Pinchot National Forest, Randle Ranger District, Lynx Timber Sale, Sale Cruise | 89-91 |
| 18 | Scheduled Rate Redetermination, Lynx Timber Sale, Section A – Sale Cruise | 92-94 |
| 19 | Deposition of Ronald Lewis, June 16, 1993, p. 46 | 95-97 |

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Anderson v. Liberty Lobby, Inc.*
477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)....................20

*Capital Development Co. v. United States*
49 Fed. Cl. 178 (2001), *aff'd* 308 F.3d 1283 (Fed. Cir. 2003)....................passim

*Cedar Lumber, Inc. v. United States*
5 Cl. Ct. 539 (1984)....................14

*Dan Rice Constr. Co. v. United States*
36 Fed. Cl. 1 (1996)....................25

*Hoskins Lumber Co. v United States*
1996 U.S. App. LEXIS 9612 (Fed. Cir. 1996)....................2, 20, 21

*In re: Cleereman Forest Products*
AGBCA No. 2000-101-1....................21

*J.F. Allen Co. v. United States*
25 Cl. Ct. 312 (1992)....................3, 20

*Madigan v. Hobin Lumber Co.*
986 F.2d 1401 (Fed. Cir. 1993)....................2, 20, 21

*Manke Lumber Co. v. United States*
45 Fed. Cl. 157 (1999)....................25

*Opryland USA, Inc. v. Great Am. Music Show, Inc.*
970 F.2d 847 (Fed. Cir. 1992)....................23

*Phillips Petroleum Co. v. Huntsman Polymers Corp.*
157 F.3d 866 (Fed. Cir. 1998)....................20

*Seaboard Lumber Co. v. United States*
48 Fed. Cl. 814 (2001)....................5, 18, 24

*Teleflex, Inc. v. Ficosa N. Am. Corp.*
299 F.3d 1313 (Fed. Cir. 2002)....................20

*Telemac Cellular Corp. v. Topp Telecom, Inc.*
247 F.3d 1316 (Fed. Cir. 2001)....................19

*Tel-Instrument Electronics Corp. v. United States*
56 Fed. Cl. 174 (2003)....................25

# TABLE OF AUTHORITIES

**Page**

**RULES**

36 C.F.R. § 223.60 .......... 8

RCFC 56(f) .......... 23

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| GATEWAY LUMBER CO., *et al.* | ) | |
| and MANKE LUMBER CO., *et al.* | ) | |
| (Mt. Adams Veneer Co.), | ) | |
| | ) | |
| Plaintiffs, | ) | Consolidated under lead cases |
| | ) | Nos. 435-87C & 589-87C |
| v. | ) | (No. 91-984C) |
| | ) | (Judge Bruggink) |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

## I. INTRODUCTION

The defendant has applied for judgment on its counterclaim, without trial, in the amount of approximately $7 million ($3,789,615 in principal damages, plus interest). The government necessarily does not argue that it suffered injury in this amount. Indeed, the evidence developed thus far demonstrates it is unlikely that it has suffered any injury at all.[1] Rather, having chosen for reasons of public policy to retain rather than to sell the timber that was subject to the contract, the government proffers the Contracting Officer's calculation of entitlement under the terms of a contractual remedy for Mt. Adams Veneer's failure to cut it down. The validity of the calculation – its consistency or lack of consistency with government policy as mandated by the

[1] An internal government memorandum dated February 2, 1990, states:

> If we were given approval to resell the [Lynx] sale in its original form, it is likely that the current contract rates (DF - $678.00; H&O - $500.00; C - $220.35) would be equaled or exceeded, thus mitigating the damages.

P. App. at 1; *see also* Declaration of Paul Ehinger, dated January 22, 2004, at ¶ 18 (hereinafter "Ehinger Decl.").

terms of the contractual remedy itself – is nowhere demonstrated in the conclusory declaration submitted with the government's motion. In fact, the Contracting Officer's calculation is demonstrably at odds with many of these standards. As a result, it does not reflect the contractual remedy the government relies upon to obtain the money it seeks to accompany the trees it keeps.

The parties agree that Article B9.4 provides the starting point for the analysis, as set forth in the government's motion. The government argues forcefully that, based upon *Hoskins Lumber Co. v United States*, 1996 U.S. App. LEXIS 9612 (Fed. Cir. 1996) (unpublished), and *Madigan v. Hobin Lumber Co.*, 986 F.2d 1401, 1405 (Fed. Cir. 1993), questions of fairness, accuracy, or reasonableness of the appraisal utilized in connection with the calculation are not pertinent. That is not the import of those cases when applied to the present motion. While those cases indeed provide that the court will not look behind the appraisal policies to judge their fairness or accuracy, they just as decidedly require the government to demonstrate that the Contracting Officer's calculation adheres to those policies:

> …compliance with the standard appraisal method is the sole measure of its accuracy and reliability.

*Hoskins*, 1996 U.S. App. LEXIS 9612 at *4.

The government ignores its burden. The government's moving papers neither identify the applicable standards nor demonstrate compliance. Instead, the government submits the final mathematical calculations, a fragment of one sub-calculation, and a conclusory declaration by a Forest Service official, uninvolved in the Contracting Officer's decision, which claims that the

appraisal was "standard."[2] Ms. Anderson does not reveal what elements of the underlying appraisal, if any, that she reviewed to reach this conclusion. The Anderson declaration lacks foundation and should be stricken.[3]

One may search the Anderson Declaration in vain for any description of the standards from which the conclusion of compliance arises or against which it could be tested. Not a single regulation is cited. Not a single provision from the Forest Service Manual or Handbook is referenced. No policies of any kind are identified. The Declaration is simply an exercise of checking the Contracting Officer's algorithm combined with an unsubstantiated declaration that the calculation looks "standard." Stated otherwise, replicating a set of summary mathematical calculations in a declaration begs the question of the source of the underlying data and whether it meets the standards that the Forest Service mandates. Without second-guessing those standards, Mt. Adams will demonstrate that the Contracting Officer failed to comply with them and that this has had a material impact on the results. In so doing, the Forest Service has failed to comply with the contract.

The Forest Service Manual is, as one would expect, an important touchstone for the measurement of the Contracting Officer's consistency with Forest Service policy. The

---

[2] "This appraisal of the value of the remaining timber in Mt. Adams' defaulted Lynx Sale, including the determination and addition of the weighted average bid premiums, was performed in accordance with the standard Forest Service method in use at the time." Declaration of Christine Anderson, dated September 11, 2003, (hereinafter "Anderson Decl."), ¶ 14.

[3] This Court has previously rejected the Forest Service's attempts to use Ms. Anderson's testimony to fill in evidentiary gaps on matters about which she has no personal knowledge. For instance, in the *Capital Development* trial, this Court specifically ruled that Anderson could not testify about the source of data contained in a government spreadsheet that had been prepared by another Forest Service employee because she lacked personal knowledge of the underlying data. P. App. at 3-4. That is precisely the kind of impermissible testimony the government offers in this case, and her declaration should therefore be stricken. *See, e.g., J.F. Allen Co. v. United States*, 25 Cl. Ct. 312, 325 (affidavits based upon reports and statements of others without personal knowledge cannot be considered in summary judgment motion).

government's failure to apply it to the Contracting Officer's analysis is emblematic of the weakness of the government's argument. The manual describes, in hierarchical fashion, standard appraisal policies, the elements of a basic appraisal, and goes on to point out the need for adjustments in appraisals for more particularized circumstances.

Mt. Adams will show in detail the many ways in which the Contracting officer failed to follow these standards, but the more salient examples, supported by USFS policy quotations, can be summarized as follows:

1. "When there is an overriding reason which precludes reoffering the remaining timber, the resale value is the appraised value at expiration, adjusted as appropriate to reflect transaction evidence." The government's attempts to comply with this provision are superficial, at best. Though the contracting officer added an "estimated bid premium" to the basic appraised rates, the bid premium decidedly did not accurately "reflect" the transaction evidence because the contracting officer failed to account for significant differences between the Lynx Sale and the sales against which Lynx was compared.

2. "If similar sales can be found, use the average bid premium for those sales and document what was done." The Contracting Officer recognized that sales had to first be comparable to the Lynx Sale before they could be used in computing an average bid premium, and yet two of the four sales he used for comparison were deteriorating "salvage sales," which typically contain dead, insect-infested, damaged, or down timber that is of substantially different quality than timber contained in "green sales." Salvage sales are so different from a "green sale" of live timber that the Forest Service specifically labels these sales (e.g, "Beech 4 Salvage") as an unmistakable warning to

prospective bidders. Inclusion of these two dissimilar sales to compare against Lynx, which was a "green sale," drives nearly two million dollars of the "loss" calculated by the Contracting Officer.

3. "Since no two tracts of timber are identical, it follows that the stumpage prices paid or to be paid for any two tracts cannot be directly compared without adjusting for the physical or quality differences between them." The Contracting Officer failed to make any adjustments for the physical and quality differences between Lynx and the four "comparables" he used when he computed an adjusted bid premium. His computation completely ignored the high quality of the Douglas fir timber contained in the Lynx Sale and also failed to adjust for other important differences in the sales, such as the volumes of timber offered in the Lynx Sale and the duration of the Lynx contract. The comparables were also different from the Lynx Sale in requiring a cash down payment and midpoint payments that had not been required in the Lynx Sale. This Court has previously ruled in the *Seaboard* and *Capital Development* cases that these increased financial burdens have a material impact on the prices bid on timber. *Seaboard Lumber Co. v. United States*, 48 Fed. Cl. 814, 835-36 (2001); *Capital Development Co. v. United States*, 49 Fed. Cl. 178, 184 (2001). Yet the contracting officer made no adjustments for these differences between Lynx and the "comparables."

4. "The appraiser must document his conclusions on all pertinent factors significantly affecting stumpage value." If an appraiser or the Contracting Officer made any of the foregoing adjustments, or found some justification for not doing so, it is nowhere evident in the documents produced by the government in this case. It is self-

evidently not contained within the documents selected to support the government's present motion.

The government's Motion for Summary Judgment cites the contractual basis for its recovery and the cases which support its applicability, but little else. Proof that a Contracting Officer performed an appraisal and used the resulting values to generate a damages figure is not proof that the appraisal conformed with government policy on what is required to be done in the appraisal. The conclusory declaration that the approach was "standard" not only begs the question of what the standard is, but suggests that the government likely knows that a review of the standard will demonstrate just how far this Contracting Officer departed from it.

## II. STATEMENT OF CASE

### A. The distinguishing characteristics of the Lynx Sale.

In August 1979, the government advertised a timber sale located in the Randle Ranger District of the Gifford-Pinchot National Forest known as the "Lynx Sale." The Lynx Sale contained large volumes of old-growth Douglas fir suitable for veneer production and also for producing lumber, and was particularly attractive and valuable to prospective purchasers. Ehinger Decl. ¶ 7.

The Lynx Sale area spanned approximately 1,300 acres, and contained an estimated 536 acres of timber for clearcutting. D. App. 2-3. The sale contained an additional 38 acres of right-of-way for specified road construction. D. App. 2-3. The government estimated the volume of the sale at 37,500 MBF,[4] not including 574 acres of pulp and cull material. D. App. 3, 16. The government estimated that 19,600 MBF of this timber was Douglas fir. D. App. 3, 16. Another 16,400 MBF was western hemlock and other coniferous species, according to the government's

[4] "MBF" means "thousand board feet."

estimates. *Id.* The government also estimated that the sale included 1,600 MBF western red cedar. *Id.* These volumes would have kept a typical family-owned sawmill operational for six straight months. Ehinger Decl. ¶ 17. The Lynx Sale was so large, approaching one square mile of timber, that before it was offered, the government contemplated whether Lynx should have been offered as two sales. P. App. 6.

The original duration of the contract was seven and a half years. D. App. 14; Anderson Decl. ¶ 2. This period for performance was lengthy even by Forest Service standards. Anderson Decl., ¶ 2. The performance period was later extended by agreement of the parties to June 30, 1989, bringing the total performance period to nearly ten years. D. App. 18.

The singular quality of the old-growth timber, and especially the Douglas fir, contained in the Lynx sale is another distinguishing feature of the sale. Ehinger Decl. ¶ 7. An estimated twenty percent of the Douglas fir in the Lynx Sale consisted of #1 peeler and #2 peeler logs. D. App. 3, 16; Ehinger Decl. ¶ 11. These #1 and #2 peelers are more valuable than lower-grade timber because they have a clear surface that is free of knots, and a minimum diameter of 30 inches at the small end. Ehinger Decl. ¶ 11. This allows the logs to be peeled to produce veneer and also to be used to produce lumber. Ehinger Decl. ¶ 11.

The quality of the cedar was also notable. Thirty-six percent of the cedar in the Lynx sale was graded as #2 Cedar sawlogs, which has at least a twenty-inch diameter. Ehinger Decl. ¶ 11.

**B. There were sizeable discrepancies between the government appraisal of the Lynx Sale and the prices actually bid at the original Lynx auction.**

The government established the minimum bids that it would accept on the Lynx Sale in August 15, 1979, when the government finalized its pre-sale appraisal. D. App. 9. According to

that appraisal, the estimated price of the Lynx Sale was $213.85/MBF for the Douglas fir and $125.18/MBF for the hemlock and other coniferous timber.[5] D. App. 9.

The Lynx Sale was bid at an oral auction, and there were twelve bidders. P. App. 7-14. There were a total of 143 bids made at the auction. P. App. 7-14. The prices bid by the three highest bidders on the biddable species were well in excess of the government's pre-sale appraisal:

| | **Douglas fir** | **Hemlock & Other** |
|---|---|---|
| Mt. Adams | $678.00/MBF | $500.00/MBF |
| Tom Co. | $677.50/MBF | $500.00/MBF |
| Bald Knob | $648.00/MBF | $500.00/MBF |
| Minimum Bid | $213.85/MBF | $125.18/MBF |

P. App. at 7-140.

These kinds of discrepancies between the government's pre-sale appraisal and the prices established by competitive bidding were typical of timber sales in the region where Lynx was located. P. App. 7-18. At the time Lynx was bid, bidders were typically bidding more than double the government's pre-sale appraisal rates, and at least one government-commissioned study questioned the effectiveness of the government's pre-sale appraisal process on this basis. P. App. 17-18.[6] Even the government concedes that the rates established by its pre-sale appraisal process generally tended to be lower than actual sale prices in the market. Anderson Decl. ¶ 11.

[5] The cedar and PAM were sold at fixed rates and could not be bid. PAM is always offered at fixed rates, as are minor species on the sale. Ehinger Decl., ¶ 7.

[6] The Forest Service has now largely abandoned the residual value appraisal methodology that was used at that time, and the current preferred method of appraising timber is by using transaction evidence. 36 C.F.R. § 223.60. However, under standard contract provision B9.4, the relevant appraisal methods and practices are those in place at the time the contract expired. *See infra*, Section II.E.

**C. Mt. Adams was awarded the contract, but could not perform.**

Based upon its high bid, Mt. Adams was awarded the Lynx Sale. For reasons previously addressed in a prior summary judgment motion, the sale expired uncompleted on June 30, 1989. Mt. Adams will not reargue these issues again in this brief, as they have been decided previously.

**D. The government took a year before deciding whether to resell the contract.**

Once the contract expired uncompleted, Forest Service policy required the government to decide whether to resell the Lynx Sale within a "reasonable time." P. App. 21. Forest Service policy also specified that this decision should ordinarily be made within six months. P. App. 21.

However, the government did not make a decision about whether to resell the Lynx Sale within six months. It was not until June 22, 1990 – a year after expiration – that the government announced in its contracting officer's decision that it would not reoffer the Lynx Sale, for the stated reason that there were potential adverse effects on the watershed that would have resulted from the cutting. D. App. 27. Curiously though, the government did not formally memorialize the rationale for its decision not to resell the Lynx Sale until September 21, 1990 – several months after the government had already assessed damages against Mt. Adams. Decl. Anderson ¶ 8 & D. App. 19-24.

**E. Contract provision B9.4 required the government to conduct a new appraisal consistent with the then-existing standard Forest Service methods.**

Standard provision B9.4 of the Lynx Sale contract provides that when a purchaser fails to cut timber before the termination date, the Forest Service is required to conduct a new appraisal using current Forest Service methods at the time of termination, and damages are to be computed based upon that appraisal if the timber is not resold:

> B9.4 Failure to Cut. In event of (a) termination for breach or (b) Purchaser's failure to cut designated timber on portions of Sale Area by Termination date, *Forest Service shall*

> *appraise remaining Included Timber*, unless termination is under B8.22. *Such appraisal shall be made with the standard Forest Service method in use at time of termination.*
>
> Damages due to the United States for Purchaser's Failure to cut and remove such timber meeting Utilization Standards shall be the amount by which Current Contract Value plus the cost of resale, less any effective Purchaser Credit remaining at time of termination, exceeds the resale value at new Bid Rates. *If there is no resale, damages due shall be determined by subtracting the value established by said appraisal from the difference between Current Contract Value and Effective Purchaser Credit.*

D. App. 25. According to this provision, the government was first required to conduct an appraisal of the timber using the standard methods of appraisal in place on June 30, 1989. *Id.*

**F. The government appraised the timber using out-of-date data when attempting to compute the value of the timber at the time of termination.**

The contracting officer's damage calculation in this case is based upon an appraisal that was conducted on June 1, 1990. D. App. 26. In that appraisal, the government appraised the Douglas fir at $426.35/MBF and the western hemlock at $121.16/MBF. D. App. 26. The appraisal states that it was prepared using data from the first quarter of 1989 and March 1989. D. App. 26, Ehinger Decl., ¶ 20. No explanation can be found in the Contracting Officer's decision or in the appraisal as to why this particular data period was chosen, given that the contract expired three months later. D. App. 26-28.

The Contracting Officer certainly had more current data available to him, and without explanation he decided to ignore it. In an earlier appraisal of damages, conducted on April 24, 1990, data for the third quarter of 1989 and for September 1989 were used. P. App. 38. Because of a lag between the time the data are compiled and when they are published, the third quarter data would have better reflected the June 30, 1989, appraisal date. Ehinger Decl., ¶ 20. That

more current data, had it been used in the final computation of damages, would have reduced the damage claim by over $400,000. *See* P. App. 38; D. App. 26; Ehinger Decl., ¶ 20.[7]

**G. The standard method of appraising damages in cases where timber was not resold required the Forest Service to adjust its basic appraised rates by adding an estimated bid premium computed from comparable sales.**

The government recognized that its pre-sale appraisals were not an adequate substitute for resale prices in determining the remaining value of the contract at the time of termination. Anderson Decl. ¶ 11; Deposition of Ronald Lewis at 46 (reproduced at P. App. 96). For that reason, it was standard Forest Service policy in damages appraisals that when timber was not resold, the contracting officer was required to make adjustments to the appraised value: "When there is an overriding reason which precludes reoffering the remaining timber, the resale value is the appraised value at expiration, <u>adjusted as appropriate to reflect transaction evidence</u>." FSM 2433.6 2/81 Amend. 123 (reproduced at P. App. 40) (emphasis added).

The government concedes that it was the Forest Service's "practice" to treat damages appraisals differently than pre-sale appraisals. Anderson Decl. ¶ 11. Specifically, the contracting officer was required to calculate an "estimated bid premium" (also sometimes referred to as an "overbid") that was added to the appraised rates when the uncut volume in a defaulted sale was not being resold. Anderson Decl. ¶ 11; FSM 2433.6 2/83 Amend. 123 (reproduced at P. App. 40). Higher estimated bid premiums result in lower damages owed to the government, and conversely, understated bid premiums artificially increase damages owing to the government.

David Note was the contracting officer who assessed damages on the Lynx Sale, and he participated in computing the bid premiums on the Lynx Sale. Deposition of David Note

---

[7] Using the first quarter and March 1989 data, the government estimated the contract value, before adding a bid premium adjustment, at $10,413,380. D. App. 26. Using the later data, the estimate of contract value before adjustment was $10,848,702. P. App. 38. The difference exceeds $400,000.

(hereinafter "Note Dep.") at 41 (reproduced at P. App. 34-39). He testified that he was not aware of any specific Forest Service policies or procedures for computing bid premium. Note Dep. at 41. He was, however, aware of a "general direction" that the government was to select sales that are "representative of the sale that you're concerned with and use those to determine what the bid premium was on those sales." Note Dep. at 41-42. Mr. Note acknowledged that in selecting comparable sales for computing the bid premium, he would have ordinarily considered the age of the timber, species composition, the systems needed to log the sale, quality of the timber, and overall volume. Note Dep. at 41-42. He did not recall haul distance or duration of the sale being considered as factors. Note Dep. at 42-43.

In fact, Forest Service policy specifically required contracting officers to consider all significant factors affecting prices when making any appraisal, and admonishes contracting officers to make adjustments for the differences when comparing contracts as part of any appraisal:

> **Appraised Market Value.** Since no two tracts of timber are identical, it follows that the stumpage prices paid or to be paid for any two tracts cannot be directly compared without adjusting for the physical or quality differences between them.
>
> …
>
> The fundamental rule in determining the items to be included and the general scope of timber appraisal is to include consideration of all significant factors affecting stumpage prices.

FSM 2421.4 10/77 Amend. 109 (reproduced at P. App. 25) (emphasis added). This is particularly true when the government is computing damages, because in that context, the contracting officer is directed to appraise damages "with the utmost care and impartiality, and no item shall be included which cannot be supported." FSM 2433.54 5/83 Amend. 129 (reproduced at P. App. 51).

**H. In computing bid premiums on the Lynx Sale, the government selected four "comparables" for reasons that the contracting officer cannot remember.**

In the case of the Lynx Sale, the government considered only ten timber sales sold on the Randle District in the two years prior to the date of default. D. App. 27; P. App. 57-63. The government did not bother to consider sales after the date of default, even though such data was available by the time the government assessed damages. D. App. 27; Ehinger Decl. ¶ 19. Nor did the government look at any sales outside of the Randle District, even though the Director of Timber Management recommended consideration of sales in other forests if comparable sales could not be found in the Gifford-Pinchot National Forest. P. App. 64. It did not do any of these things even though in the months preceding the termination of the Lynx Sale, "there was considerably less representative timber sold on the Forest than would be sold under normal circumstances" because of an injunction on timber sales that had been issued to protect the spotted owl. P. App. 1. The contracting officer's artificial restrictions on the data he considered exacerbated the situation.

From its initial list of ten sales, the government selected four that it contends were "similar" to the Lynx Sale. D. App. 27. The four sales chosen as comparables were the Polk 4 Salvage, Beech 4 Salvage, Polar 2, and Silver 7 sales. D. App. 30. However, Mr. Note acknowledges that he cannot recall anything about those four sales that made them comparable to Lynx. Note Depo. at 43 (P. App. 47). And the only justification given in his contracting officer's decision was that those four sales "contained similar species and both Douglas fir and western hemlock were biddable species." D. App. 27.

**I. The "comparables" used to compute overbid do not share many of the Lynx Sale's characteristics.**

1. The government included two salvage sales as "comparables" and this alone artificially inflated damages by nearly two million dollars.

Lynx was a "green sale" with only incidental salvage involved. P. App. 5; Ehinger Decl. ¶ 9. However, half of the sales (two out of four) chosen by the government to generate its bid premium were "salvage sales." D. App. 30; Ehinger Decl. ¶ 9. A salvage sale is, by definition, one in which the primary reason for entry is to salvage insect-infested, dead, dying, damaged, or down timber. *See Cedar Lumber, Inc. v. United States*, 5 Cl. Ct. 539, 546 n.9 (1984); FSM 2435.05 2/81 Amend. 123 (reproduced at P App. 42). The quality of the timber contained in a salvage sale is greatly dissimilar from the quality found in a green sale, and performance on the salvage sale must usually be accelerated to protect against further deterioration of the timber during the performance period. Ehinger Decl. ¶ 9. Salvage sales are sold under completely different circumstances from green sales, and bidder conduct is driven by very different assumptions.[8] Ehinger Decl. ¶ 9.

Paul Ehinger, who has previously been recognized by this Court as an expert witness in both the *Seaboard* and *Capital Development* trials, recalculated the government's damages by eliminating the Polk 4 Salvage and Beech 4 Salvage from the government's bid premium calculation. Ehinger Decl. ¶ 10. By simply eliminating the use of incomparable salvage sales from the overbid calculation and making no additional adjustments, the government's damages would be reduced by nearly two million dollars. Ehinger Decl. ¶ 10.

[8] Even the accuracy of the cruise is different for salvage sales. Regional policy required cruises to have sampling errors of no more than 5% for green sales. FSM 2431.23 12/82 R-6 Supp. 296 (reproduced in P. App. 66). For salvage sales, a larger sampling error of 10% was tolerated. *Id.*

2. The government also failed to adjust its overbid calculations to reflect the high quality of the timber contained in the Lynx Sale.

The timber included in the Lynx timber sale was of much superior quality to the timber contained in the comparables. Ehinger Decl. ¶ 11. Twenty percent of the Douglas fir timber included in the Lynx Sale was graded as a #1 or #2 peelers. Ehinger Decl. ¶ 11; D. App. 3. By comparison, the four comparables had only between 1% and 7% of its Douglas fir graded as a #1 or #2 peeler. Ehinger Decl. ¶ 11; P. App. 67-86.

These quality differences are significant, as bidding is historically more aggressive on sales of higher quality because the purchaser has more options in the marketplace – purchasers can sell their timber for both lumber and veneer. Ehinger Decl. ¶ 11. As a result, the higher quality of the Lynx Sale timber would be expected to produce higher overbids. *Id.* This is borne out by the observed overbids on the four comparables chosen by the government. The Polk 4 Salvage sale had the lowest share of high quality #1 and #2 Douglas fir peelers at a mere 1%, and the adjusted bid premium on the Douglas fir was the lowest of all four of the sales. In contrast, the Polar 2 Sale had the highest share of #1 and #2 peelers, also had the highest adjusted bid premium for Douglas fir in the amount of $374.46. Ehinger Decl. ¶¶ 10-11; D. App. 30; P. App. 67-86.

The government made no adjustments to its bid premium computation to account for the differences in quality between Lynx and the sales used for comparison. Ehinger Decl. ¶ 11. It failed to do so, even though Forest Service policy specifically provided that "the stumpage prices paid or to be paid for any two tracts cannot be directly compared without adjusting for the physical or quality differences between them." FSM 2421.4 10/77 Amend 109 (reproduced at P. App. 25).

3. The Lynx Sale included four times the volume of timber contained in any of the "comparables."

Not one of the four contracts used to compare Lynx comes anywhere near the volume of timber included in the Lynx Sale. Of those four contracts, the one with the largest volume was Polar 2, and even that sale only included 9,300 MBF in total volume. P. App. 85-86; Ehinger Decl., Exh. 2. The Lynx Sale had an estimated 38,300 MBF in total volume remaining at the time the contract expired – four times as much timber as in Polar 2. Anderson Decl. ¶ 7.

The volumes of the four comparables are also dissimilar from Lynx when considered by species. Lynx contained 19,100 MBF of estimated remaining Douglas fir when the contract expired. D. App. 28. That was five times as much Douglas fir as was contained in any of the four comparables. D. App. 31. And Lynx's estimated 15,800 MBF of remaining hemlock and other conifers was almost four times as great as any of the four contracts used for comparison. D. App. 28, 31.

The government did nothing to adjust its overbid calculations to compensate for Lynx's significantly higher volumes. D. App. 27-32. It ignored these substantial volume differences even though research conducted by Walter J. Mead, commissioned by the Forest Service, had already confirmed in 1981 that "firms are willing to pay substantial premiums to secure the largest size timber sales held for auction by the Forest Service." P. App. 20.

Indeed, the government's own policies recognize the importance of volumes in the context of appraising values when the Forest Service Manual advises that in the context of an appraisal, a "volume estimate … is the first consideration." FSM 2423.2 10/77 Amend. 109 (reproduced at P. App. 29). Yet the government still did nothing to adjust its overbid calculations to account for the unusually high volumes of timber included in the Lynx Sale. D. App. 27-32.

4. <u>The Lynx Sale also had a performance period that was twice as long as any of the "comparables," providing for greater scheduling flexibility.</u>

The Lynx Sale also had a lengthy performance period of 90 months. That was more than twice as long as the four sales that the government used as comparables. The next longest sale was the Beech 4 Salvage Sale, which had a length of only 43 months. Ehinger Decl. Exh. 2; P. App. 71. One of the comparable sales, Silver 7, only had a duration of 25 months. Ehinger Decl., Exh. 2; P. App. 83.

As with volumes, the government also failed to make any adjustments to account for the differences in contract duration. Ehinger Decl. ¶ 14; *see also* D. App. 27-32. Contract duration has a significant impact on bidding because lengthy contracts like Lynx provide the purchaser with the scheduling flexibility to time the market and thereby realize higher prices on the timber once it is cut. Ehinger Decl. ¶ 14. In fact, the government-commissioned Mead Report revealed that for 31 out of 45 potential bidders interviewed, the "length of the timber sale contract was the dominant factor" in influencing their bid prices. P. App. 19.

5. <u>The government also failed to take into account the different contract terms contained in the "comparables."</u>

When the Forest Service performs an appraisal in connection with determination of damages, it is required to appraise the timber "under the original contract terms and conditions." FSM 2424.3 10/77 Amend. 109 (reproduced at P. App. 35). This is to ensure that the damage appraisal is comparable with the current contract value, since those are two critical components of the damage formula in a no-resale case. *Id.*

Standard contract provisions had changed dramatically from 1979 when the Lynx Sale was sold to the time when the comparable sales were sold in 1988 and 1989. All four of the comparables included provisions that increased the financial burden of purchasing those sales by requiring cash down payments and midpoint payments, which were not required in the Lynx

Sale. Ehinger Decl. ¶ 12(d) – (e). This Court has previously determined that these changed financial requirements have a material effect on the prices bid on timber. *Seaboard Lumber Co. v. United States*, 48 Fed. Cl. 814, 835-36 (2001); *Capital Development Co. v. United States*, 49 Fed. Cl. 178, 184 (2001). Yet there is no evidence that these differences are reflected anywhere in the government's overbid calculations, even though the Forest Service Manual requires damages to be appraised using original contract terms and conditions.

Similarly, the Lynx Sale was a flat rate sale, whereas all of the contracts used to compute overbid contained Stumpage Rate Adjustment (SRA) clauses. Ehinger Decl., ¶ 12(c). These SRA clauses call for quarterly adjustments of the stumpage rates, and therefore do not give the contract purchaser the benefits of a rising market, the way that flat-rate sales like Lynx did. Ehinger Decl., ¶ 12(c).[9] There is no evidence that the government adjusted for the fact that the comparables were all SRA sales, while Lynx was not.

**J. The government then computed damages using data about timber volumes that was apparently never verified for accuracy.**

Timber volumes are a critical component of the government's appraisal for damages. Indeed, the Forest Service Manual states that in conducting a damages appraisal in connection with expired contracts, "The volume and quality of the remaining timber and its accessibility must be carefully determined, as well as all other factors influencing its value." FSM 2424.3 10/77 Amend. 109 (reproduced at P. App. 5). Yet the contracting officer who assessed damages admitted that he does not know of any steps that were taken by the government to ensure the accuracy of the volumes used in its determination of damages. Note Dep. at 51.

[9] The Lynx Sale did have a scheduled rate redetermination provision. P. App. 88. However, unlike SRA sales, which updated rates quarterly, Lynx's rate redetermination was a one-time rate adjustment that had been scheduled to occur July 1, 1985. *Id.*

Even more surprisingly, the data which formed the basis for the government's volume estimates does not appear to have ever been certified for accuracy or compliance with Forest Service policies. P. App. 90. The Forest Service Manual, Region 6 Supplement clearly requires certification:

> All timber cruises, used in connection with timber sale appraisals, must be approved for use by a Certified Cruiser. His approval shall be in the form of a signed statement indicating that he has examined the cruise, that it meets standards, and is technically proper, that unit volumes, species grade distributions and other estimated volumes are reasonable, and that in his opinion the cruise is acceptable. The intensity of his examination will vary depending on the complexity of the sale and the cruise plan, the experience of the cruisers, and the value of the resources involved.

FSM 2431.23 12/82 R-6 Supp. 296 (reproduced at P. App. 66). This was not done. P. App. 91.

The Lynx pre-sale appraisal even contains a form titled "Sale Cruise" where the Supervisory Forestry Technician was supposed to be make the required certification. P. App. 91. The certification is unsigned, and there is no evidence on the form that any field check was ever conducted by an appropriate supervisor. *Id.* A similar certification form is again left blank in a damages appraisal that was conducted on the Lynx Sale in September 1989, after the contract expired. P. App. 94. Without these mandatory certifications of accuracy, the accuracy of the government's volume estimate and its damage calculations are seriously in doubt because of noncompliance with government policies.

## III. ARGUMENT

### A. Summary Judgment Standard.

Summary judgment is appropriate only where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." RCFC 56(c); *see also Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1323 (Fed. Cir. 2001). Summary judgment is improper if "the dispute about a material fact is 'genuine,' that is, if the

evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

In determining whether there are any genuine issues of material fact, all reasonable inferences are drawn in favor of Mount Adams as the non-moving party. *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1323 (Fed. Cir. 2002) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)). Moreover, affidavits containing conclusory statements on issues of ultimate fact are of no help to the determination of a summary judgment if the affidavits fail to reveal the underlying factual basis for the conclusion. *See, e.g., Phillips Petroleum Co. v. Huntsman Polymers Corp.*, 157 F.3d 866, 876 (Fed. Cir. 1998); *J.F. Allen Co. v. United States*, 25 Cl. Ct. 312, 325 (1992). The serious questions regarding the defendant's compliance with its own policies give rise to genuine issues of material fact which dictate that a trial is necessary to determine the extent, if any, of damages in this case.

**B. Contract provision B9.4 required the government to conduct an appraisal that complied in all material respects with its standard appraisal methods.**

Standard contract provision B9.4 requires that if a contract expires before the timber is cut, an "appraisal shall be made with the standard Forest Service method in use at time of termination." This appraisal is then used as a baseline against which the government computes its contractual remedy under B9.4.

There are only a handful of cases that have interpreted this provision in the context of a defaulted timber contract that was not resold. *See, e.g., Hoskins Lumber Co. v United States*, 1996 U.S. App. LEXIS 9612 (Fed. Cir. 1996) (unpublished); *Madigan v. Hobin Lumber Co.*, 986 F.2d 1401, 1405 (Fed. Cir. 1993); *Capital Development Co. v. United States*, 49 Fed. Cl. 178 (2001), *aff'd* 308 F.3d 1283 (Fed. Cir. 2003). Those cases have determined that B9.4 is an

enforceable contractual remedy. *See, e.g.*, *Capital Development*, 49 Fed. Cl. at 182-83. Mt. Adams is not asking for this Court to find otherwise.

Instead, Mt. Adams requests only what it is explicitly entitled to under the contract – an appraisal that complies in all material respects with Forest Service appraisal methods. *Hoskins* clearly states that "the only appraisal to which [the purchaser in default] was entitled was one that complied in all material respects 'with the standard Forest Service method in use at [the] time of the termination.'" *Hoskins*, 1996 U.S. App. LEXIS 9612 at *4 (emphasis added).

