United States
Department of
Agriculture

Forest
Service

Timber
Management

# THE EFFECTIVENESS OF COMPETITION AND APPRAISALS IN THE AUCTION MARKETS FOR NATIONAL FOREST TIMBER IN THE PACIFIC NORTHWEST



83019775

# THE EFFECTIVENESS OF COMPETITION AND APPRAISALS IN THE AUCTION MARKETS FOR NATIONAL FOREST TIMBER IN THE PACIFIC NORTHWEST

by

Walter J. Mead
Mark Schniepp
Richard B. Watson

USFS Contract No. 53-3187-1-43
and PSW G-34

September 30, 1981
University of California
Santa Barbara, California 93106



83019776

3. <u>Competition for National Forest timber has increased markedly over the last two decades</u>. A prior study[1] showed that over the four-year period 1959-1962 the average number of bidders for National Forest timber on the Westside of Region 6 was 4.20 bidders per sale. Over the seventeen years covered in the present study the average number of bidders per sale increased to 5.42. In every year except 1963, the average number of bidders per sale exceeded the record for 1959-1962.

For the Eastside, the average number of bidders per sale in 1959 through 1962 was 2.39. This increased to 2.75 for the subsequent seventeen years. All of the numbers shown above indicate that Westside sales are subject to more intense bidding than found on the Eastside.

Defining a competitive timber sale as one where the high bid exceeds the appraised price by 1% or more, we find that the share of sales transacted under competitive conditions increased sharply. Over the years 1959 through 1962, 67.9% of all National Forest timber sales on the Westside were sold under competitive conditions. In 1979, 93.2% of all sales were classed as competitive. Over the latter seventeen years the percent competitive exceeded 67.9% in all except five years. Timber sales since 1963 have been increasingly competitive.

For the Eastside, a similar trend toward increased competition is found. In the base years 1959-1962, 42.8% of Eastside sales were classified as competitive. In 1979 the competitive share was 78.5%. In the seventeen years ending in 1979, the percent competitive exceeded 42.8 in all but six years.

A third measure of competition, the ratio of high bid to the appraised price, provides similar evidence of increased competition. For Westside timber sales taking place in the years 1959-1962, the average bid-appraisal ratio was 1.46. For the next seventeen years this ratio was exceeded in all but six years. In 1979 it was 2.20 indicating that competition forced bidders to pay a 120% premium over the fair market value as determined by the Forest Service.

For the Eastside, the bid-appraisal ratio for the base years was 1.20. In the seventeen years following, this ratio was exceeded in all but four years. For 1979 the ratio stood at 2.30 indicating a 130% premium over the appraised price for Eastside timber.

This evidence of vigorous competition for National Forest timber in Region 6, especially in the last seven or eight years

---

[1] W.J. Mead and T.E. Hamilton, <u>Competition for Federal Timber in the Pacific Northwest -- An Analysis of Forest Service and Bureau of Land Management Timber Sales</u>, U.S. Forest Service, Pacific N.W. Forest and Range Experiment Station, 1968, p.4.





8301979

of the decade of the 1970's, raises questions about the effectiveness of Forest Service appraisals. When competitive auction markets establish market prices that are approximately double the "fair market values" as appraised by the Forest Service, the effectiveness of the appraisal process must be examined.

4. Mill studies yielding overrun data are obsolete. Forest Service overrun studies are based on mill studies which were conducted in the mid-1960's. In the ensuing approximately fifteen years, there have been significant technological improvements in both lumber and plywood product recovery from logs. There may also have been a decline in the average diameter of logs cut from National Forest timber. Due to the peculiarities of the Scribner Log Scale measure, overrun increases as log diameter decreases. It is therefore probable that a steadily increasing actual overrun during the period since the mid-60's has contributed to under-appraisals of Forest Service stumpage and to high ratios of bid price to appraised price.

5. Appraised volumes differ widely from volumes actually cut from Forest Service timber sales. For 842 Westside timber sales that have been fully cut and closed out, the record shows that the actual cut is only 1.8% below the appraised volume. This record suggests an astonishingly high degree of cruise accuracy. However, on a sale by sale basis we find nearly offsetting large errors of over- and under-appraised volumes. The errors become apparent when the absolute values of the appraisal errors are averaged. When the algebraic sign of the appraisal error is ignored we find that the average absolute difference between the appraised volume and actual cut was 36%. Such cruise errors contribute to an explanation of high bid-appraisal ratios. Where bidders perceive that a biddable species is incorrectly cruised and that the appraised volume for one or more species is overstated, then bidding will often be concentrated in that species. If it is in fact overappraised in volume, then the final cost to the buyer is less than indicated by the bid-appraisal ratio. This follows from the fact that payments to the Forest Service are made on the basis of volumes actually cut by species.

