IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| GATEWAY LUMBER CO., *et al.*<br>and MANKE LUMBER CO., *et al.*<br>(Mt. Adams Veneer Co.),<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | Consolidated under lead case<br>Nos. 435-87C & 589-87C<br>(No. 91-984C)<br>(Judge Bruggink) |

**DECLARATION OF PAUL F. EHINGER**
**IN SUPPORT OF PLAINTIFF'S MEMORANDUM**
**IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

I, Paul F. Ehinger, declare the following is true and correct under penalty of perjury.

1. I have been retained as a consultant by Schwabe, Williamson & Wyatt to research and testify about events, practices, knowledge and expectations in the forest product industry, and in particular United States Forest Service ("USFS") timber sales. In this capacity I have earlier provided expert testimony by affidavit and at trial in this and various of these related pending cases.

2. My current profession is as a consultant to the forest products industry. My education and basic training and work experience are fully described in the attached memorandum and resume (Exhibit 1).

3. I was directly involved during all federal timber contract relief efforts and default problems during the early and mid-1980s. I served as Executive Vice President for Western Resource Alliance during 1981 and 1982 when it was the lead organization in dealing with the Administration and Congress on contract relief. My involvement with Western Resource

Alliance continued through 1983. After becoming a consultant in January 1984, I continued to be involved with these issues, and I have specific first-hand knowledge of the development of contract relief legislation and regulations and related timber sale defaults.

4. I was specifically involved in tracking all federal timber sale issues from the mid-1950s, both as a member of management and later as Sr. Vice President of the Edward Hines Lumber Co. After leaving Edward Hines Lumber Co. in 1980, my involvement in timber sale issues continued as Executive Vice President of the Western Resource Alliance, a group of companies dealing with federal timber problems including those related to contract issues, timber sale buyout, and other timber supply matters. In 1984, this organization was dissolved, but I established my consulting business and continued to work with the industry on these legislative issues. When the contract termination legislation was completed, I prepared numerous filings for small individual operators who availed themselves of the opportunity to buy out of their defaulted timber sales. During the 20-year period prior to the 1980 recession, I served on the boards of directors of several national associations, including the American Plywood Association, where I served as president in the early 1970s, and the National Forest Products Association, where I headed the federal timber purchase committee during the mid-1970s and later was chairman of the committee overseeing the entire resource operations of the Association.

5. During my entire career, I worked extensively with Forest Service timber sales. Edward Hines Lumber Co., my employer for 31 years, derived 95% of its timber from USFS timber sales in the West. I had the direct responsibility for all timber acquisitions, both public and private, and after 1965 approved our bids on all major timber sales in the West. Because of this involvement, I was continually aware of the appraisal and bidding process used by timber sale purchasers in the 1970s during the period of high inflation. I knew the various timber

supply predictions made by governmental agencies and others, and demand as well as projected future price trends for timber and wood products based on the impact of short supplies. I am familiar, based on all of the foregoing, with many of the Forest Service practices and policies regarding appraisals and related computations in the full range of contexts in which they arise.

6. I have performed an extensive review of the documents produced by the government in this case which relate to the original Lynx sale in 1979, the Contracting Offer's various calculations of damages in 1989 and 1990, sales and index data pertinent to the June 30, 1989 termination, and the USFS policies pertinent to preparation of an appraisal for calculation of damages-- including where there is no actual resale. I have gathered additional timber sales information as reported on Forest Services forms, for the period of time following, but in reasonably close proximity to, the contract termination date. I have done so in order to supplement the absence of any such data in the government documents. The opinions expressed in this Declaration are based upon my extensive review of this information and upon my experience as outlined above. Each rests upon a level of confidence equal to or exceeding a "more probable than not" basis, as I understand the court requires.

7. The Lynx sale involved a USFS offering of 19,600 MBF of Douglas fir, 16,400 MBF of Western Hemlock and other conifers, 1,600 MBF of Western Red Cedar and 574 acres of pulp logs and cull material. The latter element is referred to as "per acre material" or "PAM". The Hemlock and Douglas fir were designated by the Forest Service as "biddable", while the cedar and the PAM carried a pre-designated price. This approach was typical since PAM is always offered at fixed rates, and minor species within the mix of a sale usually are as well. The Lynx sale, while standard in the bid approach, was rare and quite valuable in terms of the substance of the offering. I detail some of its important characteristics later in this Declaration.

