IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MANKE LUMBER CO., et al. (MT. ADAMS VENEER CO.), Plaintiffs, | ) | Consolidated under lead case No. 33-85C (No. 91-984C) (Judge Bruggink) |
| v. | ) | |
| THE UNITED STATES, Defendant. | ) | |

SUPPLEMENTAL DECLARATION OF CHRISTINE ANDERSON
IN MT. ADAMS VENEER CO. v. UNITED STATES, NO. 91-984C

I, Christine Anderson, make this supplemental declaration to clarify how the Forest Service appraisal of Mt. Adams' defaulted Lynx Sale was performed, and also to respond to Mr. Ehinger's criticisms of the appraisal in his January 22, 2004 Declaration ("Ehinger Decl.") filed in support of Mt. Adams' opposition to the United States' motion for summary judgment.

1. I have broad knowledge of the standard Forest Service appraisal method in use when Mt. Adams' Lynx contract terminated uncompleted on June 30, 1989. As stated in my initial declaration in this case ("Anderson Decl."), I have 29 years of experience with the Forest Service as a timber sale contract administration forester, contracting officer, pre-sale forester, and appraiser. I have not only prepared appraisals, but also served as a reviewer of appraisals prepared by other Forest Service personnel to ensure that they complied with the standard Forest Service method. My appraisal experience includes assisting ranger districts with the appraisal of timber on defaulted sales and reviewing such appraisals, including termination value appraisals such as the one prepared after Mt. Adams' Lynx contract expired uncompleted.

This supplemental declaration is based upon my knowledge and experience, as well as my review of the Forest Service records pertaining to the Lynx Sale and the appraisal of the timber remaining on the Sale after Mt. Adams' default.

2. When the Forest Service decides not to resell the remaining timber included in a defaulted sale, the agency prepares a termination value appraisal. The appraisal estimates the value of the remaining timber on the date the contract terminated uncompleted; it must be prepared in accordance "with the standard Forest Service method in use at [the] time of termination[,]" as required by Standard Provision B9.4. D. App. 25.[1] The appraisal is used to determine whether any damages are due the United States under the "no-resale" clause in Standard Provision B9.4.

3. In my initial declaration, I explained generally the steps the Forest Service took to prepare the termination value appraisal for Mt. Adams' uncompleted Lynx Sale. Anderson Decl. ¶¶ 10-14. Here, I will explain further to clarify how the appraisal was prepared, and then I will address Mr. Ehinger's comments on it. Preparation of the appraisal, using the standard Forest Service method in use at the time of termination (June 30, 1989), was essentially a two-step process. The first step involved the determination of the indicated "advertised rates" appearing on line 43 of the Forest Service "APPRAISAL SUMMARY" for the defaulted Lynx Sale. <u>See</u> D. App. at 26; Anderson Decl. ¶ 10. These advertised rates were the product of a standardized computer program which was developed to uniformly apply the residual value appraisal method used by the Forest Service at the time. The computer program was designed to store the data

---

[1] "D. App. __" refers to the cited page(s) in the appendix filed earlier with the United States' motion for summary judgment.

needed to appraise the timber as of a given date. In general, the residual value appraisal method begins with the selling value of the end products that could be produced from the timber, and then subtracts production costs (such as logging, hauling, manufacturing, profit, etc.) to arrive at the estimated value (the residual value) of the standing timber included in the sale. The residual value methodology uses historical cost and price data to estimate the value of the timber to an operator of average efficiency, not the actual selling or market value to a particular high bidder or purchaser. See Pl. App. 25 (Forest Service Manual provision stating that "the bid price is apt to be greater than the appraised value because the appraised value is based on the operator of average efficiency").[2] The Government presented extensive testimony on the Forest Service's residual value appraisal method at the earlier trials in the Capital Development Company and Seaboard Lumber Company cases. In my opinion, the advertised rates set forth in the appraisal summary for the defaulted Lynx Sale (D. App. 26, line 43) were determined in accordance with the standard Forest Service method (the residual value method) in use when Mt. Adams' Lynx contract terminated.

4. The second step in the standard Forest Service method of preparing a termination value appraisal was to add, if appropriate, an estimated bid premium to the advertised rates produced by the residual value appraisal method described above. See Pl. App. at 55 n.3 (Forest Service Manual exhibit stating "[i]t may be appropriate to add [an] estimated bid premium for unsold volume"). The bid premium – also referred to as an "overbid" – on a particular timber sale is the amount by which a purchaser's bid exceeds the advertised rate for a particular species

[2] "Pl. App. __" refers to the cited page(s) in the appendix filed with Mt. Adams' opposition to the Government's summary judgment motion.

