IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MANKE LUMBER CO., et al. (MT. ADAMS VENEER CO.), Plaintiffs, | ) | Consolidated under lead case No. 33-85C (No. 91-984C) (Judge Bruggink) |
| v. | ) | |
| THE UNITED STATES, Defendant. | ) | |

DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT IN MT. ADAMS VENEER CO. v. UNITED STATES, No. 91-984C

Defendant respectfully submits this reply to Mt. Adams' "Memorandum in Opposition to Defendant's Motion for Summary Judgment" ("Mt. Adams Opp.").

Where, as in this case, the Forest Service does not resell the timber remaining in a defaulted sale and seeks damages under the no-resale clause of Standard Provision B9.4, the Federal Circuit has made clear that "the *only* question" for the trial court is "whether the government complied with its standard appraisal method" in determining the value of the remaining timber at the time of contract termination. Hoskins Lumber Co. v. United States, 89 F.3d 816, 817 (Fed. Cir. 1996) (emphasis in original). In our moving brief and the supporting Declaration of Christine Anderson, we demonstrated that the Forest Service, after Mt. Adams' Lynx contract terminated, did comply with its standard appraisal method and that damages, therefore, are due the United States under the formula prescribed in Standard Provision B9.4.

In its opposition to our summary judgment motion, Mt. Adams concedes, as it must, that the sole issue is whether the appraisal was performed in accordance with the standard Forest Service method in use when its contract terminated. Mt. Adams contends, however, that it is

entitled to a trial on this issue because "[t]here are numerous issues of material fact regarding whether the Forest Service complied in all material respects with their standard damages appraisal methods." Mt. Adams Opp. at 25. In support of its opposition, Mt. Adams relies primarily upon the Declaration of Paul Ehinger, and also upon the documents in the appendix to its brief.[1]

In considering whether Mt. Adams has produced evidence sufficient to establish the existence of a "genuine" issue of "material" fact, the Court should be mindful of the standards for summary judgment under Rule 56(c). Not every fact in dispute is "material" and not every dispute about a material fact is "genuine." A "material" fact is one which "might affect the outcome of the suit," and a dispute as to a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Further, "the burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact[;]" rather, "the burden on the moving party may be discharged by showing . . . that there is an absence of evidence to support

---

[1] To respond to Mr. Ehinger's criticism of the Forest Service's appraisal and to further explain how the appraisal was performed, we attach the Supplemental Declaration of Christine Anderson ("Anderson Suppl. Decl."). Mt. Adams suggests that Ms. Anderson's initial declaration should be stricken because she did not prepare the appraisal of the defaulted Lynx Sale. Mt. Adams Opp. at 3 & n.3. Ms. Anderson is nonetheless qualified to testify on the key issue of whether the appraisal was performed in accordance with the standard Forest Service method in use when the Lynx contract terminated. As described in her Declaration and Supplemental Declaration, Ms. Anderson has broad knowledge of the appraisal methodology in use during the relevant period. She has extensive experience not only in preparing Forest Service appraisals, but also in reviewing appraisals performed by other Forest Service personnel to ensure that they complied with the standard Forest Service method. Anderson Suppl. Decl. ¶ 1. In addition, this Court previously decided that she was competent to testify about Forest Service policies, procedures, and practices in the Capital Development and Seaboard Lumber trials.

the non-moving party's case." Sweats Fashions, Inc. v. Pannill Knitting Co., 833 F.2d 1560, 1563 (Fed. Cir. 1987) (emphasis in original) (internal quotations omitted). In considering whether Mt. Adams has produced evidence sufficient to create a "genuine" issue as to whether the Forest Service complied with its standard appraisal method, we address first the testimony of Mr. Ehinger.

In his January 22, 2004 Declaration, Mr. Ehinger criticizes the Forest Service's appraisal of the defaulted Lynx Sale. His criticism primarily concerns differences between the Lynx Sale and the four sales the contracting officer used to estimate the bid premiums, and the contracting officer's failure to make adjustments for such differences in calculating the estimated bid premiums. Mr. Ehinger also criticizes the use of data from the first quarter of 1989 in the pre-bid premium stage of the appraisal process (i.e., the preparation of the residual value appraisal described in Anderson Suppl. Decl. ¶ 3), and the contracting officer's exclusion of sales that post-dated the June 30, 1989 termination of the Lynx contract in determining the estimated bid premiums. See Anderson Suppl. Decl. ¶ 4-6 (describing the Forest Service practice regarding estimated bid premiums).