This includes material compliance with all aspects of the Forest Service's regulations, manuals, handbooks, and other written policies and guidelines. As the Board of Contract Appeals poignantly noted in another case, "The [timber sale] contract does not place upon the purchaser the risk of having the Government conduct the sale without regard to the dictates of the handbook, with which, the contract specifies, the government's actions are to comply." *In re Cleereman Forest Products*, AGBCA No. 2000-101-1 at *2 (Nov. 1, 2001).

Once the purchaser in default challenges whether the Forest Service complied in all material respects with standard Forest Service methods, the purchaser is entitled to a trial on that issue. *Hoskins* is particularly instructive because in that case the Federal Circuit specifically recognized that due to the complex nature and long history of the case, the purchaser was "entitled to a trial" to determine whether the Forest Service materially complied with the standard Forest Service appraisal methods in place at the time its contract terminated. *See Hoskins*, 1996 U.S. App. LEXIS 9612 at *3-4; *cf. Madigan*, 986 F.2d at 1403 (awarding summary judgment to government where purchaser argued unfairness of B.94 but did not dispute government's compliance with Forest Service standard appraisal methods). This Court's decision in *Capital Development*, 49 Fed. Cl. 178, is equally instructive, because in that case the

Court allowed Capital Development to conduct a full trial to resolve factual issues on damages, including damages on two contracts that were not resold by the government. *Id.* Mt. Adams has that same right to have the factual disputes of its case resolved on the merits, after a full trial.

**C. There are factual issues to show that the government did not comply in several material respects with its standard appraisal methods, and resolution of these factual issues requires a trial.**

1. There are issues of fact as to whether the Forest Service complied in all material respects with its standard method of conducting a damage appraisal when no resale is conducted.

Mt. Adams has clearly raised numerous factual issues about whether the contracting officer failed to comply with standard appraisal methods in this case. For instance, the quoted Forest Service policies required consideration of all factors that affect stumpage value and also require adjustments for qualitative differences when two sales are compared against one another. This is no different from the adjustments that would normally be expected in a real estate appraisal based upon transaction evidence. Yet the contracting officer's own computations reveal that he made no adjustments for differences in volume, quality, duration, or different financial requirements (cash down payment and mid-point payment) when he computed adjusted bid premiums based upon four sales that were qualitatively different from Lynx.

By the testimony of the contracting officer himself, Forest Service policy also required consideration of "representative" and "comparable" sales in computing overbid. Yet two of the four contracts that the contracting officer used to appraise damages were salvage sales sold under circumstances that bear no relationship to Lynx, which was a sale of "green" timber.

Still more factual questions exist about whether the contracting officer complied with Forest Service policies that emphasize the importance of volumes as the first consideration in an appraisal, and which require certification of the Forest Service cruise estimates as being both accurate and consistent with Forest Service policy in connection with any appraisal.

Another significant factual issue of compliance with Forest Service policy is raised by the fact that the contracting officer was not even aware that any policies existed. *See* Note Dep. at 41-43. It is reasonable to infer, at least at this summary stage of the proceedings, that if the contracting officer was not aware of the relevant policies that governed his appraisal, then he likely did not satisfy those policies.

In addition, there are issues of fact as to whether still other relevant standard Forest Service methods of appraisal were in place at the time the Lynx Sale expired. This issue of fact exists in large part because of the government's unwillingness to expose its standard policies to the light of day in its moving papers, and because of the contracting officer's inability to remember what the applicable standards were.

Forest Service policy manuals and handbooks have been reconstituted to the best of Mt. Adams's abilities from the myriad of scattered pages and incomplete updates produced by the government through the discovery process. However, as government is wont to do, these policies appear to have changed from time to time, and it is not always clear where or if the government has produced the correct versions of policies relevant to this dispute, or if it has, it has not done so in any coherent form. In any event, at this summary stage of proceedings, Mt. Adams has not had the opportunity to compile a definitive set of all of the standard "methods" or "policies" that were in place on June 30, 1989. This process would require additional discovery, which will become necessary if this matter proceeds to trial, as it must.[10]

[10] At the very least, it would be inappropriate to grant the government's summary judgment motion at this juncture, without allowing Mt. Adams an additional opportunity to conduct discovery to investigate whether any additional Forest Service policies were in place on June 30, 1989 which might also not have been satisfied. *See* RCFC 56(f); *see also Opryland USA, Inc. v. Great Am. Music Show, Inc.*, 970 F.2d 847, 852 (Fed. Cir. 1992) ("when the discovery [sought] is reasonably directed to 'facts essential to justify the party's opposition,' in the words of Rule 56(f), such discovery must be permitted or summary judgment refused").

Even without a definitive set of each and every rule and directive, the overarching policies and themes that Mt. Adams has uncovered in the documents cited above demonstrate that the careless practices of the contracting officer in administering its damage claim on the Lynx Sale are inconsistent with the Forest Service's standard damages appraisal methods. Moreover, even Christine Anderson and the contracting officer confirm that when the Forest Service was conducting a damages appraisal, it required consideration of comparable sales and computation of an adjustment to the appraised rates ordinarily used to establish minimum bids for timber. There is ample evidence in the record on this issue alone to create issues of fact about whether that policy was properly applied such that summary judgment at this stage would be inappropriate.

2. The deviations from the government's standard method of conducting a damages appraisal are material to the government's assessment of damages and therefore preclude summary judgment.

The contracting officer's deviations from policy are by no means trivial or *de minimis*. Each of these deviations from policy strikes at the heart of the government's calculation of the amounts supposedly owed by Mt. Adams. For instance, there is evidence that the inclusion of the two dissimilar salvage sales in the appraisal calculations inflated the government's calculations by nearly two million dollars. Its use of out-of-date data from the first quarter of 1999 inflated the calculations by another $400,000 or more. Other factors not taken into consideration, such as volumes, contract duration, quality of the timber, etc., also have an important effect on bid prices, and if those factors had been properly adjusted for, would have had a significant effect on the appraisal calculation as well. And this Court has already found in the resale context that the increased financial requirements on the four "comparable" contracts have a material effect on bidding. *Seaboard Lumber Co. v. United States*, 48 Fed. Cl. 814, 835-36 (2001); *Capital Development Co. v. United States*, 49 Fed. Cl. 178, 184 (2001).

Since these deviations were not "minor irregularities" and would make a difference in the damages analysis, they should be deemed material deviations that were not permitted by B9.4. *See, e.g., Tel-Instrument Electronics Corp. v. United States*, 56 Fed. Cl. 174, 176 (2003) (defining "material" defect in bid as one other than "minor informalities or irregularities"); *Dan Rice Constr. Co. v. United States,* 36 Fed. Cl. 1, 3 (1996) (defining "material" fact in summary judgment context as "one that could make a difference in the outcome"). And because Mt. Adams has raised factual issues on both noncompliance with Forest Service policy and on materiality of noncompliance, this case must proceed to a trial so that the factual issues can be resolved.[11]

## IV. CONCLUSION

There are numerous issues of material fact regarding whether the Forest Service complied in all material respects with their standard damages appraisal methods. In light of these material facts, summary judgment should be denied, and this matter should proceed to trial.

[11] In addition to the arguments advanced in this response, the plaintiff believes that summary judgment in any case involving Mt. Adams is inappropriate until the Forest Service has issued a final decision regarding the buyout applications submitted by Mt. Adams, and Mt. Adams has been given the opportunity to seek review of that decision if appropriate. This Court previously ordered the government to accept these amended buy-out applications as timely filed. *Manke Lumber Co. v. United States*, 45 Fed. Cl. 157, 162 (1999). The government has not produced a final decision on those buy-out applications in the more than four years since this Court's prior ruling on this subject.

Respectfully submitted this 22nd day of January, 2004.

s/ Steven A. Miller for
Dennis J. Dunphy
SCHWABE, WILLIAMSON & WYATT, PC
1420 Fifth Avenue, Suite 3010
Seattle, WA 98101
Phone: (206) 622-1711
Fax: (206) 292-0460

Of Counsel:

Steven A. Miller
SCHWABE, WILLIAMSON & WYATT
1420 Fifth Avenue
Suite 3010
Seattle, WA 98101-2393
Phone: (206) 622-1711
Fax: (206) 292-0460

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 22nd day of January, 2004, I caused copies of the foregoing PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT and the accompanying APPENDIX TO PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT to be served upon the following individual electronically and a courtesy copy was sent by Federal Express.

Richard P. Nockett<br>
Trial Attorney<br>
Commercial Litigation Branch<br>
Civil Division<br>
Department of Justice<br>
Attn: Classification Unit<br>
1100 L St., N.W. (8th Floor)<br>
Washington, D.C. 20530

s/ Steven A. Miller

Consolidated under lead cases
Nos. 435-87C & 589-87C
(No. 91-984C)
(Judge Bruggink)

---

GATEWAY LUMBER CO., *et al.*
and MANKE LUMBER CO., *et al.*
(Mt. Adams Veneer Co.),

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

**APPENDIX TO PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

Dennis J. Dunphy, Esq.
*Attorneys for Plaintiffs*

SCHWABE WILLIAMSON & WYATT, P.C.
1420 Fifth Avenue
Suite 3010
Seattle, Washington 98101-2393
Telephone: (206) 622-1711

*Of counsel:*

Steven A. Miller, Esq.
SCHWABE WILLIAMSON & WYATT, P.C.
1420 Fifth Avenue
Suite 3010
Seattle, Washington 98101-2393
Telephone: (206) 622-1711

January 22, 2004

Mt. Adams Veneer Company, Inc. v. United States
No. 91-984C

## APPENDIX TO PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


| No. | | Page Nos. |
|---|---|---|
| 1 | February 2, 1990, Memo from Jerry J. Brown, Fire/Timber Management Staff, to Regional Forester, Region 6 | 1 |
| 2 | October 6, 1999, Trial Transcript, *Capital Development Co. v. The United States*, U. S. Court of Federal Claims, Cause No. 750-87C | 2-4 |
| 3 | January 2, 1979 Memo from Robert D. Tokarczyk, Forest Supervisor, to District Manager, Randle R.D., with attachments | 5-6 |
| 4 | Timber Sales Action Bid Record for Lynx Sale | 7-14 |
| 5 | September 30, 1981, The Effectiveness of Competition and Appraisals in the Auction Markets for National Forest Timber in the Pacific Northwest, pp. iii, iv, viii, and 209 | 15-20 |
| 6 | July 24, 1984 Letter from George M. Leonard, Director of Timber Management, to Regional Foresters | 21-22 |
| 7 | Selection Portions of Forest Service Manual 2420 10/77 Amend. 109: §§ 2421.4, 2423.2, 2424.25, 2424.3 | 23-37 |
| 8 | April 24, 1990 Appraisal Summary | 38 |
| 9 | Selected Portions of Forest Service Manual 2430 (2/81) Amend. 123: §§ 2433.6, 2435.05 | 39-43 |
| 10 | Selection Portions of Deposition of David E. Note, July 9, 1993, pp. 41, 42, and 43 | 44-49 |
| 11 | FSM 2433.54 5/83 Amend. 129 | 50-56 |

| No. | | Page Nos. |
|---|---|---|
| 12 | April 13, 1990 Memo from Beulah Johnson to David Note, with attachments | 57-63 |
| 13 | February 14, 1990 Memo from Wendall L. Jones, Director of Timber Management, to Regional Attorney | 64 |
| 14 | Forest Service Manual § 2431.23 (12/82) R-6 Supp. No. 296 | 65-66 |
| 15 | Form 2400-17s of Beech 5, Polk 4 Salvage, Beech 4 Salvage, Kraus 7, Schooley 11, Cozy 3, Tumble 4, Holdaway 2, Silver 7, and Polar 2 | 67-86 |
| 16 | October 24, 1979 Lynx Timber Sale Contract, Section A7-Scheduled Rate Redetermination | 87-88 |
| 17 | Report and Appraisal, Gifford Pinchot National Forest, Randle Ranger District, Lynx Timber Sale, Sale Cruise | 89-91 |
| 18 | Scheduled Rate Redetermination, Lynx Timber Sale, Section A – Sale Cruise | 92-94 |
| 19 | Deposition of Ronald Lewis, June 16, 1993, p. 46 | 95-97 |

United States Department of Agriculture | Forest Service | Gifford Pinchot National Forest | 26 E. Fourth Plain Blvd. P.O. Box 8944 Vancouver, WA 98668-8944

COPY

Reply To: 2450

Date: FEB 2 1990

Subject: Mt. Adams Veneer Co., Lynx Sale, Contract No. 06785-1

To: Regional Forester, R-6

The Lynx Timber Sale, awarded to Mt. Adams Veneer Company on October 24, 1979, expired on June 30, 1989. This sale contains 37,500 MBF of timber having a contract value of $21,820,375.00. No volume has been removed from this sale.

We had planned to immediately reoffer this sale under its original conditions and base damages on the resale value. The spotted owl controversy prevented the resale as we had planned. The sale is still in our FY 90 program and is scheduled to go to the Advisory Board next week. There is a very strong chance that we will not be able to resell this sale without major modifications. If we were given approval to resell the sale in its original form, it is likely that the current contract rates (DF - $678.00; H&O - $500.00; C - $220.35) would be equalled or exceeded, thus mitigating the damages.

In light of the above circumstances, we are in the process of trying to develop damages based on a reappraisal using values and costs in effect on the termination date. We have run into problems using this approach. During the 6 months preceding the termination date of this sale, there was considerably less representative timber sold on the Forest than would be sold under normal circumstances. Therefore, a bid premium developed from that 6-month period to be added to the reappraisal may not be representative.

The purchaser's attorney, sensing the possible dilemma we are in, has drafted the enclosed letter. We would like your advice on how to proceed in order to minimize the chances of jeopardizing our case.

/s/ Jerry J. Brown

JERRY J. BROWN
Fire/Timber Management Staff

Enclosure

cc:
GRAN

JB:dn/kc

# UNITED STATES
# COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SEABOARD LUMBER, et al., (CAPITAL DEVELOPMENT COMPANY), Plaintiff, | ) | |
| v. | ) | No.: 610-84C 750-87C |
| THE UNITED STATES, Defendant. | ) | |

Pages: 245 through 460

Place: Seattle, Washington

Date: October 6, 1999

**HERITAGE REPORTING CORPORATION**

*Official Reporters*

1220 L Street, N.W., Suite 600
Washington, D.C. 20005-4018
(202) 628-4888
hrc@concentric.net

too late now to go into that issue, if Plaintiff has had them available.

If your concern is -- I think the government is basically right. If you want to impeach the quality of the worksheet, that's a separate question. It seems to me this wasn't testified as a government record. I've looked through, and this is my calculation of what these other people tell me about the slash costs.

MR. LENIHAN: No, in other words, it's a failure to prove, Your Honor. She said, I don't dispute that the worksheet says that the increase of cost of lopping to $45 on resale. We don't dispute that. We accept that. And the worksheet would be admissible to prove that, but that doesn't tell us where the number came from or how it was employed and whether it was employed properly. Ms. Anderson is speculating and must speculate as to what --

MR. NOCKETT: I don't think Mr. Lenihan understands the business records exception. Would the information in the slash disposal plans have come from a person with knowledge of the facts and plans, or would the information in the plans have been transmitted by a person with knowledge of the facts, Ms. Anderson?

THE WITNESS: Yes, it would have.

MR. LENIHAN: My answer to that, Judge, is well, then, why aren't the people here? Why isn't Kleinfelder or

Schelhaas, the contracting officers, both of whom are alive, and I believe living in Eastern Washington, why aren't they witnesses? They're competent to testify.

THE COURT: What exactly is the nature of the objection? If it's not, if the underlying data would be admissible as an exception to the hearsay rule, if this is an accurate summary, what is the nature of the objection?

MR. LENIHAN: That she just cannot testify that the increase in price comes from the increase of cost, because she doesn't know what the cost values are, what the source of the data is. And that's speculation.

Now, she can testify that there is an increase, but she can't testify why there was an increase.

THE COURT: She can testify as to the records.

MR. LENIHAN: Absolutely. We don't dispute that, but not the why, or not the, you know -- because she doesn't know. And that's speculation.

THE COURT: Okay, I'm inclined to agree with you. You can't explore through this witness what processes were used to find the underlying data.

MR. NOCKETT: That's fine, Your Honor. The question to her was why -- we stipulated that the rates per MBF should be A, by the original, by the resale purchaser, for slash disposal deposits, differed by, what was it, 56 cents per MBF. The question to Ms. Anderson was can she

UNITED STATES DEPARTMENT OF AGRICULTURE
FOREST SERVICE
GIFFORD PINCHOT NATIONAL FOREST
500 West 12th Street
Vancouver, WA 98660

REPLY TO: 2450 Sale Contracts & Permits January 2, 1979

SUBJECT: Lynx Sale (Proposed)

TO: District Ranger, Randle R.D.

Please excuse the delay in responding to your December 6, 1978 memo. It was necessary to get as much advice as possible to help decide the best approach in this case.

After careful consideration, we believe that an extra term sale with a rate-redetermination is the best alternative. We cite the following reasons:

1. The implementing instructions for the 14 i. provision cautions against setting interim completion dates for a portion of the construction unless early removal of the timber is necessary for management purposes. We understand that the Lynx Sale is basically a green sale with only incidental salvage involved. The instructions infer that interim dates can be expected to cause significant increase in construction bids.

2. A three-side assumption to increase production and therefore decrease operating time is not very realistic. While it is obviously possible - and might be warranted in salvage circumstances - it would appear to be a burdensome requirement in a green sale of this nature and preclude any flexibility in the purchasers schedule of operations.

3. Since the sale is long term in any event - it seems advantageous for the government to reappraise the values at the 3/4 mark to reflect current values - which if inflation continues to plod it weary course - will be much higher in 1985 or 1986.

90004951

4. Finally - the sale design is such - that a strong argument could be made for two sales instead of one. Since we are already committed for this 35.5 MMbf for FY 1979-it is questionable if targets could be met by replacement with other sales. Therefore from the Forest viewpoint, this is not a viable alternative at this time.

We advise you to proceed ahead with your second alternative as described in your 12/6/78 memo.

Assuming you decide this, please refer to your copy of memo we wrote Regional Office to obtain approval for scheduled R.R. on Silver 5. We will need comparable information on Lynx.

for JAMES L. UNTERWEGNER

ROBERT D. TOKARCZYK
Forest Supervisor

cc: R. Mazna
H. Schermerhorn

BCoughlan:elm

90004952

# TIMBER SALE AUCTION BID RECORD

BIDS RECEIVED ON Lynx National Forest GP.

| SPECIES | DF | C. | H+O | | PAM | TOTAL |
|---|---|---|---|---|---|---|
| VOLUME - M board feet. | 19,600 | 1,500 | 16,400 | | 574/A | 37,500 + 574A |
| MINIMUM BID | $213.85 | $220.35 | $125.18 | $ | $1.83 | $6,575,987.42 |
| Bidder: 1. [illegible] | 214.00 | | 126.00 | | | 6,592,375.42 |
| 2. Bald Knob Land & Timb | 250.00 | | 125.18 | | | 7,284,527.42 |
| 3. Mt Adams V. | 250.00 | | 150.00 | | | 7,691,575.42 |
| 4. [illegible] | 213.85 | | 125.18 | | | 6,575,987.42 |
| 5. Pac Timb Sales | 213.85 | | 125.18 | | | 6,575,987.42 |
| 6. [illegible] | 213.85 | | 125.18 | | | 6,575,987.42 |
| 7. [illegible] West | 213.85 | | 125.18 | | | 6,575,987.42 |
| 8. [illegible] | 213.85 | | 125.18 | | | 6,575,987.42 |
| 9. [illegible] | [illegible] | | [illegible] | | | 6,575,987.42 |
| 10. Coffelt Bros | 213.85 | | 125.18 | | | 6,575,987.42 |
| 11. Astoria Plywood | [illegible] | | [illegible] | | | 8,071,575.42 |
| 12. [illegible] Co | 213.85 | | 125.18 | | | 6,575,987.42 |
| 13. Mt Adams | 250.00 | | 180.00 | | | 8,183,575.42 |
| 14. Astoria | 215.00 | | 250.00 | | | 8,645,575.42 |
| 15. Mt Adams | 250.00 | | 225.00 | | | 8,921,575.42 |
| 16. [illegible] | 300.00 | | 250.00 | | | 10,311,575.42 |
| 17. Mt Adams | 350.00 | | 225.00 | | | 10,881,575.42 |
| 18. Coffelt Bros | 350.00 | | 250.00 | | | 11,201,575.42 |
| 19. Mt Adams | 300.00 | | 275.00 | | | 11,701,575.42 |
| 20. Coffelt Bros | 350.00 | | 300.00 | | | 12,111,57[illegible] |

90005070



Instructions: Use to record all bids from a single bidder or consecutive oral bids of all bidders, depending upon local preference.

TIMBER SALE AUCTION BID RECORD

BIDS RECEIVED ON Lynne National Forest KP

| SPECIES | DF | C | H+O | | PAM | TOTAL |
|---|---|---|---|---|---|---|
| VOLUME - M board feet. | 19,600 | 1500 | 16,400 | | 574/A | 37500+574A |
| MINIMUM BID | $213.85 | $221.35 | $125.18 | $ | $1.83 | $6575,987.42 |
| Bidder: 1. Mt Adams | 350.00 | | 350.00 | | | 12,931,575.42 |
| 2. Caffall Bros | 350.00 | | 360.00 | | | 13,095,575.42 |
| 3. Mt Adams | 350.00 | | 400.00 | | | 13,751,575.42 |
| 4. Caffall Bros | 350.00 | | 410.00 | | | 13,915,575.42 |
| 5. Mt Adams | 375.00 | | 400.00 | | | 14,241,575.42 |
| 6. Caffall Bros | 375.00 | | 410.00 | | | 14,405,575.42 |
| 7. Mt Adams | 400.00 | | 400.00 | | | 14,731,575.42 |
| 8. Caffall Bros | 400.00 | | 410.00 | | | 14,895,575.42 |
| 9. Mt Adams | 425.00 | | 400.00 | | | 15,221,575.42 |
| 10. Caffall Bros | 450.00 | | 410.00 | | | 15,875,575.42 |
| 11. Mt Adams | 475.00 | | 400.00 | | | 16,201,575.42 |
| 12. Caffall Bros | 475.00 | | 410.00 | | | 16,365,575.42 |
| 13. Mt Adams | 500.00 | | 400.00 | | | 16,691,575.42 |
| 14. Caffall Bros | 500.00 | | 410.00 | | | 16,855,575.42 |
| 15. Mt Adams | 525.00 | | 400.00 | | | 17,181,575.42 |
| 16. Caffall Bros | 500.00 | | 445.00 | | | 17,429,575.42 |
| 17. Mt Adams | 550.00 | | 400.00 | | | 17,671,575.42 |
| 18. Caffall Bros | 500.00 | | 475.00 | | | 17,921,575.42 |
| 19. Mt Adams | 550.00 | | 425.00 | | | 18,081,575.42 |
| 20. Caffall Bros | 500.00 | | 490.00 | | | 18,167,575.42 |



90005071

Instructions: Use to record all bids from a single bidder or consecutive oral bids of all bidders, depending upon local preference.

3

TIMBER SALE AUCTION BID RECORD

BIDS RECEIVED ON Lyny National Forest Gifford Pinchot

| SPECIES | DF | C | H40 | | PAM | TOTAL |
|---|---|---|---|---|---|---|
| VOLUME - M board feet. | 19600 | 1500 | 16400 | | 574/A | 37500+574A |
| MINIMUM BID | $213.85 | $220.35 | $125.18 | $ | $1.83 | $6,575,987.42 |
| Bidder: 1. Mt Adams | 550.00 | | 435.00 | | | 18,245,575.42 |
| 2. Cattell Bros | 500.00 | | 500.00 | | | 18,331,575.42 |
| 3. Mt Adams | 550.00 | | 445.00 | | | 18,409,575.42 |
| 4. Cattell Bros | 500.00 | | 505.00 | | | 18,413,575.42 |
| 5. Mt Adams | 550.00 | | 450.00 | | | 18,491,575.42 |
| 6. Cattell | 500.00 | | 510.00 | | | 18,495,575.42 |
| 7. Mt Adams | 550.00 | | 475.00 | | | 18,901,575.42 |
| 8. Cattell | 500.00 | | 535.00 | | | 18,905,575.42 |
| 9. Mt Adams | 550.00 | | 500.00 | | | 19,311,575.42 |
| 10. Cattell Bros | 500.00 | | 560.00 | | | 19,315,575.42 |
| 11. Mt Adams | 560.00 | | 500.00 | | | 19,507,575.42 |
| 12. Cattell Bros | 510.00 | | 560.00 | | | 19,511,575.42 |
| 13. Mt Adams | 565.00 | | 500.00 | | | 19,605,575.42 |
| 14. Cattell Bros | 515.00 | | 560.00 | | | 19,609,575.42 |
| 15. Mt Adams | 570.00 | | 500.00 | | | 19,703,575.42 |
| 16. Bald Knob | 575.00 | | 500.00 | | | 19,801,575.42 |
| 17. Mt Adams | 576.00 | | 500.00 | | | 19,821,175.42 |
| 18. Bald Knob | 580.00 | | 500.00 | | | 19,899,575.42 |
| 19. Mt Adams | 581.00 | | 500.00 | | | 19,919,175.42 |
| 20. Bald Knob | 585.00 | | 500.00 | | | 19,997,575.42 |

90005072



Instructions: Use to record all bids from a single bidder or consecutive oral bids of all bidders, depending upon local preference.

4..

TIMBER SALE AUCTION BID RECORD

BIDS RECEIVED ON [illegible] National Forest GP

| SPECIES | DF | C | H+O | | PIAM | TOTAL |
|---|---|---|---|---|---|---|
| VOLUME - M board feet. | 19,600 | 1500 | 16,400 | | 574/A | 37,500 + 574 A |
| MINIMUM BID | $ 213.85 | $ 220.35 | $ 125.18 | $ | $ 1.83 | $ 6,575,982.42 |
| Bidder: 1. Mt Adams | 586.00 | | 500.00 | | | 20,017,175.42 |
| 2. Bald Knob | 590.00 | | 500.00 | | | 20,095,575.42 |
| 3. Mt Adams | 591.00 | | 500.00 | | | 20,115,175.42 |
| 4. Bald Knob | 595.00 | | 500.00 | | | 20,193,575.42 |
| 5. Mt Adams | 596.00 | | 500.00 | | | 20,213,175.42 |
| 6. Bald [illegible] | 600.00 | | 500.00 | | | 20,291,575.42 |
| 7. [illegible] | 601.00 | | 500.00 | | | 20,311,175.42 |
| 8. Bald Knob | 605.00 | | 500.00 | | | 20,389,575.42 |
| 9. Mt Adams | 606.00 | | 500.00 | | | 20,409,175.42 |
| 10. Bald K | 610.00 | | 500.00 | | | 20,487,575.42 |
| 11. [illegible] | [illegible] | | 500.00 | | | 20,507,175.42 |
| 12. Bald Knob | 615.00 | | 500.00 | | | 20,585,575.42 |
| 13. Mt Adams | 616.00 | | 500.00 | | | 20,605,175.42 |
| 14. Bald Knob | 620.00 | | 500.00 | | | 20,683,575.42 |
| 15. Mt Adams | 621.00 | | 500.00 | | | 20,703,175.42 |
| 16. Bald Knob | 625.00 | | 500.00 | | | 20,781,575.42 |
| 17. Mt Adams | 626.00 | | 500.00 | | | 20,801,175.42 |
| 18. Bald Knob | 630.00 | | 500.00 | | | 20,879,575.42 |
| 19. Mt [illegible] | 631.00 | | 500.00 | | | 20,899,175.42 |
| 20. Bald Knob | 632.00 | | 500.00 | | | 20,918,775.42 |



90005073

Instructions: Use to record all bids from a single bidder or consecutive oral bids of all bidders, depending upon local preference.

# TIMBER SALE AUCTION BID RECORD

BIDS RECEIVED ON Lynx National Forest GP

| SPECIES | DF | C | H+O | | PAM | TOTAL |
|---|---|---|---|---|---|---|
| VOLUME - M board feet. | 19,600 | 1500 | 16,400 | | 574/A | 37,500 + 574 A |
| MINIMUM BID | $ 213.85 | $ 220.35 | $ 125.18 | $ | $ 1.83 | $ 6,575,987.42 |
| Bidder: 1. Mt Adams | 633.00 | / | 500.00 | | / | 20,938,375.42 |
| 2. Bald Knob | 634.00 | | 500.00 | | | 20,957,975.42 |
| 3. Mt Adams | 635.00 | | 500.00 | | | 20,977,975.42 |
| 4. Bald Knob | 636.00 | | 500.00 | | | 20,997,175.42 |
| 5. Mt Adams | 637.00 | | 500.00 | | | 21,016,775.42 |
| 6. Bald Knob | 638.00 | | 500.00 | | | 21,036,375.42 |
| 7. Mt Adams | 639.00 | | 500.00 | | | 21,055,975.42 |
| 8. Bald Knob | 640.00 | | 500.00 | | | 21,075,575.42 |
| 9. Mt. Adams | 641.00 | | 500.00 | | | 21,095,175.42 |
| 10. Bald Knob | 642.00 | | 500.00 | | | 21,114,775.42 |
| 11. Mt Adams | 643.00 | | 500.00 | | | 21,134,375.42 |
| 12. Bald Knob | 644.00 | | 500.00 | | | 21,153,975.42 |
| 13. Mt Adams | 645.00 | | 500.00 | | | 21,173,575.42 |
| 14. Bald Knob | 646.00 | | 500.00 | | | 21,193,175.42 |
| 15. Mt. Adams | 647.00 | | 500.00 | | | 21,212,775.42 |
| 16. Bald Knob | 648.00 | | 500.00 | | | 21,232,375.42 |
| 17. Mt. Adams | 650.00 | | 500.00 | | | 21,271,575.42 |
| 18. Tom Co | 651.00 | | 500.00 | | | 21,291,175.42 |
| 19. Mt. Adams | 652.00 | | 500.00 | | | 21,310,775.42 |
| 20. Tom Co | 653.00 | | 500.00 | | | 21,330,375.42 |



90005074

Instructions: Use to record all bids from a single bidder or consecutive oral bids of all bidders, depending upon local preference.

5

TIMBER SALE AUCTION BID RECORD

BIDS RECEIVED ON Lynx National Forest GP

| SPECIES | DF | C | H+O | | PAM | TOTAL |
|---|---|---|---|---|---|---|
| VOLUME - M board feet. | 19,600 | 1500 | 16,400 | | 574/Ac | 37,500 + 574/A |
| MINIMUM BID | $ 213.85 | $ 220.35 | $ 125.18 | $ | $ 1.83 | $ 6,525,987.42 |
| Bidder: | | | | | | |
| 1. Mt. Adams | 654.00 | | 500.00 | | | 21,349,975.42 |
| 2. Tom Co | 655.00 | | 500.00 | | | 21,369,575.42 |
| 3. Mt. Adams | 656.00 | | 500.00 | | | 21,389,175.42 |
| 4. Tom Co. | 657.00 | | 500.00 | | | 21,408,775.42 |
| 5. Mt. Adams | 658.00 | | 500.00 | | | 21,428,375.42 |
| 6. Tom Co | 659.00 | | 500.00 | | | 21,447,975.42 |
| 7. Mt. Adams | 660.00 | | 500.00 | | | 21,467,575.42 |
| 8. Tom Co. | 660.50 | | 500.00 | | | 21,477,375.42 |
| 9. Mt. Adams | 661.00 | | 500.00 | | | 21,487,175.42 |
| 10. Tom Co. | 661.50 | | 500.00 | | | 21,496,975.42 |
| 11. Mt. Adams | 662.00 | | 500.00 | | | 21,506,775.42 |
| 12. Tom Co. | 662.50 | | 500.00 | | | 21,516,575.42 |
| 13. Mt. Adams | 663.00 | | 500.00 | | | 21,526,375.42 |
| 14. Tom Co | 663.50 | | 500.00 | | | 21,536,175.42 |
| 15. Mt. Adams | 664.00 | | 500.00 | | | 21,545,975.42 |
| 16. Tom Co | 664.50 | | 500.00 | | | 21,555,775.42 |
| 17. Mt. Adams | 665.00 | | 500.00 | | | 21,565,575.42 |
| 18. Tom Co. | 665.50 | | 500.00 | | | 21,575,375.42 |
| 19. Mt. Adams | 666.00 | | 500.00 | | | 21,585,175.42 |
| 20. Tom Co | 666.50 | | 500.00 | | | 21,594,975.42 |



90005075

Instructions: Use to record all bids from a single bidder or consecutive bids of all bidders, depending upon local preference.

# TIMBER SALE AUCTION BID RECORD

**BIDS RECEIVED ON** Lump **National Forest** GP

| SPECIES | OF | C | H+O | | PAM | TOTAL |
|---|---|---|---|---|---|---|
| VOLUME - M board feet. | 19,600 | 1500 | 16,400 | | 574/A | 37,500 + 574 A |
| MINIMUM BID | $213.85 | $220.35 | $125.18 | $ | $1.83 | $6,575,987.42 |
| Bidder: 1. Mt. Adams | 667.00 | | 500.00 | | | 21,604,775.42 |
| 2. TomCo | 667.50 | | 500.00 | | | 21,614,575.42 |
| 3. Mt. Adams | 668.00 | | 500.00 | | | 21,624,375.42 |
| 4. TomCo | 668.50 | | 500.00 | | | 21,634,175.42 |
| 5. Mt Adams | 669.00 | | 500.00 | | | 21,643,975.42 |
| 6. Tom Co | 669.50 | | 500.00 | | | 21,653,775.42 |
| 7. Mt. Adams | 670.00 | | 500.00 | | | 21,663,575.42 |
| 8. Tom Co | 670.50 | | 500.00 | | | 21,673,375.42 |
| 9. Mt Adams | 671.00 | | 500.00 | | | 21,683,175.42 |
| 10. Tom Co | 671.50 | | 500.00 | | | 21,692,975.42 |
| 11. mt. Adams | 672.00 | | 500.00 | | | 21,702,775.42 |
| 12. Tom Co | 672.50 | | 500.00 | | | 21,712,575.42 |
| 13. mt Adams | 673.00 | | 500.00 | | | 21,722,375.42 |
| 14. Tom Co | 673.50 | | 500.00 | | | 21,732,175.42 |
| 15. mt Adams | 674.00 | | 500.00 | | | 21,741,975.42 |
| 16. Tom Co | 674.50 | | 500.00 | | | 21,751,775.42 |
| 17. mt Adams | 675.00 | | 500.00 | | | 21,761,575.42 |
| 18. Tom Co | 675.50 | | 500.00 | | | 21,771,375.42 |
| 19. Mt Adams | 676.00 | | 500.00 | | | 21,781,175.42 |
| 20. Tom Co | 676.50 | | 500.00 | | | 21,790,975.42 |



90005076

Instructions: Use to record all bids from a single bidder or consecutive oral bids of all bidders, depending upon local preference.