6. Some Forest Service timber sale policies indirectly affect bid prices via their effect on the number of bidders. It is a well established fact that on average the high bid is a positive function of the number of bidders taking part in auctions. Further, the number of bidders is normally the dominant variable in explaining high bids. Our study provides further confirmation. Throughout Region 6 the record shows that bidder participation increases sharply with the contract duration (term). Sale size is determined by the Forest Service. Similarly, bidders avoid lump sum sales relative to the conventional scale sales. Bidders appear to resist any major changes from established policies.

For the Eastside National Forests, sealed bidding procedures tended to increase high bids in the less competitive areas and have no effect otherwise. However, in contrast with the West-side, significance levels were low. Statistical tests for the Eastside suffer from the relatively small number of sealed bid sales, even during the mandate period. For the entire Region 6, the fact that 15 of the 20 National Forests were estimated to have large positive overbids on sealed relative to oral auction sales during the mandate period is sufficient reason to generalize that competition was strengthened by sealed bidding methods. However, oral bidding protects the public where competition is effective.

10. The log export restriction introduced in 1969 (the Morse Act) appears to have reduced effective competition for National Forest timber. Our model explaining bidder participation established that Federal legislation restricting log exports significantly reduced the level of bidder participation throughout Region 6. Further, we found that overbids were depressed by an average of $4.43/MBF in the Westside for the years following imposition of the restrictions, but ending in 1972. In the Eastside, overbids were depressed $1.70 for the same time period (1967 dollars).

11. An important explanation of observed high overbids, especially under higher rates of inflation during the decade of the 1970's, is the fact that bid prices for National Forest timber are essentially futures prices. Bids for National Forest timber are submitted in the present, but payments are not made until the timber is harvested in the future and revenues follow even later when the timber products are sold. Therefore, payments to the Forest Service are made in inflated cheaper dollars. If bidders anticipate inflation, then stumpage values increase with the term of the sale. Where timber sale contracts provide for price escalation (as on the Eastside) part the gains in stumpage value may be lost to the timber buyer.

To compound the problem further, Forest Service appraisals are based on estimated prices and costs which existed from one to six months prior to the sale date. Thus (1) the longer the appraisal lag, (2) the longer the duration of the sale, and (3) the higher the expected rate of inflation, the greater will be the observed overbids. In a series of interviews with potential bidders, they were asked which sale attribute influenced their bid prices most. In response, 31 out of 45 replied that "length of the timber sale contract was the dominant factor".

The Westside bidding record shows that bidders were willing to pay an additional $8.50/MBF more for a 60 month compared to the average 31.2 month contract, and Eastside bidders about $2.75/MBF more than for an average 34.9 month contract (1967 dollars). The introduction of price and cost expectation variables into the model specifications established that for every additional dollar of anticipated increases in product revenues, overbids increased by 10 cents.



8301978

The R-square of .71 and the fact that 12 of the 18 included variables are significant at the .05 level indicate that sales volume is non-randomly related to other timber sale characteristics. In view of these results, regression analysis should be performed to examine the exact relationship between overbids and sale size holding all other sale cost, method, and quality characteristics constant. The dichotomous size variables are introduced in the overbid equations previously estimated. The inclusion of the size categories will produce parameter estimates which will trace out the functional relationship between sale size and overbid. If no relationship exists, the parameter estimates will be close to zero. Table 9.15 presents the specific results of the regressions involving sales size for both appraisal Zones and both study periods. The parameter values of the 8 size categories (SIZE1 is captured by the intercept) are given along with the corresponding significance tests (T-ratio).

The size coefficients are small and insignificant for appraised volumes up to 16000 mbf in the 1963-72 estimated regression for Westside sales. For the two highest volume categories, the coefficients of size classes 8 and 9 indicate a significant negative impact on overbids. This latter result is consistent with the plot based on average overbids in Figure 9.6. However, unlike Figure 9.6, the regression results show that Westside overbids were never an increasing function of sale size in the early timber sales period of our analysis.