One of the most important features that added to its value and would attract great interest among bidders is the fact that it contained a very large volume of old growth Douglas fir suitable for either veneer production or for the manufacture of lumber.

8. The Forest Service recognizes that the appraisal is an inaccurate method of determining value, and follows a policy of adding a bid premium, or overbid. The overbid is supposedly an average of the amount that timber purchasers routinely bid above appraised value in order to obtain timber of comparable quality and value. In making its damage assessment in this case, the Forest Service used overbid data from the following sales: Polk 4 Salvage, Beech 4 Salvage, Polar 2, and Silver 7. The overbid analysis done by the Contracting Officer in this case is fatally flawed. The sales used to obtain an average overbid involve completely different timber than that found in the Lynx Timber Sale. Since overbid supposedly reflects the effect of competition on the price of comparable timber, the use of data from completely different timber type is unreliable and inaccurate. If "transaction evidence" means pertinent transactions, or the term "similar" is to be given any reasonable meaning, these terms cannot be applied to describe these four sales in relation to the Lynx sale.

9. Half of the selected sales (two of four) cannot on any rational basis be considered similar to Lynx, nor even be adjusted to make them so. Polk 4 Salvage and Beech 4 Salvage, as even their names disclose, are both salvage sales. This means that they consist of significant volumes of dead or damaged timber subject to decay and deterioration. Each day that passes they will yield less at the mill. On the other hand, Lynx was a "green" sale—meaning that live trees predominate. A decision by a green sale purchaser as to when to harvest will not be affected by considerations of deterioration as in a salvage sale. Stated simply: knowledgeable bidders do

not approach a salvage sale in the same way as a green sale and would not consider these two different types of sale as similar.

10. The unexplained and indefensible inclusion of the salvage sales in the Contracting Officer's transaction evidence analysis improperly drives the similar sales prices (and the dollar amount of the overbid) down. As a consequence this drives his calculation of damages up nearly $2 million dollars. If these two salvage sales are excluded, and the Contracting Officer's calculations are applied to the remaining sales he has selected as "similar", the resulting calculation is as follows:

| **SALE** | **SPECIES** | **C.O.'S ADJUSTED BID PREMIUM** | **WEIGHTED AVERAGE** |
|---|---|---|---|
| Polar 2 | Douglas Fir | $374.46 | $285.88 |
| Silver 7 | Douglas Fir | $156.69 | |
| Polar 2 | Hemlock | $150.13 | $209.26 |
| Silver 7 | Hemlock | $289.38 | |

| **C.O.'s Contract Yield Calculation based on Polk 4 Salvage, Beech 4 Salvage, Polar 2 Salvage and Polar 7 Salvage** | **Contract Yield Recalculated to Eliminate Influence of Salvage Sales** |
|---|---|
| $21,159,271 | $19,179,997 |
| **Difference: Increased proceeds reduce damages by $1,979,274** | |

Again, this calculation does not even reflect any adjustment for contract differences, and simply eliminates the use of salvage sales for overbid calculations. When all appropriate changes are accounted for, it is apparent that the defendant would have profited from the resale of the Lynx Timber Sale.

11. Apart from the use of salvage rather than green sales, there are significant quality differences between the timber included in the Lynx sale versus the four sales selected by the Contracting Officer which any knowledgeable person would recognize as material dissimilarities. The per acre material (PAM) volume was 19% of Polk 4 Salvage, 24% of Beech 4 Salvage, 14% for Polar 2 and 18% for Silver 7, which is an indicator of highly defective timber. The Lynx sale had only 5% PAM, indicating much sounder timber. There is a disclaimer that PAM volume is for statistical purposes only, but it is a part of the appraisal and obviously represents the cruiser's judgment about defect. Another illustration of the qualitative difference is the percentage of Douglas fir. Douglas fir is the premium species in western Washington. The following were the percent of Douglas fir:

| | |
|---|---|
| Lynx | 50% |
| Polk 4 Salvage | 37.5% |
| Beech 4 Salvage | 29% |
| Polar 2 | 38% |
| Silver 7 | 36% |

Lynx clearly was the higher quality sale.