(on a per-MBF basis). An estimated bid premium was added (if appropriate) to the advertised rates for biddable species only, not for species which were sold at a fixed, non-biddable rate. When there was no resale after a purchaser's default, the Forest Service typically added an estimated bid premium to the advertised rates because the agency recognized that its residual value appraisal method generally understated the actual selling value (or market value) of the timber. Anderson Decl. ¶ 11. The Forest Service practice of adding an estimated bid premium to the advertised rates established by the residual value appraisal was essentially an effort to bring the advertised rates more in line with local market conditions existing at the time the defaulted contract terminated (the "as of" date for the appraisal).

5. To the best of my knowledge, the Forest Service issued no detailed written guidance on how to calculate an estimated bid premium. The practice during the relevant period, however, was to review other sales in the same area (ideally the same ranger district) with the same biddable species as the defaulted sale to see whether a price differential existed between the Forest Service's advertised rates and the purchasers' bid rates on those sales. If so, it was standard practice to calculate a weighted average bid premium for each biddable species and add them to the advertised rates for the defaulted sale established by the residual value appraisal. The addition of an estimated bid premium to the advertised rates increased the total appraised value of the remaining timber and, thus, reduced the amount of damages (if any) which would otherwise be due from the defaulting purchaser under the damages methodology set forth in Standard Provision B9.4.

6. On the original Lynx Sale, the biddable species were Douglas Fir ("DF") and Hemlock and Other Coniferous Species ("H&O"). Before calculating an estimated bid premium

for the DF and H&O remaining in the defaulted Lynx Sale, the contracting officer reviewed ten other timber sales on the Randle Ranger District (the District where the Lynx Sale was located) which had occurred before Mt. Adams' default. Anderson Decl. ¶ 12; D. App. 27. The standard practice was to consider sales that occurred before the default because the appraisal was to be as of the contract termination date, not a later date. The contracting officer selected four of the sales for use in calculating an estimated bid premium for the DF and H&O on the defaulted Lynx Sale. He concluded that the four sales "were similar to the Lynx [S]ale in that they contained similar species and both Douglas fir and western hemlock were bid[d]able species." D. App. 27. Using the price differentials between the advertised rates and the purchasers' bid rates on the four sales, the contracting officer calculated weighted average bid premiums for DF and H&O. D. App. 31. Next, he added the weighted average bid premiums to the advertised rates for DF and H&O established by the residual value appraisal for the defaulted Lynx Sale, and computed the total appraised value of the timber remaining on the Lynx Sale at the time of termination. D. App. 32. The addition of the estimated bid premiums for DF & H&O increased the total appraised value of the defaulted Lynx Sale to $17,269,656 (D. App. 32) from the $10,413,380.96 value indicated by the residual value appraisal (D. App. 26, line 43), an increase of almost $7 million.

7. As stated in my initial declaration, it is my opinion that the termination value appraisal of the remaining timber included in the defaulted Lynx Sale – including the contracting officer's determination of the weighted average bid premiums – was performed in accordance with the standard Forest Service appraisal method in use at the time of contract termination. Anderson Decl. ¶ 14. The appraisal, therefore, complied with the requirements of Standard

Provision B9.4.

8. Mr. Ehinger, in his Declaration, criticizes, among other things, the contracting officer's calculation of the estimated bid premiums because the method the contracting officer used does not comply with what Mr. Ehinger considers to be a reasonable methodology. I am unaware, however, of any applicable Forest Service regulation, rule, policy, practice, or other authority that requires the Forest Service to appraise the timber or estimate bid premiums in the manner suggested by Mr. Ehinger. My Ehinger fails to cite any such authority. To the best of my knowledge, none exists. I am unaware, for example, of any Forest Service authority pertaining to the calculation of estimated bid premiums that requires the contracting officer to take into account, or make adjustments for, differences in sale characteristics (e.g., timber quality, volume, duration, etc.) between a defaulted sale and the sales used to calculate estimated bid premiums. In fact, the standard Forest Service method and practice in use during the relevant period did not consider, or make adjustments for, any such differences. I am unaware of any instance in which the Forest Service prepared a termination value appraisal, or calculated estimated bid premiums, in the manner suggested by Mr. Ehinger.