Specifically, Mr. Ehinger asserts the following:

a. two of the four sales the contracting officer used to estimate the bid premiums were salvage sales and should not have been considered because the Lynx Sale was not a salvage sale (Ehinger Decl. ¶ 9);

b. the quality of the timber in the four sales the contracting officer used to estimate the bid premiums was materially inferior to the quality of the timber included in the Lynx Sale (Ehinger Decl. ¶¶ 11, 12(a));

c. the logging costs on the four sales the contracting officer used to estimate bid premiums were not comparable to the logging costs on the Lynx Sale (Ehinger Decl. ¶ 12(b));

d. the four sales the contracting officer used to estimate bid premiums were stumpage rate adjustment sales and the Lynx Sale was not (Ehinger Decl. ¶ 12(c));

e. the four sale the contracting officer used to estimate bid premiums contained different financial requirements (e.g., down payment and midpoint payment requirements) than the Lynx Sale (Ehinger Decl. ¶¶ 12(d)-(e));

f. the bidding on the Lynx Sale was more aggressive than the bidding on the four sales the contracting officer used to estimate bid premiums (Ehinger Decl. ¶ 12(f));

g. two of the sales the contracting officer used to estimate bid premiums were canceled and never logged (Ehinger Decl. ¶ 12(g));

h. the sales the contracting officer used to estimate bid premiums were different from the Lynx Sale in other respects such as total volume, duration, hauling costs, and the percentage of the various species included (Ehinger Decl. ¶ 12(h));

i. in calculating the bid premiums for the defaulted Lynx Sale, the contracting officer did not make any adjustments for such differences in sale characteristics between the Lynx Sale and the four sales used to estimate bid premiums (Ehinger Decl. ¶¶ 13, 14, 15));

j. the contracting officer's method of determining "the resale value" of the defaulted Lynx Sale "does not comply with [unspecified] USFS policy" (Ehinger Decl. ¶ 16);

k. in calculating the estimated bid premiums, the contracting officer did not consider "a multitude of sales on the Randle [Ranger] District which occurred after June 30, 1989, the date Mt. Adams' Lynx contract expired uncompleted (Ehinger Decl. ¶ 19);

l. in computing the advertised rates in the residual value appraisal, the Forest Service used data from the first quarter of 1989, but should have used data from the third quarter of 1989 because it was available when the residual value appraisal was completed on June 1, 1990. Ehinger Decl. ¶ 20.

Mr. Ehinger asserts, conclusorily, that the "Contracting Officer's method of determining resale value in this case does not comply with USFS policy." Ehinger Decl. ¶ 16. Remarkably, Mr. Ehinger fails to cite *any* Forest Service regulation, rule, policy, practice or other authority requiring that a termination value appraisal be prepared in the manner he suggests. Contrary to what Mr. Ehinger says, the Forest Service was not required to "determine" the "resale value" of the timber remaining in the Lynx Sale. The resale value (if the sale were resold) would be established in the marketplace by an actual resale. In this case, the Forest Service decided not to resell the timber. Thus, appraised value, not resale value, is the basis for determining damages. Because there was no resale, the contract required only that the Forest Service appraise the remaining timber in accordance "'with the standard Forest Service method in use at [the] time of the termination' of the timber contract." Hoskins Lumber, 89 F.3d at 817 (quoting Standard Provision B9.4). We have demonstrated that the Forest Service did that. See Anderson Decl. ¶¶ 10-14; Anderson Suppl. Decl. ¶¶ 2-7.

Mr. Ehinger essentially criticizes the Forest Service, not for its failure to appraise the timber in accordance with the agency's standard method but, rather, for its failure to appraise the timber in a manner that he believes to be a reasonable. What Mr. Ehinger believes to be a reasonable method is, of course, immaterial. Hoskins Lumber, 89 F.3d at 817 (observing that a defaulting purchaser is "emphatically *not* entitled to a 'fair' appraisal, an 'accurate' appraisal,

a 'reasonable' appraisal, or any manner of appraisal other than the one indicated in section B9.4.") (emphasis in original).

We are unaware of any applicable Forest Service regulation, rule, policy, practice, or other authority that requires the Forest Service to appraise the timber or to estimate bid premiums in the manner suggested by Mr. Ehinger. Anderson Suppl. Decl. ¶ 8. There is no Forest Service authority pertaining to the calculation of estimated bid premiums that requires the contracting officer to take into account, or make adjustments for, differences in sale characteristics (such as timber quality, volume, duration, etc.) between a defaulted sale and the sales used to calculate estimated bid premiums. Id.