## TIMBER SALE AUCTION BID RECORD

BIDS RECEIVED ON Lyme National Forest GP

| SPECIES | DF | C | N+O | | PAM | TOTAL |
|---|---|---|---|---|---|---|
| VOLUME - M board feet. | 19,600 | 1500 | 16,400 | | 574/A | 37,500 + 574/A |
| MINIMUM BID | $213.85 | $220.35 | $125.18 | $ | $1.83 | $ 6,575,987.42 |
| Bidder: 1. mt Adams | 677.00 | | 500.00 | | | 21,800,775.42 |
| 2. Tom Co | 677.50 | | 500.00 | | | 21,810,575.42 |
| 3. mt Adams | 678.00 | | 500.00 | | | 21,820,375.42 |
| 4. | | | | | | |
| 5. | | | | | | |
| 6. | | | | | | |
| 7. | | | | | | |
| 8. | | | | | | |
| 9. | | | | | | |
| 10. | | | | | | |
| 11. | | | | | | |
| 12. | | | | | | |
| 13. | | | | | | |
| 14. | | | | | | |
| 15. | | | | | | |
| 16. | | | | | | |
| 17. | | | | | | |
| 18. | | | | | | |
| 19. | | | | | | |
| 20. | | | | | | |

90005077



Instructions: Use to record all bids from a single bidder or consecutive oral bids of all bidders, depending upon local preference.

United States
Department of
Agriculture

Forest
Service

Timber
Management

# THE EFFECTIVENESS OF COMPETITION AND APPRAISALS IN THE AUCTION MARKETS FOR NATIONAL FOREST TIMBER IN THE PACIFIC NORTHWEST



83019775

# THE EFFECTIVENESS OF COMPETITION AND APPRAISALS IN THE AUCTION MARKETS FOR NATIONAL FOREST TIMBER IN THE PACIFIC NORTHWEST

by

Walter J. Mead
Mark Schniepp
Richard B. Watson

USFS Contract No. 53-3187-1-43
and PSW G-34

September 30, 1981
University of California
Santa Barbara, California 93106



83019776

3. Competition for National Forest timber has increased markedly over the last two decades. A prior study[1] showed that over the four-year period 1959-1962 the average number of bidders for National Forest timber on the Westside of Region 6 was 4.20 bidders per sale. Over the seventeen years covered in the present study the average number of bidders per sale increased to 5.42. In every year except 1963, the average number of bidders per sale exceeded the record for 1959-1962.

For the Eastside, the average number of bidders per sale in 1959 through 1962 was 2.39. This increased to 2.75 for the subsequent seventeen years. All of the numbers shown above indicate that Westside sales are subject to more intense bidding than found on the Eastside.

Defining a competitive timber sale as one where the high bid exceeds the appraised price by 1% or more, we find that the share of sales transacted under competitive conditions increased sharply. Over the years 1959 through 1962, 67.9% of all National Forest timber sales on the Westside were sold under competitive conditions. In 1979, 93.2% of all sales were classed as competitive. Over the latter seventeen years the percent competitive exceeded 67.9% in all except five years. Timber sales since 1963 have been increasingly competitive.

For the Eastside, a similar trend toward increased competition is found. In the base years 1959-1962, 42.8% of Eastside sales were classified as competitive. In 1979 the competitive share was 78.5%. In the seventeen years ending in 1979, the percent competitive exceeded 42.8 in all but six years.

A third measure of competition, the ratio of high bid to the appraised price, provides similar evidence of increased competition. For Westside timber sales taking place in the years 1959-1962, the average bid-appraisal ratio was 1.46. For the next seventeen years this ratio was exceeded in all but six years. In 1979 it was 2.20 indicating that competition forced bidders to pay a 120% premium over the fair market value as determined by the Forest Service.

For the Eastside, the bid-appraisal ratio for the base years was 1.20. In the seventeen years following, this ratio was exceeded in all but four years. For 1979 the ratio stood at 2.30 indicating a 130% premium over the appraised price for Eastside timber.

This evidence of vigorous competition for National Forest timber in Region 6, especially in the last seven or eight years

---

[1]W.J. Mead and T.E. Hamilton, Competition for Federal Timber in the Pacific Northwest -- An Analysis of Forest Service and Bureau of Land Management Timber Sales, U.S. Forest Service, Pacific N.W. Forest and Range Experiment Station, 1968, p.4.

of the decade of the 1970's, raises questions about the effectiveness of Forest Service appraisals. When competitive auction markets establish market prices that are approximately double the "fair market values" as appraised by the Forest Service, the effectiveness of the appraisal process must be examined.

4. Mill studies yielding overrun data are obsolete. Forest Service overrun studies are based on mill studies which were conducted in the mid-1960's. In the ensuing approximately fifteen years, there have been significant technological improvements in both lumber and plywood product recovery from logs. There may also have been a decline in the average diameter of logs cut from National Forest timber. Due to the peculiarities of the Scribner Log Scale measure, overrun increases as log diameter decreases. It is therefore probable that a steadily increasing actual overrun during the period since the mid-60's has contributed to under-appraisals of Forest Service stumpage and to high ratios of bid price to appraised price.

5. Appraised volumes differ widely from volumes actually cut from Forest Service timber sales. For 842 Westside timber sales that have been fully cut and closed out, the record shows that the actual cut is only 1.8% below the appraised volume. This record suggests an astonishingly high degree of cruise accuracy. However, on a sale by sale basis we find nearly offsetting large errors of over- and under-appraised volumes. The errors become apparent when the absolute values of the appraisal errors are averaged. When the algebraic sign of the appraisal error is ignored we find that the average absolute difference between the appraised volume and actual cut was 36%. Such cruise errors contribute to an explanation of high bid-appraisal ratios. Where bidders perceive that a biddable species is incorrectly cruised and that the appraised volume for one or more species is overstated, then bidding will often be concentrated in that species. If it is in fact overappraised in volume, then the final cost to the buyer is less than indicated by the bid-appraisal ratio. This follows from the fact that payments to the Forest Service are made on the basis of volumes actually cut by species.

6. Some Forest Service timber sale policies indirectly affect bid prices via their effect on the number of bidders. It is a well established fact that on average the high bid is a positive function of the number of bidders taking part in auctions. Further, the number of bidders is normally the dominant variable in explaining high bids. Our study provides further confirmation. Throughout Region 6 the record shows that bidder participation increases sharply with the contract duration (term). Sale size is determined by the Forest Service. Similarly, bidders avoid lump sum sales relative to the conventional scale sales. Bidders appear to resist any major changes from established policies.

For the Eastside National Forests, sealed bidding procedures tended to increase high bids in the less competitive areas and have no effect otherwise. However, in contrast with the West-side, significance levels were low. Statistical tests for the Eastside suffer from the relatively small number of sealed bid sales, even during the mandate period. For the entire Region 6, the fact that 15 of the 20 National Forests were estimated to have large positive overbids on sealed relative to oral auction sales during the mandate period is sufficient reason to generalize that competition was strengthened by sealed bidding methods. However, oral bidding protects the public where competition is effective.

10. The log export restriction introduced in 1969 (the Morse Act) appears to have reduced effective competition for National Forest timber. Our model explaining bidder participation established that Federal legislation restricting log exports significantly reduced the level of bidder participation throughout Region 6. Further, we found that overbids were depressed by an average of $4.43/MBF in the Westside for the years following imposition of the restrictions, but ending in 1972. In the Eastside, overbids were depressed $1.70 for the same time period (1967 dollars).

11. An important explanation of observed high overbids, especially under higher rates of inflation during the decade of the 1970's, is the fact that bid prices for National Forest timber are essentially futures prices. Bids for National Forest timber are submitted in the present, but payments are not made until the timber is harvested in the future and revenues follow even later when the timber products are sold. Therefore, payments to the Forest Service are made in inflated cheaper dollars. If bidders anticipate inflation, then stumpage values increase with the term of the sale. Where timber sale contracts provide for price escalation (as on the Eastside) part the gains in stumpage value may be lost to the timber buyer.

To compound the problem further, Forest Service appraisals are based on estimated prices and costs which existed from one to six months prior to the sale date. Thus (1) the longer the appraisal lag, (2) the longer the duration of the sale, and (3) the higher the expected rate of inflation, the greater will be the observed overbids. In a series of interviews with potential bidders, they were asked which sale attribute influenced their bid prices most. In response, 31 out of 45 replied that "length of the timber sale contract was the dominant factor".

The Westside bidding record shows that bidders were willing to pay an additional $8.50/MBF more for a 60 month compared to the average 31.2 month contract, and Eastside bidders about $2.75/MBF more than for an average 34.9 month contract (1967 dollars). The introduction of price and cost expectation variables into the model specifications established that for every additional dollar of anticipated increases in product revenues, overbids increased by 10 cents.



83019784

The R-square of .71 and the fact that 12 of the 18 included variables are significant at the .05 level indicate that sales volume is non-randomly related to other timber sale characteristics. In view of these results, regression analysis should be performed to examine the exact relationship between overbids and sale size holding all other sale cost, method, and quality characteristics constant. The dichotomous size variables are introduced in the overbid equations previously estimated. The inclusion of the size categories will produce parameter estimates which will trace out the functional relationship between sale size and overbid. If no relationship exists, the parameter estimates will be close to zero. Table 9.15 presents the specific results of the regressions involving sales size for both appraisal Zones and both study periods. The parameter values of the 8 size categories (SIZE1 is captured by the intercept) are given along with the corresponding significance tests (T-ratio).

The size coefficients are small and insignificant for appraised volumes up to 16000 mbf in the 1963-72 estimated regression for Westside sales. For the two highest volume categories, the coefficients of size classes 8 and 9 indicate a significant negative impact on overbids. This latter result is consistent with the plot based on average overbids in Figure 9.6. However, unlike Figure 9.6, the regression results show that Westside overbids were never an increasing function of sale size in the early timber sales period of our analysis.

The parameter estimates for Zone 1 are also small and insignificant for all 1963-72 size categories. From our model specifications of overbid, we can find no significant relationship between overbids and sale size in the 1963-72 period throughout Region 6. This conclusion however, cannot be applied to the more recent period of analysis. The estimated coefficients for both appraisal Zones are generally increasing over the range of sale sizes. The Westside results show that relative to the first size category, the largest sale size class (>20,000 mbf) adds $30 to the overbid. Further, an increment of $10 is shown over the next largest size category. It is interesting to note that the results for both Zones fail to show a leveling off of overbids as sales size increases. The results of this analysis suggest that bidder behavior has changed significantly over the 17 year period of study with regard to the demand for large timber sales. In the past, overbids were generally insensitive to the size of the timber sale, and actually declined on very large sales. More recently, however, firms are willing to pay substantial premiums to secure the largest size timber sales held for auction by the Forest Service. This result is consistent with higher levels of actual and anticipated inflation in product prices in the later period.

83019997

WO

24 JUL 1984

2430 Commercial Timber Sales
6500 Finance and Accounting

Expiration of Uncompleted Timber Sale Contracts
(Our Ref. 9/9/83)

Regional Foresters

Our referenced letter (copy enclosed) discussed procedures to be followed upon expiration of uncompleted timber sale contracts. Questions have arisen concerning the initial billing for damages as addressed on page 13 of the letter. The pertinent part of the letter includes:

"The Forest Service does not have the authority to waive the collection of these damage payments. Once it has been determined that damages have occurred, and the amount of damages estimated, collection action will start. Initial billing for damages caused by loss of stumpage value of the remaining timber does not have to wait until the remaining timber is resold.

"Collection efforts can start once the damage has been estimated. The estimate will be on the comparison of the current contract value at termination with the appraised value at termination Form 2400-6(T) contracts. The billing for this collection should indicate that the billing is for the estimated amount of damages.

"Pursuant to the Contract Disputes Act, the Contracting Officer shall issue a written decision claiming these damages on sales made subsequent to March 1, 1979."

We wish to clarify the above statement on collection of damages upon expiration of uncompleted timber sale contracts. Most timber sale contracts in this category contain clause B9.4 - Failure to Cut, which is the contractually agreed upon measure of damages in the case of "termination for breach" or for a "purchaser's failure to cut designated timber .... by termination date." This formula relies upon a resale of the timber or a decision not to resell and use of appraised value. A decision to resell or not to resell and any resale must be done within a reasonable time after the default to prevent attacks on the determined damages and to avoid unnecessary loss of the use of the money owed to the Government. We have previously stated resale should occur within 6 months. Prompt action is required by contract case law and the Federal Claims Collection Standards (49 Fed. Reg. 8889, March 9, 1984).

For purposes of the new Federal Claims Collection Standards (4 CFR 101.2 at 49 Fed. Reg. 8896), a claim or debt is "an amount of money or property which has been determined by an appropriate agency official to be owed to the United States." Pursuant to the timber sale contract terms, the amount owned or claimed cannot be determined until resale or a decision not to resell has been made.

83012958

Therefore, within one-week of the expiration of an uncompleted contract, the Contracting Officer should send the purchaser and surety a letter confirming that on (date) , contract number ___ held by the purchaser expired uncompleted. This letter should inform the purchaser and surety that we are in the process of calculating damages.

Once the remaining timber has been resold, or it is decided not to resell the timber, and the damages have been calculated, the purchaser should be billed for any damages. If the contract is subject to the Contract Disputes Act (CDA), collection of damages shall be based upon a prompt, final Contracting Officer's decision on the Government's claim. This decision shall include a statement of the CDA appeal rights (FSM 2434.21e). Collection of damages on pre-CDA contracts shall conform to FSM 6572.

Prompt action in collection of damages in timber sale defaults will reduce the Government's losses caused by delayed receipts, and will provide timely notice of the damages to the purchaser and surety.

GEORGE M. LEONARD

GEORGE M. LEONARD
Director of Timber Management

Enclosure

Limited Distribution

cc: F&AM, OGC, John Morrison (F&AM-FCCC), NFPA (Pawlicki), WFIA (Gaskins) w/enclosure, Olson, Sales

TM:LWOLSON:dyj:7/17/84: Olson/Ltrs.3 RF

See previous yellow for initials

8301 2959

# TITLE 2400 - TIMBER MANAGEMENT

## CHAPTER 2420 - TIMBER APPRAISAL

Contents


*- 2420.1 Authority
2420.2 Objective
2420.3 Policy
2420.31 Price Quotations Before Appraisal
2420.32 Availability of Appraisal Records
2420.33 Location of Manufacturing or Marketing Point
2420.34 Operations of Average Efficiency
2420.4 Responsibility

2421 APPRAISAL THEORY AND PRINCIPLES
2421.1 Residual Value Theory
2421.2 Nature of Stumpage
2421.3 Market Value of Stumpage
2421.4 Appraised Market Value
2421.5 Advertised Rates
2421.6 Base Rate and Adjustment for Regeneration Costs
2421.7 Salvage Sale Fund

2422 APPRAISAL COMPONENTS
2422.1 Basic Data Period
2422.2 Base Period
2422.3 Selling Value
2422.31 Determination of End Product
2422.32 Quality Estimate
2422.33 Lumber Selling Prices
2422.34 Computation of Selling Value
2422.35 Freight Problems
2422.36 Chip and Miscellaneous Byproduct Utilization
2422.37 Product Recovery Studies
2422.4 Production Costs
2422.41 Logging
2422.42 Logging Cost Adjustment Studies
2422.43 Manufacturing
2422.44 Selling
2422.45 Depreciation and Investment Problems
2422.5 Conversion Return
2422.51 Margin for Profit and Risk
2422.52 Determining Margin for Profit and Risk
2422.53 Profit Ratio Guidelines
2422.54 Stumpage Value
2422.55 Analytical Stumpage Appraisals
2422.56 Stumpage Rates by Species and Product Groups
2422.57 Adjustment to Eliminate Deficits -*

TITLE 2400 - TIMBER MANAGEMENT

*-2423 TIMBER SALE REPORT AND APPRAISAL
2423.1 Timber Sale Report
2423.2 Appraisal

2424 SPECIAL APPRAISALS
2424.1 Rate Redetermination Appraisals
2424.11 Special Characteristics of Rate Redetermination Appriasals
2424.12 Issues on Rate Redetermination Premises
2424.13 Alternate Volume Base Premises
2424.14 Establishment of Redetermined Rates
2424.15 Rate Redetermination Timing
2424.2 Kinds of Rate Redeterminations or Appraisals
2424.21 Scheduled Rate Redetermination
2424.22 Rate Redetermination Upon Application of Purchaser (Emergency)
2424.23 Rate Redetermination After Catastrophic Damage
2424.24 Rate Redetermination for Devalued Timber
2424.25 Rate Redetermination When Contract Period Is Extended
2424.26 Rate Redetermination in Connection With Contract Modification To Prevent Resource and Environmental Damage
2424.3 Appraisal for Determination of Damages in Expired Contracts
2424.4 Stumpage Value of Timber Cut in Trespass
2424.5 Exchange (Reserved)
2424.6 Settlement (Reserved)
2424.7 Simplified Stumpage Appraisal by Comparison
2424.8 Special Instructions for Reappraisal of Contracts Written on Form 2400-2.

2425 SELLING VALUE AND COST COLLECTION -*

*- Market value or appraised value as defined above is not necessarily the highest price received for similar timber by competitive bidding. In the sale of National Forest timber, except as provided in 36 CFR 223.5, each sale of more than $10,000 appraised value must be advertised for at least 30 days and sold at the highest qualified bid. Thus the bid price or selling price is apt to be greater than the appraised value because the appraised value is based on the operator of average efficiency and is aimed at a market value which will interest sufficient purchasers to harvest the allowable annual cut offered for sale.

The criterion for establishing market value - a willing buyer and a willing seller, neither under compulsion to deal - is seldom encountered in National Forest timber sales. Purchasers frequently are in immediate need of timber to remain in production. The Forest Service is committed to offer timber for sale on a regular basis in accordance with financed sale targets. The Forest Service appraisal is the best available estimate of what the market value of stumpage would be if the "willing" criterion were met.

2421.4 - Appraised Market Value. Since no two tracts of timber are identical, it follows that the stumpage prices paid or to be paid for any two tracts cannot be directly compared without adjusting for the physical or quality differences between them. Analytical appraisals are used both for stumpage transaction comparisons and for making market value determinations for new offerings.

The Forest Service analytical appraisal is a two-part system. First, the conversion return is developed by deducting costs from selling values. Second, the conversion return is divided into stumpage and profit margin. The first step is used to reconcile the differences between tracts as to quality and accessibility.

The second step is used to make a division of this conversion return of the tract in the same proportions as average purchasers are dividing conversion returns of tracts to be operated under similar conditions.

1. Criteria for Dividing Conversion Return. The dividing mechanism, profit ratio or other methods, which is obtained from analytical appraisal of those current sales where there is a reasonable balance between alternate purchasers and alternate timber supplies, can be expected to produce a profit margin and residual stumpage which fill two criteria:

a. A profit margin sufficient to maintain operations over the long run. -*

*- b. An appraised stumpage equal to current market value considering lumber market trends.

The Forest Service appraisal policy is not designed to penalize efficiency nor subsidize inefficiency. Consequently, all cost and selling values used in timber appraisals are those of an operator of average efficiency.

2. Analytical Appraisal Guidelines. Highly efficient purchasers can consistently overbid Forest Service sale offerings and still figure to make a profit margin they consider adequate. In determining profit ratios from current transactions to be used as one of the guides in dividing analytical conversion returns this effect must be factored out.

The analytical appraisal, therefore, should produce appraised market-value prices for stumpage which:

a. Are based upon long-term profit considerations.

b. Are sensitive to forest-product market changes.

c. Are appropriate for the average efficient purchaser.

d. Are responsive to the actual prices being paid for stumpage thus giving the United States a fair return for its stumpage.

e. Reflect all conditions of sale under which National Forest timber sales are made.

The fundamental rule in determining the items to be included and the general scope of timber appraisal is to include consideration of all significant factors affecting stumpage price. Established guidelines for systematic work should be observed whenever applicable. If, in the judgment of the appraiser, observance of the guidelines would prevent proper consideration of all significant factors, he should present his findings in a manner which does properly evaluate them. However, the appraiser must bear the burden of proof of justification for departure from established appraisal guidelines and he should explain his course of action.

2421.5 - Advertised Rates. Appraised value, or appraised rate, means a value or rate resulting from an appraisal which considers all costs, including construction costs for specified roads. Such value or rate includes stumpage value plus additional amounts of deposits for sale area betterment (Act of June 9, 1930, A6 Stat. 527, 16 U.S.C. 576b). The term "net appraised rate" is sometimes used -*

*- in place of appraised rate to emphasize that this rate differs from advertised rate as used in form 2400-5 and 2400-6 contracts. The latter includes the estimated costs of specified roads and the advertised rate therefore exceeds the net by that amount.

2421.6 - Base Rate and Adjustment for Regeneration Costs. Base rate is the lowest rate at which timber will be advertised under the authority of 36 CFR 223.4, even though standard appraisal calculations indicate lower rates. Base rates will be the applicable minimum rates increased where necessary to produce a total value at base rates equal to the value at $0.50 per M board feet plus the cost of regeneration made necessary by the sale. Where increases are applicable, minimum rates for each species group in the sale normally will be increased by an equal amount per M board feet. For example:

| | |
|---|---|
| Sale volume 10,000 M at $0.50 . . . . | $ 5,000 |
| Regeneration costs . . . . . . . . . . . . | 24,000 |
| Regeneration costs plus 50 cents . | 29,000 |

| Species | Estimated volume, M | Minimum rates Per M | Minimum rates Total | Base rates Per M | Base rates Total |
|---|---|---|---|---|---|
| Pine | 5,000 | $3.00 | $15,000 | 1/$3.40 | $17,000 |
| Fir | 5,000 | 2.00 | 10,000 | 1/ 2.40 | 12,000 |
| | 10,000 | | $25,000 | | $29,000 |

1/ Minimum Rates, $25,000; regeneration costs plus 50 cents, $29,000; difference, $29,000 minus $25,000, equals $4,000; $4,000/10,000 M equals 40 cents per M above minimum rates.

Note that in the immediately foregoing example, minimum rates would have applied if the total regeneration costs plus 50 cents had been $25,000 or less.

The described procedure is the preferred method. However, if some species appraised rates are well above and others are below minimum rates, this procedure may cause the low-value species to be advertised at above their appraised values when it is not necessary to do this in order to make available the amount needed to cover costs of regeneration. In such cases, a second method may be used. The amount of the increase above minimum rates for the low-valued species may be eliminated and offset by a compensating larger increase in the base rates for the higher-valued species. If fir appraised at $0.00 in the example, such a situation would result in base rates of $3.80 per M for pine (for example, $3 plus $4,000/5,000 M) and $2 per M for fir, totaling $29,000 as in the example. -*-

*-An adjustment comparable to that shown may prove necessary when the appraised net stumpage is compiled on form 2400-17.

2423 - TIMBER SALE REPORT AND APPRAISAL. As indicated by its title, there are two parts to this item:

2423.1 - Timber Sale Report. The timber sale report is the narrative report. Its purpose is to document the objectives of the sale and how it was planned and prepared. The report must include all of the information which the approving officer needs to determine that the sale has been prepared in accordance with laws, regulations, and the current multiple use plan.

The report will include the following parts:

1. The environmental analysis report.

2. An amplification of section IX of environmental analysis report which (1) explains how the identified requirements and constraints have been accommodated in the sale layout and sample contract, (2) compares the involvement in the preparation work by persons with special skills, with the skills identified as needed in the environmental analysis report, (3) summarizes the advice obtained and how it was utilized, (4) explains the bases for any decisions contrary to such advice and (5) explains any failure to utilize needed skills. Written reports, recommendations, etc., from specialists should be appended to the timber sale report.

3. To the extent not included either in the above or in the appraisal, other information needed to provide a complete picture of the offering, such as volume and cruise data, discussion of markets, etc.

4. A certification that the sale meets the requirements of 36 CFR 223.3.

5. Such other information as the Regional Forester may require.

2423.2 - Appraisal. The appraisal is essentially a statistical summary which is necessary to document that fair market value has been developed. Sufficient written explanations of such things as data sources and appraisal premises, must be included to provide a clear picture of the whole. While material covered in the timber sale report should not be duplicated in the appraisal, there may be need to include therein certain key portions of the report to clarify the appraisal. -*

*- The amount of detail contained in an appraisal will depend on the volume and value of the timber involved and the need for supplying information to the approving officer to support the appraised value. For small Ranger sales, the appraisal may be very brief and consist of an appraisal summary and explanatory notes. Appraisals which require a review and approval of a Forest Supervisor, a Regional Forester, or the Chief should be prepared in more detail. These latter appraisals should develop and present clearly and concisely the relevant data on which they are based, and give reference to the source of the data. The soundness of an appraisal will be in proportion to the completeness, accuracy, and applicability of the data used and the good judgment and accuracy with which these data are applied. All essential facts must be included. Given the essential data, a systematic arrangement of the conclusions will be of considerable aid. First, a clear summary gives the appraiser a better opportunity to follow the different items, step by step, to guard against omissions and errors, and to see whether the variations from other appraisals of similar timber are logical and well considered. Second, systematic treatment gives the reviewing officer who must act on appraisals prepared by different men, a uniform arrangement of the salient points and a check to assure himself that the estimate of market value appears reasonable and that it is consistent with values developed in other cases.

The Forest Service, in dealing with a great number of purchasers, some of whom may buy timber on several Forests and in different Regions, must have a high degree of consistency in application of appraisal procedures in determining stumpage values. The presentation should be as brief as practical, yet the appraiser must guard against seeking brevity as an objective at the expense of leaving out essential information. Clarity and simple computations are desirable in order that the basis of derived values can be easily followed by a reviewer. The essence of the usual pay-as-cut appraisal can be summarized under the following headings:

1. Volume Data. A volume estimate, made with an intensity commensurate with the values at stake, is the first consideration. The volume compilation should show by species or groups of species the total gross and net volume of the stand, cull factors, gross and net volumes per acre, volume to be cut, and the quality of timber. The report should show the date, intensity, method and reliability of the volume estimate and the tree and product utilization standards on which the estimate is based. It should also explain the basis and reliability of the quality estimate.

2. Plan of Operation. The plan of operation, contemplated rate of cutting, and order of cutting should be briefly summarized. In the report, such items as the following should be discussed: -*

*- a. Method of operation contemplated, including logging method, transportation, manufacture, and period of operation--seasonal or yearlong.

b. Location of timber with respect to market to which appraised, shipping and appraisal point, distance of haul by road classes or by other means, such as rail or water, location with respect to other markets, and relative transportation costs.

c. Market requirements as to specifications, and the demand for each class of material.

d. Contract provisions needed to implement sale layout and appraisal items. If special provisions are needed, this need should be thoroughly documented and a draft provided.

3. Selling Prices. The appraisal report should clearly state the basis for the selling prices used and how they are developed. A summary of the computations to develop selling prices by species and products should be included in the report. The period on which the lumber selling prices by grades are based should be stated. When the period on which selling prices are based is different from the cost period, it should be explained and justified.

4. Production Costs. Production costs should be developed on the unit basis by which the timber will be offered for sale and measured. The period on which the costs are based and the source of data should be stated. Each item of cost that applies to the timber being appraised should be developed with explanation for any unusual costs. A departure from the standard classification may in some instances be necessary and in such cases it should be explained. The explanation should bring out that all costs are included with no duplicate entries.

5. Division of Conversion Return. Summarize the computations by major logging and manufacturing cost items, and determine the conversion return by species and average all species. Divide the conversion return between stumpage and profit margin. Compare the results with other recent and similar sales in the general area.

6. Discussion of Appraised Values. The appraisal is not complete without a discussion of the derived stumpage values and the profit margin. At this point, the appraiser should review his work prepare a statement to support his conclusions. In preparing this statement, he should consider market trends, risk, accuracy of data, transaction evidence, and any other factors which are pertinent to determination of values. Here is where the appraiser must -*

*- a. Method of operation contemplated, including logging method, transportation, manufacture, and period of operation--seasonal or yearlong.

b. Location of timber with respect to market to which appraised, shipping and appraisal point, distance of haul by road classes or by other means, such as rail or water, location with respect to other markets, and relative transportation costs.

c. Market requirements as to specifications, and the demand for each class of material.

d. Contract provisions needed to implement sale layout and appraisal items. If special provisions are needed, this need should be thoroughly documented and a draft provided.

3. Selling Prices. The appraisal report should clearly state the basis for the selling prices used and how they are developed. A summary of the computations to develop selling prices by species and products should be included in the report. The period on which the lumber selling prices by grades are based should be stated. When the period on which selling prices are based is different from the cost period, it should be explained and justified.

4. Production Costs. Production costs should be developed on the unit basis by which the timber will be offered for sale and measured. The period on which the costs are based and the source of data should be stated. Each item of cost that applies to the timber being appraised should be developed with explanation for any unusual costs. A departure from the standard classification may in some instances be necessary and in such cases it should be explained. The explanation should bring out that all costs are included with no duplicate entries.

5. Division of Conversion Return. Summarize the computations by major logging and manufacturing cost items, and determine the conversion return by species and average all species. Divide the conversion return between stumpage and profit margin. Compare the results with other recent and similar sales in the general area.

6. Discussion of Appraised Values. The appraisal is not complete without a discussion of the derived stumpage values and the profit margin. At this point, the appraiser should review his work prepare a statement to support his conclusions. In preparing this statement, he should consider market trends, risk, accuracy of data, transaction evidence, and any other factors which are pertinent to determination of values. Here is where the appraiser must -*

*- justify his conclusions and make the record clear that he has determined current market value for the timber.

7. Appraisal Summary Form. The appraisal summaries on the backs of forms 2400-17 and 2400-19 provide for summarization of appraisal data.

Each timber sale report and rate redetermination report should include a copy of the appropriate form completed as to the appraisal summary information. After bids have been received, or after redetermined rates have been established, the front of the appropriate form will be completed. Instructions are given on the form, as well as in FSM 2492 (form 2400-17) and FSM 2493 (forms 2400-19 and -19a).

## 2424 - SPECIAL APPRAISALS

2424.1 - Rate Redetermination Appraisals. (36 CFR 223.3). Rate redetermination, where included in contracts, provides for periodic adjustment of stumpage rates at intervals.

The objective of a rate redetermination is to arrive at current market stumpage value as of the effective redetermination date, subject to the provisions of the contract. The rate redetermination will be made as though the sale were a new offering being originally appraised for bid opening on the effective rate redetermination date, using the standard Forest Service appraisal methods and appraisal data in effect 45 days prior to the rate redetermination date. This will produce redetermined rates analogous to the minimum acceptable bid rates on the subject timber, if it were offered for sale on the rate redetermination date. This is because a delay of approximately 45 days is experienced on new sales between the date of appraisal and the date scheduled for opening bids after a normal advertising period. Unless the contract specifically provides otherwise, or the contract has been previously modified or is being modified coincidentally with the subject rate redetermination to provide otherwise, the appraisal should be based on the original contract requirements and appraisal premises. Except for limited rate redeterminations, the appraisal should use the latest standard appraisal procedures and data in use in the Region as of 45 days prior to the rate redetermination date, and it should also reflect applicable information and experience gained on the specific sale area since the original appraisal or since the previous rate redetermination. In limited rate redeterminations, original procedures must be used with data in effect 45 days prior to the effective date. -*

*- <u>2424.25 - Rate Redetermination When Contract Period Is Extended.</u> If the contract is extended at the request of the purchaser, a rate redetermination will be made either for the timber on the sale as a whole, or for the timber to be cut during the ensuing period depending upon the wording in the contract for sales with scheduled rate redetermination provision. For sales without scheduled rate redeterminations, extension rate redeterminations will be based on the sale as a whole.

1. The rate redetermination will be made as though the sale were a new sale being originally appraised, using the standard appraisal method and data in effect 45 days prior to the expiration date. If the weighted average redetermined rates plus the weighted average bid premium rates on the volume remaining are greater than the weighted average current contract rates in effect immediately prior to the extension the new rates will be placed in effect. Otherwise the rates in effect at time of extension will remain in effect. The proportion by species of the remaining volume can be the deciding factor in determining whether weighted average value of redetermined rates plus bid premium is higher than the weighted value of current contract rates applied to the remaining volume. For this reason, a reliable estimate of the remaining volume by species must be made. The established rates of any species-product cannot be less than the current contract rate. Therefore, appraised rates for some species-products may need to be adjusted downward to compensate for establishing current contract rates for those species-products which appraise below current contract rates, in order that the redetermined plus bid premium value of the remaining timber will not be changed. Unused purchaser credits for specified road construction may be carried forward into the extension period.

Revised cost estimates will be prepared for specified road work which has not been done. The revised purchaser credit limit for each road or segment will be the sum of the purchaser credit earned as of the date of the appraisal for extension and the current estimate using the most recent cost guide of the cost of road work which has not yet been done. If the most recent Form 2400-21, Report of Purchaser Credit for Specified Road Construction, does not reflect the actual construction status as of the rate redetermination date, an updated report will be prepared so that the work accomplished to that date is accurately reflected. In an extension rate redetermination (2400-5 contract) or appraisal for extension (2400-6 contract), the purchaser credit limit may be increased or decreased to correspond with the revised estimates, only if new appraised stumpage rates are placed in effect for the extended period. If purchaser credit is increased, it may not be increased -*

*- by more than the increase in contract value that is made as a part of the extension. This is based upon the principle that the Forest Service will not accept less for the remaining timber than would have been received under the rates in effect prior to extension. For stumpage-rate adjustment sales, "rates in effect" as used in the above sentence are considered to be the stumpage-rate formula, which includes tentative rate, bid premium rate, base index, and purchaser credit limit.

2. If the contract term is extended subsequent to a contract-term adjustment, a reappraisal must be made for the extension just as though no contract-term adjustment had been made. Therefore, appraisal methods and data will be the standard methods and data in effect 45 days prior to the original expiration date or any extensions, but not adjustments, thereof. The foregoing procedure will ensure that the granting of a contract-term adjustment will neither penalize nor benefit the purchaser insofar as rates during the extended period are concerned.

The contract-term adjustment will merely provide additional operating time at the original stumpage rates, to replace time lost as a result of force majeure event. The procedure will also eliminate speculation in making decisions as to whether or not a contract term adjustment will be to the purchaser's benefit during an extension period following the contract term adjustment.

See FSM 2424.8 for special instructions for 2400-2 contracts.

2424.26 - Rate Redetermination in Connection With Contract Modification To Prevent Resource and Environmental Damage. When environmental conflicts develop or are recognized after a timber sale has been sold, contract modifications going beyond the original intent of the offering may be approved, within certain specified limits. Rates will be redetermined as a part of the modification, and adjustments in stumpage rates will be made if the rate redeterminations justify such adjustments. Rate redeterminations for resource/environmental adjustments are made as though the change were the result of catastrophic damage, as described in FSM 2424.23, with four exceptions: (1) An adjustment rate will be calculated for each species and applied to each species. If a negative adjustment causes one or more species stumpage rate to be below base rates the deficit will be written off against the remaining positive value species on the basis of a sale-as-a-whole package deal, (2) rates may not be set below base rates, (3) timing relative to effective date and (4) escalation ceilings should not be changed.

If a modification is made during the original period of contract, but not in conjunction with a scheduled or other type of rate redetermi- -*

*-2424.3 - Appraisal for Determination of Damages in Expired Contracts. When the purchaser fails to cut and remove all of the included timber by the expiration date, it is necessary to determine whether or not the United States has suffered damages from loss of stumpage value. The general measure of such damage is the extent to which the resale value of remaining timber is less than the amount the purchaser would have paid had he completed the contract. Timber sale contracts define the latter as the value at the stumpage rates in effect at termination. This value is called current contract value in contract form 2400-6.