The parameter estimates for Zone 1 are also small and insignificant for all 1963-72 size categories. From our model specifications of overbid, we can find no significant relationship between overbids and sale size in the 1963-72 period throughout Region 6. This conclusion however, cannot be applied to the more recent period of analysis. The estimated coefficients for both appraisal Zones are generally increasing over the range of sale sizes. The Westside results show that relative to the first size category, the largest sale size class (>20,000 mbf) adds $30 to the overbid. Further, an increment of $10 is shown over the next largest size category. It is interesting to note that the results for both Zones fail to show a leveling off of overbids as sales size increases. The results of this analysis suggest that bidder behavior has changed significantly over the 17 year period of study with regard to the demand for large timber sales. In the past, overbids were generally insensitive to the size of the timber sale, and actually declined on very large sales. More recently, however, firms are willing to pay substantial premiums to secure the largest size timber sales held for auction by the Forest Service. This result is consistent with higher levels of actual and anticipated inflation in product prices in the later period.



83019997

WO

24 JUL 1984

2430 Commercial Timber Sales
6500 Finance and Accounting

Expiration of Uncompleted Timber Sale Contracts
(Our Ref. 9/9/83)

Regional Foresters

Our referenced letter (copy enclosed) discussed procedures to be followed upon expiration of uncompleted timber sale contracts. Questions have arisen concerning the initial billing for damages as addressed on page 13 of the letter. The pertinent part of the letter includes:

"The Forest Service does not have the authority to waive the collection of these damage payments. Once it has been determined that damages have occurred, and the amount of damages estimated, collection action will start. Initial billing for damages caused by loss of stumpage value of the remaining timber does not have to wait until the remaining timber is resold.

"Collection efforts can start once the damage has been estimated. The estimate will be on the comparison of the current contract value at termination with the appraised value at termination Form 2400-6(T) contracts. The billing for this collection should indicate that the billing is for the estimated amount of damages.

"Pursuant to the Contract Disputes Act, the Contracting Officer shall issue a written decision claiming these damages on sales made subsequent to March 1, 1979."

We wish to clarify the above statement on collection of damages upon expiration of uncompleted timber sale contracts. Most timber sale contracts in this category contain clause B9.4 - Failure to Cut, which is the contractually agreed upon measure of damages in the case of "termination for breach" or for a "purchaser's failure to cut designated timber .... by termination date." This formula relies upon a resale of the timber or a decision not to resell and use of appraised value. A decision to resell or not to resell and any resale must be done within a reasonable time after the default to prevent attacks on the determined damages and to avoid unnecessary loss of the use of the money owed to the Government. We have previously stated resale should occur within 6 months. Prompt action is required by contract case law and the Federal Claims Collection Standards (49 Fed. Reg. 8889, March 9, 1984).

For purposes of the new Federal Claims Collection Standards (4 CFR 101.2 at 49 Fed. Reg. 8896), a claim or debt is "an amount of money or property which has been determined by an appropriate agency official to be owed to the United States." Pursuant to the timber sale contract terms, the amount owned or claimed cannot be determined until resale or a decision not to resell has been made.

83012958

Therefore, within one-week of the expiration of an uncompleted contract, the Contracting Officer should send the purchaser and surety a letter confirming that on (date) , contract number ___ held by the purchaser expired uncompleted. This letter should inform the purchaser and surety that we are in the process of calculating damages.

Once the remaining timber has been resold, or it is decided not to resell the timber, and the damages have been calculated, the purchaser should be billed for any damages. If the contract is subject to the Contract Disputes Act (CDA), collection of damages shall be based upon a prompt, final Contracting Officer's decision on the Government's claim. This decision shall include a statement of the CDA appeal rights (FSM 2434.21e). Collection of damages on pre-CDA contracts shall conform to FSM 6572.

Prompt action in collection of damages in timber sale defaults will reduce the Government's losses caused by delayed receipts, and will provide timely notice of the damages to the purchaser and surety.

GEORGE M. LEONARD

GEORGE M. LEONARD
Director of Timber Management

Enclosure

Limited Distribution

cc: F&AM, OGC, John Morrison (F&AM-FCCC), NFPA (Pawlicki), WFIA (Gaskins) w/enclosure, Olson, Sales

TM:LWOLSON:dyj:7/17/84: Olson/Ltrs.3 RF

See previous yellow for initials

8301 2959