Another measure of quality is the percent of #3 Douglas fir sawlogs, the lowest grade, which was much higher in the other sales:

Douglas Fir #3 Sawlogs

| | |
|---|---|
| Lynx | 15% |
| Polk 4 Salvage | 19% |
| Beech 4 Salvage | 19% |
| Polar 2 | 22% |
| Silver 7 | 17% |

There is a much larger percent of small logs on all the other sales used as "comparables."

The Lynx sale also included a large volume of Douglas fir #1 and #2 peeler logs. These logs have a minimum of 90% clear surface (no knots), for #1 and 75% for #2. Both must be minimum diameter of 30 inches at the small end. These are logs of extraordinary quality. They are also suitable for making lumber. The following are the percentages of #1 and #2 peelers in each of the sales:

| | |
|---|---|
| Lynx | 20% |
| Polk 4 Salvage | 1% |
| Beech 4 Salvage | 2% |
| Polar 2 | 7% |
| Silver 7 | 3% |

This major difference in quality of Lynx compared with the other sales used as "comparables" is obvious; the other sales are not comparable.

Cedar maintained a similar quality differential. This is represented by the presence of #2 Cedar sawlogs which are at least 20 inches in diameter and are superior to #3. No sale had any #1 Cedar so this percentage of #2 is representative of the quality.

Percentage of #2 Cedar Sawlogs

| | |
|---|---|
| Lynx | 36% |
| Polk 4 Salvage | 1% |
| Beech 4 Salvage | 12% |
| Polar 2 | 20% |
| Silver 7 | No Cedar Identified |

Again, Lynx cedar is the superior quality and value by a large margin.

The significance of these comparisons rests on the fact that bidding historically is more aggressive on sales of higher quality, because the purchaser has more options in the marketplace for improving realization for lumber and veneer that cannot be recovered from the lower grade logs. Obviously the higher the quality, the greater the overbid. It is my opinion that no knowledgeable person could view sales with these enormous quality differences from Lynx to be similar. The Contracting Officer does not offer any reason why they should be considered similar, nor has he made any adjustments in an effort to make them so.

12. The Lynx Timber Sale was unusual to the extent that it included an unusually large volume of high quality, large old growth Douglas fir. The price bid for the original Lynx sale was based, in large part, upon the volume of timber, the length of the contract term, and the high quality of the timber and its suitability for manufacturing into veneer. All of these factors are very significant in assessing the price bid for timber sales. The sales used to compute the overbid calculation had none of these characteristics. As a result, they have no bearing on the potential overbid that a Lynx resale would obtain. Specifically, the sales used to calculate expected overbid are irrelevant because:

(a) Lynx was a timber sale of such superior quality to any of the sales used as comparisons.

(b) The annual logging requirements ranged 2200 mbf per operating season to a maximum of 4250 mbf per operating season on the comparables. Lynx required 5470 mbf to be logged per operating season. Logging costs were not comparable.

(c) Lynx was a flat rate sale. All comparables were SRA (stumpage rate adjustment sales), an overbid would be as high for an escalated sale as a long term fixed rate sale with a scheduled rate redetermination. To make alleged damages comparable, an appraisal would require that Mt. Adams be credited for all potential escalation during the eight year life of the sale, because in the bidding process of a fixed rate sale, the purchaser anticipates appreciation in values over the life of the sale.

(d) There were numerous financial requirements on these “comparable sales,” including cash down and mid-point payments, additional deposits for premium bid, midpoint payments, higher bonding limits, discount for early removal, etc. All these materially impacted competition, increased costs, and lowered the amounts bid.

(e) The original Lynx sale downpayment was covered with a payment bond; there were no cash requirements until cutting began, which is a major difference between the sales used to calculate overbid. This changed the contract from a pay-as-you-cut contract as with Lynx to pay-or-cut contract which requires strict levels of performance or payments of 50% of stumpage at mid-point if the timber had not been cut. In a sale the size of Lynx, these items can add significant costs as well as stretch the cash resources of an operator. As a result, damages are grossly overstated, because the comparisons are made with sales with drastically changed conditions when compared with Lynx.

(f) Since bidding historically is more aggressive on sales of higher quality, because the purchaser has more options in the marketplace for improving realization of lumber and plywood that are not available with the lower grades, the value of the timber included in the Lynx sale is much higher than any of the sales used to calculate overbid.

(g) It should be noted that two of the "comparable" sales were canceled and never logged: Polar 2 and Silver 7.