9. Mr. Ehinger appears to suggest that the contracting officer should have calculated the bid premiums for the Lynx Sale and then made adjustments to them for differences between the Lynx Sale and the other sales considered, as in a residential real estate appraisal. Such a methodology would be impracticable, speculative, and administratively inconvenient. More importantly, Mr. Ehinger's suggested methodology is inconsistent with the standard Forest Service appraisal method in use when the Lynx Sale terminated.

10. The purpose of adding an estimated bid premium was to increase the advertised

rates established by the residual value appraisal by an amount which represented the (weighted) average price differential between advertised rates and purchaser bid rates occurring on sales with the same biddable species of timber in the same area as the Lynx sale at the time of contract termination. The Forest Service practice of adding estimated bid premiums to advertised rates was an effort to capture the average price difference (existing at the time of termination) between advertised rates and local market prices for the same species included in a defaulted sale. The practice of adding an estimated bid premium was intended to bring the advertised rates established by the residual value appraisal more in line with market conditions existing at the time the defaulted contract terminated.

11. Mr. Ehinger states that the contracting officer should not have used salvage sales in selecting sales for use in estimating bid premiums for the Lynx Sale. I am unaware of any Forest Service practice or policy requiring the exclusion of salvage sales from consideration in estimating bid premiums for a defaulted sale. The residual value appraisal methodology takes into account the higher costs of operating salvage sales which, in turn, leads to advertised rates for salvage sales that are lower than they otherwise would be. The particular salvage sales the contracting officer used in estimating bid premiums (the Polk 4 Salvage Sale and the Beech 4 Salvage Sale) had relatively high numbers of bidders; there were seven bidders for the Beech 4 Salvage Sale and five bidders for the Polk 4 Salvage Sale. Such competitive bidding would logically increase the amount of the bid premium or overbid.

12. Mr. Ehinger asserts that the contracting officer, in selecting sales used to calculate the bid premium, did not consider sales on the Randle Ranger District which occurred after June 30, 1989, the date the Lynx contract expired uncompleted. Ehinger Decl. ¶ 19. The standard

Forest Service practice, however, was generally to consider sales that occurred on or before the termination date of the defaulted sale (as the contracting officer did here) because the appraisal was to be as of the termination date. Sales that occurred after the termination date were, therefore, generally excluded from consideration.

13. Mr. Ehinger states that the Forest Service should have used third quarter, instead of first quarter, 1989 data in calculating the advertised rates in the residual value appraisal for the defaulted Lynx Sale. Because the appraisal was as of June 30, 1989, however, the standard residual value method required the use of data that was in effect as of June 30, 1989. Third quarter 1989 data would not have been in effect then. Use of the first quarter 1989 data in the residual value appraisal program was correct and consistent with our standard practice.

14. Mr. Ehinger, as noted above (in ¶ 8), fails to cite any Forest Service regulation, rule, policy, or other authority requiring that estimated bid premiums be adjusted to account for differences between a defaulted sale and the sales used to estimate a bid premium. Mt. Adams, however, cites excerpts from two Forest Service Manual ("FSM") provisions which it asserts require the contracting officer to make such adjustments to estimated bid premiums: FSM 2433.6 (reproduced at Pl. App. 40-41); and FSM 2421.4 (reproduced at Pl. App. 25). The language in FSM 2433.6 that Mt. Adams cites states that when there is no resale, "the resale value is the appraised value, adjusted as appropriate to reflect transaction evidence." Pl. App. 41. This provision refers to the need to adjust, where appropriate, the advertised rates established by the residual value appraisal to reflect market conditions existing at the time the defaulted sale terminated. As I explained above (in ¶¶ 4 and 10), that is exactly what the estimated bid premium does. The additional language Mt. Adams cites, from FSM 2421.4, states that

"stumpage prices paid or to be paid for any two tracts cannot be directly compared without adjusting for the physical or quality differences between them." Pl. App. 25. This provision does not pertain to estimated bid premiums but, rather, to general appraisal theory and principles, as indicated in the table of contents for FSM Chapter 2420. See Pl. App. 23 (FSM Chapter 2420 table of contents).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed at Olympia, Washington, on this 2d day of April 2004.

s/Christine Anderson
CHRISTINE ANDERSON