To the contrary, the standard Forest Service method and practice is use during the relevant period was not to make adjustments for any such differences. Anderson Suppl. Decl. ¶ 8. Mr. Ehinger fails to cite a *single* instance in which the Forest Service prepared a termination value appraisal, or calculated estimated bid premiums, using the method he suggests. We are unaware of any instance in which the Forest Service prepared a termination value appraisal, or calculated estimated bid premiums, in the manner Mr. Ehinger suggests. Id. Mr. Ehinger's method is inconsistent with the standard Forest Service appraisal method in use at the time the Lynx contract terminated. Anderson Suppl. Decl. ¶ 9. In addition, applying his method would be administratively inconvenient and impracticable. Id.

This is not a case like Seaboard Lumber or Capital Development where the Forest Service resold the remaining timber included in defaulted sales on different terms and issued specific guidelines directing contracting officers to adjust the resale values to account for the impact of the changed terms on the resale price. This is a no-resale case. Pertinent precedent

requires only that the Forest Service appraise the remaining timber included in the defaulted sale in accordance with the standard Forest Service method in use at the time of termination, as required under the terms of the contract. Hoskins Lumber, 89 F.3d at 817.

Further, Mr. Ehinger misapprehends (or ignores) the purpose of adding an estimated bid premium. The purpose was not to determine "the resale value" of the Lynx Sale as he seems to assume. See Ehinger Decl. ¶ 16. While the Forest Service apparently issued no detailed guidance on calculating estimated bid premiums (Anderson Suppl. Decl. ¶ 5), the agency practice of adding them to the advertised rates established by the residual value appraisal was intended to capture the (weighted) average price difference between advertised rates and local market prices for the same biddable species included in a defaulted sale. Anderson Suppl. Decl. ¶ 10. The practice was an attempt to bring the Forest Service's advertised rates more in line with market conditions existing at the time of default. Id.

As noted above, Mr. Ehinger also opines that the contracting officer should not have used salvage sales in selecting sales for use in estimating the bid premiums. Ehinger Decl. ¶ 9. He fails to cite any authority for excluding them. We are unaware of any Forest Service policy or practice requiring the exclusion of salvage sales from consideration in estimating bid premiums for a defaulted sale. Anderson Suppl. Decl. ¶ 11. The two salvage sales the contracting officer used were competitively bid (seven bidders for the Beech 4 Salvage Sale and five bidders for the Polk 4 Salvage Sale). Such competitive bidding would tend to increase the size of the bid premium or overbid. Id.

In addition, Mr. Ehinger criticizes the contracting officer for not considering sales on the Randle Ranger District that occurred after the June 30, 1989 termination of the Lynx contract.

Ehinger Decl. ¶ 19. The standard Forest Service practice, however, was generally to consider only sales that occurred on or before the termination date of the defaulted contract. This is logical because the appraisal was to be "as of" the termination date, not some later point in time. Anderson Suppl. Decl. ¶ 12.

Mr. Ehinger also criticizes the Forest Service's use of first quarter, instead of third quarter, 1989 data for computing the advertised rates in the residual value appraisal. Ehinger Decl. ¶ 20. Because the appraisal was as of June 30, 1989, the residual value method required using data that was in effect and available as of June 30, 1989. Third quarter 1989 data would obviously not have been available on June 30, 1989. Use of the first quarter 1989 data was consistent with the Forest Service's standard appraisal method. Anderson Suppl. Decl. ¶ 13. Mr. Ehinger's remaining testimony is irrelevant and immaterial.

As stated before, Mr. Ehinger fails to cite any authority requiring the contracting officer to adjust the estimated bid premiums to account for differences between the defaulted Lynx Sale and the sales used to estimate the bid premiums. Mt. Adams, however, in its brief (Mt. Adams Opp. at 11-12), cites excerpts from two Forest Service Manual ("FSM") provisions which it claims compelled the contracting officer to make such adjustments to the bid premiums: 1) FSM 2433.6 (reproduced at Pl. App. 40-41); and 2) FSM 2421.4 (reproduced at Pl. App. 25). In FSM 2433.6, Mt. Adams points to language stating that, when there is no resale, "the resale value is the appraised value, adjusted as appropriate to reflect transaction evidence." Pl. App. 41. This provision simply refers to the need to adjust, where appropriate, the advertised rates established by the residual value appraisal to reflect market conditions existing when the defaulted sale terminated. That is precisely what the estimated bid premium does. Anderson

Suppl. Decl. ¶ 14. Further, the provision is consistent with FSM 2433.54 which also recognizes that "[i]t may be appropriate to add [an] estimated bid premium for unsold volume." Pl. App. 55 at n.3. The second excerpt Mt. Adams relies upon, from FSM 2421.4, states that "stumpage prices paid or to be paid for any two tracts cannot be directly compared without adjusting for the physical or quality differences between them." Pl. App. 25. This statement has nothing to do with estimated bid premiums. Rather, it deals with general appraisal theory and principles, as indicated in the table of contents for FSM Chapter 2420. See Pl. App. 23 (FSM Chapter 2420 table of contents).