Resale value of the remaining timber is defined as the appraised value at termination or the actual value bid in a resale, whichever is greater. Because the appraised value is the minimum resale value, irrespective of subsequent actions, the first step in determining damages is to appraise the remaining timber using standard Forest Service methods in effect at termination and under the original contract terms and conditions. The latter will include completion of all uncompleted work required of the original purchaser or made necessary by his operation. The volume and quality of the remaining timber and its accessibility must be carefully determined, as well as all other factors influencing its value. Note that the appraised value developed as described above may be different from the appraised value, exclusive of bid premium, which would have been developed for extension because the latter would have been based on data in effect 45 days prior to termination.

Appraised value must be developed so as to be comparable with current contract value. For 2400-5 or 2400-6 contracts, the appraisal, or rate redetermination must develop an estimated market value of the remaining timber as though the specified roads were in place. (Unused purchaser credit will be applied to reduce damages otherwise indicated.) For other contracts the appraisal will develop net stumpage value. If damages are indicated and the timber is subsequently resold, it may be necessary to adjust the bid value received, which will be gross stumpage, to determine a resale value which is comparable to the current contract value.

When the appraised value, determined as described above, is equal to or greater than current contract value at termination, there will be no damages assessed for loss of stumpage value regardless of how the timber is subsequently offered and what value is received. However, there may be other damages including the cost of resale.

When the appraised value is less than current contract value, determination of resale value and hence, damages, will depend on when and how the timber is reoffered. While there are four principal situations, individual cases may involve unusual conditions -*

*- and require special treatment. All damage cases, involving uncompleted expired contracts, over $2,000 in value and those cases in which the timber is not reoffered for resale, reoffered under different conditions, or any part reoffered, must be reviewed and approved by the Regional Forester. All damage cases involving abandoned or unexpired contracts will be reviewed by the Regional Forester who will consult with the field representative of the General Counsel. The four situations are:

1. Timber Not Reoffered for Sale. In this situation, resale value is appraised value as discussed above and the United States will be considered to have been damaged in the amount that resale value is less than current contract value.

2. Timber Reoffered Under Original Conditions. When the remaining timber is offered for resale under the original conditions, resale value is the greater of (1) bid value of the resale and (2) appraised value as discussed above. As in item 1, damage is the amount by which resale value is less than current contract value.

The choice between items 1 and 2 is necessary because there may be no buyers, or because resale may be delayed for some time after expiration. In such cases, if the market has dropped significantly by the time of resale, the resale value might be lower than it would have been if resale had been made promptly following the expiration date. Note that when the timber is reoffered, advertised rates will be based on the market at the time of advertisement and not at the time of expiration.

3. Timber Reoffered Under Different Conditions. It may be desirable to reoffer the remaining timber, but under different contract provisions from those in the original sale. Under such circumstances, it is necessary to make two appraisals. The first is made under the assumption that the original contract provisions apply, and the second assumes changed provisions. Both appraisals will be made using standard methods in use at expriation. The differences between the two appraisals is the effect of the changed conditions on the value of the remaining timber. This difference , if it reduces the value of the remaining timber, will be used to reduce damages.

Example:

The contract value of uncut timber at expiration date is $6,000. An appraisal of the uncut timber, using standard method of appraisal for new sale offerings and assuming the original contract -*

*- provisions, is $4,000. An appraisal of the uncut timber using standard method of appraisal for new sale offerings, but assuming changed contract provisions (skyline yarding, instead of tractor skidding, for example) is $3,000. Thus, the changed conditions have reduced the appraised value by $1,000 (from $4,000 to $3,000). This change must be considered in damage determination. An adjustment for market change as discussed in item 2, above, may be necessary, also.

If changed contract provisions result in an increase in appraised value for uncut timber, the changed condition value would not be used in damage determination. Damage in that event is determined as in item 2.

4. Timber Reoffered Partially. The example discussed in item 3 presumes that all of the uncut timber will be resold. It may be appropriate, for environmental or other reasons, to reoffer only a portion of the uncut timber, or to include a portion of the uncut timber with other timber. When these alternatives are appropriate, the prices received for the reoffered timber are not as good a measure of damages as when the entire volume of uncut timber is sold as a package. When partial reofferings are made, careful study should be given to present a defensible analysis of the exact damages suffered by the government.

The first step should always be to determine the difference between the contract value of the uncut timber at expiration date and the appraised value of the uncut timber under the same contract conditions in effect at time of expiration, using the standard appraisal method in effect for new offerings. A detailed analysis will be needed of bid results for the portions of the sale that are resold, to determine whether or not the resale values justify any reduction of the appraised damages. Bid prices higher than contract value should be carefully considered. Bid premiums in excess of appraised value should also be considered, even though the resale value, itself, is lower than contract value, due to market conditions.

For example, an expired sale has uncut timber with a contract value of $10,000. It appraises at $9,000 as of the expiration date. Thus, appriased damage is $1,000. If it is decided to resell only half of the timber, advertised at $4,500, and the timber is bid in at $5,000, there is no loss on that half. The other half remains unsold with an appraised $500 of damages. However, if study indicates the probability that the other half would also have been bid in at $500 above the appraisal, had the Forest Service chosen to include it in the resale, the appraiser could recommend that in his -*

( 128.69)

SALE NAME: D LYNX DAMAGE SUMMARY CHECKED BY: DATE: 04/24/90

CARD TYPE 5

SPECIFIED RD CONST (MILES) .0 (17-19) RECONSTRUCTION (MILES) .0 (20-22) PURCH CR LIM $ 0 (23-29) (INC. $ 0 P&R **)

PRODUCT: APPRAISED TO: HAUL (MILES) 16 (33-35) TEMP RD CONSTR (MILES) 3.0 (30-32) TEMP RD COST $ 29830 (36-42)

1 RANDLE WASH
4 RANDLE WASH
0 X

BASIC DATA PERIOD: C.Y.1987R
ADJ TO APPR BASE PERIOD: LBR: IC 3RD QTR 1989, ALL OTHERS SEP 1989 PLY: SEP 1989

CARD TYPE 6

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | PRODUCT/UNIT | (14-15) | 1-1 | 1-1 | 1-1 | 4-1 |
| 2 | SPECIES | | D | H&O | C | PAM* |
| 3 | SPECIES CODE | (16-18) | 205 | 263 | 242 | 002 |
| 4 | % BY SPECIES | | 49.87% | 41.25% | 3.66% | 5.22% |
| 5 | VOLUME | (19-25) | 19100 | 15800 | 1400 | 2000 |
| 6 | SELLING VALUE | | 601.72 | 337.91 | 461.01 | 247.20 |
| 7 | SV ADJUSTMENT, SCHEDULE 1089 | | 1.176 | 1.080 | 1.000 | 1.000 |
| 8 | ADJ SELLING VALUE | | 707.62 | 364.94 | 461.01 | 247.20 |
| 9 | CHIP & BYPRODUCTS | | 40.03 | 45.60 | 0.00 | 0.00 |
| 10 | SELLING VALUE L.S. | (26-31) | 747.65 | 410.54 | 461.01 | 247.20 |
| 11 | FALLING & BUCKING | | 12.12 | 12.12 | 12.12 | 3.63 |
| 12 | SKIDDING | | 15.94 | 15.94 | 15.94 | 10.63 |
| 13 | LOADING | | 6.30 | 6.30 | 6.30 | 5.36 |
| 14 | SUBTOTAL, STUMP-TO-TRUCK | | 34.36 | 34.36 | 34.36 | 19.62 |
| 15 | HAUL HAUL AND SCALE | | 20.31 | 20.31 | 20.31 | 16.93 |
| 16 | ROAD MAINTENANCE CO-OP $3.16 | | 3.66 | 3.66 | 3.66 | 0.00 |
| 17 | SUBTOTAL, TRANSPORTATION | | 23.97 | 23.97 | 23.97 | 16.93 |
| 18 | GENERAL LOGGING OVERHEAD | | 13.96 | 13.96 | 13.96 | 10.28 |
| 19 | LOGGING DEPRECIATION | | 5.54 | 5.54 | 5.54 | 4.73 |
| 20 | SUBTOTAL, ADMINISTRATIVE | | 19.50 | 19.50 | 19.50 | 15.01 |
| 21 | SLASH DISPOSAL (INC. 4.39 CO-OP) | | 16.72 | 16.72 | 16.72 | 0.00 |
| 22 | EROSION CONTROL | | 1.97 | 1.97 | 1.97 | 0.00 |
| 23 | SNAG DISPOSAL | | 0.00 | 0.00 | 0.00 | 0.00 |
| 24 | FIRE & OTHER | | 0.67 | 0.67 | 0.67 | 0.57 |
| 25 | SUBTOTAL, ENVIRONMENTAL PROTECTION | | 19.36 | 19.36 | 19.36 | 0.57 |
| 26 | TEMPORARY ROADS | | 0.82 | 0.82 | 0.82 | 0.00 |
| 27 | OTHER TEMPORARY DEVELOPMENTS | | 0.00 | 0.00 | 0.00 | 0.00 |
| 28 | SUBTOTAL,TEMPORARY DEVELOPMENT | | 0.82 | 0.82 | 0.82 | 0.00 |
| 29 | SUBTOTAL, LOGGING COSTS | (32-36) | 98.01 | 98.01 | 98.01 | 52.13 |
| 30 | SPECIFIED ROAD COST (A10) | | 0.00 | 0.00 | 0.00 | 0.00 |
| 31 | TOTAL LOGGING COST L.S., SCHEDULE 0589 | | 98.01 | 98.01 | 98.01 | 52.13 |
| 32 | MFG. COST L.S. (INCL. PRODUCT HAUL) | | 142.30 | 153.60 | 157.01 | 120.00 |
| 33 | WASH STATE EXCISE TAX | | 22.13 | 6.45 | 8.56 | 2.90 |
| 34 | SUBTOTAL, MANUFACTURING | (37-41) | 164.43 | 160.05 | 165.57 | 122.90 |
| 35 | TOTAL PRODUCTION COST L.S. | | 262.44 | 258.06 | 263.58 | 175.03 |
| 36 | CONVERSION (10)-(35) | | 485.21 | 152.48 | 197.43 | 72.17 |
| 37 | P&R RATIO % NORMAL/ADVERTISED | | 6.00 | 6.00 | 6.00 | 6.00 |
| 38 | P&R MARGIN NORMAL/ADVERTISED | | 42.62 | 23.40 | 26.28 | 14.09 |
| 39 | INDICATED NET STUMPAGE (36)-(38) | | 442.59 | 129.08 | 171.15 | 58.08 |
| 40 | INDICATED ADVERTISED RATES (39)+(30) | | 442.59 | 129.08 | 171.15 | 58.08 |
| 41 | BASE RATES | | 20.00 | 10.63 | 20.00 | 2.00 |
| 42 | ADJUSTMENTS TO BASE RATES | | 0.00 | 0.00 | 0.00 | 0.00 |
| 43 | ADVERTISED RATES (40)+(42) | (42-47) | 442.59 | 129.08 | 171.15 | 58.08 |
| 44 | INDICATED STAT NET RATES(43)-(30) | | 442.59 | 129.08 | 171.15 | 58.08 |
| 45 | APPRAISED NET RATES | (48-53) | 442.59 | 129.08 | 171.15 | 58.08 |
| 46 | BASE INDICES | | 311.49 | 248.22 | 0.00 | 0.00 |

* PAM ACTUALLY APPRAISED AT $ 216.72,/ACRE FOR 536 ACRES.

CARD TYPE 7

: UNIT OF MEASURE: 1 (16)
:(T) TOTAL OR (A) AVERAGE:
: T 100.0 %
: T 38300 (17-23)
: A 469.23
: A 571.97
: A 11.68 (24-28)
: A 15.66 (29-33)
: A 6.25 (34-38)
: A 20.13 (39-42)
: A 3.47 (43-46)
: A 13.77 (47-50)
: A 5.50 (51-54)
: A 15.85 (55-58)
: A 1.87 (59-62)
: A .00 (63-66)
: A .66 (67-70)
: A .78 (71-74)
: A .00 (75-78)
: A 95.62
: A .00
: A 95.62
: A 146.33
: A 14.16
: A 160.50
: A 256.12
: A 315.86
: NORM 6.0 ADV 6.0 **
: NORM 32.60 ADV 32.60 **
: A 283.26
: T 10848702.96
: A 283.26
: A 15.19
: A .00
: T 10848702.96
: A 283.26
: A 283.26
: A 283.26

90012356

RECEIVED
Directives, Forms and
Reports Mgmt. Group
MAR 2 1981
Reviewed by________

FOREST SERVICE MANUAL
WASHINGTON

RECORD COPY

February 1981

TITLE 2400 - TIMBER MANAGEMENT

Amendment No. 123

POSTING NOTICE. Amendments to this title are numbered consecutively. Check the last transmittal received for this title to see that the above amendment number is in sequence. If not, order intervening amendments at once on form 1100-6. Do not post this amendment until the missing one(s) is received and posted. After posting retain this transmittal until the next amendment to this title is received. Place it at the front of the title.

| Page Code | Superseded (Number of Sheets) | New (Number of Sheets) |
|---|---|---|
| (Entire chapter) | | |
| 2430--1 thru 2437 | 127 | - |
| 2430--1 thru 2438.5 | - | 157 |
| ID No. 62, FSM 2430, 2/27/80 | | |
| ID No. 63, FSM 2430, 4/4/80 | | |
| ID No. 66, FSM 2430, 8/19/80 | | |
| ID No. 67, FSM 2430, 8/19/80 | | |

83018413

<u>2433.6 - Action When Timber Sale Contract Has Expired Prior to Completion.</u> When a timber sale contract has expired leaving material which was required to be removed under the contract, action must begin immediately to determine if the United States will be damaged (FSM 2433.53). If so, the Forest Service shall seek compensation for said damages and prevent and/or remedy future or increasing damages. This includes (1) seeing that all remaining work required of the original purchaser or made necessary by the purchaser's operation (particularly--that needed to repair or prevent physical damage to resources or improvements) is performed in a timely fashion, and (2) promptly reoffering the remaining timber unless there is an overriding reason not to do so (FSM 2433.52).

Remaining work may be completed by (1) the defaulter; (2) Forest Service, using defaulter's deposits, forfeited bonds including payments made by sureties (FSM 6531.12a), appropriated funds, or a combination of such funds; (3) surety; or (4) purchaser of the resale. The approach or combination of approaches to be used shall depend upon the attitude and ability of the defaulter; the kind, amount, and urgency of the work; and the schedule for reoffering the timber.

Except for the work that logically should be deferred and accomplished in conjunction with the harvest of remaining timber, the defaulted purchaser should be notified of the remaining work and requested to do it as set forth in the settlement provision of the timber sale contract. If the purchaser refuses, any unencumbered deposits on hand should be used in the manner authorized by the contract (FSM 2451.95). Work remaining after all available deposits are used may be accomplished in several ways.

If the work must be done promptly to avoid damage, such as may be the case where the rainy season is at hand and erosion control structures are needed, any available appropriated funds which may be expended properly for the purpose shall be used. If damage is not imminent and an unacceptable delay in the planned reoffering shall not result, surety may be requested to do the work. Otherwise, any nonurgent work may be required of the resale purchaser.

There may be monetary damages for loss of stumpage value when the appraised value of the remaining timber, as of the

expiration date and under the original terms and conditions, is less than the contract value just prior to expiration.

Prompt advertisement under the original contract provisions shall facilitate determination and collection of damages. This is the preferred practice. All uncompleted work required of the original purchaser or made necessary by the purchaser's operation and not otherwise programmed for accomplishment shall be required of the resale purchaser. However, the remaining timber may be reoffered under different terms when clearly necessary to provide adequate resource coordination and/or to meet current environmental protection standards. Different terms may include different harvest methods or other changes which preclude reoffering all of the remaining timber. Sales which need to be reoffered on terms significantly different from those in the original sale should be reviewed by the Regional Forester, who shall consult with the Regional representative of the General Counsel, as appropriate. Damages shall be computed in a different manner for sales offered under changed sale conditions (FSM 2424.3).

When there is an overriding reason which precludes reoffering the remaining timber, the resale value is the appraised value at expiration, adjusted as appropriate to reflect transaction evidence.

2433.7 - Cancellation of Contracts.

2433.71 - Authority. Cancellation is the termination of a contract prior to the specified termination date. Contracts may be canceled under the conditions listed in 36 CFR 223.9 (FSM 1023.4). Implementing provisions for this authority are contained in timber sale contracts as follows:

1. 36 CFR 223.9 (a) (1)
a. 2400-2 - Section 12b - Termination.
b. 2400-3 - Paragraph 14.
c. 2400-5 and 5T - B8.25 - Breach (FSM 2453.82e).
d. 2400-6 and 6T - B9.3 and BT9.3 - Breach (FSM 2451.93 a 2452.93)

83018656

2435.03 - Policy.

1. To assist in obtaining optimum practical use of salvable wood material from national Forest lands, a salvage sale fund shall be established on each proclaimed National Forest which has salvage opportunities.

2. Funds authorized to be collected for deposit into the SSF shall only be from salvage sales or from other sales containing a salvable component to be sold.

3. Minimum rates in timber sale contracts shall not be increased to insure the collection of needed salvage funds. (36 CFR 223.4.)

2435.04 - Responsibility. Two areas of responsibility are identified and assigned to the officer authorized to approve the timber sale (FSM 2404.13): (1) Determination that the sale qualifies as a salvage sale. The Forest Officer making this determination must be guided by the definition in FSM 2435.05-item 1. (2) Approval of the SSF plan (FSM 2435.24) and subsequent revisions thereto.

Approval of a salvage sale carries with it the same responsibilities as approval of a normal timber sale. Forest Officers approving salvage sales must insure that the sale is in full compliance with 36 CFR 223.3 and the applicable land management plan. Particular attention needs to be given to retaining adequate habitat for cavity-nesting birds.

2435.05 - Definition.

1. Qualifying Sales. A salvage sale is one in which the primary reason for entry is to salvage insect-infested, dead, damaged, or down timber. It may also include associated trees for stand improvement, if it is efficient and desirable to include them in order to leave the area in a productive condition. An approved silvicultural prescription shall be prerequisite to including the following types of trees for stand improvement.

a. Trees predicted to be in imminent danger of insect or disease attack or windthrow and other high risk trees that are expected to die from any cause before the next harvest (or compartment) entry. The harvest of high risk



8301871

trees is applicable only to species, such as ponderosa pine, for which systems of risk or sanitation cutting have been developed.

b. Trees impacted by disease to the extent that their net growth is nominal and diseased trees that, if left in place, would adversely affect the growth of other trees.

c. Trees which because of their species or genetic inferiority are undesirable as a source of natural regeneration on the site.

d. Trees which must be removed for access to and operations of the sale.

e. Trees in understocked stands requiring regeneration, when the agent causing the need for salvage, or the salvage operation itself, would create the understocked condition.

f. Trees in overstocked stands when thinning or released will benefit the vigor of the residual stand.

2. Other sales. Ordinarily, collection of salvage sale funds will be limited to salvage sales. Occasionally, however, there may be an identifiable component of a regularly programmed sale which contains a unit of blown-down, insect-infested or other salvage timber. When it is decided to include such salvage opportunities in a regular sale, collections may be deposited to SSF to cover the cost of preparing and administering the salvage component.

In the event timber included in a normal sale area is damaged by fire, insects, windthrow or other agent, salvage sale funds may be collected to cover the cost of preparing and administering the additional salvage volume on the sale.

All deposits to and expenditures from the salvage sale fund must be covered by an approved salvage plan (FSM 2435.23).

<u>2435.1</u> - <u>Authorized Work and Expenses.</u>

1. Sale preparation. Includes the reconnaissance, silvicultural prescriptions, design of logging systems, volume estimates, marking, associated land line location,



83018712

IN THE UNITED STATES CLAIMS COURT

| | | |
|---|---|---|
| MANKE LUMBER, et al., | ) | |
| Plaintiff, | ) | |
| vs. | ) | No. 33-85C et al |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEPOSITION OF DAVID E. NOTE

Taken in behalf of Plaintiff

July 9, 1993

* * *

CHANGES HAVE BEEN MADE TO THIS DEPOSITION PLEASE SEE LAST PAGE OF THIS TRANSCRIPT FOR CHANGES

Q. Now, the second component of a reappraisal that we discussed was the bid premium.
Was it your testimony that the District was responsible for doing the calculating on the bid premium as well?
A. They had ultimate responsibility.
Q. All right. And did you participate in that process?
A. Yes.
Q. How did you participate, sir?
A. As I recall, I worked with them in selecting the sales to be analyzed and actually figuring up the bid premium.
Q. Did you have to provide direction to the District as to how to calculate the bid premium, to your recollection, or did they already know how to do that?
A. I don't recall giving them direction, specific direction.
Q. All right. Are you aware of any specific policies or procedures for determining the bid premium?
A. General direction.
Q. What is your understanding of that general direction, sir?
A. That you select sales that are representative of the sale that you're concerned with and use those to

determine what the bid premium was on those sales.
Q. All right.
A. And after analysis, use that bid premium in the calculation of damages.
Q. All right, sir. Now, just so that I understand your answer, is it a goal, then, to find sales which are comparable to the sale that you're concerned with?
A. Yes.
Q. And what factors do you look at to determine whether or not other sales are comparable?
A. Age of the timber, species composition, logability.
Q. By logability, do you mean the type of systems needed to log the sale?
A. Right.
Q. Any other factors?
A. Quality of timber comes in to play. That's about it.
Q. How about length of the sale in terms of the number of years?
A. I don't recall whether that is in the general direction or not.
Q. Is it a factor that you looked at in terms of trying to find comparable sales?
A. I'm sure it was.
Q. How about overall volume?
A. As near as could be determined, yeah.

Q. All right. How about haul distance?
A. I don't recall that being a factor.
Q. All right. Now, do you have any recollection of any of the specifics about any of the four sales identified here on this calculation, handwritten calculation included in Exhibit 1; Polk 4 Salvage, Beech 4 Salvage, Polar 2 or Silver 7?
A. No.
Q. Do you recall anything about any of those sales that made them comparable to Lynx's?
A. No, I don't -- I don't remember the specifics of each sale.
Q. During the time you were a contracting officer on the Gifford Pinchot, were you aware of any sales as large as Lynx's in terms of total volume?
A. I think there were some. I don't remember the names of any sales, but I think there were some.
Q. Were those sales that were under contract during that time or that were actually awarded during your tenure as a contracting officer?
A. They would have been awarded if they existed prior to my being contracting officer.
Q. Do you recall whether or not any of them were larger than Lynx's?
A. No, I don't recall.

C E R T I F I C A T E

I, Kimberly Knight, Shorthand Reporter and Notary Public, do hereby certify that, pursuant to stipulation of counsel hereinbefore set out, DAVID E. NOTE personally appeared before me at the time and place mentioned in the caption herein; that the witness was by me first duly sworn on oath, and examined upon oral interrogatories propounded by counsel; that said examination, together with the testimony of said witness, was taken down by me in stenotype and thereafter reduced to typewriting; and, that the foregoing transcript, Pages 1 to 96, both inclusive, constitutes a full, true and accurate record of said examination of and testimony given by said witness, and of all other proceedings had during the taking of said deposition, and of the whole thereof, to the best of my ability.

Witness my hand at Portland, Oregon, this 19th day of July, 1993.

Kimberly Knight
Kimberly Knight
Shorthand Reporter and
Notary Public
My Commission expires: 4-23-96

DAVID E. NOTE
CORRECTION SHEET

MANKE LUMBER VS. THE UNITED STATES

| PAGE | LINE | CORRECTION |
|---|---|---|
| 9; throughout document | 5 | Roberta Moltzen (not Molt |
| 9 | 15 | ranger (not ranging) |
| 23 | 14 | large sale (not large scale |
| 25 | 8 | reappraisal (not preappraisa |
| 50 | 7 | a weighted (not awaited) |
| 53 | 14 | Detect (not defection) |

I hereby certify that I have read the foregoing transcript, and that this transcription, together with any corrections noted above, is a true and accurate record of my testimony given at the time and place noted.

Witness Name

SUBSCRIBED AND SWORN to before me this _____ day of _________________, 199 __.

____________________________________
Notary Public for (state) ________________
My commission expires: ___________

TITLE 2400 - TIMBER MANAGEMENT

*-When there is an overriding reason that precludes reoffering the remaining timber, the resale value is the appraised value at expiration, adjusted as appropriate to reflect transaction evidence.

2433.52 - Procedure in Completion of Timber Sale Contract by Sureties. In cases of abandonment, repudiation of contract, or inability or unwillingness of the purchaser to satisfy requirements essential to prevent loss to the United States, the surety on the bond shall be given an opportunity to complete the sale. Sureties should be notified of the status of the sale, and formally requested in writing to complete the contract if they desire. This action shall be taken by the Contracting Officer. If the surety does not wish to carry out the contract, the contract shall be cancelled or action brought for breach of contract, as the circumstances may require.

2433.53 - Resale of Timber. Included timber remaining upon the expiration, abandonment, or cancellation of a sale contract shall be offered for sale promptly unless there is an overriding reason not to do so. Timber included in an abandoned contract should not be reoffered until the evidence of abandonment has been determined by the Regional attorney to be conclusive and surety has declined to complete the contract.

When timber is reoffered after expiration of a contract, there may be restrictions that prohibit the purchaser who failed to complete the original contract from bidding on the resale (36 CFR 223.5, paragraph (h); FSM 2431.6).

2433.54 - Determination of Damages in Uncompleted Timber Sale Contract. When it is necessary to determine whether damages have resulted from the breach of a contract, operations of the purchaser shall be carefully checked with reference to the specific provision involved. -*

*-Damage to the United States must be appraised with the utmost care and impartiality, and no item shall be included that cannot be supported. Reports should fully discuss each item of damage, the provision of the contract breached, the amount of damage sustained, and the method of appraisal used. Whenever a contract has expired, or has been abandoned or is being considered for cancellation leaving a part of the area uncut, the cost of making a resale of the timber and the cost of reappraisal and readvertisement, should be reported.

Damage appraisals of included merchantable timber shall be made in accordance with standard appraisal practices and instructions in effect at time of sale expiration (FSM 2424.3). For young growth that is damaged or destroyed, values should be determined by following appraisal instructions under FSM 6572.25a.

Cost estimates for completing work on the sale area shall be based upon doing the work to the standard required in the contract.

The following are the more common kinds of damage:

1. Merchantable Timber Cut and Not Paid For. Determine the amount and value by species of (a) designated trees and (b) undesignated trees.

Where the contract provides payment of liquidated damages for the cutting of undesignated timber, determine the amount due and show separately from the stumpage value.

2. Designated Trees Left Uncut. Determine amount and value by species of designated timber left on portions of the sale area that have been logged. Do not include volumes in occasional trees left for reasons permitted by the contract and for which charges would not have been made in the normal course of sale administration.

Damages resulting from the physical presence of uncut trees (as opposed to loss of stumpage) should also be determined and shown separately from stumpage. If provided in the contract, damages may be based on the cost of cutting and removing or otherwise disposing of the uncut trees.
-*



83007040

*- 3. Merchantable Material Wasted in Abandoned Logs and in Top and Stumps. Determine amount and value by species. Do not include volumes of (a) incidental material, the leaving of which was justified under existing sale condition, or (b) material authorized to be left.

If the contract does not provide for payment for designated timber cut but not removed, damages shall include the cost of removing or otherwise disposing of wasted material as well as the stumpage value.

4. Parts of Sale Area Left Uncut, Whether Timber Is Marked or Unmarked. Determine amount and value, by species, particularly with reference to any reduction in value due to the acts of the purchaser removing timber of better quality or accessibility than the average for the entire sale area, and in reducing the volume to be cut below that suitable for economical operation.

5. Young Growth and Standing Trees Which Have Been Killed or Seriously Injured. Determine amount and value by species (FSM 6572.25a).

6. Slash, Snags, and Refuse Left on the Sale Area in Violation of the Contract. Determine cost of disposition.

7. Failure to Clean up Camp Area, Sawmill Sites, Landings in Accordance With the Terms of the Contract. Determine cost of disposition.

8. Forest Service Expenditures Necessary Because of Failure of the Purchaser to Require Employees to Prevent or Fight Fires

9. Damage to Improvements Not Repaired. Estimate the cost of the repairs.

10. Unacceptable Damage to Stream and Stream Environment From Excessive Accumulation of Slash and Logging Debris. Determine cost of channel clearing and disposition of debris.

11. Any Other Damage Directly Attributable to a Violation of the Sale Contract -*

83007041

*- 12. Cost of Resale. Report the cost of reselling the timber, including the cost of reappraisal and readvertisement.

13. Failure to Cut. (For sales containing special provision C/CT9.4 (4/82).) In addition to the costs listed in items 1-12, purchasers shall be liable for the following when applicable:

a. Any increase in construction costs for specified roads not completed by termination date. Such roads must be needed to harvest the uncut timber in the resale. Costs are limited to increases for constructing the road to the same standard and specifications that were in the contract on termination date.

b. The Government's loss caused by the delay in receipt of stumpage payments. Interest, at the current rate being paid for borrowing by the United States (as calculated and published by the U.S. Treasury in Treasury Fiscal Requirements Manual 6-8020-20) at termination, shall be charged on the unpaid contract value for half of the contract resale period. Not more than 1 year's additional interest is allowed to cover the time needed by the Forest Service to resell the timber, for example, if the resale contract is a 3 year sale, and does not take place until 18 months after the contract termination date, then interest would be charged for 2 1/2 years (18 months to midpoint, plus the 1 year maximum resale period). Conversely, if the resale takes place 4 months after sale expiration date then interest would be charged for 22 months (4 months plus 18 months to resale midpoint).

c. The loss to the Government caused by delay in harvest measured by increased regeneration costs (including site preparation, seeding, and planting). Such costs must be substantiated by the difference in the regeneration costs in original sale area improvement plan and increased costs caused by the delay in harvest as measured by the regeneration costs in the sale area improvement plan prepared at time of resale. -*

8307042

*-Exhibits 1 and 2 show examples of how damages are determined under various circumstances. Note that the situation at termination is the same for all examples in each exhibit.

**Exhibit 1**

| A. Calculation of Potential Damages | Potential Damages MBF | Potential Damages $ |
|---|---|---|
| 1. Volume and contract value of remaining timber | | |
| a. on area not cut over (item 4) | 1,000 | 25,000 |
| b. on area cut over | | |
| (1) designated | | |
| a) cut, but not removed (item 1) | 200 | 5,000 |
| b) not cut (item 2) | 100 | 2,500 |
| (2) not designated, cut, but not removed (item 1) | 50 | 1,250 |
| (3) material wasted (item 3) | 50 | 1,250 |
| Total remaining timber | 1,400 | 35,000 |
| 2. Liquidated damages (if provided for in the timber sale contract) | | |
| a. on area cut over, designated but not cut (item 2) | | 2,500 |
| b. on area cut over, not designated, cut but not removed (item 1) | | 1,250 |
| 3. Cost of resale (item 12) | | 500 |
| 4. Less effective purchaser credit | | (5,500) |
| 5. Maximum potential damage | | 33,750 |

-*



83007043

*- Exhibit 1 -- Continued

APPRAISED VALUE AT TERMINATION DATE IS:

| | Greater Than Maximum Potential Damage | | Less than Maximum Potential Damages | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Timber Not Reoffered | | Timber is Reoffered for Sale | | | | | | | |
| | | | | | Timber Reoffered Promptly | | | | Reoffered at Later Date | | | |
| | | | | | Under Original Terms | | Under New Terms | | Market Lower | | Market Higher | |
| | (M) | ($) | (M) | ($) | (M) | ($) | (M) | ($) | (M) | ($) | (M) | ($) |
| B. Calculation of Resale Value | | | | | | | | | | | | |
| (1) Appraised value at termination: a. Original terms | 1,350 1/ | 40,500 2/ | 1,350 1/ | 27,000 2/ | 1,350 1/ | 27,000 2/ | 1,350 1/ | 27,000 2/ | 1,350 1/ | 27,000 2/ | 1,350 1/ | 27,000 2/ |
| b. New terms | -- | -- | | | | | 1,000 | 15,000 | 1,000 | 15,000 | 1,000 | 15,000 |
| (2) Adjustment for Changed Conditions | | -- | -- | -- | | N.A. | | 12,000 | | 12,000 | | 12,000 |
| (3) Resale bid value | -- | -- | -- | -- | | 28,350 | | 16,000 | | 10,000 | | 30,000 |
| (4) Line B (2) + B (3) | -- | -- | -- | -- | | 28,350 | | 28,000 | | 22,000 | | 42,000 |
| (5) Resale value | -- | 40,500 | | 27,000 3/ | | 28,350 | | 28,000 3/ | | 27,000 | | 42,000 |
| C. Calculation of Damages | | | | | | | | | | | | |
| (1) Maximum potential damage (A5) | | 33,750 | | 33,250 | 4/ | 33,750 | | 33,750 | | 33,750 | | 33,750 |
| (2) Resale value (B5) | | 40,500 | | 27,000 | | 28,350 | | 28,000 | | 27,000 | | 42,000 |
| (3) Damages (A5) less (B5) | | None | | 6,250 | | 5,400 | | 5,750 | | 6,750 | | None |
| (4) Unobligated cash on hand | | 1,450 | | 1,450 | | 1,450 | | 1,450 | | 1,450 | | 1,450 |
| (5) Additional due from purchaser | | -- | | 4,800 | | 3,950 | | 4,300 | | 5,300 | | -- |
| (6) Refund due purchaser | | 1,450 | | -- | | -- | | -- | | -- | | 1,450 |

1/ Material wasted, not salable, hence not appraised. Cost of disposing of material included in operating costs.
2/ Includes completion of uncompleted work (FSM 2424.3)
3/ It may be appropriate to add estimated bid premium for unsold volume (FSM 2424.3).
4/ When timber is not reoffered, the total cost of resale (A 3) will not be included in maximum potential damage.

-*

83007044

*- Exhibit 2

Calculation of Damages When C/CT9.4 - Failure to Cut (4/82) Applies

| Contract Conditions | Example 1 MBF | Example 1 Cost or Value | Example 2 MBF | Example 2 Cost or Value |
|---|---|---|---|---|
| 1. Current contract value and uncut volume at termination date | 1,000 | $100,000 | 1,000 | $100,000 |
| 2. Unused effective purchaser credit | - | (10,000) | - | (10,000) |
| 3. Cost of resale (appraisal, adv., and any other prepraration costs) | - | 3,000 | - | 3,000 |
| 4. Increased cost of specified road | - | 6,000 | - | 6,000 |
| 5. Increased regeneration costs | - | 2,000 | - | 2,000 |
| 6. Interest on stumpage payments not made (assume 14.00% rate at term. date, and sale reoffered 90 days after term. date. Resale is for 2 years. Interest will be charged on $90,000 for 15 months.) | - | 15,750 1/ | - | 15,750 1/ |
| 7. Appraised value for resale | 1,000 | 80,000 | 1,000 | 80,000 |
| 8. Actual resale value | 1,000 | 95,000 | 1,000 | 2/ |
| 9. Total amount of damages | | 21,750 3/ | | 36,750 4/ |

1/ Interest charged on $90,000 (Current contract value less unused effective purchaser credit).
2/ Reoffered but no bids received.
3/ Amount by which current contract value, plus all costs, less unused effective purchaser credit, exceeds resale value.
4/ Damages determined by subtracting appraised value from the difference between current contract value and effective purchaser credit, plus all costs.