(h) The table attached as Exhibit "2" shows some of the basic factors that demonstrate why the sales used to establish comparability of premium bid are not comparable. These facts include total volume, length of sale logging costs, hauling costs, harvest requirements to complete sales as offered, both in terms of calendar months and operating season months, quality of species and the percent of species, quality of both net and gross (stand defect).

13. In terms of the damage calculations made by the defendant, the Forest Service failed to make any reasonable adjustments for differences as specified above in the contracts used to calculate overbid. On the one hand, the Forest Service admits that its appraisal method does not provide a reasonable measure of actual market value. They use transaction to augment their appraisals. The overbid is used for that purpose. But, the Forest Service utilized incomparable sales to calculate the overbid adjustment. I earlier pointed out that neither the timber nor the contract forms used for comparison purposes were anything like the Lynx sale.

14. No adjustment has been made by the Contracting Officer to account for the extreme dissimilarity of the selected sales with respect to their very short duration as compared to Lynx. Lynx was ninety months, while the <u>longest</u> "similar" sale, Beech 4, had a duration less than half that length (43 months). A multi-year contract, of whatever volume, allows greater flexibility to the purchaser. Greater flexibility translates into greater value to a purchaser. In a

single season sale, purchased shortly before the operating season commences, only those purchasers who can immediately use that timber and have the capacity to log it will bid. Prudent bidders would, thus, not exceed the immediate cash market price. In a multi-year contract, a purchaser can bid higher if needed to obtain the timber. Scheduling flexibility allows one to take advantage of the best possible market during the term of the contract. As a result, multi-year contracts result in higher bids. The resale of Lynx in 1989 would have given the purchaser a seven and one-half year opportunity to maximize profits during a period of extreme market price increases due to timber shortages. Contract duration on green sales is in my view one of the most important factors driving the price a knowledgeable timber purchaser is willing to pay.

15. There is another significant feature demonstrating lack of similarity with Lynx of the selected sales and the Contracting Officer's departure from standard practice. The Contracting Officer measured the absolute dollar differences between appraised values and bid amounts and then compared them across sales. Comparability is the key word, and viewing stumpage price alone indicates that none of these sales can be considered comparable.

<u>Advertised Rates</u>

| | Lynx Damage App | Polk 4 | Beech 4 | Silver 7 | Polar 2 |
|---|---|---|---|---|---|
| Douglas Fir | 442.17 | 164.48 | 143.93 | 214.26 | 253.53 |
| Hemlock | 111.90 | 91.35 | 55.73 | 71.27 | 89.01 |

The 4 sales were sold at auction the following bids.

<u>Bid Rates</u>

| | | | | |
|---|---|---|---|---|
| Douglas Fir | 285.00 | 301.50 | 367.00 | 607.50 |
| Hemlock | 185.50 | 200.00 | 348.50 | 222.25 |

The way to effectively compare these sales with the Lynx is by using "adjustment factors" (percentage increase over the appraised rate represented by the bid premium). This is standard Forest Service timber sale appraisal practice on every sale to update its basic market data on line #7 of the 2400-17 appraisal document.

16. The Contracting Officer's method of determining resale value in this case does not comply with USFS policy. His departures from Forest Service standards results in a value that significantly overstates any amount arguably recoverable if one applies contract provision B 9.4.

17. The Lynx sale has enough volume to run a typical family corporation sawmill for six months. Couple contract duration and timber volume factors with the exceptionally high quality of the timber; there is no telling how high the bidding would go.

18. For all of the reasons discussed above, as an experienced buyer of timber sales, I believe the Lynx Timber Sale, re-sold in June 1989 on its original terms, would have been purchased for a price probably in excess of the amount bid by Mt. Adams Veneer in 1979.

19. The Contracting Officer utilized transaction data from a universe of potentially similar sales which was limited to sales prior to June 30, 1989. In fact, he reached back as far as June 1987 to consider "similar" sales. He failed to look at a single sale after March 1989. Putting aside the issue of what can reasonably be considered "similar" for a moment, there were a multitude of sales on the Randle District between June 30, 1989 and June 30, 1990, all of which were ignored.