Mt. Adams' other points are immaterial. For example, Mt. Adams complains that the volume estimate for the original Lynx Sale was never certified in accordance with a Forest Service Region 6 supplement to the FSM. Mt. Adams Opp. at 18-19. According to Mt. Adams, the Forest Service's volume estimates, therefore, "are seriously in doubt[.]" Id. at 19. Volume estimates are, however, exactly that: "estimates." They are not guarantees. When it signed the contract, Mt. Adams agreed to the use of the volume estimates (which are part of the contract) in the event it later failed to perform and damages were found due under the B9.4 formula. In addition, the standard appraisal method does not require re-cruising after a purchaser's default.[2]

---

[2] In addition to responding on the merits to our summary judgment motion, Mt. Adams invokes Rule 56(f) and claims that summary judgment would be "inappropriate" "without allowing Mt. Adams an *additional* opportunity to conduct discovery[.]" Mt. Adams Opp. at 23 n.10 (emphasis added). Rule 56(f) requires that the party seeking discovery submit an affidavit to the Court demonstrating why the party cannot present "facts essential to justify [its] opposition" to a summary judgment motion. Mt. Adams has not submitted such an affidavit. Further, Mt. Adams has responded on the merits of our summary judgment motion. Mt. Adams has already had ample discovery, as is apparent from its appendix. The parties in these consolidated cases had years to conduct discovery and obtain all available, relevant evidence. No additional discovery is warranted at this stage of the proceedings. Finally, Mt. Adams claims (continued...)

In ruling on our motion, the issue for the Court is whether Mt. Adams has produced evidence sufficient to create a "genuine" issue as to whether the Forest Service complied with its standard appraisal method. Anderson v. Liberty Lobby, 477 U.S. at 248 (a dispute over a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."). What evidence has Mt. Adams produced demonstrating non-compliance with the standard Forest Service appraisal method? Mr. Ehinger, in his Declaration, fails to cite any authority whatsoever indicating that the Forest Service did not comply with its own standard appraisal method. The remaining evidence produced by Mt. Adams is insufficient to support a judgment in its favor for the reasons previously discussed. Because Mt. Adams has failed to produce evidence that would allow this Court to rule in its favor, summary judgment in favor of the United States is appropriate.

Conclusion

For the foregoing reasons, the United States respectfully requests that the Court grant its motion for summary judgment, and enter an order directing the entry of a judgment awarding the United States $3,789,615, plus interest, on its counterclaim, and dismissing plaintiff's complaint.

---

[2](...continued)
that summary judgment is "inappropriate" until the Forest Service issues a final decision on its buyout applications at issue in another case, Mt. Adams Veneer Co. v. United States, No. 589-87C. Mt. Adams Opp. at 25 n.11. The buyout applications in No. 589-87C do not, however, include the Lynx Sale. Further, the Forest Service issued a draft decision on the buyout applications which undersigned counsel provided to Andy Gala, then-counsel for Mt. Adams, nearly two years ago (in June 2002). Undersigned counsel also provided the Forest Service decision to Mt. Adams' current counsel four months ago, at their request. Mt. Adams has not responded in any way. The pendency of other cases involving different contracts and different disputes is not a basis for postponing a ruling on the summary judgment motion in this case.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/John W. Showalter by s/Richard P. Nockett
JOHN W. SHOWALTER
Assistant Director

s/Richard P. Nockett
RICHARD P. NOCKETT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L Street, N.W. (8th Floor)
Washington, D.C. 20530
Tele: (202) 307-1134
Fax: (202) 307-0494

Attorneys for Defendant

Dated: April 2, 2004

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this __2d_ day of April 2004 I caused copies of the foregoing "DEFENDANT'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT IN MT. ADAMS VENEER CO. v. UNITED STATES, No. 91-984C," and the accompanying "SUPPLEMENTAL DECLARATION OF CHRISTINE ANDERSON" to be served upon the following individuals by facsimile and by United States mail (first-class, postage prepaid):

DENNIS J. DUNPHY, Esq.
Schwabe, Williamson & Wyatt
1420 Fifth Avenue, Suite 3010
Seattle, Washington 98101-2393

STEVEN A. MILLER, Esq.
Schwabe, Williamson & Wyatt
1420 Fifth Avenue, Suite 3010
Seattle, Washington 98101-2393

s/Richard P. Nockett