-*

83007045

Buddy - for our files

4-13-90

Dave Note,

Attached is the documentation of figures used to come up with the average adjusted bid premium by species for use with the D-Lynx damage estimate.

DF Adj. Bid Premium = $226.21

H+O Adj. Bid Premium = $169.89

Both of these bid premiums have been weighted and indexed to the time of the expiration date of the D-Lynx Sale.

There are no adj. figures for Cedar or PAM as these were not biddable species + are not indexed.

If you have any questions call me.

Beulah Johnson

* Also attached are the 2400-17's for the sales.

90012212

# Wgtd. Adj. Bid Premiums

| Sale | Vol. | Adj. Bid Prem |
|---|---|---|
| Polk 4 Salvage | 3200 | 134.82 |
| Beech 4 Salvage | 1900 | 171.87 |
| Polar 2 | 3500 | 378.87 |
| Silver 7 | 2400 | 168.44 |

DF
Wtd. Adj. Bid Prem = $226.21

H&O
Wtd. Adj. Bid Premiums

| Sale | Vol | Adj. Bid Prem. |
|---|---|---|
| Polk 4 Salvage | 3200 | 103.17 |
| Beech 4 Salvage | 2500 | 153.29 |
| Polar 2 | 4200 | 144.69 |
| Silver 7 | 3100 | 286.31 |

H&O
Wtd. Adj. Bid Prem = $169.89

90012213

# Indices Adj.

ale - Polk 4 Salv.

| Species | Index | Lynx Index | Index Dif | Adj. | Bid Prem | Adj. Bid Prem |
|---|---|---|---|---|---|---|
| D | 282.90 | 311.49 | +28.59 | +14.30 | 120.52 | 134.82 |
| H+O | 230.17 | 248.22 | +18.05 | +9.02 | 94.15 | 103.17 |

ale - Beech 4 Salvage

| Species | Index | Lynx Index | Index Dif | Adj. | Bid Prem | Adj. Bid Prem |
|---|---|---|---|---|---|---|
| D | 282.90 | 311.49 | +28.59 | +14.30 | 157.57 | 171.87 |
| H+O | 230.17 | 248.22 | +18.05 | +9.02 | 144.27 | 153.29 |

Sale - Polar 2

| Species | Index | Lynx Index | Index Dif | Adj | Bid Prem | Adj. Bid Prem |
|---|---|---|---|---|---|---|
| D | 261.68 | 311.49 | +49.81 | +24.90 | 353.97 | 378.87 |
| H+O | 225.32 | 248.22 | +22.90 | +11.45 | 133.24 | 144.69 |

sale - Silver 7

| Species | Index | Lynx Index | Index Dif | Adj | Bid Prem | Adj Bid Prem. |
|---|---|---|---|---|---|---|
| D | 276.35 | 311.49 | +35.14 | +17.57 | 150.87 | 168.44 |
| H+O | 230.06 | 248.22 | +18.16 | + 9.08 | 277.23 | 286.31 |

90012214

# Sale Comparison
## D-Lynx

✓ = sales used for comparison

Schooley 11 Bid Date - 9/23/88

| Species | Vol | Adv | Bid |
|---|---|---|---|
| D | 3500 | 172.25 | 415.50 |
| C | 800 | 166.50 | 166.50 |
| H+O | 900 | 126.39 | 126.39 |
| PAM | 700 | 7.85 | 7.85 |

Tumble 4 - Bid Date - 6/3/88

| Species | Vol | Adv | Bid |
|---|---|---|---|
| D | 1700 | 197.63 | 197.63 |
| C | 200 | 128.37 | 128.37 |
| H+O | 4000 | 82.25 | 230.00 |
| PAM | 1700 | 2.00 | 2.00 |

✓ Polk 4 Salvage, Bid Date 9-2-88

| Species | Vol | Adv. | Bid | Bid Prem. |
|---|---|---|---|---|
| D | 3200 | 164.48 | 285.00 | 120.52 |
| C | 500 | 136.31 | 136.31 | 0 |
| H+O | 3200 | 91.35 | 185.50 | 94.15 |
| PAM | 1600 | 2.00 | 2.00 | 0 |

Cozy 3, Bid Date - 6/29/87

| Species | Vol | Adv | Bid |
|---|---|---|---|
| D | 2100 | 133.88 | 165.00 |
| C | 800 | 110.44 | 110.44 |
| A+O | 1800 | 40.87 | 100.00 |
| PAM | 800 | .50 | .50 |

Kraus 7 Bid Date - 9/19/88

| Species | Vol | Adv | Bid |
|---|---|---|---|
| D | 6400 | 178.97 | 344.00 |
| H+O | 800 | 140.32 | 140.32 |
| PAM | 1700 | 10.86 | 10.86 |

Beech 5 Bid Date - 8/29/88

| Species | Vol | Adv | Bid |
|---|---|---|---|
| D | 400 | 125.85 | 125.85 |
| H+O | 2400 | 63.15 | 179.00 |
| PAM | 1300 | 2.00 | 2.00 |

90012216

Beech 4 Salvage 9/12/88 Bid Date

| Species | Vol | Adv | Bid |
|---|---|---|---|
| D | 1900 | 143.93 | 301.50 |
| C+YC | 600 | 109.36 | 109.36 |
| H+O | 2500 | 55.73 | 200.00 |
| PAM | 1600 | 2.00 | 2.00 |

Polar 2 3/20/89 Bid Date

| Species | Vol | Adv | Bid |
|---|---|---|---|
| D | 3500 | 253.53 | 607.50 |
| C | 300 | 148.99 | 148.99 |
| H+O | 4200 | 89.01 | 222.25 |
| PAM | 1300 | 12.32 | 12.32 |

Silver 7 2/24/89 Bid Date

| Species | Vol | Adv | Bid |
|---|---|---|---|
| D | 2400 | 216.13 | 367.00 |
| H+O | 3100 | 71.27 | 348.50 |
| PAM | 1200 | 8.42 | 8.42 |

90012217

)rig. Holdaway 2 Bid Date - 2/24/89

| Species | Vol | Adv | Bid |
|---|---|---|---|
| D | 2200 | 214.92 | 350.00 |
| A+O | 2600 | 81.90 | 260.00 |
| PAM | 1200 | 2.00 | 2.00 |

D-Lynx Resale

| Species | Vol | Adv. |
|---|---|---|
| D | 18,700 | 442.17 |
| H+O | 15,600 | 111.90 |
| C | 1,400 | 170.73 |
| PAM | 2,000 | 58.07 |

90012218

United States Department of Agriculture | Forest Service | RO

Reply to: 2450

Date: February 14, 1990

Subject: Mt. Adams Veneer, Lynx Sale, Defaulted Timber Sale

To: Regional Attorney

Enclosed is a letter from the Gifford Pinchot National Forest requesting assistance on the subject named sale. Attached to their letter is a letter from Attorney William Lenihan, stating the views of purchaser Mt. Adams Veneer.

We feel this is a relatively simple case but would appreciate your review and advice on it.

As you know, a sale does not have to be resold for us to establish damages. We feel the Forest should do the following:

1. Use data available at the time of the termination date for reappraisal, which is standard practice.

2. They should "look" at an enlarged area to study bid premium, i.e., Olympic and Mt. Hood for similar sales. Normally sales are reviewed only on the Forest where the sale occurred. If similar sales can be found, use the average bid premium for those sales and document what was done. If there are no similar sales, use professional judgment on what would have been typical on the Gifford Pinchot, as though we were not in spotted owl problems, and again document what was done.

We realize it is difficult to say everything that needs to be said in a letter. If you have questions or would like to discuss further, please call Jerry Hustead at 3587.

/s/ Ronald S. Johnson (for)

WENDALL L. JONES
Director of Timber Management

Enclosure

cc:
Gifford Pinchot NF

Author:J.Hustead, DG, 2/7/90

I concur:S.Burk,02/08/90
I CONCUR:JVH:02/12/90

90012227

# CONTROL COPY

FOREST SERVICE MANUAL
PORTLAND, OREGON

December 1982

TITLE 2400 - TIMBER MANAGEMENT

Region 6 Supplement No. 296

POSTING NOTICE. Supplements to this title are numbered consecutively. Check the last transmittal received for this title to see that the above supplement number is in sequence. If not, order intervening supplements at once on form 1100-6. Do not post this supplement until the missing one(s) is received and posted. After posting retain this transmittal until the next supplement to this title is received. Place it at the front of the title.

| Page Code | | No. of Sheets Superseded | New |
|---|---|---|---|
| 2431.2—1 thru —6 | | 3 | - |
| ~~2431.2—1 thru —15~~ | Supp. 308, 6-83 | | ~~8~~ |
| 2431.22 | | 1 | - |
| ~~2431.22—1 thru —5~~ | Supp. 307, 6-83 | | ~~3~~ |
| 2431.23—1 thru —4 | | 2 | - |
| 2431.23—1 thru —7 (2431.23—5 thru —7, Supp. 365, 6-86) | | - | 4 |
| ~~—2434.5~~ | Supp. 321, 5-84 | - | ~~1~~ |

Digest:

Expands parent text to include definitions of activities before passing each gate and includes additional reportable data. The time frame for individual timber sale planning has been expanded to 10 years.

Revises standards for timber cruise sampling errors and sets suggested standards for check reviews.

JEFF M. SIRMON
Regional Forester

82510778

2431.23 Sale Plan Implementation

1. Sale Volume Determination. All cruises for timber sale volume and grade determination will be done by, or under the direct supervision of and in company with, Certified Cruisers. Certain volume cruises, where grade information is not needed and where defect is less than 5 percent, may be conducted by Cruisers who have not yet been certified but who are designated by the District Ranger as being able to work independently but under the general supervision of Certified Cruisers.

a. Cruising Methods - Volumes estimates for green sales of 100 trees or less will be made by a 100 percent measurement of all trees in the sale. For larger sales, various timber sampling (cruising) methods are available, and most cruises using these methods can be processed by Regional computer programs. In special circumstances, other methods, including comparison cruising or 3P Fall, Buck, and Scale (3PFBS) cruising, may be appropriate. Volumes and grades for tree measurement sales will be estimated by a 3PFBS cruise whenever the total net sale volume will be 1000 MBF or more and where total defect and breakage is expected to be 20 percent or more of the total gross sale volume. Regional assistance is available for planning and processing such cruises or other special cruises. Detailed information on cruise design, sampling methods, and processing procedures can be found in FSH 2409.22 R6, Timber Appraisal Handbook, Chapter 200.

b. Sampling Error Standards - Timber sale cruises shall be designed to achieve the following sampling errors at the 67 percent confidence level, for the sale as a whole:

(1) For sales in which volumes to be paid for are determined by log scaling:

(a) Salvage sales: 10 percent sampling error

(b) Green (non-salvage) sales.: 5 percent sampling error

(2) For all tree measurement sales in which volumes to be paid for are determined by the cruise.

(a) Sale of dead lodgepole pine: 10 percent sampling error.

(b) Other: 5 percent sampling error.

FOREST SER (1)

REPORT OF TIMBER SALE
CONVERTIBLE AND NON CONVERTIBLE PRODUCTS

(Reference FSM 2490, Report 2400-A)

| | | | |
|---|---|---|---|
| REGION 0 6 (2 3) | FOREST 0 3 (4 5) | DISTRICT (OR AREA) 0 5 (6 7) SALE NUMBER 0 7 3 (8 9 10) | QTR.FY (11-13) 3 (QTR.) 8 8 (YEAR) |
| Six | Gifford Pinchot | Randle | |
| STATE 5 3 (14 15) | COUNTY 0 5 9 (16 17 18) | SALE NAME (19-44) BEECH 5 | |
| Washington | Skamania | | |
| ACRES IN SALE 110 (49-55) | SIZE CLASS 6 | LEGAL DESCRIPTION (56-80) T10N,R6E,S11,12,13,14,WMR | COMPARTMENT 5 3 0 3 (45 46 47 48) |
| BID DATE 08 / 29 / 88 (14-15 16-17 18-19) | STATUS ** 4 (20) | SBA SET-ASIDE N (21) | APP. BASE PRD. 6 - 4 8 (22 23 24) ZONE 2 (25) |
| SALVAGE N (26) | PRICING METHOD 3 (27) | PLAN'D BAB COL $ 77,032 (28-34) | TERM. DATE 12 / 31 / 90 (35-36 37-38 39-40) CONTRACT DATE __/__/__ (41-42 43-44 45-46) |
| CONT. NO. 077629 (47-57) | CONTRACT FORM 2400 6 __ (58 59) | CONTRACTING OFFICER R (60) | METHOD OF SALE A (61) REG. 36CFR221 6 __ (62 63) |

| SPEC. | SPEC CODE 14-16 | PROD UNIT 17-18 | VOLUME | ADVERT RATES $ | STAT. HIGH BIDDER $ 19-24 | HIGH BIDDER $ 25-30 | 2ND HIGH BIDDER $ 31-36 | 3RD HIGH BIDDER $ 37-42 | 4TH HIGH BIDDER $ 43-48 | 5TH HIGH BIDDER $ 49-54 | 6TH HIGH BIDDER $ 55-60 | 7TH HIGH BIDDER $ 61-66 | 8TH HIGH BIDDER $ 67-72 | 9TH HIGH BIDDER $ 73-78 | 10TH HIGH BIDDER $ | 11TH HIGH BIDDER $ | 12TH HIGH BIDDER $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D | 205 | 1-1 | 400 | 125.85 | 125.85 | 125.85 | 125.85 | 125.85 | 125.85 | 125.85 | 125.85 | | | | | | |
| NSO | 263 | 1-1 | 2400 | 63.15 | 179.00 | 179.00 | 178.00 | 155.00 | 150.00 | 63.15 | 63.15 | | | | | | |
| *PAM | 002 | 4-1 | 1300 | 2.00 | 2.00 | 2.00 | 2.00 | 2,00 | 2.00 | 2.00 | 2.00 | | | | | | |
| TOTAL/AVER. | 1 | | 4100 | 49.88 | 117.69 | 117.69 | | | | | | | | | | | |

SEP 1 1988
Received
Timber Data Co.

SUMMARY OF BIDDERS

| RANK 14-15 | NAME 16-40 | SBA CLASS 41 | IDENTIFICATION NUMBER 42-57 | | TOTAL VALUE OF BID 58-69 |
|---|---|---|---|---|---|
| HIGH 1 | Wescor Forest Products | N | 043910 | 5239 2761 | 482 540.00 |
| 2 | Pacific Lumber Sales CO | S | 060460 | 1033 | 480 140.00 |
| 3 | Max West Inc | S | 085396 | 575 | 424 940.00 |
| 4 | B L Logging | N | 046660 | | 412 940.00 |
| 5 | Western Timber Div CO | L | 011805 | | 204 500.00 |
| 6 | Stimson Lumber CO | L | 004000 | | 204 500.00 |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |

4/6

I certify that I have personally examined the bids submitted for this sale and that this is an accurate record thereof.

Diane Elledge

Title Administrative Officer 8/29/88

| Species | MBF | SP | 1S | 2S | 3S | 4S | F | 1P | 2P | 3P |
|---|---|---|---|---|---|---|---|---|---|---|
| D | 400 | 4 | -- | 45 | 23 | -- | -- | -- | -- | 28 |
| C | 10 | -- | -- | -- | 100 | -- | -- | -- | -- | -- |
| H | 1960 | -- | -- | 50 | 50 | -- | -- | -- | -- | -- |
| A | 390 | -- | -- | 42 | 58 | -- | -- | -- | -- | -- |
| WP | 20 | -- | -- | 61 | 39 | -- | -- | -- | -- | -- |
| YC | 10 | -- | -- | 16 | 84 | -- | -- | -- | -- | -- |
| NF | 10 | -- | -- | 76 | 24 | -- | -- | -- | -- | -- |

*PAM sold at the rate of $23.64 per acre for 110 acres; per M figures for statistical purposes only.

** Pending submission of 44, 45 and 43 Forms

DISTRIBUTION: Orig. and 1cc to RO (orig. to WO), 1cc to RO of SBA

Previous edition of this form is obsolete.

FS-2400-17 (9/82)

# APPRAISAL SUMMARY
( 130.87)

SALE NAME: BEECH 5

SUMMARY CHECKED BY:

DATE: 07/25/88

------------------------------ CARD TYPE 5 ------------------------------

SPECIFIED RD CONST (MILES) .0 (17-19) RECONSTRUCTION (MILES) .0 (20-22) PURCH CR LIM $ 0 (23-29) (INC. $ 0 P&R **)

PRODUCT: APPRAISED TO: HAUL (MILES) 47 (33-35) TEMP RD CONSTR (MILES) .1 (30-32) TEMP RD COST $ 3835 (36-42)

RANDLE WA

TACOMA WA

BASIC DATA PERIOD: C.Y.1986R

ADJ TO APPR BASE PERIOD: LBR: IC 2ND QTR 1988, ALL OTHERS JUN 1988 PLY: JUN 1988

------------------------------ CARD TYPE 6 ------------------------------

| # | Item | Card cols | 1-1 | 1-1 | 4-1 |
|---|---|---|---|---|---|
| 1 | PRODUCT/UNIT | (14-15) | 1-1 | 1-1 | 4-1 |
| 2 | SPECIES | | D | H&G | PAM* |
| 3 | SPECIES CODE | (16-18) | 205 | 263 | 002 |
| 4 | % BY SPECIES | | 9.76% | 58.54% | 31.71% |
| 5 | VOLUME | (19-25) | 400 | 2400 | 1300 |
| 6 | SELLING VALUE | | 465.51 | 319.37 | 229.45 |
| 7 | ADJUSTMENT, SCHEDULE 0888 | | 1.086 | 1.050 | 1.000 |
| 8 | ADJ SELLING VALUE | | 505.54 | 335.34 | 229.45 |
| 9 | CHIP & BYPRODUCTS | | 47.46 | 64.69 | 0.00 |
| 10 | SELLING VALUE L.S. | (26-31) | 553.00 | 400.03 | 229.45 |
| 11 | FALLING & BUCKING | | 13.35 | 13.35 | 4.52 |
| 12 | SKIDDING | | 25.60 | 25.60 | 16.89 |
| 13 | LOADING | | 10.05 | 10.05 | 7.97 |
| 14 | SUBTOTAL, STUMP-TO-TRUCK | | 49.00 | 49.00 | 29.32 |
| 15 | HAUL, HAUL AND SCALE | | 26.23 | 26.23 | 38.41 |
| 16 | ROAD MAINTENANCE CO-OP $8.91 | | 9.83 | 9.83 | 0.00 |
| 17 | SUBTOTAL, TRANSPORTATION | | 36.06 | 36.06 | 38.41 |
| 18 | GENERAL LOGGING OVERHEAD | | 13.90 | 13.90 | 9.75 |
| 19 | LOGGING DEPRECIATION | | 4.49 | 4.49 | 3.79 |
| 20 | SUBTOTAL, ADMINISTRATIVE | | 18.39 | 18.39 | 13.54 |
| 21 | SLASH DISPOSAL (INC. 9.38 CO-OP) | | 31.67 | 31.67 | 0.00 |
| 22 | EROSION CONTROL | | 1.39 | 1.39 | 0.00 |
| 23 | SNAG DISPOSAL | | 0.00 | 0.00 | 0.00 |
| 24 | FIRE AND OTHER | | 0.61 | 0.61 | 0.48 |
| 25 | SUBTOTAL, ENVIRONMENTAL PROTECTION | | 33.67 | 33.67 | 0.48 |
| 26 | TEMPORARY ROADS | | 1.37 | 1.37 | 0.00 |
| 27 | OTHER TEMPORARY DEVELOPMENTS | | 0.00 | 0.00 | 0.00 |
| 28 | SUBTOTAL, TEMPORARY DEVELOPMENT | | 1.37 | 1.37 | 0.00 |
| 29 | SUBTOTAL, LOGGING COSTS | (32-36) | 138.49 | 138.49 | 81.75 |
| 30 | SPECIFIED ROAD COST (A10) | | 0.00 | 0.00 | 0.00 |
| 31 | TOTAL LOGGING COST L.S., SCHEDULE 0588 | | 138.49 | 138.49 | 81.75 |
| 32 | MFG. COST L.S. (INCL. PRODUCT HAUL) | | 232.05 | 158.83 | 124.95 |
| 33 | WASH STATE EXCISE TAX | | 6.29 | 3.14 | 0.10 |
| 34 | SUBTOTAL, MANUFACTURING | (37-41) | 238.34 | 161.99 | 125.05 |
| 35 | TOTAL PRODUCTION COST L.S. | | 376.83 | 300.48 | 206.80 |
| 36 | CONVERSION (10)-(35) | | 176.17 | 99.55 | 22.65 |
| 37 | P&R RATIO % NORMAL/ADVERTISED | | 10.00 | 10.00 | 10.00 |
| 38 | P&R MARGIN NORMAL/ADVERTISED | | 50.32 | 36.40 | 20.88 |
| 39 | INDICATED NET STUMPAGE (36)-(38) | | 125.85 | 63.15 | 1.77 |
| 40 | INDICATED ADVERTISED RATES (39)+(30) | | 125.85 | 63.15 | 2.00 |
| 41 | BASE RATES | | 28.89 | 19.10 | 2.00 |
| 42 | ADJUSTMENTS TO BASE RATES | | 0.00 | 0.00 | 0.00 |
| 43 | ADVERTISED RATES (40)+(42) | (42-47) | 125.85 | 63.15 | 2.00 |
| 44 | INDICATED STAT NET RATES(43)-(30) | | 125.85 | 63.15 | 2.00 |
| 45 | APPRAISED NET RATES | (48-53) | 125.85 | 63.15 | 2.00 |
| 46 | BASE INDICES | | 282.90 | 230.17 | 0.00 |

* PAM ACTUALLY APPRAISED AT $ 23.64,/ACRE FOR 110 ACRES.

------- CARD TYPE 7 -------

UNIT OF MEASURE: 1 (16)

(T) T WAL OR (A) AVERAGE:

| | | | | |
|---|---|---|---|---|
| T | 100.0 % | | | |
| T | 4100 | (17-23) | | |
| A | 305.12 | | | |
| A | 360.87 | | | |
| A | 10.55 | (24-28) | | |
| A | 22.83 | (29-33) | | |
| A | 9.38 | (34-38) | | |
| A | 30.09 | (39-42) | | |
| A | 6.71 | (43-46) | | |
| A | 12.58 | (47-50) | | |
| A | 4.27 | (51-54) | | |
| A | 21.63 | (55-58) | | |
| A | .95 | (59-62) | | |
| A | .00 | (63-66) | | |
| A | .57 | (67-70) | | |
| A | .94 | (71-74) | | |
| A | .00 | (75-78) | | |
| A | 120.50 | | | |
| A | .00 | | | |
| A | 120.50 | | | |
| A | 155.23 | | | |
| A | 2.49 | | | |
| A | 157.72 | | | |
| A | 278.22 | | | |
| A | 82.64 | | | |
| NORM | 10.0 | ADV | 10.0 | ** |
| NORM | 32.84 | ADV | 32.76 | ** |
| A | 49.81 | | | |
| T | 204500.00 | | | |
| A | 49.88 | | | |
| A | 14.43 | | | |
| A | .00 | | | |
| T | 204500.00 | | | |
| A | 49.88 | | | |
| A | 49.88 | | | |
| A | 49.89 | | | |

IO .23

Beech - 5

FOREST SERVICE

REPORT OF TIMBER SALE
CONVERTIBLE AND NONCONVERTIBLE PRODUCTS
(Reference FSM 2450, Report FS-2400-A)

| | | | |
|---|---|---|---|
| REGION 0 6 | FOREST Gifford Pinchot 0 3 | DISTRICT (OR AREA) Randle 0 5 | SALE NUMBER 0 7 5 |
| STATE 5 3 | COUNTY Lewis 0 4 1 | SALE NAME (19-44) POLK 3 SALVAGE | QTR.FY (11-13) 3 QTR. 8 8 YEAR |
| ACRES IN SALE 185 | SIZE CLASS 7 | LEGAL DESCRIPTION (56-80) T 11 & 12N, R 8E, WM | COMPARTMENT 5 4 0 1 |
| BID DATE 09 / 02 / 88 | STATUS **4 | SBA SET-ASIDE 1 | APP. BASE PRD. 6 8 8 |
| SALVAGE 1 | PRICING METHOD 3 | PLAN'D SAW COL. $ 118,950 | TERM. DATE 03 / 31 / 91 |
| CONT. NO. 077637 | CONTRACT FORM 2400 6 | CONTRACTING OFFICER 2 | METHOD OF SALE 1 |

ZONE 2 — CONTRACT DATE __/__/__ — REG. 36CFR221 6

| SPEC. | SPEC CODE | PROD UNIT | VOLUME | ADVERT RATES | STAT. HIGH BIDDER $ | HIGH BIDDER $ | 2ND HIGH BIDDER $ | 3RD HIGH BIDDER $ | 4TH HIGH BIDDER $ | 5TH HIGH BIDDER $ | 6TH HIGH BIDDER $ | 7TH HIGH BIDDER $ | 8TH HIGH BIDDER $ | 9TH HIGH BIDDER $ | 10TH HIGH BIDDER $ | 11TH HIGH BIDDER $ | 12TH HIGH BIDDER $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D | 205 | 1-1 | [illegible] | [illegible] | 278.70 | 285.00 | 267.00 | 182.00 | 165.00 | 164.48 | | | | | | | |
| C | 242 | 1-1 | 900 | [illegible] | 130.01 | 136.31 | 236.31 | 136.31 | 136.31 | 136.31 | | | | | | | |
| HEO | 263 | 1-1 | [illegible] | 91.35 | 179.26 | 185.50 | 203.00 | 237.00 | 239.00 | 91.35 | | | | | | | |
| STAM | 002 | 8-1 | 1,600 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | | | | | | | |
| TOTAL/AVER. | 1 | 1 | [illegible] | [illegible] | 180.41 | 185.52 | | | | | | | | | | | |

SUMMARY OF BIDDERS

| RANK | NAME 4/6. | SBA CLASS | IDENTIFICATION NUMBER | | TOTAL VALUE OF BID |
|---|---|---|---|---|---|
| HIGH 1 | Pacific Lumber Sales Co | S | 060460 | 1033 | $1,576,935.00 |
| 2 | Stimson Lumber Co | L | 004000 | 425 | $1,575,335.00 |
| 3 | B L Logging | N | 046660 | 4395 | $1,412,155.00 |
| 4 | Max West, Inc | S | 085396 | | $1,364,155.00 |
| 5 | Western Timber Div Co | L | 011805 | | $ 890,011.00 |
| 6 | | | | | |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |

I certify that I have personally examined the Bids submitted for this sale and that this is an accurate record thereof.

Buddy D. Rose FORESTRY TECH 9/2/88

| Species | 1S | 2S | 3S | 4S | 2 | 1Z | 2Z | 3Z | 8Z |
|---|---|---|---|---|---|---|---|---|---|
| D | | 49 | 19 | | | | 1 | 30 | 1 |
| C | | 1 | 99 | | | | | | |
| N | | 65 | 35 | | | | | | |
| A | | 62 | 38 | | | | | | |
| MF | | 80 | 20 | | | | | | |

* PAM sold at the rate of $22.07 per acre for 185 acres; per M figures for statistical purposes only.
** Pending submission of 44 & 45 forms.

DISTRIBUTION: Orig. and 1cc to RO (orig. to WO), 1cc to RO of SBA

/20/88
. 8 3949 PER 99)
88
PB 7
ASURE: 1 (16)
H (A) AVERAGE:
0.0 $
8500 (17-23)
5.85
9.62
1.34 (24-28)
6.81 (29-33)
6.81 (34-38)
4.97 (39-42)
2.79 (43-46)
3.05 (47-50)
7.56 (51-54)
4.57 (55-58)
1.83 (59-62)
.00 (63-66)
.59 (67-70)
1.28 (71-74)
.08 (75-78)
3.20
5.11
8.31
8.70
5.23
3.94
2.25
7.37
.0 ADV 9.8 **
0 ADV 38.24 **
0.74
11.00
14.71
12.96
.00
11.00
14.71
99.59
99.59

SALE NAME: POLK 4 SALVAGE SUMMARY CHECKED BY: SERTEMA M. HILL DATE: 07/20/88

CARD TYPE 5

SPECIFIED RD CONST (MILES) 1.0 (17-19) RECONSTRUCT. (MILES) 1.1 (20-22) PUNCH CR LIN $ 43449 (23-29) (INC. $ 3949 PAR **)

PRODUCT: APPRAISED TO: HAUL (MILES) 32 (33-35) TEMP RD CONSTR (MILES) 1.0 (30-32) TEMP RD COST $ 10870 (36-42)

1 RANDLE WA

4 TACOMA WA

0

BASIC DATA PERIOD: O.T.1986R

ADJ TO APPR BASE PERIOD: LBR: TO 2ND QTR 1988, ALL OTHERS JUN 1988 PLY: JUN 1988

CARD TYPE 6

| | | | | | |
|---|---|---|---|---|---|
| 1 PRODUCT/UNIT | (14-15) | 1-1 | 1-1 | 1-1 | 4-1 |
| 2 SPECIES | | D | C | RAO | PAM* |
| 3 SPECIES CODE | (16-18) | 205 | 242 | 265 | 00R |
| 4 % BY SPECIES | | 37.65% | 5.88% | 37.65% | 18.82% |
| 5 VOLUME | (19-25) | 3200 | 500 | 3200 | 1600 |
| 6 SELLING VALUE | | 476.16 | 450.66 | 310.50 | 229.45 |
| 7 BF ADJUSTMENT, SCHEDULE 0588 | | 1.086 | 1.000 | 1.050 | 1.000 |
| 8 ADJ SELLING VALUE | | 517.11 | 450.60 | 326.02 | 229.45 |
| 9 CHIP & BYPRODUCTS | | 47.36 | 0.00 | 65.56 | 0.00 |
| 10 SELLING VALUE L.S. | (26-31) | 564.47 | 450.60 | 391.58 | 229.45 |
| 11 FALLING & BUCKING | | 13.06 | 13.06 | 13.06 | 3.98 |
| 12 SKIDDING | | 19.45 | 19.45 | 19.45 | 13.03 |
| 13 LOADING | | 7.01 | 7.01 | 7.01 | 6.90 |
| 14 SUBTOTAL, STUMP-TO-TRUCK | | 39.52 | 39.52 | 39.52 | 23.01 |
| 15 HAUL AND SCALE | | 20.33 | 20.33 | 20.33 | 44.97 |
| 16 ROAD MAINTENANCE CO-OP (3.33 | | 3.44 | 3.44 | 3.44 | 0.00 |
| 17 SUBTOTAL, TRANSPORTATION | | 23.77 | 23.77 | 23.77 | 44.97 |
| 18 GENERAL LOGGING OVERHEAD | | 13.72 | 13.72 | 13.72 | 10.16 |
| 19 LOGGING DEPRECIATION | | 7.78 | 7.78 | 7.78 | 6.40 |
| 20 SUBTOTAL, ADMINISTRATIVE | | 21.50 | 21.50 | 21.50 | 16.76 |
| 21 SLASH DISPOSAL (INC. 5.61 CO-OP) | | 17.95 | 17.95 | 17.95 | 0.00 |
| 22 EROSION CONTROL | | 2.25 | 2.25 | 2.25 | 0.00 |
| 23 SNAG DISPOSAL | | 0.00 | 0.00 | 0.00 | 0.00 |
| 24 FIRE AND OTHER | | 0.61 | 0.61 | 0.61 | 0.52 |
| 25 SUBTOTAL, ENVIRONMENTAL PROTECTION | | 20.81 | 20.81 | 20.81 | 0.52 |
| 26 TEMPORARY ROADS | | 1.58 | 1.58 | 1.58 | 0.00 |
| 27 OTHER TEMPORARY DEVELOPMENTS | | 0.00 | 0.00 | 0.00 | 0.00 |
| 28 SUBTOTAL, TEMPORARY DEVELOPMENT | | 1.58 | 1.58 | 1.58 | 0.00 |
| 29 SUBTOTAL, LOGGING COSTS | (32-36) | 107.18 | 107.18 | 107.18 | 86.06 |
| 30 SPECIFIED ROAD COST (A10) | | 6.30 | 6.30 | 6.30 | 0.00 |
| 31 TOTAL LOGGING COST L.S., SCHEDULE 0588 | | 113.48 | 113.48 | 113.48 | 86.06 |
| 32 MFG. COST L.S. (INCL. PRODUCT HAUL) | | 231.80 | 159.47 | 153.42 | 124.95 |
| 33 WASH STATE EXCISE TAX | | 8.22 | 6.81 | 4.57 | 0.10 |
| 34 SUBTOTAL, MANUFACTURING | (37-41) | 242.02 | 166.48 | 157.99 | 125.06 |
| 35 TOTAL PRODUCTION COST L.S. | | 355.50 | 280.16 | 271.47 | 211.11 |
| 36 CONVERSION (10)-(35) | | 208.97 | 170.44 | 120.11 | 18.34 |
| 37 P&R RATIO % NORMAL/ADVERTISED | | 10.00 | 10.00 | 10.00 | 10.00 |
| 38 P&R MARGIN NORMAL/ADVERTISED | | 50.79 | 40.43 | 35.06 | 20.88 |
| 39 INDICATED NET STUMPAGE (36)-(38) | | 158.18 | 130.01 | 85.05 | -2.54 |
| 40 INDICATED ADVERTISED RATES (39)+(30) | | 164.48 | 136.31 | 91.35 | 2.00 |
| 41 BASE RATES | | 20.00 | 20.00 | 10.31 | 2.00 |
| 42 ADJUSTMENTS TO BASE RATES | | 0.00 | 0.00 | 0.00 | 0.00 |
| 43 ADVERTISED RATES (40)+(42) | (42-47) | 164.48 | 136.31 | 91.35 | 2.00 |
| 44 INDICATED STAT NET RATES(43)-(30) | | 158.18 | 130.01 | 85.05 | 2.00 |
| 45 APPRAISED NET RATES | (48-53) | 158.18 | 130.01 | 85.05 | 2.00 |
| 46 BASE INDICES | | 282.90 | 0.00 | 230.17 | 0.00 |

CARD TYPE 7

UNIT OF MEASURE: 1 (16)

(T) TOTAL OR (A) AVERAGE:

| | |
|---|---|
| T | 100.0 % |
| T | 8500 (17-23) |
| A | 365.85 |
| A | 429.62 |
| A | 11.34 (24-28) |
| A | 18.41 (29-33) |
| A | 6.81 (34-38) |
| A | 24.97 (39-42) |
| A | 2.79 (43-46) |
| A | 13.05 (47-50) |
| A | 7.56 (51-54) |
| A | 14.57 (55-58) |
| A | 1.83 (59-62) |
| A | .00 (63-66) |
| A | .59 (67-70) |
| A | 1.28 (71-74) |
| A | .80 (75-78) |
| A | 103.20 |
| A | 5.11 |
| A | 108.31 |
| A | 178.70 |
| A | 5.23 |
| A | 183.94 |
| A | 292.25 |
| A | 137.57 |
| NORM | 10.0 ADV 9.8 ** |
| NORM | 39.10 ADV 38.24 ** |
| A | 98.74 |
| T | 890011.00 |
| A | 104.71 |
| A | 12.96 |
| A | .00 |
| T | 890011.00 |
| A | 104.71 |
| A | 99.59 |
| A | 99.59 |

T.O. 4.54

PolK-4-SALVAGE

* PAM ACTUALLY APPRAISED AT $ 22.07 /ACRE FOR ... ACRES



5

FOREST SERVICE

CONVERTIBLE AND NONCONVERTIBLE PRODUCTS
(Reference FSM 2430, Report FS-2400-A)

| | | | |
|---|---|---|---|
| REGION (3) 0 6 / 2 3 | FOREST Gifford Pinchot 0 3 / 4 5 | DISTRICT (OR AREA) 0 5 / 6 7 Randle — SALE NUMBER 0 7 8 / 8 9 10 | QTR.FY (11-13) 3 / QTR. — 8 / YEAR |
| STATE 5 3 / 14 15 | COUNTY Skamania 0 5 9 / 16 17 18 | SALE NAME (19-44) BENCH 4 SALVAGE | |
| ACRES IN SALE 167 (49-55) | SIZE CLASS 7 | LEGAL DESCRIPTION (56-80) T10N, R6E & 7E, W.M.R. | COMPARTMENT 5 3 0 / 45 46 47 |
| BID DATE MO. 09 / DAY 12 / YR. 88 / (14-15, 16-17, 18-19) | STATUS **4 / 20 | SBA SET-ASIDE N / 21 — APP. BASE PRD. 6 8 8 / 22 23 24 | ZONE |
| SALVAGE Y / 26 | PRICING METHOD 3 / 27 | PLAN'D SAB COL. $ 86,102.00 (28-34) — TERM. DATE 03 / 31 / 92 / (35-36, 37-38, 39-40) | CONTRACT DATE __/__/__ (41-42, 43-44, 45) |
| CONT. NO. 077660 (47-57) | CONTRACT FORM 2400 6 __ / 58 59 | CONTRACTING OFFICER S / 60 — METHOD OF SALE A / 61 | REG. 36CFR221 6 / 62 |

| SPEC. | SPEC CODE (14-16) | PROD UNIT (17-18) | VOLUME | ADVERT RATES $ | STAT. HIGH BIDDER $ (19-24) | HIGH BIDDER $ (25-30) | 2ND HIGH BIDDER $ (31-36) | 3RD HIGH BIDDER $ (37-42) | 4TH HIGH BIDDER $ (43-48) | 5TH HIGH BIDDER $ (49-54) | 6TH HIGH BIDDER $ (55-60) | 7TH HIGH BIDDER $ (61-66) | 8TH HIGH BIDDER $ (67-72) | 9TH HIGH BIDDER $ (73-78) | 10TH HIGH BIDDER $ | 11TH HIGH BIDDER $ | 12TH HIGH BIDDER |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D | 205 | 1-1 | 1,900 | 143.93 | 288.77 | 301.50 | 155.00 | 300.00 | 144.00 | 145.00 | 144.00 | 143.93 | | | | | |
| CAYC | 242 | 1-1 | 600 | 109.36 | 96.63 | 109.36 | 109.36 | 109.36 | 109.36 | 109.36 | 109.36 | 109.36 | | | | | |
| HLO | 263 | 1-1 | 2,500 | 55.73 | 187.27 | 200.00 | 311.00 | 190.00 | 58.00 | 55.73 | 56.00 | 55.73 | | | | | |
| *PAM | 002 | 4-1 | 1,600 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | | | | | |
| TOTAL/AVER. | 1 | | 6,600 | 72.97 | 163.34 | 172.98 | | | | | | | | | | | |

SUMMARY OF BIDDERS

| RANK (14-15) | NAME (16-40) 6/7 | SBA CLASS (41) | IDENTIFICATION NUMBER (42-57) | TOTAL VALUE OF BID (58-69) |
|---|---|---|---|---|
| HIGH 1 | Pacific Lumber Sales Co | S | 060460 1033 | 1,141,666.00 |
| 2 | D C Walker *Enterprises* | N S | 000000 4628 | 1,140,816.00 |
| 3 | Max West, Inc | S | 085396 575 | 1,113,816.00 |
| 4 | B L Logging | N | 046660 | 487,416.00 |
| 5 | Western Timber Div Co | L | 011805 | 483,641.00 |
| 6 | Stimson Lumber Co | L | 004000 | 482,416.00 |
| 7 | Wescor Forest Products | N | 043910 | 481,508.00 |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |

I certify that I have personally examined the Bids submitted for this sale and that this is an accurate record thereof.