20. Similarly, the appraisal input database selected by the Contracting Officer for the pre-bid premium stage of the appraisal ignores published data for the "as of" date of the appraisal, June 30, 1989. Despite being performed a year later when "publication lag" is not an

issue, the appraisal employed the first quarter 1989 database and, for monthly data, March 1989. This selection is nowhere explained by him. An earlier Forest Service Lynx damages appraisal, prepared in April 1990, used third quarter and September 1989 data inputs in the appraisal. This approach would have better reflected the "as of" June 30, 1989 appraisal date due to the data lag issue mentioned above, but it was disregarded by the Contracting Officer in favor of first quarter data. Had the Contracting Officer used September data, the government's damage claim would be reduced by approximately $400,000. This is the difference between the unadjusted appraisal value from the April 1990 appraisal and the June 1990 version.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

DATED at Eugene, Oregon, this 22nd day of January, 2004.

s/Paul F. Ehinger
PAUL F. EHINGER
Filed electronically by s/Steven A. Miller

**CERTIFICATE OF SERVICE**

I hereby certify under penalty of perjury that on this 22nd day of January, 2004, I caused copies of the foregoing DECLARATION OF PAUL F. EHINGER IN SUPPORT OF PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT to be served upon the following individual electronically and a courtesy copy was sent by Federal Express.

Richard P. Nockett
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L St., N.W. (8th Floor)
Washington, D.C. 20530

s/ Steven A. Miller

PAUL F. EHINGER & ASSOCIATES
Consultants to the Forest Products Industry
1200 HIGH STREET, SUITE 22
EUGENE, OREGON 97401
503/686-9607 FAX 503/686-8124

*Introduction to the Firm*
*of*
*PAUL F. EHINGER & ASSOCIATES*

Established in 1983, Paul F. Ehinger & Associates provides a broad range of services to the Western forest products industry. Since 1983, we have served over 100 clients -- both large and small. Our consulting business covers a broad range of activities based on over 46 years of experience. Some of the areas of operation are described as follows.

I. Consultation -- Timber

a. We handle Federal timber contract problems. We provide large and small companies with detailed monitoring of the legislative, regulatory, and legal activities surrounding specific Federal timber issues.

b. We provide information and expert guidance to those companies with operating problems related to public and private timber sale contracts. We assist in resolving these problems or in pursuing and defending claims through administrative remedies or litigation.

c. We provide damage analysis services to assist those involved in claims arising out of losses due to forest fires, logging operations, timber trespass, and other woods activities.

II. Consultation -- Forest Products Operations

a. We analyze timber as well as other raw material supply situations, i.e., chips, sawdust, hog fuel for companies, mills, industry organizations, and governmental entities. We provide complete studies of available resource supply

In Portland, Dave Redmond of D.H. Redmond & Associates, Inc. gives us additional strength in the areas of business planning and development, corporate financing, and in developing both export and domestic markets. Other individuals with special expertise are available and to consult with us on individual projects as needed, enabling us to apply the best expertise to your problem.

Consultants have two primary functions: (1) to resolve problems for which the client has insufficient knowledge or skills; and (2) to resolve problems for which the client has insufficient time.

If properly used, consultants can be a cost-effective way to improve your bottom line. Our only justification for offering you our consulting service is to provide information and/or assistance that will make your operation more profitable or help you meet the goals and objectives of your specific projects.

"I not only use all the brains I have, but all that I can borrow."

Woodrow Wilson

Paul F. Ehinger & Associates
*Consultants to the Forest Products Industry*

2300 OAKMONT WAY, #212
EUGENE, OR 97401
541/686-9607 FAX 541/686-8124
pfehinger@willamette.net

## *BACKGROUND SUMMARY OF PAUL F. EHINGER*

### *PAUL F. EHINGER AND ASSOCIATES, 1983 TO PRESENT*

Established in 1983, Paul F. Ehinger & Associates provides a broad range of services to the Western forest products industry. Since 1983, we have served over 140 clients -- large and small, public and private. Our consulting business covers a broad range of activities based on our experience. Some of the areas of operation are described as follows.

1. Consultation -- Forest Industry Operations

   a. We analyze available timber resources as well as other raw material supply situations, i.e., chips, sawdust, hog fuel for companies, mills, cogeneration plants, industry organizations, and governmental entities. We provide complete studies of current resource use patterns and industry trends for specific areas.

   b. We provide consulting services on operations and acquisitions or disposal of companies, mills, and timber. We analyze a company's operations and assets for their ability to provide a return to potential purchasers.

   c. We assist forest products companies in solving operating problems -- from falling the timber to loading the product into the car.