*Diane Elledge*
Administrative Officer 8-12-88

| Species | 1S | 2S | 3S | 4S | P | 1P | 2P | 3P | SP |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2 | 42 | 1 |
| D | | 36 | 19 | | | | | | |
| C | | 12 | 88 | | | | | | |
| YC | | | 100 | | | | | | |
| H | 1 | 45 | 54 | | | | | | |
| A | | 57 | 43 | | | | | | |
| MF | 10 | 44 | 29 | | | 17 | | | |
| W | 17 | 43 | 19 | 21 | | | | | |

* PAM sold at the rate of $19.16 per acre for 167 acres; per [illegible] figures for statistical purposes only.

** Pending Submission of 43 & 45 forms.

DISTRIBUTION: Orig. and 1cc to RO (orig. to WO), 1cc to RO of SBA

Previous edition of this form is obsolete.

FS-2400-17 (9/8

( 134.14)

SALE NAME: BEECH 4 SALVAGE

SUMMARY CHECKED BY: BERTENA M. HILL DATE: 07/28/88

CARD TYPE

SPECIFIED RD CONST (MILES) 1.1 (17-19) RECONSTRUCTION (MILES) 1.0 (20-22) PURCH CR LIM $ 63647 (23-29) (INC. $ 5786 P&R **)

HAUL (MILES) 40 (33-35) TEMP RD CONSTR (MILES) .8 (30-32) TEMP RD COST $ 15553 (36-42)

PRODUCT: APPRAISED TO:
1 RANDLE WASH
4 TACOMA WASH
0

BASIC DATA PERIOD: C.Y.1986R
ADJ TO APPR BASE PERIOD: LBR: IC 2ND QTR 1988, ALL OTHERS JUN 1988 PLY: JUN 1988

| CARD TYPE 6 | | | | | | CARD TYPE 7 — UNIT OF MEASURE: 1 (16) | |
|---|---|---|---|---|---|---|---|
| | | | | | | (T) TOTAL OR (A) AVERAGE: | |
| 1 PRODUCT/UNIT | (14-15) | 1-1 | 1-1 | 1-1 | 4-1 | | |
| 2 SPECIES | | D | CAIC | BAO | PAM* | | |
| 3 SPECIES CODE | (16-18) | 205 | 242 | 263 | 002 | | |
| 4 % BY SPECIES | | 28.79% | 9.09% | 37.88% | 24.24% | T | 100.0 % |
| 5 VOLUME | (19-25) | 1900 | 600 | 2500 | 1600 | T | 6600 (17-23) |
| 6 SELLING VALUE | | 491.48 | 458.87 | 310.89 | 229.45 | A | 356.59 |
| 7 SV ADJUSTMENT, SCHEDULE 0888 | | 1.086 | 1.000 | 1.050 | 1.000 | | |
| 8 ADJ SELLING VALUE | | 533.75 | 458.87 | 326.43 | 229.45 | | |
| 9 CHIP & BYPRODUCTS | | 47.39 | 0.00 | 65.24 | 0.08 | | |
| 10 SELLING VALUE L.S. | (26-31) | 581.14 | 458.87 | 391.67 | 229.45 | A | 413.00 |
| 11 FALLING & BUCKING | | 14.19 | 14.19 | 14.19 | 4.24 | A | 11.77 (24-28) |
| 12 SKIDDING | | 30.39 | 30.39 | 30.39 | 18.18 | A | 27.43 (29-33) |
| 13 LOADING | | 8.59 | 8.59 | 8.59 | 7.30 | A | 8.28 (34-38) |
| 14 SUBTOTAL, STUMP-TO-TRUCK | | 53.17 | 53.17 | 53.17 | 29.69 | | |
| 15 HAUL | | 23.50 | 23.50 | 23.50 | 45.68 | A | 28.87 (39-42) |
| 16 ROAD MAINTENANCE FS CO-OP DEP $7.43 | | 8.57 | 8.57 | 8.57 | 0.00 | A | 6.49 (43-46) |
| 17 SUBTOTAL, TRANSPORTATION | | 32.07 | 32.07 | 32.07 | 45.64 | | |
| 18 GENERAL LOGGING OVERHEAD | | 13.22 | 13.22 | 13.22 | 10.10 | A | 12.46 (47-50) |
| 19 LOGGING DEPRECIATION | | 12.70 | 12.70 | 12.70 | 10.78 | A | 12.23 (51-54) |
| 20 SUBTOTAL, ADMINISTRATIVE | | 25.92 | 25.92 | 25.92 | 20.88 | | |
| 21 SLASH DISPOSAL (INC. 7.46 CO-OP) | | 26.33 | 26.33 | 26.33 | 0.00 | A | 19.95 (55-58) |
| 22 EROSION CONTROL | | 2.12 | 2.12 | 2.12 | 0.00 | A | 1.61 (59-62) |
| 23 SNAG DISPOSAL | | 0.00 | 0.00 | 0.00 | 0.00 | A | .00 (63-66) |
| 24 MISC INCL FIRE PROT | | 0.61 | 0.61 | 0.61 | 0.52 | A | .59 (67-70) |
| 25 SUBTOTAL, ENVIRONMENTAL PROTECTION | | 29.06 | 29.06 | 29.06 | 0.52 | | |
| 26 TEMPORARY ROADS | | 3.11 | 3.11 | 3.11 | 0.00 | A | 2.36 (71-74) |
| 27 OTHER TEMPORARY DEVELOPMENTS | | 0.00 | 0.00 | 0.00 | 0.00 | A | .00 (75-78) |
| 28 SUBTOTAL, TEMPORARY DEVELOPMENT | | 3.11 | 3.11 | 3.11 | 0.00 | | |
| 29 SUBTOTAL, LOGGING COSTS | (32-36) | 143.33 | 143.33 | 143.33 | 96.73 | A | 132.04 |
| 30 SPECIFIED ROAD COST (A10) | | 12.73 | 12.73 | 12.73 | 0.00 | A | 9.64 |
| 31 TOTAL LOGGING COST L.S., SCHEDULE 0588 | | 156.06 | 156.06 | 156.06 | 96.73 | A | 141.68 |
| 32 MFG. COST L.S. (INCL. PRODUCT HAUL) | | 234.95 | 160.11 | 155.35 | 124.95 | A | 171.33 |
| 33 WASH STATE EXCISE TAX | | 7.20 | 5.47 | 2.78 | 0.10 | A | 3.65 |
| 34 SUBTOTAL, MANUFACTURING | (37-41) | 242.15 | 165.58 | 158.13 | 125.05 | A | 174.98 |
| 35 TOTAL PRODUCTION COST L.S. | | 398.21 | 321.64 | 314.19 | 221.78 | A | 316.66 |
| 36 CONVERSION (10)-(35) | | 182.93 | 137.23 | 77.48 | 7.67 | A | 96.35 |
| 37 P&R RATIO % NORMAL/ADVERTISED | | 10.00 | 10.00 | 10.00 | 10.00 | NORM | 10.0 ADV 8.9 ** |
| 38 P&R MARGIN NORMAL/ADVERTISED | | 51.73 | 40.60 | 34.48 | 20.88 | NORM | 37.58 ADV 33.90 ** |
| 39 INDICATED NET STUMPAGE (36)-(38) | | 131.20 | 96.63 | 43.00 | -13.21 | A | 59.64 |
| 40 INDICATED ADVERTISED RATES (39)+(30) | | 143.93 | 109.36 | 55.73 | 2.00 | T | 481608.00 |
| | | | | | | A | 72.97 |
| 41 BASE RATES | | 20.00 | 20.00 | 10.60 | 2.00 | A | 12.08 |
| 42 ADJUSTMENTS TO BASE RATES | | 0.00 | 0.00 | 0.00 | 0.00 | A | .00 |
| 43 ADVERTISED RATES (40)+(42) | (42-47) | 143.93 | 109.36 | 55.73 | 2.00 | T | 481608.00 |
| 44 INDICATED STAT NET RATES(43)-(30) | | 131.20 | 96.63 | 43.00 | 2.00 | A | 72.97 |
| 45 APPRAISED NET RATES | (48-53) | 131.20 | 96.63 | 43.00 | 2.00 | A | 63.33 |
| 46 BASE INDICES | | 282.90 | 0.00 | 230.17 | 0.00 | A | 63.33 |

* PAM ACTUALLY APPRAISED AT $ 19.16,/ACRE FOR 167 ACRES.

TP. 15.21

FOREST SR. CE

**REPORT OF TD SALE**
**CONVERTIBLE AND NONCONVERTIBLE PRODUCTS**
**(Reference FSM 2490, Report FS-2400-A)**

| | | | |
|---|---|---|---|
| REGION 0 6 (2 3) | FOREST Gifford Pinchot 0 3 (4 5) | DISTRICT (OR AREA) Randle 0 5 (6 7); SALE NUMBER 0 8 3 (8 9 10) | QTR.FY (11-13) 4 3 QTR. — 8 8 YEAR |
| STATE 5 3 (14 15) | COUNTY Lewis 0 4 1 (16 17 18) | SALE NAME (19-44) KRAUS 7 | |
| ACRES IN SALE 92 (49-55) | SIZE CLASS I | LEGAL DESCRIPTION (56-80) T.11N., R.7E., W.M.S. | COMPARTMENT 5 4 0 (45 46 47) |
| BID DATE MO. 09 / DAY 19 / YR. 88 (14-15 16-17 18-19) | STATUS 1 (20) | SBA SET-ASIDE N (21); APP. BASE PRD. 6 8 8 (22 23 24) | ZONE 2 |
| SALVAGE N (26) | PRICING METHOD 3 (27) | PLAN'D SAD COL $ 69,300 (28-34); TERM. DATE 03 / 31 / 92 (35-36 37-38 39-40) | CONTRACT DATE 09 / 22 / 88 (41-42 43-44 45-) |
| CONT. NO. 077686 (47-57) | CONTRACT FORM 2400 6 — (58 59) | CONTRACTING OFFICER S (60); METHOD OF SALE A (61) | REG. 36CFR221 6 (62) |

| SPEC. | SPEC CODE (14-16) | PROD UNIT (17-18) | VOLUME | ADVERT RATES $ | STAT. HIGH BIDDER $ (19-24) | HIGH BIDDER $ (25-30) | 2ND HIGH BIDDER $ (31-36) | 3RD HIGH BIDDER $ (37-42) | 4TH HIGH BIDDER $ (43-48) | 5TH HIGH BIDDER $ (49-54) | 6TH HIGH BIDDER $ (55-60) | 7TH HIGH BIDDER $ (61-66) | 8TH HIGH BIDDER $ (67-72) | 9TH HIGH BIDDER $ (73-78) | 10TH HIGH BIDDER $ | 11TH HIGH BIDDER $ | 12TH HIGH BIDDER $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D | 205 | 1-1 | 6,400 | 178.97 | 336.57 | 344.00 | 343.00 | 296.00 | 178.97 | 178.97 | 178.97 | | | | | | |
| H&O | 263 | 1-1 | 800 | 140.32 | 132.89 | 140.32 | 140.32 | 140.32 | 140.32 | 140.32 | 140.32 | | | | | | |
| *PAM | 002 | 4-1 | 1,700 | 10.86 | 10.86 | 10.86 | 10.86 | 10.86 | 10.86 | 10.86 | 10.86 | | | | | | |
| TOTAL/AVER. | 1 | | 8,900 | 143.38 | 256.05 | 262.06 | | | | | | | | | | | |

**SUMMARY OF BIDDERS**

| RANK (14-15) | NAME (16-40) 3/6 | SBA CLASS (41) | IDENTIFICATION NUMBER (42-57) | | TOTAL VALUE OF BID (58-69) |
|---|---|---|---|---|---|
| HIGH 1 | Pacific Lumber Sales Co | S | 060460 | 1033 | 2,332,318.00 |
| 2 | Stimson Lumber Co | L | 004000 | 425 | 2,325,918.00 |
| 3 | D.C. Walker | N | 000000 | 4628 | 2,025,118.00 |
| 4 | Max West Inc | S | 085396 | | 1,276,126.00 |
| 5 | Wescor Forest Products | N | 043910 | | 1,276,126.00 |
| 6 | Western Timber Div Co | L | 011805 | | 1,276,126.00 |
| 7 | | | | | |
| 8 | | | | | |
| 9 | | | | | |
| 10 | | | | | |
| 11 | | | | | |
| 12 | | | | | |

I certify that I have personally examined the Bids submitted for this sale and that this is an accurate record thereof.

Diane Elledge
~~Contracting Officer~~ Administrative Officer 9-19-88

| Species | 1S | 2S | 3S | 4S | P | 1P | 2P | 3P | 5P |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 1 | 30 | 3 |
| D | | 44 | 22 | | | | | | |
| H | | 46 | 54 | | | | | | |
| C | | | 100 | | | | | | |

* PAM sold at the rate of $200.67 per acre for 92 acres; per M figures for statistical purposes only.

DISTRIBUTION: Orig. and 1cc to RO (orig. to WO), 1cc to RO of SBA

FS-2400-17 (9/82)

( 107.97 )

SAI NAME: KRAUS 7 SUMMARY CHECKED BY: BERTENA M. HILL DATE: 08/03/88

---------------------------------------- CARD TYPE 5 ----------------------------------------

SPECIFIED RD CONST (MILES) 1.5 (17-19) RECONSTRUCTION (MILES) .4 (20-22) PURCH CR LIM $ 53463 (23-29) (INC. $ 4860 P&R **)

PRODUCT: APPRAISED TO: HAUL (MILES) 26 (33-35) TEMP RD CONSTR (MILES) .3 (30-32) TEMP RD COST $ 5070 (36-42)
1 RANDLE
4 TACOMA
0

BASIC DATA PERIOD: C.Y.1986R
ADJ TO APPR BASE PERIOD: LBR: IC 2ND QTR 1988, ALL OTHERS JUN 1988 PLT: JUN 1988

| No. | Item | Card Type 6 | | | | Card Type 7: Unit of Measure: 1 (16) — (T) Total or (A) Average | |
|---|---|---|---|---|---|---|---|
| 1 | PRODUCT/UNIT | (14-15) | 1-1 | 1-1 | 4-1 | | |
| 2 | SPECIES | | D | H&O | PAM* | | |
| 3 | SPECIES CODE | (16-18) | 205 | 263 | 002 | | |
| 4 | % BY SPECIES | | 71.91% | 8.99% | 19.10% | T | 100.0 % |
| 5 | VOLUME | (19-25) | 6400 | 800 | 1700 | T | 8900 (17-23) |
| 6 | SELLING VALUE | | 464.12 | 373.36 | 229.45 | A | 411.14 |
| 7 | SV ADJUSTMENT, SCHEDULE 0888 | | 1.086 | 1.050 | 1.000 | | |
| 8 | ADJ SELLING VALUE | | 504.03 | 392.03 | 229.45 | | |
| 9 | CHIP & BYPRODUCTS | | 47.45 | 49.17 | 0.00 | | |
| 10 | SELLING VALUE L.S. | (26-31) | 551.48 | 441.20 | 229.45 | A | 480.06 |
| 11 | FALLING & BUCKING | | 12.04 | 12.04 | 3.50 | A | 10.41 (24-28) |
| 12 | SKIDDING | | 13.49 | 13.49 | 10.38 | A | 12.88 (29-33) |
| 13 | LOADING | | 6.09 | 6.09 | 5.14 | A | 5.91 (34-38) |
| 14 | SUBTOTAL, STUMP-TO-TRUCK | | 31.62 | 31.62 | 18.94 | | |
| 15 | HAUL AND SCALE | | 19.00 | 19.00 | 40.06 | A | 23.02 (39-42) |
| 16 | ROAD MAINTENANCE FS CO-OP $1.94 | | 2.42 | 2.42 | 0.00 | A | 1.96 (43-46) |
| 17 | SUBTOTAL, TRANSPORTATION | | 21.42 | 21.42 | 40.06 | | |
| 18 | GENERAL LOGGING OVERHEAD | | 13.03 | 13.03 | 9.14 | A | 12.29 (47-50) |
| 19 | LOGGING DEPRECIATION | | 4.22 | 4.22 | 3.56 | A | 4.09 (51-54) |
| 20 | SUBTOTAL, ADMINISTRATIVE | | 17.25 | 17.25 | 12.70 | | |
| 21 | SLASH DISPOSAL (INC. 3.51 CO-OP) | | 10.65 | 10.65 | 0.00 | A | 8.62 (55-58) |
| 22 | EROSION CONTROL | | 0.46 | 0.46 | 0.00 | A | .37 (59-62) |
| 23 | SNAG DISPOSAL | | 0.00 | 0.00 | 0.00 | A | .00 (63-66) |
| 24 | MISC INCL FIRE PROT | | 0.64 | 0.61 | 0.52 | A | .59 (67-70) |
| 25 | SUBTOTAL, ENVIRONMENTAL PROTECTION | | 11.72 | 11.72 | 0.52 | | |
| 26 | TEMPORARY ROADS | | 0.70 | 0.70 | 0.00 | A | .57 (71-74) |
| 27 | OTHER TEMPORARY DEVELOPMENTS | | 0.00 | 0.00 | 0.00 | A | .00 (75-78) |
| 28 | SUBTOTAL, TEMPORARY DEVELOPMENT | | 0.70 | 0.70 | 0.00 | | |
| 29 | SUBTOTAL, LOGGING COSTS | (32-36) | 82.71 | 82.71 | 72.22 | A | 80.71 |
| 30 | SPECIFIED ROAD COST (A10) | | 7.43 | 7.43 | 0.00 | A | 6.01 |
| 31 | TOTAL LOGGING COST L.S., SCHEDULE 0588 | | 90.14 | 90.14 | 72.22 | A | 86.72 |
| 32 | MFG. COST L.S. (INCL. PRODUCT HAUL) | | 231.34 | 171.68 | 124.95 | A | 205.66 |
| 33 | WASH STATE EXCISE TAX | | 8.95 | 7.02 | 0.54 | A | 7.17 |
| 34 | SUBTOTAL, MANUFACTURING | (37-41) | 240.29 | 178.70 | 125.49 | A | 212.82 |
| 35 | TOTAL PRODUCTION COST L.S. | | 330.43 | 268.84 | 197.71 | A | 299.54 |
| 36 | CONVERSION (10)-(35) | | 221.05 | 172.36 | 31.74 | A | 180.51 |
| 37 | P&R RATIO % NORMAL/ADVERTISED | | 10.00 | 10.00 | 10.00 | NORM | 10.0 ADV 10.0 ** |
| 38 | P&R MARGIN NORMAL/ADVERTISED | | 49.51 | 39.47 | 20.88 | NORM | 43.68 ADV 43.69 ** |
| 39 | INDICATED NET STUMPAGE (36)-(38) | | 171.54 | 132.89 | 10.86 | A | 137.37 |
| 40 | INDICATED ADVERTISED RATES (39)+(30) | | 178.97 | 140.32 | 10.86 | T / A | 1276126.00 / 143.38 |
| 41 | BASE RATES | | 20.00 | 12.50 | 2.00 | A | 15.89 |
| 42 | ADJUSTMENTS TO BASE RATES | | 0.00 | 0.00 | 0.00 | A | .00 |
| 43 | ADVERTISED RATES (40)+(42) | (42-47) | 178.97 | 140.32 | 10.86 | T / A | 1276126.00 / 143.38 |
| 44 | INDICATED STAT NET RATES(43)-(30) | (48-53) | 171.54 | 132.89 | 10.86 | A | 137.37 |
| 45 | APPRAISED NET RATES | | 171.54 | 132.89 | 10.86 | A | 137.37 |
| 46 | BASE INDICES | | 282.90 | 230.17 | 0.00 | | |

* PAM ACTUALLY APPRAISED AT $ 200.67,/ACRE FOR 92 ACRES.

FOREST SERVICE (1)

REPORT OF TIMBER SALE
CONVERTIBLE ( ) NONCONVERTIBLE PRODUCTS
(Reference FSM 2490, Report FS-2400-A)

REGION 0 6 (2 3)
FOREST Gifford Pinchot 0 3 (4 5)
DISTRICT (OR AREA) Randle 0 5 (6 7)
SALE NUMBER 0 8 5 (8 9 10)
QTR.FY (11-13) 4 3 QTR. — 8 8 YEAR

STATE 5 3 (14 15)
COUNTY Lewis 0 4 1 (16 17 18)
SALE NAME (19-44) Schooley 11

ACRES IN SALE 84 (49-55)
SIZE CLASS 1
LEGAL DESCRIPTION (56-80) T12N,R7E,S28,29,32,33,WM
COMPARTMENT 5 4 0 1 (45 46 47 48)

BID DATE MO. 09 / DAY 23 / YR. 88 / (14-15 16-17 18-19)
STATUS 1 (20)
SBA SET-ASIDE N (21)
APP. BASE PRD. 6 8 8 (22 23 24)
ZONE 2 (25)

SALVAGE N (26)
PRICING METHOD 3 (27)
PLAN'D SAD COL $69,859 (28-34)
TERM. DATE 03 / 31 / 91 / (35-36 37-38 39-40)
CONTRACT DATE 09 / 26 / 88 / (41-42 43-44 45-46)

CONT. NO. 077710 (47-57)
CONTRACT FORM 2400 6 — (58 59)
CONTRACTING OFFICER 3 (60)
METHOD OF SALE 4 (61)
REG. 36CFR221 6 — (62 63)

| SPEC. | SPEC CODE | PROD UNIT | VOLUME | ADVERT RATES $ | STAT. HIGH BIDDER $ | HIGH BIDDER $ | 2ND HIGH BIDDER $ | 3RD HIGH BIDDER $ | 4TH HIGH BIDDER $ | 5TH HIGH BIDDER $ | 6TH HIGH BIDDER $ | 7TH HIGH BIDDER $ | 8TH HIGH BIDDER $ | 9TH HIGH BIDDER $ | 10TH HIGH BIDDER $ | 11TH HIGH BIDDER $ | 12TH HIGH BIDDER $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 14-16 | 17-18 | | | 19-24 | 25-30 | 31-36 | 37-42 | 43-48 | 49-54 | 55-60 | 61-66 | 67-72 | 73-78 | | | |
| D | 205 | 1-1 | 3,500 | 172.25 | 401.64 | 415.50 | 415.00 | 390.00 | 375.00 | 180.00 | 175.00 | 172.25 | | | | | |
| C | 242 | 1-1 | 800 | 166.50 | 152.64 | 166.50 | 166.50 | 166.50 | 166.50 | 166.50 | 166.50 | 166.50 | | | | | |
| H & O | 263 | 1-1 | 900 | 126.39 | 112.53 | 126.39 | 126.39 | 126.39 | 126.39 | 126.39 | 126.39 | 126.39 | | | | | |
| * PAM | 002 | 4-1 | 700 | 7.85 | 7.85 | 7.85 | 7.85 | 7.85 | 7.85 | 7.85 | 7.85 | 7.85 | | | | | |
| TOTAL/AVER. | | 1 | 5,900 | 144.97 | 277.05 | 209.27 | | | | | | | | | | | |

SUMMARY OF BIDDERS

| RANK (14-15) | NAME (16-40) 6/7 | SBA CLASS (41) | IDENTIFICATION NUMBER (42-57) | TOTAL VALUE OF BID (58-69) |
|---|---|---|---|---|
| HIGH 1 | Pacific Lumber Sales Co | S | 060460 1033 | 1 706 696.00 |
| 2 | Stimson Lumber Co | L | 004000 425 | 1 704 946.00 |
| 3 | Max West Inc | S | 085396 575 | 1 617 446.00 |
| 4 | Western Timber Div Co | L | 011805 | 1 564 946.00 |
| 5 | B L Logging | N | 046660 | 882 446.00 |
| 6 | D C Walker | N | 000000 | 864 946.00 |
| 7 | Wescor Forest Product | N | 043910 | 855 321.00 |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |

I certify that I have personally examined the Bids submitted for this sale and that this is an accurate record thereof.

Duane L. Elledge
Administarative Officer 9/23/88

| | 2S | 3S | 5S | 2S | 3S |
|---|---|---|---|---|---|
| Douglas-fir | 1 | 34 | 11 | 42 | 12 |
| Western redcedar | | | | 66 | 34 |
| Western hemlock | | | | 5 | 95 |

* PAM actually sold at $65.42 per acre for 84 acres; per M figure for statistical purposes only.

DISTRIBUTION: Orig. and 1cc to RO (orig. to WO). 1cc to RO of SBA
Previous edition of this form is obsolete.

FS-2400-17 (9/82)

SALE NAME: SCHOOLEY 11 SUMMARY CHECKED BY: BERTENA M. HILL DATE: 06/17/88

CARD 1 5

SPECIFIED RD CONST (MILES) .9 (17-19) RECONSTRUCTION (MILES) .0 (20-22) PURCH CR LIN $ 72084 (23-29) (INC. $ 6553 .&R **)

HAUL (MILES) 13 (33-35) TEMP RD CONSTR (MILES) 1.0 (30-32) TEMP RD COST $ 19532 (36-42)

PRODUCT: APPRAISED TO:
1 RANDLE WASH
4 TACOMA WASH
0

BASIC DATA PERIOD: C.Y.1986R
ADJ TO APPR BASE PERIOD: LBR: IC 2ND QTR 1988, ALL OTHERS JUN 1988 PLT: JUN 1988

CARD TYPE 6

| | | 1-1 | 1-1 | 1-1 | 4-1 |
|---|---|---|---|---|---|
| 1 PRODUCT/UNIT | (14-15) | 1-1 | 1-1 | 1-1 | 4-1 |
| 2 SPECIES | | D | C | HAD | PAW* |
| 3 SPECIES CODE | (16-18) | 205 | 242 | 263 | 002 |
| 4 % BY SPECIES | | 59.32% | 13.56% | 15.25% | 11.86% |
| 5 VOLUME | (19-25) | 3500 | 800 | 900 | 700 |
| 6 SELLING VALUE | | 457.02 | 454.64 | 323.28 | 229.45 |
| 7 SV ADJUSTMENT, SCHEDULE 0888 | | 1.078 | 1.000 | 1.050 | 1.000 |
| 8 ADJ SELLING VALUE | | 492.67 | 454.64 | 339.44 | 229.45 |
| 9 CHIP & BYPRODUCTS | | 47.19 | 0.00 | 65.56 | 0.00 |
| 10 SELLING VALUE L.S. | (26-31) | 539.86 | 454.64 | 405.00 | 229.45 |
| 11 FALLING & BUCKING | | 11.59 | 11.59 | 11.59 | 3.64 |
| 12 SKIDDING | | 13.90 | 13.90 | 13.90 | 9.70 |
| 13 LOADING | | 6.18 | 6.18 | 6.18 | 5.26 |
| 14 SUBTOTAL, STUMP-TO-TRUCK | | 31.67 | 31.67 | 31.67 | 18.56 |
| 15 HAUL HAUL AND SCALE | | 13.82 | 13.82 | 13.82 | 43.59 |
| 16 ROAD MAINTENANCE FS CO-OP DEP$.43 | | 0.71 | 0.71 | 0.71 | 0.00 |
| 17 SUBTOTAL, TRANSPORTATION | | 14.53 | 14.53 | 14.53 | 43.59 |
| 18 GENERAL LOGGING OVERHEAD | | 13.42 | 13.42 | 13.42 | 9.41 |
| 19 LOGGING DEPRECIATION | | 3.90 | 3.90 | 3.90 | 3.30 |
| 20 SUBTOTAL, ADMINISTRATIVE | | 17.32 | 17.32 | 17.32 | 12.71 |
| 21 SLASH DISPOSAL (INC. 3.93 CO-OP) | | 10.34 | 10.34 | 10.34 | 0.00 |
| 22 EROSION CONTROL | | 1.56 | 1.56 | 1.56 | 0.00 |
| 23 SNAG DISPOSAL | | 0.00 | 0.00 | 0.00 | 0.00 |
| 24 FIRE AND OTHER | | 0.61 | 0.61 | 0.61 | 0.52 |
| 25 SUBTOTAL, ENVIRONMENTAL PROTECTION | | 12.51 | 12.51 | 12.51 | 0.52 |
| 26 TEMPORARY ROADS | | 3.76 | 3.76 | 3.76 | 0.00 |
| 27 OTHER TEMPORARY DEVELOPMENTS | | 0.00 | 0.00 | 0.00 | 0.00 |
| 28 SUBTOTAL,TEMPORARY DEVELOPMENT | | 3.76 | 3.76 | 3.76 | 0.00 |
| 29 SUBTOTAL, LOGGING COSTS | (32-36) | 79.79 | 79.79 | 79.79 | 75.38 |
| 30 SPECIFIED ROAD COST (A10) | | 13.86 | 13.86 | 13.86 | 0.00 |
| 31 TOTAL LOGGING COST L.S., SCHEDULE 0588 | | 93.65 | 93.65 | 93.65 | 75.38 |
| 32 MFG. COST L.S. (INCL. PRODUCT HAUL) | | 231.34 | 159.92 | 156.91 | 124.95 |
| 33 WASH STATE EXCISE TAX | | 8.61 | 8.32 | 6.32 | 0.39 |
| 34 SUBTOTAL, MANUFACTURING | (37-41) | 239.95 | 168.24 | 163.23 | 125.34 |
| 35 TOTAL PRODUCTION COST L.S. | | 333.60 | 261.89 | 256.88 | 200.72 |
| 36 CONVERSION (10)-(35) | | 206.26 | 192.75 | 148.12 | 28.73 |
| 37 P&R RATIO % NORMAL/ADVERTISED | | 10.00 | 10.00 | 10.00 | 10.00 |
| 38 P&R MARGIN NORMAL/ADVERTISED | | 47.87 | 40.11 | 35.59 | 20.88 |
| 39 INDICATED NET STUMPAGE (36)-(38) | | 158.39 | 152.64 | 112.53 | 7.85 |
| 40 INDICATED ADVERTISED RATES (39)+(30) | | 172.25 | 166.50 | 126.39 | 7.85 |
| 41 BASE RATES | | 20.00 | 20.00 | 10.00 | 2.00 |
| 42 ADJUSTMENTS TO BASE RATES | | 0.00 | 0.00 | 0.00 | 0.00 |
| 43 ADVERTISED RATES (40)+(42) | (42-47) | 172.25 | 166.50 | 126.39 | 7.85 |
| 44 INDICATED STAT NET RATES(43)-(30) | | 158.39 | 152.64 | 112.53 | 7.85 |
| 45 APPRAISED NET RATES | (48-53) | 158.39 | 152.64 | 112.53 | 7.85 |
| 46 BASE INDICES | | 282.90 | 0.00 | 230.17 | 0.00 |

* PAW ACTUALLY APPRAISED AT $ 65.42,/ACRE FOR 84 ACRES.