2. Consultation -- Professional

   a. We provide expertise on the forest products industry to the legal, accounting, insurance, banking, and other professions. As a result, these professionals can work knowledgeably with the industry on problems related to their specific fields.

   b. We provide current background information on the state of the industry for legislators, lobbyists, news media, industry, and other interested parties.

We maintain a close working relationship with other individuals with special expertise who are available to consult with us on individual projects as needed, enabling us to apply the best expertise to your problem or project.

Consultants have two primary functions: (1) to assist in resolving problems for which the client has insufficient knowledge or skills; and (2) to assist in resolving problems for which the client has insufficient time.

"I not only use all the brains I have, but all that I can borrow." Woodrow Wilson

***WESTERN RESOURCE ALLIANCE*, 1981-1983 -- Executive Vice President**

This organization provided coordination and leadership on a broad spectrum of issues affecting Western forest industry companies primarily dependent on public timber. The issues handled were those involving legislative, administrative, and regulatory agencies in Washington, D.C.:

1. Timber Supply Policies -- developing statements and policies for the current Administration.

2. Federal Timber Contract Relief -- coordinating industry actions on the administrative, legislative, and legal fronts to seek relief from the Federal timber.

3. Chaired the Lumber Industry Coalition pursuing a countervailing duty against Canadian Lumber -- 1982-1983.

Western Resource Alliance was phased out in December 1983, when it had served its purpose and the need for this organization no longer existed.

***EDWARD HINES LUMBER CO.*, 1949-80. Senior Vice President (1972-80). Vice President (1965-72). General Manager, Westfir Operations (1960-1965)**

I was responsible for the Western manufacturing operations, including all activities from acquisition of timber through selling and shipping of products. Additionally, I sought and developed new opportunities through acquisitions, expansion, and modernization of mills.

These operations were heavily oriented towards lumber and plywood production, but also included millwork operations, treating plants, and veneer mills. Logging operations were both company and contract.

These operations were located in Oregon, Idaho, Colorado, Wyoming, South Dakota, and Arkansas.

***EMPLOYMENT CHRONOLOGY - PAUL F. EHINGER***

| | |
|---|---|
| *1983--Present....* | *Paul F. Ehinger & Associates, Consulting, Eugene, OR* |
| *1991-Present* | *Consultant-Manager, Small Business Timber Council)* |
| *1981-83.........* | *Western Resource Alliance, Exec. V.P., Eugene, OR* |
| *1949-80.........* | *Edward Hines Lumber Co., Westfir and Eugene, OR* |

*(Corporate Headquarters - Chicago, IL)*

*1965-80 V.P and Sr. V.P., Western Operations in Oregon, Idaho, Colorado, Wyoming, South Dakota and Arkansas.*

1949-65 Forester--Logging Manager--General Manager, Westfir Operations

*1947-49.......... Consulting (K.B. Wood Forest Engrs.), Portland, OR*

*1946-47.......... U.S. Forest Service – Kentucky/Ohio/Missouri*

*1946 - Graduated from University of Michigan - B.S. in Forestry*

*1943-45 1951-52.... U.S. Marine Corps – Active Duty (42 months total)*

## ***INDUSTRY ASSOCIATIONS***

*American Forest and Paper Association (formerly National Forest Products Assn.), Washington, D.C. Resource Committee Chairman, 1977-79; Executive Committee, 1970-73 and 1977-79*
*American Plywood Association, Tacoma, WA. (Now APA Engineered Wood Products Association) - President and Chairman of Board, 1971-73 Board of Trustees, 1962--80*
*Industrial Forestry Association, Portland, OR. President, 1966 and 1967; Board Member, 1958-80.*
*Western Wood Products Association, Portland, OR. Director and Executive Committee, 1960s and 1970s.*
*Oregon Logging Conference, Eugene, OR. President, 1965; Board Member, 1958-Present.*
*Keep Oregon Green, Salem, OR. President, 1978-80; Board Member, 1970 Present.*
*Bureau of Land Management (U.S. Dept. Interior), Eugene District Advisory Council Chairman, 1987-92.*
*American Pulpwood Association - Member - Current*