CARD TYPE 7

UNIT OF MEASURE: 1 (16)

(T) TOTAL OR (A) AVERAGE:

| | | |
|---|---|---|
| T | 100.0 % | |
| T | 5900 | (17-23) |
| A | 409.30 | |
| A | 470.90 | |
| A | 10.64 | (24-28) |
| A | 13.40 | (29-33) |
| A | 6.07 | (34-38) |
| A | 17.35 | (39-42) |
| A | .63 | (43-46) |
| A | 12.94 | (47-50) |
| A | 3.83 | (51-54) |
| A | 9.11 | (55-58) |
| A | 1.37 | (59-62) |
| A | .00 | (63-66) |
| A | .60 | (67-70) |
| A | 3.31 | (71-74) |
| A | .00 | (75-78) |
| A | 79.25 | |
| A | 12.22 | |
| A | 91.47 | |
| A | 197.68 | |
| A | 7.25 | |
| A | 204.93 | |
| A | 296.40 | |
| A | 174.50 | |
| NORM | 10.0 | ADV 10.0 ** |
| NORM | 42.85 | ADV 42.86 ** |
| A | 132.75 | |
| T | 855321.00 | |
| A | 144.97 | |
| A | 16.34 | |
| A | .00 | |
| T | 855321.00 | |
| A | 144.97 | |
| A | 132.75 | |
| A | 132.75 | |

USDA - FORES[T SE]RVICE

REPORT OF [TIM]BER SALE
CONVERTIBLE AND NON-[CON]VERTIBLE PRODUCTS
(Reference FSH 2490, Report FS-2400-A)

REGION 0 6 (2 3) | Gifford Pinchot FOREST 0 3 (4 5) | Randle DISTRICT (OR AREA) 0 5 (6 7) | SALE NUMBER 0 6 9 (8 9 10) | QTR.FY (11-13) 2 QTR. — 8 7 YEAR

STATE 5 3 (14 15) | COUNTY Lewis 0 4 1 (16 17 18) | SALE NAME (19-44) COZY 3

ACRES IN SALE 152 (49-55) | SIZE CLASS 7 | LEGAL DESCRIPTION (56-80) T11NR9ES13,14,23,24WM | COMPARTMENT 5 6 0 2 (45 46 47 48)

BID DATE MO. DAY YR. 06 / 29 / 87 / (14-15 16-17 18-19) | STATUS ** 4 (20) | SBA SET-ASIDE N (21) | APP. BASE PRD. 1 6 7 (22 23 24) | ZONE 2 (25)

SALVAGE N (26) | PRICING METHOD 3 (27) | PLAN'D SAN COL $93,230 (28-34) | TERM. DATE 03 / 31 / 89 / (35-36 37-38 39-40) | CONTRACT DATE __/__/__ (41-42 43-44 45-)

CONT. NO. 077256 (47-57) | CONTRACT FORM 2400 6 (58 59) | CONTRACTING OFFICER 8 (60) | METHOD OF SALE A (61) | REG. 36CFR221 6 (62 63)

| SPECIE | SPEC. CODE (14-16) | PROD UNIT (17-18) | VOLUME | ADVERT RATES $ | STAT. HIGH BIDDER $ (19-24) | HIGH BIDDER $ (25-30) | 2ND HIGH BIDDER $ (31-36) | 3RD HIGH BIDDER $ (37-42) | 4TH HIGH BIDDER $ (43-48) | 5TH HIGH BIDDER $ (49-54) | 6TH HIGH BIDDER $ (55-60) | 7TH HIGH BIDDER $ (61-66) | 8TH HIGH BIDDER $ (67-72) | 9TH HIGH BIDDER $ (73-78) | 10TH HIGH BIDDER $ | 11TH HIGH BIDDER $ | 12TH HIGH BIDDER $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D | 205 | 1-1 | 2,100 | 133.88 | 165.00 | 165.00 | 209.00 | 208.00 | 133.88 | 133.88 | | | | | | | |
| C | 242 | 1-1 | 800 | 110.44 | 110.44 | 110.44 | 110.44 | 110.44 | 110.44 | 110.44 | | | | | | | |
| A&O | 025 | 1-1 | 1,800 | 40.87 | 100.00 | 100.00 | 41.00 | 40.87 | 40.87 | 40.87 | | | | | | | |
| *PAM | 002 | 4-1 | 800 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | 0.50 | | | | | | | |
| TOTAL/AVER. | | 1 | 5,500 | 80.63 | 111.86 | 111.86 | | | | | | | | | | | |

JUL 1987 Received Timber Data Co.

SUMMARY OF BIDDERS

| RANK (14-15) | NAME (16-40) | SBA CLASS (41) | IDENTIFICATION NUMBER (42-57) | TOTAL VALUE OF BID (58-69) |
|---|---|---|---|---|
| HIGH 1 | Stimson Lumber Company | L | 004000 425 | 615 252.00 |
| 2 | Max West Inc. | S | 085396 575 | 601 452.00 |
| 3 | Wescor Forest Prod | N | 087230 5239 | 599 118.00 |
| 4 | Multnomah Plywood Corp | S | 029000 | 443 466.00 |
| 5 | Cispus Logging | N | 043630 | 443 466.00 |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |

3/5

I certify that I have personally examined the Bids submitted fo[r] this sale and that this is an accurate record thereof.

Diane Elledge
Supervisory Business Mgt Assistant 6/29/87

| Species | 1P | 2P | 3P | SP | 1S | 2S | 3S |
|---|---|---|---|---|---|---|---|
| D | 4 | 9 | 34 | 3 | | 10 | 40 |
| C | | | | | | 4 | 96 |
| A | | | | | | 42 | 58 |
| H | | | | | | 27 | 73 |
| WP | | | | | 49 | 25 | 26 |

*PAM sold at the rate of $2.63 per acre for 152 acres; per M figures for statistical purposes only.

** Pending submission of 44 & 45 Forms.

DISTRIBUTION: Orig. and 1cc to RO (orig. to WO), 1cc to RO of SBA
Previous edition of this form is obsolete.

FS-2400-17 (8/

# APPRAISAL SUMMARY

( 125.42)

SALE NAME: COZY 3 SUMMARY CHECKED BY: TABER DATE: 04/24/87

CARD TYPE 5

SPECIFIED RD CONST. (MILES) .0 (17-19) RECONSTRUCTION (MILES) .0 (20-22) PURCH CR LIM $ 0 (23-29) (INC. $ 0 FAR ***

PRODUCT: APPRAISED TO: HAUL (MILES) 36 (33-35) TEMP RD CONSTR (MILES) 1.2 (30-32) TEMP RD COST $ 6350 (36-42)

1 RANDLE, WASH

4 TACOMA, WASH BASIC DATA PERIOD: C.Y.1985R

X ADJ TO APPR BASE PERIOD: LBR: 1ST QTR 1987 FOR ALL SPECIES PLY: 1ST QTR 1987 FOR ALL SPECIES

CARD TYPE 6 / CARD TYPE 7

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 PRODUCT/UNIT | (14-15) | 1-1 | 1-1 | 1-1 | 4-1 | : UNIT OF MEASURE: 1 (16) | |
| 2 SPECIES | | D | C | A&C | PAM* | : | |
| 3 SPECIES CODE | (16-18) | 205 | 242 | 025 | 002 | :(T) TOTAL OR (A) AVERAGE: | |
| 4 % BY SPECIES | | 38.18% | 14.55% | 32.73% | 14.55% | : T | 100.0 % |
| 5 VOLUME | (19-25) | 2100 | 800 | 1800 | 800 | : T | 5500 (17-23) |
| 6 SELLING VALUE | | 482.43 | 496.09 | 289.01 | 309.38 | : A | 395.74 |
| 7 SV ADJUSTMENT, SCHEDULE 0587 | | 1.046 | 1.000 | 1.059 | 1.000 | : | |
| 8 ADJ SELLING VALUE | | 504.62 | 496.09 | 306.06 | 309.38 | : | |
| 9 CHIP & BYPRODUCTS | | 63.02 | 0.00 | 92.27 | 0.00 | : | |
| 10 SELLING VALUE L.S. | (26-31) | 567.64 | 496.09 | 398.33 | 309.38 | : A | 464.26 |
| 11 FALLING & BUCKING | | 14.23 | 14.23 | 14.23 | 5.21 | : A | 12.92 (24-28) |
| 12 SKIDDING | | 26.86 | 26.86 | 26.86 | 19.79 | : A | 25.83 (29-33) |
| 13 LOADING | | 8.37 | 8.37 | 8.37 | 7.11 | : A | 8.19 (34-38) |
| 14 SUBTOTAL, STUMP-TO-TRUCK | | 49.46 | 49.46 | 49.46 | 32.11 | : | |
| 15 HAUL & SCALE | | 30.97 | 30.97 | 30.97 | 54.90 | : A | 34.45 (39-42) |
| 16 ROAD MAINTENANCE CO-OP $6.53 | | 7.52 | 7.52 | 7.52 | 0.00 | : A | 6.43 (43-46) |
| 17 SUBTOTAL, TRANSPORTATION | | 38.49 | 38.49 | 38.49 | 54.90 | : | |
| 18 GENERAL LOGGING OVERHEAD | | 13.65 | 13.65 | 13.65 | 9.53 | : A | 13.05 (47-50) |
| 19 LOGGING DEPRECIATION | | 3.50 | 3.50 | 3.50 | 2.93 | : A | 3.42 (51-54) |
| 20 SUBTOTAL, ADMINISTRATIVE | | 17.15 | 17.15 | 17.15 | 12.46 | : | |
| 21 SLASH DISPOSAL (INC. 7.56 CO-OP) | | 24.37 | 24.37 | 24.37 | 0.00 | : A | 20.83 (55-58) |
| 22 EROSION CONTROL | | 2.73 | 2.73 | 2.73 | 0.00 | : A | 2.33 (59-62) |
| 23 SNAG DISPOSAL | | 0.00 | 0.00 | 0.00 | 0.00 | : A | .00 (63-66) |
| 24 FIRE & OTHER | | 0.63 | 0.63 | 0.63 | 0.54 | : A | .62 (67-70) |
| 25 SUBTOTAL, ENVIRONMENTAL PROTECTION | | 27.73 | 27.73 | 27.73 | 0.54 | : | |
| 26 TEMPORARY ROADS. | | 1.35 | 1.35 | 1.35 | 0.00 | : A | 1.15 (71-74) |
| 27 OTHER TEMPORARY DEVELOPMENTS | | 0.00 | 0.00 | 0.00 | 0.00 | : A | .00 (75-78) |
| 28 SUBTOTAL, TEMPORARY DEVELOPMENT | | 1.35 | 1.35 | 1.35 | 0.00 | : | |
| 29 SUBTOTAL, LOGGING COSTS | (32-36) | 134.18 | 134.18 | 134.18 | 100.01 | : A | 129.22 |
| 30 SPECIFIED ROAD COST (A10) | | 0.00 | 0.00 | 0.00 | 0.00 | : A | .00 |
| 31 TOTAL LOGGING COST L.S., SCHEDULE 0387 | | 134.18 | 134.18 | 134.18 | 100.01 | : A | 129.22 |
| 32 MFG. COST L.S. (INCL. PRODUCT HAUL) | | 240.22 | 199.98 | 184.68 | 204.89 | : A | 211.05 |
| 33 WASH STATE EXCISE TAX | | 7.70 | 6.35 | 2.35 | 0.03 | : A | 4.64 |
| 34 SUBTOTAL, MANUFACTURING | (37-41) | 247.92 | 206.33 | 187.03 | 204.92 | : A | 215.69 |
| 35 TOTAL PRODUCTION COST L.S. | | 382.10 | 340.51 | 321.21 | 304.93 | : A | 344.91 |
| 36 CONVERSION (10)-(35) | | 185.54 | 155.58 | 77.12 | 4.45 | : A | 119.36 |
| 37 P&R RATIO % NORMAL/ADVERTISED | | 10.00 | 10.00 | 10.00 | 10.00 | : NORM | 10.0 ADV 9.1 ** |
| 38 P&R MARGIN NORMAL/ADVERTISED | | 51.66 | 45.14 | 36.25 | 28.15 | : NORM | 42.25 ADV 38.73 ** |
| 39 INDICATED NET STUMPAGE (36)-(38) | | 133.88 | 110.44 | 40.87 | -23.70 | : A | 77.11 |
| 40 INDICATED ADVERTISED RATES (39)+(30) | | 133.88 | 110.44 | 40.87 | 0.50 | : T | 443466.00 |
| | | | | | | : A | 80.63 |
| 41 BASE RATES | | 19.85 | 15.85 | 15.85 | 0.50 | : A | 15.14 |
| 42 ADJUSTMENTS TO BASE RATES | | 0.00 | 0.00 | 0.00 | 0.00 | : A | .00 |
| 43 ADVERTISED RATES (40)+(42) | (42-47) | 133.88 | 110.44 | 40.87 | 0.50 | : T | 443466.00 |
| | | | | | | : A | 80.63 |
| 44 INDICATED STAT NET RATES(43)-(30) | | 133.88 | 110.44 | 40.87 | 0.50 | : A | 80.63 |
| 45 APPRAISED NET RATES | (48-53) | 133.88 | 110.44 | 40.87 | 0.50 | : A | 80.63 |
| 46 BASE INDICES | | 240.45 | 0.00 | 209.83 | 0.00 | : | |

T.O. 24.20

* PAM ACTUALLY APPRAISED AT $ 2.63,/ACRE FOR 152 ACRES.

FOREST SERVICE

REPORT OF TIMBER SALE
CONVERTIBLE AND NONCONVERTIBLE PRODUCTS
(Reference FSM 2[illegible]) Report FS-2400-A)

| | | | |
|---|---|---|---|
| REGION 06 (2-3) | FOREST Gifford Pinchot 03 (4-5) | DISTRICT (OR AREA) Randle 05 (6-7) SALE NUMBER 042 (8-10) | QTR.FY (11-13) 4 QTR. 88 YEAR |
| STATE 53 (14-15) | COUNTY Lewis 041 (16-18) | SALE NAME (19-44) TOWNLE 4 | Bulley Spaced Bidding |
| ACRES IN SALE 163 (49-55) | SIZE CLASS 7 | LEGAL DESCRIPTION (56-80) T13N,R9E,S8,W.M.S. | COMPARTMENT 5 9 0 3 (45-48) |
| BID DATE MO. 06 / DAY 03 / YR. 88 (14-15, 16-17, 18-19) | STATUS ** 9 (20) | SBA SET-ASIDE N (21) | APP. BASE PRD. 1 (22) 8 (23) 8 (24) |
| SALVAGE N (26) | PRICING METHOD 3 (27) | PLAN'D SAB COL $ 111,820 (28-34) | TERM. DATE 03 / 31 / 90 / (35-36, 37-38, 39-40) |
| CONT. NO. 077413 (47-57) | CONTRACT FORM 2400 6 (58-59) | CONTRACTING OFFICER 8 (60) | METHOD OF SALE A (61) |
| | | | ZONE 2 (25) |
| | | | CONTRACT DATE / / (41-42, 43-44, 45-46) |
| | | | REG. 36CFR221 6 (62) (63) |

| SPEC. | SPEC CODE (14-16) | PROD UNIT (17-18) | VOLUME | ADVERT. RATES $ | STAT. HIGH BIDDER $ (19-24) | HIGH BIDDER $ (25-30) | 2ND HIGH BIDDER $ (31-36) | 3RD HIGH BIDDER $ (37-42) | 4TH HIGH BIDDER $ (43-48) | 5TH HIGH BIDDER $ (49-54) | 6TH HIGH BIDDER $ (55-60) | 7TH HIGH BIDDER $ (61-66) | 8TH HIGH BIDDER $ (67-72) | 9TH HIGH BIDDER $ (73-78) | 10TH HIGH BIDDER $ | 11TH HIGH BIDDER $ | 12TH HIGH BIDDER $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D | 205 | 1-1 | 1,700 | 197.63 | 186.13 | 197.63 | 197.63 | 197.63 | 197.63 | | | | | | | | |
| C | 242 | 1-1 | 200 | 128.37 | 116.87 | 120.37 | 128.37 | 120.37 | 128.37 | | | | | | | | |
| H&O | 263 | 1-1 | 4,000 | 82.25 | 218.50 | 230.00 | 229.00 | 82.25 | 82.25 | | | | | | | | |
| *PAM | 002 | 4-1 | 1,700 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | | | | | | | | |
| TOTAL/AVER. | 1 | | 7,600 | 91.32 | 160.16 | 169.00 | | | | | | | | | | | |

Stewart

JUL 1988
Received
Timber Data Co

SUMMARY OF BIDDERS

| RANK (14-15) | NAME (16-40) | SBA CLASS (41) | IDENTIFICATION NUMBER (42-57) | TOTAL VALUE OF BID (58-69) |
|---|---|---|---|---|
| HIGH 1 | Pacific Lumber Sales Co | S | 050460 1033 | 1,285,045.00 |
| 2 | Stimson Lumber Co | L | 004000 475 | 1,281,045.00 |
| 3 | Max Hent Inc | S | 085396 575 | 694,045.00 |
| 4 | Hester Timber Div Co | L | 011005 | 694,045.00 |
| 5 | | | | |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |

2/4

I certify that I have personally examined the Bids submitted for this sale and that this is an accurate record thereof.

Diane L. Elledge
Administrative Officer

| Species | 1S | 2S | 3S | 4S | P | 1P | 2P | 3P | SP |
|---|---|---|---|---|---|---|---|---|---|
| | 1 | 32 | 18 | — | — | — | 12 | 36 | 1 |
| D | — | — | 100 | — | — | — | — | — | — |
| C | — | 64 | 36 | — | — | — | — | — | — |
| H | — | 60 | 40 | — | — | — | — | — | — |
| A | | | | | | | | | |

* PAM sold at the rate of $20.86 per acre for 163 acres; per M figures for statistical purposes only.

** Award pending EEO Compliance Review.

DISTRIBUTION: Orig. and 1cc to RO (orig. to WO), 1cc to RO of SBA

Previous edition of this form is obsolete.

FS-2400-17 (9/82)

L.

( 131.96) SUMMARY CHECKED BY SERYENA M. HILL DATE: 04/29/88

SALE NAME: ALE 4

CARD TYPE 5

SPECIFIED RD CONST (MILES) .6 (17-19) RECONSTRUCTION (MILES) 5.6 (20-22) PURCH CR LIM $ 67833 (23-29) (INC. $ 6166 P&R **)

HAUL (MILES) 28 (33-35) TEMP RD CONSTR (MILES) 1.0 (30-32) TEMP RD COST $ 8326 (36-42)

PRODUCT: APPRAISED TO:
1 MORTON WASH
4 TACOMA WASH

BASIC DATA PERIOD: C.Y.1986R PLI: MAR 1988
ADJ TO APPR BASE PERIOD: LBR: IC 1ST QTR 1988, ALL OTHERS MAR 1988

CARD TYPE 6 — CARD TYPE 7 — UNIT OF MEASURE: 1 (16)

| | | 1-1 | 1-1 | 1-1 | 4-1 | (T) TOTAL OR (A) AVERAGE: |
|---|---|---|---|---|---|---|
| 1 PRODUCT/UNIT | (14-15) | D | C | H&D | PAMP | |
| 2 SPECIES | (16-18) | 205 | 242 | 263 | 002 | T 100.0 % |
| 3 SPECIES CODE | | 22.37% | 2.63% | 52.63% | 22.37% | T 7600 (17-23) |
| 4 % BY SPECIES | (19-25) | 1700 | 200 | 4000 | 1700 | A 349.43 |
| 5 VOLUME | | 534.97 | 449.41 | 316.56 | 229.45 | |
| 6 SELLING VALUE | | 1.059 | 1.000 | 1.029 | 1.000 | |
| 7 SV ADJUSTMENT, SCHEDULE 0588 | | 566.53 | 449.41 | 325.74 | 229.45 | |
| 8 ADJ SELLING VALUE | | 47.39 | 0.00 | 65.56 | 0.00 | A 406.42 |
| 9 CHIP & BYPRODUCTS | (26-31) | 613.92 | 449.41 | 391.30 | 229.45 | A 11.69 (24-28) |
| 10 SELLING VALUE L.S. | | 13.75 | 13.75 | 13.75 | 4.53 | A 22.41 (29-33) |
| 11 FALLING & BUCKING | | 23.87 | 23.87 | 23.87 | 17.36 | A 9.32 (34-38) |
| 12 SKIDDING | | 9.64 | 9.64 | 9.64 | 8.19 | |
| 13 LOADING | | 47.26 | 47.26 | 47.26 | 30.08 | A 26.62 (39-42) |
| 14 SUBTOTAL, STUMP-TO-TRUCK | | 23.36 | 23.36 | 23.36 | 37.93 | A 1.03 (43-46) |
| 15 HAUL | | 1.33 | 1.33 | 1.33 | 0.00 | |
| 16 ROAD MAINTENANCE THIRD PARTY 0.15 | | 24.69 | 24.69 | 24.69 | 37.93 | A 12.92 (47-50) |
| 17 SUBTOTAL, TRANSPORTATION | | 13.84 | 13.84 | 13.84 | 9.71 | A 4.31 (51-54) |
| 18 GENERAL LOGGING OVERHEAD | | 4.47 | 4.47 | 4.47 | 3.77 | |
| 19 LOGGING DEPRECIATION | | 18.31 | 18.31 | 18.31 | 13.48 | A 18.55 (55-58) |
| 20 SUBTOTAL, ADMINISTRATIVE | | 23.89 | 23.89 | 23.89 | 0.00 | A 1.78 (59-62) |
| 21 SLASH DISPOSAL (INC. 7.02 CO-OP) | | 2.29 | 2.29 | 2.29 | 0.00 | A .00 (63-66) |
| 22 EROSION CONTROL | | 0.00 | 0.00 | 0.00 | 0.00 | A .59 (67-70) |
| 23 SNAG DISPOSAL | | 0.61 | 0.61 | 0.61 | 0.52 | |
| 24 MISC INCL FIRE PROT | | 26.79 | 26.79 | 26.79 | 0.52 | A 1.09 (71-74) |
| 25 SUBTOTAL, ENVIRONMENTAL PROTECTION | | 1.41 | 1.41 | 1.41 | 0.00 | A .00 (75-78) |
| 26 TEMPORARY ROADS | | 0.00 | 0.00 | 0.00 | 0.00 | |
| 27 OTHER TEMPORARY DEVELOPMENTS | | 1.41 | 1.41 | 1.41 | 0.00 | A 110.31 |
| 28 SUBTOTAL, TEMPORARY DEVELOPMENT | (32-36) | 118.46 | 118.46 | 118.46 | 82.01 | A 8.93 |
| 29 SUBTOTAL, LOGGING COSTS | | 11.50 | 11.50 | 11.50 | 0.00 | A 119.24 |
| 30 SPECIFIED ROAD COST (410) | | 129.96 | 129.96 | 129.96 | 82.01 | A 163.83 |
| 31 TOTAL LOGGING COST L.S., SCHEDULE 0588 | | 232.39 | 155.83 | 151.61 | 124.95 | A 4.91 |
| 32 MFG. COST L.S. (INCL. PRODUCT HAUL) | | 10.62 | 6.90 | 4.42 | 0.11 | A 168.73 |
| 33 WASH STATE EXCISE TAX | (37-41) | 243.01 | 162.73 | 156.03 | 125.06 | A 287.97 |
| 34 SUBTOTAL, MANUFACTURING | | 372.97 | 292.69 | 285.99 | 207.07 | A 118.45 |
| 35 TOTAL PRODUCTION COST L.S. | | 240.95 | 156.72 | 105.31 | 22.38 | NORM 10.0 ADV 10.0 ** |
| 36 CONVERSION (10)-(35) | | 10.00 | 10.00 | 10.00 | 10.00 | NORM 36.99 ADV 36.87 ** |
| 37 P&R RATIO % NORMAL/ADVERTISED | | 54.82 | 39.85 | 34.56 | 20.88 | A 82.28 |
| 38 P&R MARGIN NORMAL/ADVERTISED | | 186.13 | 116.87 | 70.75 | 1.50 | T 694045.00 |
| 39 INDICATED NET STUMPAGE (36)-(38) | | 197.63 | 128.37 | 82.25 | 2.00 | A 91.32 |
| 40 INDICATED ADVERTISED RATES (39)+(30) | | | | | | A 10.71 |
| | | 20.00 | 20.00 | 10.00 | 2.00 | A .00 |
| 41 BASE RATES | | 0.00 | 0.00 | 0.00 | 0.00 | T 694045.00 |
| 42 ADJUSTMENTS TO BASE RATES | (42-47) | 197.63 | 128.37 | 82.25 | 2.00 | A 91.32 |
| 43 ADVERTISED RATES (40)+(42) | | | | | | A 82.39 |
| | | 186.13 | 116.87 | 70.75 | 2.00 | A 82.39 |
| 44 INDICATED STAT NET RATES(43)-(30) | (48-53) | 186.13 | 116.87 | 70.75 | 2.00 | |
| 45 APPRAISED NET RATES | | 274.97 | 0.00 | 225.51 | 0.00 | |
| 46 BASE INDICES | | | | | | |

* PAM ACTUALLY APPRAISED AT $ 20.86,/ACRE FOR 163 ACRES.

T.D. .50

13

FOREST SERVICE

REPORT TIMBER SALE
CONVERTIBLE AND NONCONVERTIBLE PRODUCTS
(Reference FSM 2490, Report FS-2400-A)

REGION 0 6 | FOREST Gifford Pinchot 0 3 | DISTRICT (OR AREA) Randle 0 5 | SALE NUMBER 0 1 9 | QTR.FY (11-13) 2 QTR. 8 9 YEAR

STATE 5 3 | COUNTY Skamania 0 5 9 | SALE NAME (19-44) HOLDAWAY 2

ACRES IN SALE 83 (19-55) | SIZE CLASS I | LEGAL DESCRIPTION (56-80) T9N, R8E, S8, 9, 16 WMU | COMPARTMENT 5 5 0 1

BID DATE NO. 02 / DAY 24 / YR. 89 | STATUS ** 5 | SBA SET-ASIDE N | APP. BASE PRD. 6 8 9 | ZONE 2

SALVAGE N | PRICING METHOD 3 | PLAN'D SAB COL. $ 91,481 (28-34) | TERM. DATE 03 / 31 / 92 | CONTRACT DATE __/__/__

CONT. NO. 077835 (47-57) | CONTRACT FORM 2400 6 | CONTRACTING OFFICER R | METHOD OF SALE 1 | REG. 36CFR221 6

| SPEC. | SPEC CODE (14-16) | PROD UNIT (17-18) | VOLUME | ADVERT RATES $ | STAT. HIGH BIDDER $ (19-24) | HIGH BIDDER $ (25-30) | 2ND HIGH BIDDER $ (31-36) | 3RD HIGH BIDDER $ (37-42) | 4TH HIGH BIDDER $ (43-48) | 5TH HIGH BIDDER $ (49-54) | 6TH HIGH BIDDER $ (55-60) | 7TH HIGH BIDDER $ (61-66) | 8TH HIGH BIDDER $ (67-72) | 9TH HIGH BIDDER $ (73-78) | 10TH HIGH BIDDER $ | 11TH HIGH BIDDER $ | 12TH HIGH BIDDER $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D | 205 | 1-1 | 2,200 | 214.92 | 327.63 | 350.00 | 300.00 | 400.00 | 214.92 | 214.92 | | | | | | | |
| A&O | 025 | 1-1 | 2,600 | 81.90 | 237.63 | 260.00 | 302.00 | 200.00 | 81.90 | 81.90 | | | | | | | |
| *PAM | 002 | 4-1 | 1,200 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | 2.00 | | | | | | | |
| TOTAL/AVER. | 1 | | 6,000 | 114.69 | 223.50 | 241.40 | | | | | | | | | | | |

SUMMARY OF BIDDERS

| RANK (14-15) | NAME (16-40) 3/5 | SBA CLASS (41) | IDENTIFICATION NUMBER (42-57) | TOTAL VALUE OF BID (58-69) |
|---|---|---|---|---|
| HIGH 1 | Pacific Lumber Sales Co | S | 060460/035 614 | 1 448 400.00 |
| 2 | Wescor Forest Prod | N | 043910 5239 | 1 447 600.00 |
| 3 | Max West Inc | S | 085396 575 | 1 402 400.00 |
| 4 | Western Timber DIV | L | 011805 | 688 164.00 |
| 5 | Stimson Lumber | L | 004000 | 688 164.00 |
| 6 | | | | |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |

I certify that I have personally examined the Bids submitted for this sale and that this is an accurate record thereof.

Buddy S. Rose
Forestry Tech. 2/24/89

| Species | 1S | 2S | 3S | 4S | P | 1P | 2P | 3P | SP |
|---|---|---|---|---|---|---|---|---|---|
| D | | 54 | 27 | | | | 1 | 17 | 1 |
| A | | 56 | 44 | | | | | | |
| H | 2 | 45 | 53 | | | | | | |
| NF | 18 | 42 | 25 | 15 | | | | | |
| C | | | 100 | | | | | | |
| YC | | | 100 | | | | | | |

MAR 13 1989

Stars #84037

* PAM sold at the rate of $28.92 per acre for 83 acres; per M figures for statistical purposes only.

** Pending Appeal

DISTRIBUTION: Orig. and 1cc to RO (orig. to WO), 1cc to RO of SBA

( 103.61)

SUMMAF CHECKED BY: BERTENA M. HILL DATE: 01/05/89

SALE NE: HOLDAWAY2

CARD TYPE 5

SPECIFIED RD CONST (MILES) .3 (17-19) RECONSTRUCTION (MILES) 9.8 (20-22) PURCH CR LIM $ 107368 (23-29) (INC. $ 9760 P&H **)

HAUL (MILES) 42 (33-35) TEMP RD CONSTR (MILES) .5 (30-32) TEMP RD COST $ 5758 (36-42)

PRODUCT: APPRAISED TO:
1 RANDLE
4 TACOMA

BASIC DATA PERIOD: C.Y.1986R
ADJ TO APPR BASE PERIOD: LBR: IC 3RD QTR 1988, ALL OTHERS SEP 1988 PLY: SEP 1988

CARD TYPE 6

| | | | | |
|---|---|---|---|---|
| 1 PRODUCT/UNIT | (14-15) | 1-1 | 1-1 | 4-1 |
| 2 SPECIES | | D | AAO | PAH* |
| 3 SPECIES CODE | (16-18) | 205 | 025 | 002 |
| 4 % BY SPECIES | | 36.67% | 43.33% | 20.00% |
| 5 VOLUME | (19-25) | 2200 | 2600 | 1200 |
| 6 SELLING VALUE | | 433.52 | 326.32 | 230.72 |
| 7 SV ADJUSTMENT, SCHEDULE 1188 | | 1.113 | 1.041 | 1.000 |
| 8 ADJ SELLING VALUE | | 482.51 | 339.70 | 230.72 |
| 9 CHIP & BYPRODUCTS | | 43.53 | 42.93 | 0.00 |
| 10 SELLING VALUE L.S. | (26-31) | 526.04 | 382.63 | 230.72 |
| 11 FALLING & BUCKING | | 13.00 | 13.00 | 3.69 |
| 12 SKIDDING | | 16.11 | 16.11 | 10.40 |
| 13 LOADING | | 6.91 | 6.91 | 5.53 |
| 14 SUBTOTAL, STUMP-TO-TRUCK | | 36.02 | 36.02 | 19.62 |
| 15 HAUL AND SCALE | | 29.87 | 29.87 | 52.50 |
| 16 ROAD MAINTENANCE FS CO-OP $10.66 | | 12.30 | 12.30 | 0.00 |
| 17 SUBTOTAL, TRANSPORTATION | | 42.17 | 42.17 | 52.50 |
| 18 GENERAL LOGGING OVERHEAD | | 13.35 | 13.35 | 9.89 |
| 19 LOGGING DEPRECIATION | | 5.10 | 5.10 | 4.29 |
| 20 SUBTOTAL, ADMINISTRATIVE | | 18.45 | 18.45 | 14.18 |
| 21 SLASH DISPOSAL (INC. 3.19 CO-OP) | | 10.58 | 10.58 | 0.00 |
| 22 EROSION CONTROL | | 1.43 | 1.43 | 0.00 |
| 23 SNAG DISPOSAL | | 0.00 | 0.00 | 0.00 |
| 24 MISC INCL FIRE PROT | | 0.63 | 0.63 | 0.50 |
| 25 SUBTOTAL, ENVIRONMENTAL PROTECTION | | 12.64 | 12.64 | 0.50 |
| 26 TEMPORARY ROADS | | 1.20 | 1.20 | 0.00 |
| 27 OTHER TEMPORARY DEVELOPMENTS | | 0.00 | 0.00 | 0.00 |
| 28 SUBTOTAL, TEMPORARY DEVELOPMENT | | 1.20 | 1.20 | 0.00 |
| 29 SUBTOTAL, LOGGING COSTS | (32-36) | 110.48 | 110.48 | 86.80 |
| 30 SPECIFIED ROAD COST (410) | | 22.37 | 22.37 | 0.00 |
| 31 TOTAL LOGGING COST L.S., SCHEDULE 1188 | | 132.85 | 132.85 | 86.80 |
| 32 MFG. COST L.S. (INCL. PRODUCT HAUL) | | 144.07 | 153.38 | 123.53 |
| 33 WASH STATE EXCISE TAX | | 10.74 | 4.09 | 0.10 |
| 34 SUBTOTAL, MANUFACTURING | (37-41) | 154.81 | 157.47 | 123.63 |
| 35 TOTAL PRODUCTION COST L.S. | | 287.66 | 290.32 | 210.43 |
| 36 CONVERSION (10)-(35) | | 238.38 | 92.31 | 20.29 |
| 37 P&R RATIO % NORMAL/ADVERTISED | | 10.00 | 10.00 | 10.00 |
| 38 P&R MARGIN NORMAL/ADVERTISED | | 45.83 | 32.78 | 21.00 |
| 39 INDICATED NET STUMPAGE (36)-(38) | | 192.55 | 59.53 | -0.71 |
| 40 INDICATED ADVERTISED RATES (39)+(30) | | 214.92 | 81.90 | 2.00 |
| 41 BASE RATES | | 20.81 | 13.89 | 2.00 |
| 42 ADJUSTMENTS TO BASE RATES | | 0.00 | 0.00 | 0.00 |
| 43 ADVERTISED RATES (40)+(42) | (42-47) | 214.92 | 81.90 | 2.00 |
| 44 INDICATED STAT NET RATES(43)-(30) | | 192.55 | 59.53 | 2.00 |
| 45 APPRAISED NET RATES | (48-53) | 192.55 | 59.53 | 2.00 |
| 46 BASE INDICES | | 276.35 | 230.06 | 0.00 |

* PAH ACTUALLY APPRAISED AT $ 28.92./ACRE FOR 83 ACRES.