## ***PROFESSIONAL ASSOCIATIONS***

*Society of American Foresters. Member since 1946.*

## ***BUSINESS CORPORATIONS***

*Board Director - Riley Creek Lumber Co., La Clede, ID - since 1987*
*Board Director - Lane Plywood, Eugene, OR - 1986-96 (Company sold in 1996)*
*Board Director - Alpine International, Inc. - 1985-1990*

# VOLUME SPECIES - LYNX AND COMPARABLE SALES - LENGTH OF SALES

| | | D. Fir | Cedar | Hem & Other | Total Merch. | P.A.M. | Total Volume | Notes |
|---|---|---|---|---|---|---|---|---|
| #26 LYNX | Damage Appraisal Volume | 19,100 | 1,400 | 15,800 | 36,300 | 2,000 | 38,300 | |
| | Original Volume | 19,600 | 1,500 | 16,400 | 37,500 | 2,100 | 39,600 | Original |
| | % Total | 49.5% | 4.0% | 41.5% | 95.0% | 5.0% | 100.0% | |
| | % Merchantable | 52.0% | 4.0% | 44.0% | 100.0% | | | Sale actually extended 24 mos. |

9/27/79-3/31/87 = 7 yrs 6 mos (90 mos)-7 operating seasons. Average harvest/mo = 425 mbf. Average harvest/operating season = 5,470 mbf. 42 mos operating season or 943 mbf/mo.

| Comparables | | D. Fir | Cedar | Hem & Other | Total Merch. | P.A.M. | Total Volume |
|---|---|---|---|---|---|---|---|
| 1. Polk 4 Salvage | Volume | 3,200 | 500 | 3,200 | 6,900 | 1,600 | 8,500 |
| | % Total | 37.5% | 6.0% | 37.5% | 81.0% | 19.0% | 100.00% |
| | % Merchantable | 46.5% | 7.0% | 46.5% | 100.0% | | |

9/2/88-3/31/91 = 2 yrs 6 mos (30 mos)-2 operation seasons. Average harvest/mo = 283mbf. Average harvest/operating season = 4250 mbf. 14 mos operation season-607mbf/mo.*

| | | D. Fir | Cedar | Hem & Other | Total Merch. | P.A.M. | Total Volume |
|---|---|---|---|---|---|---|---|
| 2. Beech 4 Salvage | Volume | 1,900 | 600 | 2,500 | 5,000 | 1,600 | 6,600 |
| | % Total | 29.0% | 9.0% | 38.0% | 76.0% | 24.0% | 100.0% |
| | % Merchantable | 38.0% | 12.0% | 50.0% | | | |

9/12/88-3/31/92 = 3 yrs 5 mos (41mos)-3 operating seasons. Average harvest/mo = 160 mbf. Average harvst/operating season = 2200 mbf. 19.5 mos operation season-338 mbf/mo.*

| | | D. Fir | Cedar | Hem & Other | Total Merch. | P.A.M. | Total Volume |
|---|---|---|---|---|---|---|---|
| 3. Polar 2 | Volume | 3,500 | 300 | 4,200 | 8,000 | 1,300 | 9,300 |
| | % Total | 38.0% | 3.0% | 45.0% | 86.0% | 14.0% | 100.0% |
| | % Merchantable | 44.0% | 4.0% | 52.0% | 100.0% | | |

3/20/89-3/31/92 = 3 yrs 0 mos (36 mos)-3 operating seasons. Average harvest/mo = 260 mbf. Average harvest/operating season = 3100 mbf. 18 mos operating season-517 mbf/mo.*

| | | D. Fir | Cedar | Hem & Other | Total Merch. | P.A.M. | Total Volume |
|---|---|---|---|---|---|---|---|
| 4. Silver 7 | Volume | 2,400 | | 3,100 | 5,500 | 1,200 | 6,700 |
| | % Total | 36.0% | | 46.0% | 82.0% | 18.0% | 100.0% |
| | % Merchantable | 44.0% | | 56.0% | 100.0% | | |

2/24/89-3/31/91 = 2 yrs 1 mo(25 mos)-2 operating seasons. Average harvest/mo = 280 mbf. Average harvest/operating season = 3350 mbf. 12 mos operating season-560 mbf/mo.*

* All operating seasons assumed to be six months, i.e., same as Lynx.

Compiled by Paul F. Ehinger & Associates 10/93 volspec

EXHIBIT 2