CARD TYPE 7

UNIT OF MEASURE: 1 (16)

(T) TOTAL OR (A) AVERAGE:

| | | |
|---|---|---|
| T | 100.0 % | |
| T | 6000 | (17-23) |
| A | 346.51 | |
| A | 404.83 | |
| A | 11.14 | (24-28) |
| A | 14.97 | (29-33) |
| A | 6.63 | (34-38) |
| A | 34.40 | (39-42) |
| A | 9.84 | (43-46) |
| A | 12.66 | (47-50) |
| A | 4.94 | (51-54) |
| A | 8.46 | (55-58) |
| A | 1.14 | (59-62) |
| A | .00 | (63-66) |
| A | .60 | (67-70) |
| A | .96 | (71-74) |
| A | .00 | (75-78) |
| A | 105.74 | |
| A | 17.90 | |
| A | 123.64 | |
| A | 144.00 | |
| A | 5.73 | |
| A | 149.73 | |
| A | 273.37 | |
| A | 131.47 | |
| NORM | 10.0 | ADV 9.8 ** |
| NORM | 36.04 | ADV 36.30 ** |
| A | 96.26 | |
| T | 688164.00 | |
| A | 114.69 | |
| A | 14.05 | |
| A | .00 | |
| T | 688164.00 | |
| A | 114.69 | |
| A | 96.80 | |
| A | 96.80 | |

14 41 22

FOREST SERVICE

REPORT OF TIMBER SALE
CONVERTIBLE AND NONCONVERTIBLE PRODUCTS
(Reference FSM 2490. Report FS-2400-A)

REGION 0 6 (2 3)
FOREST Gifford Pinchot 0 3 (4 5)
DISTRICT (OR AREA) Randle 0 5 (6 7)
SALE NUMBER 0 2 0 (8 9 10)
QTR.FY (11-13) 2 QTR. 8 9 YEAR

STATE 5 3 (14 15)
COUNTY Lewis 0 4 1 (16 17 18)
SALE NAME (19-44) SILVER 7

ACRES IN SALE 108 (49-55)
SIZE CLASS L
LEGAL DESCRIPTION (56-80) S9,T13N,R6E,WMD
COMPARTMENT 5 1 0 (45 46 47)

BID DATE MO. 02 / DAY 24 / YR. 89 / (14-15 16-17 18-19)
STATUS 5** (20)
SBA SET-ASIDE N (21)
APP. BASE PRD. 6 8 8 (22 23 24)
ZONE 2 2

SALVAGE N (26)
PRICING METHOD 3 (27)
PLAN'D SAB COL $ 60,558 (28-34)
TERM. DATE 03 / 31 / 91 / (35-36 37-38 39-40)
CONTRACT DATE / / (41-42 43-44 45-)

CONT. NO. 077827 (47-57)
CONTRACT FORM 2400 6 (58 59)
CONTRACTING OFFICER N (60)
METHOD OF SALE 4 (61)
REG. 36CFR221 6 (62) 6

| SPEC. | SPEC CODE (14-16) | PROD UNIT (17-18) | VOLUME | ADVERT RATES $ | STAT. HIGH BIDDER $ (19-24) | HIGH BIDDER $ (25-30) | 2ND HIGH BIDDER $ (31-36) | 3RD HIGH BIDDER $ (37-42) | 4TH HIGH BIDDER $ (43-48) | 5TH HIGH BIDDER $ (49-54) | 6TH HIGH BIDDER $ (55-60) | 7TH HIGH BIDDER $ (61-66) | 8TH HIGH BIDDER $ (67-72) | 9TH HIGH BIDDER $ (73-78) | 10TH HIGH BIDDER $ | 11TH HIGH BIDDER $ | 12TH HIGH BIDDER $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D | 205 | 1-1 | 2,400 | 216.13 | 365.13 | 367.00 | 361.00 | 375.00 | 217.00 | 216.13 | 216.13 | | | | | | |
| HAO | 263 | 1-1 | 3,100 | 71.27 | 346.63 | 348.50 | 353.00 | 225.00 | 80.00 | 71.27 | 71.27 | | | | | | |
| *PAM | 002 | 4-1 | 1,200 | 8.42 | 8.42 | 8.42 | 8.42 | 8.42 | 8.42 | 8.42 | 8.42 | | | | | | |
| TOTAL/AVER. | 1 | | 6,700 | 111.90 | 292.68 | 294.22 | | | | | | | | | | | |

SUMMARY OF BIDDERS

| RANK (14-15) | NAME (16-40) | SBA CLASS (41) | IDENTIFICATION NUMBER (42-57) | TOTAL VALUE OF BID (58-69) |
|---|---|---|---|---|
| HIGH 1 | Pacific Lumber Sales Co | S | 060460 /033 514 | 1,971,254.00 |
| 2 | Wescor Forest Prod | N | 043910 5239 | 1,970,804.00 |
| 3 | Max West, Inc | S | 085396 575 | 1,607,604.00 |
| 4 | B L Logging | N | 046660 | 778,904.00 |
| 5 | Stimson Lumber | L | 004000 | 749,753.00 |
| 6 | Western Timber Div | L | 011805 | 749,753.00 |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |

I certify that I have personally examined the Bids submitted for this sale and that this is an accurate record thereof.

Buddy D. Rose
FORESTRY TECHNICIAN 2/24/89

| Species | 1S | 2S | 3S | 4S | P | 1P | 2P | 3P | 8P |
|---|---|---|---|---|---|---|---|---|---|
| D | — | 54 | 17 | — | — | — | 3 | 25 | 1 |
| H | — | 34 | 66 | — | — | — | — | — | — |
| WF | 8 | 71 | 15 | — | — | 6 | — | — | — |
| A | — | 57 | 43 | — | — | — | — | — | — |

* PAM sold at the rate of $93.56 per acre for 108 acres; per M figures for statistical purposes only.
STARS # 84070

MAR 13 1989

** Pending Appeal.

DISTRIBUTION: Orig. and 1cc to RO (orig. to WO), 1cc to RO of SBA

1.

# APPRAISAL SUMMARY
( 104.70)

SA. NAME: SILVER T    SUM. CHECKED BY: BERTENA M. HILL    DATE: 01/06/89

--- CARD TYPE 5 ---

SPECIFIED RD CONST (MILES) .0 (17-19)    RECONSTRUCTION (MILES) .3 (20-22)    PURCH CR LIM $ 10299 (23-29) (INC. $ 936 P&R **)

PRODUCT: APPRAISED TO:    HAUL (MILES) 30 (33-35)    TEMP RD CONSTR (MILES) 1.5 (30-32)    TEMP RD COST $ 9465 (36-42)

1 MORTON, WASH
4 TACOMA, WASH

BASIC DATA PERIOD: C.Y.1986R
ADJ TO APPR BASE PERIOD: LBR: IC 3RD QTR 1988, ALL OTHERS SEP 1988    PLY: SEP 1988

--- CARD TYPE 6 --- | --- CARD TYPE 7 ---

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 1 | PRODUCT/UNIT | (14-15) | 1-1 | 1-1 | 4-1 | : | UNIT OF MEASURE: 1 (16) |
| 2 | SPECIES | | D | H&O | PAMP | : | |
| 3 | SPECIES CODE | (16-18) | 205 | 263 | 002 | :(T) | TOTAL OR (A) AVERAGE: |
| 4 | $ BY SPECIES | | 35.82% | 46.27% | 17.91% | : T | 100.0 $ |
| 5 | VOLUME | (19-25) | 2400 | 3100 | 1200 | : T | 6700 (17-23) |
| 6 | SELLING VALUE | | 429.60 | 301.39 | 230.79 | : A | 334.67 |
| 7 | SV ADJUSTMENT, SCHEDULE 1188 | | 1.113 | 1.041 | 1.000 | : | |
| 8 | ADJ SELLING VALUE | | 478.14 | 313.75 | 230.79 | : | |
| 9 | CHIP & BYPRODUCTS | | 43.53 | 46.51 | 0.00 | : | |
| 10 | SELLING VALUE L.S. | (26-31) | 521.67 | 360.26 | 230.79 | : A | 394.89 |
| 11 | FALLING & BUCKING | | 11.03 | 11.03 | 3.49 | : A | 9.68 (24-28) |
| 12 | SKIDDING | | 16.75 | 16.75 | 10.20 | : A | 15.58 (29-33) |
| 13 | LOADING | | 6.45 | 6.45 | 5.48 | : A | 6.28 (34-38) |
| 14 | SUBTOTAL, STUMP-TO-TRUCK | | 34.23 | 34.23 | 19.17 | : | |
| 15 | HAUL AND SCALE | | 22.75 | 22.75 | 43.26 | : A | 26.42 (39-42) |
| 16 | ROAD MAINTENANCE FS CO-OP DEP 7.20 | | 7.73 | 7.73 | 0.00 | : A | 6.35 (43-46) |
| 17 | SUBTOTAL, TRANSPORTATION | | 30.48 | 30.48 | 43.26 | : | |
| 18 | GENERAL LOGGING OVERHEAD | | 13.35 | 13.35 | 9.92 | : A | 12.74 (47-50) |
| 19 | LOGGING DEPRECIATION | | 5.30 | 5.30 | 4.53 | : A | 5.16 (51-54) |
| 20 | SUBTOTAL, ADMINISTRATIVE | | 18.65 | 18.65 | 14.45 | : | |
| 21 | SLASH DISPOSAL (INC. 5.54 CO-OP) | | 14.87 | 14.87 | 0.00 | : A | 12.21 (55-58) |
| 22 | EROSION CONTROL | | 1.61 | 1.61 | 0.00 | : A | 1.32 (59-62) |
| 23 | SNAG DISPOSAL | | 0.00 | 0.00 | 0.00 | : A | .00 (63-66) |
| 24 | MISC INCL FIRE PROT | | 0.63 | 0.63 | 0.54 | : A | .61 (67-70) |
| 25 | SUBTOTAL, ENVIRONMENTAL PROTECTION | | 17.11 | 17.11 | 0.54 | : | |
| 26 | TEMPORARY ROADS | | 1.72 | 1.72 | 0.00 | : A | 1.41 (71-74) |
| 27 | OTHER TEMPORARY DEVELOPMENTS | | 0.00 | 0.00 | 0.00 | : A | .00 (75-78) |
| 28 | SUBTOTAL,TEMPORARY DEVELOPMENT | | 1.72 | 1.72 | 0.00 | : | |
| 29 | SUBTOTAL, LOGGING COSTS | (32-36) | 102.19 | 102.19 | 77.42 | : A | 97.76 |
| 30 | SPECIFIED ROAD COST (A10) | | 1.87 | 1.87 | 0.00 | : A | 1.54 |
| 31 | TOTAL LOGGING COST L.S., SCHEDULE 1188 | | 104.06 | 104.06 | 77.42 | : A | 99.30 |
| 32 | MFG. COST L.S. (INCL. PRODUCT HAUL) | | 145.24 | 150.63 | 123.53 | : A | 143.85 |
| 33 | WASH STATE EXCISE TAX | | 10.81 | 3.56 | 0.42 | : A | 5.60 |
| 34 | SUBTOTAL, MANUFACTURING | (37-41) | 156.05 | 154.19 | 123.95 | : A | 149.44 |
| 35 | TOTAL PRODUCTION COST L.S. | | 260.11 | 258.25 | 201.37 | : A | 248.74 |
| 36 | CONVERSION (10)-(35) | | 261.56 | 102.01 | 29.42 | : A | 146.16 |
| 37 | P&R RATIO $ NORMAL/ADVERTISED | | 10.00 | 10.00 | 10.00 | : NORM | 10.0 ADV 10.0 ** |
| 38 | P&R MARGIN NORMAL/ADVERTISED | | 47.30 | 32.61 | 21.00 | : NORM | 35.93 ADV 35.93 ** |
| 39 | INDICATED NET STUMPAGE (36)-(38) | | 214.26 | 69.40 | 8.42 | : A | 110.37 |
| 40 | INDICATED ADVERTISED RATES (39)+(30) | | 216.13 | 71.27 | 8.42 | : T | 749753.00 |
| | | | | | | : A | 111.90 |
| 41 | BASE RATES | | 20.00 | 11.61 | 2.00 | : A | 12.89 |
| 42 | ADJUSTMENTS TO BASE RATES | | 0.00 | 0.00 | 0.00 | : A | .00 |
| 43 | ADVERTISED RATES (40)+(42) | (42-47) | 216.13 | 71.27 | 8.42 | : T | 749753.00 |
| | | | | | | : A | 111.90 |
| 44 | INDICATED STAT NET RATES(43)-(30) | | 214.26 | 69.40 | 8.42 | : A | 110.37 |
| 45 | APPRAISED NET RATES | (48-53) | 214.26 | 69.40 | 8.42 | A | 110.37 |
| 46 | BASE INDICES | | 276.35 | 230.06 | 0.00 | | |

FOREST SR. CR 15

REPORT TIMBER SALE
CONVERTIBLE AT UNCONVERTIBLE PRODUCTS
(Reference FSM 2490, Report FS-2400-A)

| | | | |
|---|---|---|---|
| REGION 0 6 (2 3) | FOREST Gifford Pinchot 0 3 (4 5) | DISTRICT (OR AREA) Randle 0 5 (6 7) SALE NUMBER 0 2 5 (8 9 10) | QTR.FY (11-13) 2/ QTR. — 8 9 YEAR |
| STATE 5 3 (14 15) | COUNTY Skamania 0 5 9 (16 17 18) | SALE NAME (19-44) POLAR 2 | |
| ACRES IN SALE 123 (49-55) | SIZE CLASS 7 | LEGAL DESCRIPTION (56-80) T10N,R6E, S5 & 6 WMS | COMPARTMENT 5 2 0 4 (45 46 47 48) |
| BID DATE MO. 01 / DAY 20 / YR. 89 / (14-15 16-17 18-19) | STATUS ** 9 (20) | SBA SET-ASIDE N (21) / APP. BASE PRD. 6 — 8 8 (22 23 24) | ZONE 2 (25) |
| SALVAGE N (26) | PRICING METHOD 3 (27) | PLAN'D SAB COL $67,040. (28-34) / TERM. DATE 03 / 31 / 92 / (35-36 37-38 39-40) | CONTRACT DATE __/__/__/ (41-42 43-44 45-46) |
| CONT. NO. 077843 (47-57) | CONTRACT FORM 2400 6 __ (58 59) | CONTRACTING OFFICER 9 (60) / METHOD OF SALE 4 (61) | REG. 36CFR221 6 __ (62 63) |

| SPEC. | SPEC CODE 14-16 | PROD UNIT 17-18 | VOLUME | ADVERT RATES $ | STAT. HIGH BIDDER $ 19-24 | HIGH BIDDER $ 25-30 | 2ND HIGH BIDDER $ 31-36 | 3RD HIGH BIDDER $ 37-42 | 4TH HIGH BIDDER $ 43-48 | 5TH HIGH BIDDER $ 49-54 | 6TH HIGH BIDDER $ 55-60 | 7TH HIGH BIDDER $ 61-66 | 8TH HIGH BIDDER $ 67-72 | 9TH HIGH BIDDER $ 73-78 | 10TH HIGH BIDDER $ | 11TH HIGH BIDDER $ | 12TH HIGH BIDDER $ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| D | 205 | 1-1 | 3,500 | 253.53 | 577.87 | 607.50 | 400.00 | 455.00 | 365.00 | 254.00 | 253.53 | | | | | | |
| C | 242 | 1-1 | 300 | 148.99 | 119.36 | 148.99 | 148.99 | 148.99 | 148.99 | 148.99 | 148.99 | | | | | | |
| HAO | 263 | 1-1 | 4,200 | 89.01 | 192.62 | 222.25 | 395.00 | 200.00 | 206.00 | 89.01 | 89.01 | | | | | | |
| PAM | 002 | 4-1 | 1,300 | 12.32 | 12.32 | 12.32 | 12.32 | 12.32 | 12.32 | 12.32 | 12.32 | | | | | | |
| TOTAL/AVER. | 1 | | 9,300 | 142.14 | 310.04 | 335.53 | | | | | | | | | | | |

SUMMARY OF BIDDERS

| RANK 1-15 | NAME 16-40 (5/6) | SBA CLASS 41 | IDENTIFICATION NUMBER 42-57 | TOTAL VALUE OF BID 58-69 |
|---|---|---|---|---|
| HIGH 1 | Stimson Lumber | L | 004000 425 | 3,120,413.00 |
| 2 | Wescor Forest Prod | N | 043910 5239 | 3,119,713.00 |
| 3 | Max West, Inc | S | 085396 575 | 2,493,213.00 |
| 4 | Western Timber Div | L | 011805 | 2,203,413.00 |
| 5 | Brazier For Prod of Ore | S | 009510 | 1,323,555.00 |
| 6 | Pacific Lumber Sales CO | S | 060460 | 1,321,910.00 |
| 7 | | | | |
| 8 | | | | |
| 9 | | | | |
| 10 | | | | |
| 11 | | | | |
| 12 | | | | |

I certify that I have personally examined the Bids submitted for this sale and that this is an accurate record thereof.

Diane L. Eledge
Admin. Officer 3-20-89

| Species | 1S | 2S | 3S | 4S | P | 1P | 2P | 3P | 8P |
|---|---|---|---|---|---|---|---|---|---|
| D | | 22 | 22 | | | | 7 | 48 | 1 |
| C | | 20 | 80 | | | | | | |
| H | 1 | 63 | 36 | | | | | | |
| A | | 19 | 81 | | | | | | |
| MF | 22 | 20 | 33 | 25 | | | | | |

* PAM sold at the rate of $130.21 per acre for 123 acres; per M figures for statistical purposes only.

** Award Pending EEO Compliance Review.

DISTRIBUTION: Orig. and 1cc to RO (orig. to WO), 1cc to RO of SBA

( 107.97)

SUM CHECKED BY: BERTENA H. HILL DATE: 02/08/89

SAL NAME: POLAR 2

CARD TYPE 5

SPECIFIED RD CONST (MILES) 3.8 (17-19) RECONSTRUCTION (MILES) .0 (20-22) PURCH CR LIM $ 237046 (23-29) (INC. $ 21549 P&H **)

HAUL (MILES) 23 (33-35) TEMP RD CONSTR (MILES) .2 (30-32) TEMP RD COST $ 3214 (36-42)

PRODUCT: APPRAISED TO:
1 RANDLE WASH
4 TACOMA WASH

BASIC DATA PERIOD: C.Y.1987
ADJ TO APPR BASE PERIOD: LBR: IC 4TH QTR 1988, ALL OTHERS DEC 1988 PLI: DEC 1988

CARD TYPE 6 / CARD TYPE 7 — UNIT OF MEASURE: 1 (16) — (T) TOTAL OR (A) AVERAGE:

| | | | | | | | Card Type 7 |
|---|---|---|---|---|---|---|---|
| 1 | PRODUCT/UNIT | (14-15) | 1-1 | 1-1 | 1-1 | 4-1 | |
| 2 | SPECIES | | D | C | BAO | PAM* | |
| 3 | SPECIES CODE | (16-18) | 205 | 242 | 263 | 002 | |
| 4 | % BY SPECIES | | 37.63% | 3.23% | 45.16% | 13.98% | T 100.0 % |
| 5 | VOLUME | (19-25) | 3500 | 300 | 4200 | 1300 | T 9300 (17-23) |
| 6 | SELLING VALUE | | 471.12 | 449.55 | 318.31 | 235.88 | A 368.53 |
| 7 | SV ADJUSTMENT, SCHEDULE 0289 | | 1.080 | 1.000 | 1.020 | 1.000 | |
| 8 | ADJ SELLING VALUE | | 508.81 | 449.55 | 324.68 | 235.88 | |
| 9 | CHIP & BYPRODUCTS | | 43.53 | 0.00 | 46.51 | 0.00 | |
| 10 | SELLING VALUE L.S. | (26-31) | 552.34 | 449.55 | 371.19 | 235.88 | A 422.98 |
| 11 | FALLING & BUCKING | | 9.79 | 9.79 | 9.19 | 3.18 | A 8.87 (24-28) |
| 12 | SKIDDING | | 14.25 | 14.25 | 14.25 | 9.34 | A 13.56 (29-33) |
| 13 | LOADING | | 6.28 | 6.28 | 6.28 | 5.33 | A 6.15 (34-38) |
| 14 | SUBTOTAL, STUMP-TO-TRUCK | | 30.32 | 30.32 | 30.32 | 17.85 | |
| 15 | HAUL | | 23.28 | 23.28 | 23.28 | 46.43 | A 26.52 (39-42) |
| 16 | ROAD MAINTENANCE FS CO-OP DEP 7.09 | | 7.44 | 7.44 | 7.44 | 0.00 | A 6.40 (43-46) |
| 17 | SUBTOTAL, TRANSPORTATION | | 30.72 | 30.72 | 30.72 | 46.43 | |
| 18 | GENERAL LOGGING OVERHEAD | | 12.00 | 12.00 | 12.00 | 8.91 | A 11.57 (47-50) |
| 19 | LOGGING DEPRECIATION | | 4.93 | 4.93 | 4.93 | 4.21 | A 4.83 (51-54) |
| 20 | SUBTOTAL, ADMINISTRATIVE | | 16.93 | 16.93 | 16.93 | 13.12 | |
| 21 | SLASH DISPOSAL (INC. 4.46 CO-OP) | | 11.53 | 11.53 | 11.53 | 0.00 | A 9.92 (55-58) |
| 22 | EROSION CONTROL | | 2.98 | 2.98 | 2.98 | 0.00 | A 2.56 (59-62) |
| 23 | SNAG DISPOSAL | | 0.00 | 0.00 | 0.00 | 0.00 | A .00 (63-66) |
| 24 | MISC INCL FIRE PROT | | 0.63 | 0.63 | 0.63 | 0.54 | A .62 (67-70) |
| 25 | SUBTOTAL, ENVIRONMENTAL PROTECTION | | 15.14 | 15.14 | 15.14 | 0.54 | |
| 26 | TEMPORARY ROADS | | 0.40 | 0.40 | 0.40 | 0.00 | A .34 (71-74) |
| 27 | OTHER TEMPORARY DEVELOPMENTS | | 0.00 | 0.00 | 0.00 | 0.00 | A .00 (75-78) |
| 28 | SUBTOTAL, TEMPORARY DEVELOPMENT | | 0.40 | 0.40 | 0.40 | 0.00 | |
| 29 | SUBTOTAL, LOGGING COSTS | (32-36) | 93.51 | 93.51 | 93.51 | 77.94 | A 91.34 |
| 30 | SPECIFIED ROAD COST (A10) | | 29.63 | 29.63 | 29.63 | 0.00 | A 25.49 |
| 31 | TOTAL LOGGING COST L.S., SCHEDULE 1188 | | 123.14 | 123.14 | 123.14 | 77.94 | A 116.83 |
| 32 | MFG. COST L.S. (INCL. PRODUCT HAUL) | | 145.05 | 161.39 | 153.14 | 123.53 | A 146.22 |
| 33 | WASH STATE EXCISE TAX | | 12.68 | 7.45 | 4.45 | 0.62 | A 7.11 |
| 34 | SUBTOTAL, MANUFACTURING | (37-41) | 157.73 | 168.84 | 157.59 | 124.15 | A 153.33 |
| 35 | TOTAL PRODUCTION COST L.S. | | 280.87 | 291.98 | 280.73 | 202.09 | A 270.16 |
| 36 | CONVERSION (10)-(35) | | 271.47 | 157.57 | 90.46 | 33.79 | A 152.83 |
| 37 | P&R RATIO % NORMAL/ADVERTISED | | 10.00 | 10.00 | 10.00 | 10.00 | NORM 10.0 ADV 10.0 ** |
| 38 | P&R MARGIN NORMAL/ADVERTISED | | 47.57 | 38.21 | 31.08 | 21.47 | NORM 38.49 ADV 38.50 ** |
| 39 | INDICATED NET STUMPAGE (36)-(38) | | 223.90 | 119.36 | 59.38 | 12.32 | A 116.65 |
| 40 | INDICATED ADVERTISED RATES (39)+(30) | | 253.53 | 148.99 | 89.01 | 12.32 | T 1321910.00 |
| | | | | | | | A 142.14 |
| 41 | BASE RATES | | 20.00 | 20.00 | 10.48 | 2.00 | A 13.18 |
| 42 | ADJUSTMENTS TO BASE RATES | | 0.00 | 0.00 | 0.00 | 0.00 | A .00 |
| 43 | ADVERTISED RATES (40)+(42) | (42-47) | 253.53 | 148.99 | 89.01 | 12.32 | T 1321910.00 |
| | | | | | | | A 142.14 |
| 44 | INDICATED STAT NET RATES(43)-(30) | | 223.90 | 119.36 | 59.38 | 12.32 | A 116.65 |
| 45 | APPRAISED NET RATES | (48-53) | 223.90 | 119.36 | 59.38 | 12.32 | A 116.65 |
| 46 | BASE INDICES | | 261.68 | 0.00 | 225.32 | ^ 00 | |



NATIONAL FOREST SYSTEM · COOPERATIVE FORESTRY · FORESTRY RESEARCH

# Timber Sale Contract



Purchaser MT. ADAMS VENEER CO.

Sale Name LYNX

Award Date 10/24/79

Contract No. 06785-1

Region SIX

National Forest GIFFORD PINCHOT

Ranger District RANDLE

90011036

2400—13 (7/70)

GPO 895-867

The following definitions are established for the terms used in A5:

**Base Rates** are the lowest rates of payment for timber which are authorized by this contract. Base Rates remain constant throughout the life of this contract and are not subject to change by rate redetermination except for reduction under B3.32.

**Advertised Rates** are the minimum acceptable Bid Rates for timber, exclusive of Required Deposits. These rates are those indicated by appraisal in which no cost allowance has been made for construction of Specified Roads listed in A9, but are never less than Base Rates.

**Bid Premium Rates** are the amounts by which Purchaser's bid is in excess of Advertised Rates. The Bid Premium Rates are constant during this contract.

**Bid Rates** are the rates bid by Purchaser (exclusive of Required Deposits for slash disposal and road maintenance) and are the sum of Advertised Rates and Bid Premium Rates. Until a rate redetermination becomes effective, the Bid Rate for species and products in A5a is the Tentative Rate which is subject to quarterly adjustment under B3.2; for species and products in A5b, the Bid Rate is the Flat Rate.

**Required Deposits** are deposits which Purchaser may be required by law to pay for slash disposal (16 U.S.C. 490) and road maintenance (16 U.S.C. 537). Required Deposits may be adjusted as part of a rate redetermination or a contract extension. The table shows only Required Deposits for slash disposal; road maintenance deposits, if any, are given in C5.4.

**Base Index** is the specified average of the lumber or other product selling value index used as the basis for computing adjustment in rates for variance in product selling value as provided in B3.2. Base Indices shall be redetermined when rate redeterminations are made under B3.31.

**A6 – Indices used in Quarterly Adjustment,** applicable to B3.2

| SPECIES | INDEX NAME AND DATE |
|---|---|
| None | |

**A7 – Scheduled Rate Redetermination,** applicable to B3.31

Date for scheduled rate redetermination is July 1, 1985. Rate redeterminations shall cover Included Timber in the entire sale unless otherwise specified in C3.31. Timber volume required to be cut and scaled before lower rates developed from scheduled rate redetermination can become effective is 21,100 M board feet.

**A8 – High Stumps,** applicable to B6.412.

| SPECIES | MAXIMUM STUMP HEIGHT (Inches) |
|---|---|
| All | 12 or 1/3 of cut stump diameter, whichever is higher.<br><br>If Purchaser builds Specified Roads, stump heights will be specified in Section 201. |

90011103

UNITED STATES DEPARTMENT OF AGRICULTURE

# FOREST SERVICE

DR

2450 Sale Contracts and Permits

REPORT AND APPRAISAL

GIFFORD PINCHOT NATIONAL FOREST

RANDLE RANGER DISTRICT

LYNX TIMBER SALE

U. S. GOVERNMENT PRINTING OFFICE : 1977 O - 251-012

6200-7 (10/73)

90011379

1

TIMBER SALE APPRAISAL

FILE NAME: GP3*RAN.LYNX

SALE NAME: LYNX
DISTRICT : RANDLE
FOREST : GIFFORD PINCHOT
INPUT BY : A TABER
STATE : WASH DATE THIS RUN: 08/15/79

A. GENERAL INFORMATION

| | | CO-OP | PURCHASER | TOTAL |
|---|---|---|---|---|
| SPECIFIED ROADS - CONSTRUCTION MILES | | | | 6.1 |
| - RECONSTRUCTION MILES | | | | 5.3 |
| ROAD CONSTRUCTION CREDITS | $ | | | 915011 |
| OTHER PURCHASER CREDITS | $ | | | 18630 |
| TEMPORARY ROAD - CONSTRUCTION MILES | | | | 2.9 |
| - CONSTRUCTION COST | $ | | | 18072 |
| SLASH DISPOSAL | $/M | 5.16 | 9.57 | 14.73 |
| EROSION CONTROL | $/M | .00 | 2.30 | 2.30 |
| MISC. COSTS (OTHER THAN FIRE PROTECT) | $ | | | 5360 |
| OTHER TEMPORARY DEVELOPMENTS | $ | | | 0 |
| ESSENTIAL KV | $ | | | 404923 |
| TOTAL PAM ACRES | | | | 574 |
| % SCALING DEFECT (SALE-AS-A-WHOLE) | | | | 15 |
| TOTAL CONTRACT MONTHS (FOR FIRE LIABILITY): | | | | 81 |
| TOTAL OPERATING MONTHS (FOR BID GUARANTEE): | | | | 43 |

X
X

**************************************************************************

B. PER-ACRE MATERIAL

| SPECIES COLUMN NUMBER | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| PRODUCT / UNIT | | 4-1 | | |
| SPECIES | | CULL | | |
| SPECIES CODE | 000 | 002 | | |
| VOLUME | 0 | 2100 | | |
| SELLING VALUE | .00 | 120.15 | | |
| PRODUCT HAUL | .00 | .00 | | |
| MANUFACTURING COST | .00 | 47.60 | | |
| NORMAL P&R % | 0( ) | 16(M) | | |



90011380

Sale Cruise

Method of Cruise

**1/5 acre strip plot, 2 chains wide, 5 chains long, every third plot graded.**

Cruise Statistics

| | | | |
|---|---|---|---|
| Sampling error | **5%** | | |
| Coefficient of Variation | **70%** | Actual Coefficient of Variation | **71.25** |
| Determined No. Plots | **314** | | |
| No. Plots Taken | **314** | Standard Error | **4.02** % |

All sale cruises will adhere to the standards prescribed in FSM R-6 Supp. 239, 2431.23. Justify and explain cruises which do not meet those standards, such as comparison with local cut volumes:

Cruising was done during **Sept.,Oct.,1973** by Chief of Party **R.D.Johnson**

__________ and **B.G. Rose** , __________,

__________.

I certify that they are competent cruisers as determined by adequate testing; that a field check of the cruisers was made __________ and found satisfactory. The sale cruising and grading is performed to Forest Service standards. In my opinion, the cruise estimates of the volume to be cut are within acceptable limits (FSM 2431.23, R-6 Supplement) and the log grades have been correctly determined.

__________
Supervisory Forestry Technician



**90011410**

UNITED STATES DEPARTMENT OF AGRICULTURE

# FOREST SERVICE

(05)

2450 Sale Contracts and Permits

SCHEDULED RATE REDETERMINATION

LYNX TIMBER SALE

GIFFORD PINCHOT NATIONAL FOREST

RANDLE RANGER DISTRICT

U. S. GOVERNMENT PRINTING OFFICE : 1980 O - 309-842

FS-6200-7 (10/73)

TIMBER SALE APPRAISAL

GIFFORD PINCHOT NATIONAL FOREST

LYNX-RR TIMBER SALE Randle SUBUNIT

| | SIGNATURE | DATE |
|---|---|---|
| APPRAISED BY: | Arcola Tabor | 7-79 |
| CHECKED BY: | Bertena Hill | 9/89 |
| APPROVED BY: | (District Ranger/Monument Manager) | |
| RECOMMENDED BY: | Forester | |
| APPROVED BY: | Timber Management Staff | |

==============================================================================

APPRAISAL INFORMATION

Data Filename TAP6GIPO5 *RAW. LYNXSum (RR)
Element Name

This appraisal has been computed at the Fort Collins Computer Center, using R6-2420-22 Input Forms.

GP 2420-1 (04/89)

90010948

## SECTION A - SALE CRUISE

Method of Cruise:

______________________________________________

______________________________________________

______________________________________________

______________________________________________.

All sale cruises will adhere to the standards prescribed in FSH 2409.12, 41.1, R6 Supplement. Justify and explain cruises which do not meet those standards, such as comparison with local cut volumes: ______________________________

______________________________________________.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Cruising was done during __________ by Chief of Party ______________________

______________________________ and ______________________.

I certify that they are competent cruisers as determined by adequate testing; that a field check of the cruisers was made ____________________ and found satisfactory. The sale cruising and grading is performed to Forest Service standards. In my opinion, the cruise estimates of the volume to be cut are within acceptable limits (FSH 2409.12, 41.1, R6 Supplement) and the log grades have been correctly determined.

By: ______________________

Title: ______________________

==========================================================================

## SECTION A - PROFIT RATIOS

Ratios based on selected ranges in R6-FSH 2409.22, Appendix 417.2:

West Side, Appraisal Zone 2 — Schedule 6784

Selected Ranges (Low, Midpoint, High) — Profit Ratio 13 %

State criteria used if selected profit ratio is other than midpoint.

==========================================================================

## SECTION A - MARKETS

(Appraisal Points, FSH 2409.22, 416.52)
(Circle appraisal point used.)

Merchantable Volume Appraised To: Bingen, Longview, Morton, Randle, Packwood
(Sawlogs, Peelers)
Product Haul To: Chehalis

Chip Cull (PAM) Volume Appraised To: Bingen, Longview, Randle, Stevenson

GP 2420-2 (04/89)

90010975

IN THE UNITED STATES CLAIMS COURT

| | |
|---|---|
| MANKE LUMBER CO., et al., | ) NO. 33-85C; |
| (All Consolidated Cases) | ) 33-85C; 553-86C; |
| Plaintiff, | ) 161-88C; 589-87C; |
| vs. | ) 800-87C; 91-984C; |
| THE UNITED STATES, | ) 365-88C; 339-89C |
| Defendant. | ) (Chief Judge Smith) |

- - - - -

The deposition of **RONALD LEWIS** was taken on Wednesday, June 16, 1993, commencing at 9:15 a.m., at the offices of Schwabe, Williamson & Wyatt, 2100 Pennsylvania Avenue, N.W., Washington, D.C., before Vicki L. Forman, Notary Public.

Q. Going back to situations where timber is not resold and an appraisal is used. I'm not sure that I recall precisely what you said as to the reason an average overbid is added to the appraisal in determining the value of the timber.

A. To reflect current bidding practices.

Q. What's the objective in establishing damages for an unperformed timber contract? What's the purpose of the resale or the appraisal in term -- what are you trying to do?

A. I may need to correct my answer. I'm not sure we do add bid premium average overbids on the sales.

Q. Assume that you do.

A. I'm trying to recall whether we do or not. In some cases we do on different types of reappraisals, but I'm not sure what we did on these.

MS. MURPHY: Let the record show that the witness is examining a document dated April 13, 1990 apparently addressed to Dave Note. I'd like

DISTRICT OF COLUMBIA, to wit:

I, Vicki L. Forman, before whom the foregoing deposition was taken, do hereby certify that the within-named witness personally appeared before me at the time and place herein set out, and after having been duly sworn by me, according to law, was examined by counsel.

I further certify that the examination was recorded stenographically by me and this transcript is a true record of the proceedings.

I further certify that I am not of counsel to any party, nor an employee of counsel, nor related to any party, nor in any way interested in the outcome of this action.

As witness my hand and notarial seal this ________ day of ____________________, 1993.

______________________________

VICKI L. FORMAN

Notary Public

MY COMMISSION EXPIRES: 5/14/97