IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| MANKE LUMBER CO., et al. (MT. ADAMS VENEER CO.), | ) | |
| Plaintiffs, | ) | |
| v. | ) | Consolidated under lead case No. 33-85C (No. 91-984C) (Judge Bruggink) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW IN MT. ADAMS VENEER CO. v. UNITED STATES, No. 91-984C

Defendant, pursuant to Appendix A, ¶ 14, of the Rules of the United States Court of Federal Claims, and this Court's Order of February 3, 2005, respectfully submits the following memorandum of contentions of fact and law for the trial in Mt. Adams Veneer Co. v. United States, No. 91-984C, which is presently scheduled to commence on April 5, 2005.

## INTRODUCTION

This case involves a Government claim for damages arising out of Mt. Adams Veneer Company's ("Mt. Adams"') breach of a Forest Service timber sale contract. After Mt. Adams failed to perform, the Forest Service decided not to resell the remaining timber. The agency appraised the timber at the time of contract termination, using its standard residual value appraisal method then in effect, as required by Standard Provision B9.4 of the contract. Where, as here, there was no resale, the standard Forest Service practice at the time was to add, if appropriate, an estimated bid premium to the appraised rate established by the residual value appraisal for each biddable species of timber included in the defaulted sale.

Therefore, the contracting officer, after considering at least ten other timber sales on the same ranger district, used actual bid premiums from four of them to determine an estimated bid premium for each of the two biddable species included in Mt. Adams' defaulted sale. The contracting officer added the estimated bid premiums to the appraised rates established by the residual value appraisal for the two biddable species. The addition of the estimated bid premiums to the appraised rates increased significantly the appraised value at the time of contract termination of the timber remaining in Mt. Adams' defaulted sale. However, because the value at termination was less than the amount Mt. Adams was obligated to pay under the terms of its contract, the contracting officer issued a final decision asserting a Government claim for damages against the company. The contracting officer determined the damages using the formula prescribed by the "no-resale" clause in Standard Provision B9.4.

This Court, in a June 22, 2004 Order, denied the United States' summary judgment motion, concluding that material factual issues exist which must be resolved at trial. In this regard, the Court observed that "[i]t is far from clear what the policy of the Forest Service was with respect to appraisals of timber inventory in the event of a 'no-resale.'" Order of June 22, 2004, at 1. The Court further stated that "there are fact questions surrounding the selection of comparable sales" the contracting officer used to calculate the estimated bid premiums, and "[t]he judgment involved in making those selections can be explored at trial[.]" Id.

## CONTENTIONS OF FACT[1]

On August 27, 1979, the Forest Service advertised the Lynx Timber Sale and issued a prospectus containing information for prospective bidders concerning the timber included in the Sale and the terms and conditions of its sale. The Lynx Sale included an estimated 37,500 MBF[2] of merchantable timber located on the Randle Ranger District of the Gifford Pinchot National Forest on the westside of the Cascade Mountain Range in Washington State. Additional documents available to bidders containing information about the Sale included a sample contract, the Forest Service appraisal and cruise information, a sale area map, and plans and specifications for the construction and reconstruction of specified roads. Bidding was to be conducted on September 27, 1979. Jt. Stip. ¶ 1;[3] see also Jt. Ex. 1[4] (sale advertisement) and Jt. Ex. 2 (prospectus).

As stated in the prospectus, the Lynx Sale comprised 14 clearcutting harvest units totaling 536 acres, plus 38 acres of right-of-way to be cleared for specified road construction. The prospectus indicated that the Sale required the construction of approximately 6.1 miles of specified roads, the reconstruction of approximately 5.3 miles of specified roads, and allowed purchaser road credits in the amount of $933,641. The normal operating season was to be between May 15 and November 15. The contract termination date was to be March 31, 1987.

---

[1] The parties filed joint stipulations of fact on January 14, 2005. In this factual statement, we rely, in part, on these joint stipulations (and cite them where we do).

[2] "MBF" is a unit of measurement meaning "thousand board feet." Thus, 1 MBF equals one thousand board feet of timber.

[3] "Jt. Stip. ¶ __" refers to the cited paragraph in the parties' joint stipulations of fact.

[4] "Jt. Ex. __" refers to the cited exhibit on the parties' joint exhibit list.

Jt. Stip. ¶ 2; see also Jt. Ex. 2 (prospectus).

According to the prospectus, the total estimated volume of merchantable timber included in the Sale consisted of the following species and estimated volumes:

| Species | | Estimated Volume (MBF) |
|---|---|---|
| Douglas fir ("DF") | | 19,600 |
| Western red cedar ("C") | | 1,500 |
| Hemlock and other species ("H&O") | | 16,400 |
| | Total: | 37,500 MBF |

Jt. Stip. ¶ 3; see also Jt. Ex. 2 (prospectus) and Jt. Ex. 3 (appraisal summary, dated August 15, 1979).

In addition to the estimated 37,500 MBF of merchantable timber, the Sale included an estimated 2,100 MBF of utility pulp and special cull material located throughout the 574 acres of the Sale area to be harvested. This material is referred to as "per-acre material" or "PAM." Jt. Stip. ¶ 3; see also Jt. Ex. 2 (prospectus) and Jt. Ex. 3 (appraisal summary).

The advertised rates per MBF,[5] established by the Forest Service appraisal, for the three species of merchantable timber included in the Sale were:

[5] The advertised rates for the original Lynx Sale were the minimum acceptable bid rates for the various species of timber included in the Sale, exclusive of required deposits for slash disposal and road maintenance. Advertised rates are equal to the higher of the "appraised rates" or "base rates." Appraised rates represent the estimated fair market value of the timber as determined by the Forest Service's residual value appraisal methodology. Base rates are the lowest rates of payment which the Forest Service is authorized to accept. The advertised rates for the Lynx Sale were the appraised rates established by the residual value appraisal. See Jt. Ex. 3 (appraisal summary dated August 15, 1979, line 43).

| Species | Advertised Rate |
|---|---|
| DF | $213.85 |
| C | $220.35 |
| H&O | $125.18 |

Jt. Stip. ¶ 4. The Western red cedar was not biddable. Rather, it was to be sold and paid for at a fixed rate of $220.35 per MBF (i.e., its advertised rate). The PAM included in the Sale was also not biddable. It was subject to per-acre pricing and was to be sold and paid for at a fixed rate of $1.83 per acre. Jt. Stip. ¶ 4; see also Jt. Ex. 1 (sale advertisement) and Jt. Ex. 2 (prospectus). The total advertised value[6] for the Lynx Sale was $6,575,986.87. Jt. Stip. ¶ 4; see also Jt. Ex. 3 (appraisal summary, line 43).

The Forest Service conducted bidding on September 27, 1979. Mt. Adams was the high bidder among twelve. Mt. Adams' bid rates[7] for each species were as follows:

| Species | Unit of Measure | Advertised Rate | Mt. Adams' Bid Rate |
|---|---|---|---|
| DF | MBF | $213.85 | $678.00 |
| C | MBF | $220.35 | $220.35 |
| H&O | MBF | $125.18 | $500.00 |

[6] Total advertised value is obtained by multiplying the advertised rate per MBF for each species by the estimated volume of each species, and adding the figures thus derived. In other words, total advertised value is the sum of the products of the advertised rates multiplied by the estimated volume (in MBF) of each species.

[7] "Bid rates," as defined in the timber sale contract, "are the rates bid by [the] Purchaser (exclusive of Required Deposits for slash disposal and road maintenance) and are the sum of the Advertised Rates and Bid Premium Rates." Jt. Ex. 7 (Lynx Contract, § A5b) (parenthetical in original). "Bid Premium Rates" are defined as "the amounts by which [the] Purchaser's bid is in excess of Advertised Rates." Id.

| Species | Unit of Measure | Advertised Rate | Mt. Adams' Bid Rate |
|---|---|---|---|
| PAM | Acre | $1.83 | $1.83[8] |

Jt. Stip. ¶ 5; see also Jt. Ex. 4 (bid form, dated September 27, 1979, signed by Dean Hackett, Mt. Adams' general manager).[9]

The total bid value[10] of Mt. Adams' bid equaled $21,820,375.00. Jt. Stip. ¶ 5; see also Jt. Ex. 5 (report of timber sale, dated September 27, 1979). The total value of Mt. Adams' bid ($21,820,375.00) was more than three times the total advertised value ($6,575,986.87) of the Lynx Sale established by the Forest Service appraisal process.

By letter dated October 24, 1979, the Forest Service accepted Mt. Adams' bid and awarded the company the Lynx Timber Sale Contract. Jt. Stip. ¶ 6; see also Jt. Ex. 6 (award letter). Under the terms of the contract, Mt. Adams was obligated to cut, remove, and pay for at contract rates (i.e., its bid rates) all of the timber included in the Sale by the contract termination date of March 31, 1987. Jt. Stip. ¶ 6; see also Jt. Ex. 7 (Lynx Contract).

---

[8] As stated, the Western red cedar and PAM were offered at fixed rates and were not biddable (i.e., the Forest Service would consider no different rates than the advertised rate).

[9] The bid form signed by Mt. Adams states: BIDDERS ACKNOWLEDGE THAT FOREST SERVICE ESTIMATES OF COSTS AND TIMBER VOLUMES ARE NOT GUARANTEED AND THAT THE FOREST SERVICE GRANTS NO WARRANTY, EITHER EXPRESS OR IMPLIED OF THEIR ACCURACY. BIDDER EXPRESSLY DISCLAIMS ANY RELIANCE ON FOREST SERVICE COST ESTIMATES AND TIMBER VOLUME ESTIMATES IN SUBMITTING THIS BID. Jt. Ex. 4 (emphasis in original). Given this disclaimer by the Forest Service and Mt. Adams' written acknowledgment of it, Mt. Adams has no legitimate basis for complaining about technical errors in the agency's cruise process such as the unsigned 1979 cruise certification form it pointed to in opposition to our summary judgment motion.

[10] Total bid value is calculated by multiplying the bid rate per MBF for each species by the estimated volume of each species, and then adding the figures thus derived. In other words, total bid value is the sum of the products of the bid rates multiplied by the estimated volume (in MBF) for each species.

The parties later executed, on November 18, 1981, an "Agreement to Extend Timber Sale Contract," which extended the contract termination date by 27 months, from March 31, 1987, to June 30, 1989. Jt. Stip. ¶ 7; see also Jt. Ex. 8 (extension agreement).

When the contract terminated on June 30, 1989, Mt. Adams had only partially performed. During the performance period, Mt. Adams harvested most of the right-of-way timber, completed all of the specified roads, and transferred its resulting purchaser credits to other sales, but failed to cut, remove, and pay for any of the timber in the 14 clearcutting units included in the Sale. Jt. Stip. ¶ 9.

Mt. Adams' Lynx contract contains Standard Provision B9.4, entitled "Failure to Cut." Standard Provision B9.4 requires the Forest Service to appraise the remaining timber after a purchaser's default and prescribes the methodology for determining the damages, if any, due the United States when the purchaser fails to cut, remove, and pay for all of the timber included in the sale by the contract termination date. Standard Provision B9.4 provides in pertinent part:

> B9.4 Failure to Cut. In event of (a) termination for breach or (b) Purchaser's failure to cut designated timber on portions of Sale Area by Termination date, Forest Service shall appraise remaining Included Timber, unless termination is under B8.22. Such appraisal shall be made with the standard Forest Service method in use at the time of termination.
>
> Damages due the United States for Purchaser's failure to cut and remove such timber meeting Utilization Standards shall be the amount by which Current Contract Value[,] plus the cost of resale, less any effective Purchaser Credit remaining at time of termination, exceeds the resale value at new Bid Rates. *If there is no resale, damages due shall be determined by subtracting the value established by said appraisal from the difference between Current Contract Value and Effective Purchaser Credit.*

Jt. Stip. ¶ 10; Def. Ex. 13 (Standard Provision B9.4) (emphasis added).

After the Lynx contract expired uncompleted, the Forest Service decided not to resell the remaining timber included in the Sale.[11] The decision was memorialized in a document entitled "ANALYSIS SUMMARY AND DECISION NOT TO RESELL D-LYNX TIMBER SALE," dated September 21, 1990, and signed by the District Ranger for the Randle Ranger District. See Jt. Ex. 12.

Following the termination of the Lynx contract, the Forest Service appraised the remaining timber using the standard Forest Service method then in effect, as required by Standard Provision B9.4. Where there was no resale, the standard Forest Service appraisal method was a two-step process. The first step involved determining appraised rates for each species included in the defaulted sale using the Forest Service's residual value appraisal methodology.[12] This is the same methodology the Forest Service used during the relevant

---

[11] After the contract terminated, the Forest Service initially planned a resale. However, the agency ultimately decided not to resell.

[12] The residual value appraisal method in effect during the relevant period is concisely described in 36 C.F.R. § 223.60 (1989):

> The basic procedure will be [an] analytical appraisal under which stumpage value [i.e., the value of the standing timber] is a residual value determined by subtracting from the selling value of the products normally manufactured from the timber the sum of estimated operating costs, including costs to the purchaser for construction of roads or other developments needed by the purchaser for removal of the timber, and margins for profit and risk. Costs and product values under the residual value method shall be those of an operator of average efficiency and related to the operating difficulties and to [the] size and quality of the timber.

Id. As indicated, the residual value appraisal takes into account the quality of the timber. Thus, a sale consisting of high-grade timber would have a higher selling value than a sale consisting of relatively low-grade timber, all other things being equal. Mr. Hofer testified at length about the residual value appraisal method during the trial in the Capital Development Co. case. For (continued...)

period to determine the advertised rates (or minimum acceptable bid rates) for a new timber sale offering.

The second step in the process (where there was no resale) was to add, if appropriate, an estimated bid premium to the appraised rate established by the residual value appraisal for each biddable species of timber included in the defaulted sale.[13] The practice of adding estimated bid premiums stemmed from the agency's recognition that appraised rates established by its residual value method generally tended to understate the actual selling (or market) value of the timber. Thus, in no-resale instances, the addition of estimated bid premiums to residual value-appraised rates was intended to bring the appraised rates for biddable species more in line with local market conditions existing at the time the defaulted contract terminated.

After the Lynx Sale expired and the Forest Service decided not to resell the remaining timber, the agency performed an appraisal using its standard residual value method. See Jt. Ex. 11 (appraisal summary, dated June 1, 1990). The appraisal used first quarter 1989 data for the appraisal base period because that data was in effect on the termination date.[14] As set forth in the

[12](...continued)
purposes of judicial economy, we asked counsel for Mt. Adams to include part of Mr. Hofer's prior testimony as a joint exhibit in this case and to incorporate it into the trial record. To date, Mt. Adams' counsel has refused to do so.

[13] See, e.g., Jt. Ex. 15 (FSM § 2433.54, Exhibit 1, n.3, stating "[i]t" may be appropriate to add estimated bid premium for unsold volume"). While the Forest Service Manual and other directives refer to adding estimated bid premiums, if appropriate, to appraised rates when there is no resale, we are aware of no specific written guidance detailing the procedure to be followed.

[14] There were other residual value appraisals completed after the contract terminated, but before the June 1, 1990 appraisal. These included a September 27, 1989 rate redetermination appraisal, and an April 24, 1990 damage appraisal which used, incorrectly, third quarter 1989 data as the base period for the appraisal. Jt. Stip. ¶ 11; see also Jt. Ex. 9 and 10 (appraisal
(continued...)

appraisal summary, an estimated volume of 38,300 MBF, including PAM, remained in the sale area. The remaining timber included the following species and estimated volumes:

| Species | Estimated Volume |
| --- | --- |
| DF | 19,100 |
| C | 1,400 |
| H&O | 15,800 |
| PAM | 2,000 |
| Total Remaining Volume: | 38,300 MBF |

Jt. Stip. ¶ 12; see also Jt. Ex. 11 (June 1, 1990 appraisal summary, line 5).

[14](...continued)
summaries dated September 27, 1989, and April 24, 1990, respectively). Mt. Adams contends that the Forest Service should have used the third quarter 1989 data because it was available when the damage appraisal was performed (June 1, 1990) and would have resulted in higher appraised rates and, thus, reduced the damages. However, use of the third quarter 1989 data was incorrect and inconsistent with the standard Forest Service appraisal method. The standard method required using data that was in effect on June 30, 1989, the termination date of the Lynx contract and the "as of" date for the appraisal. Third quarter 1989 data was not in effect or available as of June 30, 1989. Mt. Adams also contends that the Forest Service should have used the rates in the September 27, 1989 rate redetermination appraisal to determine the Current Contract Value of the Lynx Sale at termination because those rates would reduce the Current Contract Value and, thus, reduce damages. However, Mt. Adams is not entitled to the benefit of the redetermined rates. Contract provision A7, entitled "Scheduled Rate Redetermination," provides that lower rates from a scheduled rate redetermination cannot become effective until after the Purchaser has cut and scaled 21,100 MBF. Because Mt. Adams failed to meet this performance requirement, it is not entitled to redetermined rates.

The rates established by the June 1, 1990 residual value appraisal were as follows for each species:

| Species | Appraised Rates |
|---|---|
| DF | $426.35 |
| C | $171.12 |
| H&O | $121.16 |
| PAM | $ 58.10 |

Jt. Stip. ¶ 12; see also Jt. Ex. 11. As determined by the June 1, 1990 residual value appraisal, the total value of the remaining volume equaled $10,413,380.96. Jt. Stip. 12; see also Jt. Ex. 11 (appraisal summary, line 43).[15]

The contracting officer determined that it was appropriate to add estimated bid premiums to the appraised rates for the two biddable species of timber (DF and H&O) included in the Lynx Sale. He considered at least ten other sales that occurred on the Randle Ranger District before June 30, 1989 (the termination date of the Lynx contract).and selected four of them to use in calculating estimated bid premiums.

---

[15] The total value of the remaining timber established by the June 1, 1990 damage appraisal ($10,413,380.96) was approximately $3.8 million greater than the total appraised value of the original 1979 sale ($6,575,986.87), notwithstanding that Mt. Adams harvested the right of way timber. However, the total value established by the June 1, 1990 appraisal was approximately $10.7 million less than the Current Contract Value of the Lynx contract at the time of termination ($21,159,271), i.e., the contract value based upon Mt. Adams' bid rates. Thus, if no estimated bid premiums were added to the appraised rates established by the June 1, 1990 residual value appraisal, the Government's claim for damages would exceed $10.7 million, exclusive of interest. As we demonstrate below, the addition of estimated bid premiums to the appraised rates for DF and H&O increased significantly the termination value of the Lynx Sale and reduced the Government's claim to $3,789,615, exclusive of interest.

The four sales he selected occurred between September 1988 and March 1989. The contracting officer considered the four sales to be "similar" to the Lynx Sale in that each sale included both DF and H&O, and in each sale both species were biddable. See Jt. Ex. 13 (contracting officer's June 22, 1990 decision, at p. 1). He also considered that each of the four sales was the subject of competitive bidding (which would tend to increase bid premiums).[16]

The contracting officer used the actual bid premiums for DF and H&O from the four sales to calculate weighted average bid premiums. He determined the weighted average bid premium for DF to be $215.27, and the weighted average bid premium for H&O to be $173.71. See Jt. Ex. 13 (handwritten calculations at p. 2, attached to contracting officer's decision). The contracting officer added these weighted average bid premiums to the appraised rates for DF and H&O established by the June 1, 1990 residual value appraisal and determined the value of the remaining timber on the Lynx Sale at the time of termination as follows:

| Species | Volume | Appraised Rate | Bid Premium | New Rate | Total |
|---|---|---|---|---|---|
| DF | 19,100 | $426.35 | $215.27 | $641.62 | $12,254,942 |
| H&O | 15,800 | $121.16 | $173.71 | $294.87 | $4,658,946 |
| C | 1,400 | $171.12 | — | $171.12 | $239,568 |
| PAM | 2,000 | $58.10 | — | $58.10 | $116,200 |

[16] Mt. Adams, through its expert, Paul Ehinger, contends that the four sales the contracting officer selected and used to calculate estimated bid premiums were not comparable to the Lynx Sale with respect to contract duration, timber volume, and timber quality. Mr. Ehinger, however, fails to point to any other sale which he believes is more comparable (or a better comparable) and which, therefore, should have been used by the contracting officer. We expect that Mt. Adams and Mr. Ehinger will concede at trial, as they must, that there were no sales closely comparable to the Lynx Sale that occurred anywhere near the time of termination (June 30, 1989). By then, sales like the Lynx Sale, particularly in terms of volume and duration, were relics of the past.

Appraised Value at Termination: $17,269,656

See Jt. Ex. 13 (handwritten calculations at p. 3, attached to contracting officer's decision).

To determine whether damages were due under Standard Provision B9.4, the contracting officer also calculated the Current Contract Value[17] of the remaining timber included in the Lynx Sale at the time of terminaton. He did so as follows:

| Species | Volume | Contract Rate | Total |
|---|---|---|---|
| DF | 19,100 | $678.00 | $12,949,800 |
| H&O | 15,800 | $500.00 | $7,900,000 |
| C | 1,400 | $220.35 | $308,490 |
| PAM | 536 acres | $1.83 | 981 |
| Current Contract Value at Termination: | | | $21,159,271 |

See Jt. Ex. 13 (handwritten calculations at p. 3, attached to contracting officer's decision).

Applying the formula prescribed by Standard Provision B9.4, the contracting officer determined the damages due the United States as follows:

| | |
|---|---|
| Current Contract Value at Termination: | $21,159,271 |
| Less Appraised Value at Termination: | - 17,269,656 |
| Damages: | $3,889,615 |
| Less Cash Deposit: | - $100,000 |
| Net Amount Due: | $3,789,615[18] |

Jt. Ex. 13 (handwritten calculations at p. 3).

[17] "Current Contract Value" is the sum of the products of the current contract rates multiplied by the estimated remaining volume (in MBF) of each species. The contract rates in effect when the Lynx Contract terminated were Mt. Adams' bid rates.

[18] No effective purchaser credit was deducted in the damages calculation because Mt. Adams, as previously stated, transferred all of its purchaser credit to other sales before the Lynx contract terminated.

In sum, the Forest Service appraised the remaining timber using the standard Forest Service method in effect when the Lynx contract terminated and the contracting officer correctly determined the damages due the United States under the agreed-upon formula prescribed by B9.4. Therefore, the United States is entitled to damages in the amount of $3,789,615.

## STATEMENT OF THE ISSUES

1. Whether the Forest Service, in determining the value of the timber remaining in Mt. Adams' defaulted Lynx Sale, complied with its standard appraisal method in use when the contract terminated?

2. Whether the standard Forest Service appraisal method took into account the quality of the timber being appraised?

3. Whether the standard Forest Service appraisal method required the use of third quarter or first quarter 1989 data in preparing the residual value appraisal used to determine the value of the remaining timber when the contract terminated?

4. Whether the Forest Service should have used the rates set forth in a September 27, 1989 rate redetermination appraisal to calculate the Current Contract Value of the Lynx Sale when the contract terminated?

5. Whether the contracting officer acted reasonably in selecting the four sales he used to calculate the estimated bid premiums?

6. Whether the standard Forest Service method required the contracting officer to exclude salvage sales in determining estimated bid premiums for the Lynx Sale?

7. Whether the standard Forest Service method required the contracting officer to use sales that occurred after the termination of the Lynx Sale in determining estimated bid premiums?

8. Whether the standard Forest Service method required the contracting officer to make adjustments to his estimated bid premiums to account for differences (in sale characteristics or in contract terms) between the Lynx Sale and the four sales used to calculate the estimated bid premiums?

## CONTENTIONS OF LAW

The Federal Circuit has repeatedly held that the United States is entitled to damages calculated in the manner prescribed by Standard Provision B9.4 when the Forest Service chooses not to resell the remaining timber included in a defaulted sale. Hoskins Lumber Co. v. United States, 89 F.3d 816, 817 (Fed. Cir. 1996) (concluding United States is entitled to damages under the formula set forth in the "no-resale" clause of B9.4); Madigan v. Hobin Lumber Co., 986 F.2d 1401, 1405 (Fed. Cir. 1993) ("The agreed-upon contract term, *i.e.*, that the government is entitled to recover damages in the event there is no resale for whatever reason, including that it chooses not to resell the timber, must be given effect.").[19]

---

[19] The only exception to this rule, not relevant here, is Louisiana-Pacific Corp. v. United States, 227 Ct. Cl. 756 (1981). Louisiana-Pacific, like this case, arose out of a defaulted Forest Service timber sale contract. The contract required the purchaser to cut, remove, and pay for an estimated 7,075 MBF within a specified time period. Before the time for performance had expired, the Forest Service decided that it did not want to sell 5,705 MBF of the original estimated volume to Louisiana-Pacific or to anyone else. Thus, the Forest Service offered Louisiana-Pacific a contract modification that would, if executed, exclude the 5,705 MBF from the sale and extend by one year the period for harvesting the remaining 1,370 MBF. Louisiana-Pacific did not agree to the modification. The contract later expired uncompleted and the Forest Service sought damages (under a predecessor provision similar to B9.4) equal to the difference
(continued...)

Further, the Federal Circuit has made clear that "the *only* question" for the trial court in a case such as this is "whether the government complied with its standard appraisal method" in determining the value of the remaining timber at the time of contract termination. Hoskins Lumber, 89 F.3d at 817 (emphasis in original). To clarify, the Court of Appeals in Hoskins stated that a defaulting purchaser is:

> emphatically *not* entitled to a 'fair' appraisal, an 'accurate' appraisal, a 'reasonable' appraisal, or any manner of appraisal other than the one indicated in section B9.4. Under section B9.4, compliance with the standard [Forest Service] appraisal method is the sole measure

---

[19](...continued)
between the contract value of the entire 7,705 MBF and its appraised value at the time of contract termination. Louisiana-Pacific challenged the Government's claim in the Court of Claims. Both parties moved for summary judgment. The Court of Claims concluded that neither party was entitled to summary judgment, but stated that "[t]he one issue we do decide at this time relates to the amount of uncut timber for which the [Forest Service] should be permitted to claim damages . . . on its counterclaim[.]" 227 Ct. Cl. at 758. On that issue, the Court held that "recovery on the counterclaim . . . cannot exceed damages for failure to cut 1,370 MBF." Id. The Federal Circuit has distinguished and sharply limited the Louisiana-Pacific decision, observing that its holding is an exception to the general rule that agreed-upon contract terms must be enforced. See Hobin Lumber, 986 F.2d at 1404. In this regard, the Federal Circuit stated:

> the exception created by *Louisiana-Pacific* must be narrowly construed to apply only in those cases where similar facts occurred. That is, *Louisiana-Pacific* should only apply in those case where the government decides during the time of contract performance that it does not want all of the contract timber cut, where the government attempts to modify the contract during the period of contract performance to limit the timber the contractor is otherwise required to cut but the contractor refuses, and where the government subsequently seeks to recover damages on that precise timber.

986 F.2d at 1405. Further, in attempting to explain the Louisiana-Pacific ruling, the Federal Circuit stated that "the government's attempted modification of the contract during the period of contract performance is a plausible justification for creating an exception to the general rule because it suggests that the [Court of Claims] applied some form of estoppel against the government." Id. at 1405 n.3. Mt. Adams' previous counsel advised us that he believed the Government's claim in this case was barred by Louisiana-Pacific. We are aware, however, of no evidence that would support such an argument in this case.

of its accuracy and reliability.

89 F.3d at 817 (emphasis in original).

We expect to demonstrate at trial that the Forest Service did comply in all material respects with its standard appraisal method – including the determination of the estimated bid premiums – when it appraised the value of the timber remaining in Mt. Adams' defaulted Lynx Sale at the time of contract termination.

Mt. Adams, through its expert, Paul Ehinger, attempts to cast doubt on whether the Forest Service complied with its standard appraisal method. Mr. Ehinger has prepared an expert report, dated December 20, 2004 ("Ehinger Report"), which contains a statement of his opinions to be expressed at trial.[20] Mr. Ehinger's Report is essentially a reiteration of his January 22, 2004 Declaration which Mt. Adams submitted in opposition to our motion for summary judgment.

In his Report, Mr. Ehinger criticizes the Forest Service's appraisal of the defaulted Lynx Sale. He asserts, conclusorily, that "[t]he Contracting Officer's method of determining resale value in this case does not comply with USFS policy." Ehinger Report ¶ 28. While Mr. Ehinger's Report (unlike his January 2004 Declaration) does quote excerpts from a handful of

[20] We expect Mr. Ehinger's December 20, 2004 expert report to be offered by Mt. Adams' as a trial exhibit. Mt. Adams also has a second expert, Ron Berg, who produced a two-and-one-half page "expert report." In his report, Mr. Berg states that he has read Mr. Ehinger's expert report and agrees with all of Mr. Ehinger's conclusions and opinions. After taking Mr. Berg's deposition, however, it appears that he is not qualified to testify as an expert in this case because he conceded at his deposition on January 21, 2005, that he is unfamiliar with the Forest Service standard appraisal method. It is difficult to comprehend how a witness who is unfamiliar with the standard appraisal method could qualify to express an expert opinion on the central issue of whether the Forest Service's appraisal of the Lynx Sale at the time of termination complies with the agency's standard appraisal method. We have urged opposing counsel to either remove Mr. Berg from Mt. Adams' witness list or, alternatively, have Mr. Berg revise his "expert report" to narrow the issues on which he may testify.

Forest Service Manual and Handbook provisions (see Ehinger Report ¶¶ 3-7) which Mr. Ehinger believes are relevant, he fails to explain how or why the Forest Service's termination value appraisal of the Lynx Sale violates or contravenes any of the provisions he cites.

For example, Mr. Ehinger cites and quotes the following excerpt from the Forest Service Manual ("FSM"):

> When there is an overriding reason that precludes reoffering the remaining timber, the resale value is the appraised value at expiration, adjusted as appropriate to reflect transaction evidence.

Ehinger Report ¶ 6 (quoting FSM § 2433.51); see also Jt. Ex. 16 (FSM § 2433.51). Mr. Ehinger fails to explain exactly how the Forest Service violated this provision in this case. As the Government's witnesses will explain at trial, this provision refers to adding estimated bid premiums, if appropriate, to the appraised rates established by the residual value appraisal when the Forest Service does not resell the timber included in a defaulted sale. As previously stated, the addition of estimated bid premiums to residual value-appraised rates (where appropriate) is intended to bring the appraised rates more in line with local market conditions existing at the time the defaulted contract terminated. The Forest Service adopted the practice of adding estimated bid premiums because the agency recognized that its residual value appraisal method tended to understate the actual selling (market) value of the timber.[21]

Much of Mr. Ehinger's report concerns the differences in sale characteristics and in contract terms between the Lynx Sale and the four sales the contracting officer used to determine

[21] None of the other Forest Service Manual, Handbook, or other provisions cited by Mr. Ehinger supports his opinion that the Forest Service's appraisal of the Lynx Sale at termination is inconsistent with the agency's standard appraisal method. In fact, the internal directive Mr. Ehinger quotes in paragraph 7 of his Report is irrelevant; it deals solely with the resale of defaulted sales.

the estimates bid premiums. Mr. Ehinger claims that the four sales the contracting officer used are "irrelevant" (Ehinger Report, ¶ 23) because they are unlike the Lynx Sale with respect to contract duration, timber volume, and timber quality. Mr. Ehinger, however, conspicuously fails to point to any other sale (or sales) that occurred during the relevant period which is more comparable to the Lynx Sale. We assume he would do so, if any existed.[22] We expect to demonstrate at trial that the contracting officer exercised his professional judgment in a reasonable manner in selecting the four sales he used to calculate the estimated bid premiums.

Mr. Ehinger criticizes the contracting officer for not making adjustments to the estimated bid premiums (or perhaps to the damages) to account for the differences between the Lynx Sale and the four sales the contracting officer used to calculate the estimated bid premiums. See Ehinger Report ¶¶ 24-25. The Government's witnesses will testify at trial that the standard Forest Service appraisal method (including the practice of adding, if appropriate, estimated bid premiums in no-resale instances) did not require the contracting officer to make adjustments for differences in sale characteristics or in contract terms between a defaulted sale and the sales used to determine estimated bid premiums. The standard practice was *not* to adjust for any such differences. Adjusting for such factors would be subjective, impracticable, and administratively inconvenient.

Mr. Ehinger also criticizes the contracting officer for using two salvage sales in calculating the estimated bid premiums and for failing to consider sales that occurred after the

[22] As previously stated, we expect that Mt. Adams and Mr. Ehinger will concede at trial that there were no sales like the Lynx Sale that occurred anywhere near the time of its termination (June 30, 1989). By then, sales with timber volumes and performance periods comparable to the Lynx Sale were relics of the past.

June 30, 1989 termination of the Lynx contract. Ehinger Report ¶¶ 14-15, 31. The Government's witnesses will testify that they are unaware of any Forest Service policy or practice requiring the exclusion of salvage sales in estimating bid premiums. The two salvage sales the contracting officer used, the Polk 4 Salvage Sale and the Beech 4 Salvage Sale, were both competitively bid.[23] This would tend to increase bid premiums. The Government's witnesses will also testify that the standard Forest Service practice was generally to consider sales that occurred on or before the termination date of the defaulted sale because the appraisal was to be "as of" the termination date, not some later point in time.

In addition, Mr. Ehinger criticizes the Forest Service for using first quarter 1989 data as the base period for the June 1, 1990 residual value appraisal. Mr. Ehinger suggests that the Forest Service should have used third quarter 1989 data because it was available when the residual value appraisal was prepared (June 1, 1990) and would have increased the appraised rates and, thus, reduced damages. Ehinger Report ¶ 32. The Government's witnesses will testify that the standard Forest Service residual value appraisal method then in use required using data that was in effect and available as of the termination date of contract (June 30, 1989). Third quarter 1989 data would not only have not been in effect as of June 30, 1989; it would obviously not have been available then.

Mr. Ehinger is also incorrect to the extent he suggests that the contracting officer should have used the residual value-appraised rates set forth in a September 27, 1989 rate redetermination appraisal to determine the Current Contract Value of the Lynx Sale when it

[23] The Polk 4 Salvage Sale had five bidders; the Beech 4 Salvage Sale had seven.

terminated. Mr. Ehinger points out that those rates, if used, would reduce the Current Contract Value and, thus, reduce damages. Ehinger Report ¶ 27. For the reasons stated previously (at p. 9 n. 14), Mt. Adams is indisputably not entitled to the benefit of redetermined rates. The contract explicitly states that lower rates from a scheduled rate redetermination cannot become effective until after the purchase has cut and scaled 21,100 MBF of the 37,500 MBF included in the Sale. See Jt. Ex. 7 (Lynx Contract § A7). Because Mt. Adams failed to meet this performance requirement, it is not entitled to redetermined rates. The contracting officer correctly recognized this.

At bottom, Mr. Ehinger criticizes the Forest Service, not for its failure to appraise the timber in accordance with the standard Forest Service method in use at the time of termination, but for its failure to appraise the timber in a manner that he believes to be reasonable. However, the central issue is *not* whether the Forest Service's appraisal is reasonable or comports with Mr. Ehinger's concept of reasonableness. Hoskins Lumber, 89 F.3d at 817. Rather, the issue is whether the Forest Service's appraisal of the Lynx Sale at the time of termination complies in all material respects with the agency's standard appraisal method then in use. We expect to prove at trial that it does.

## CONCLUSION

Unless Mt. Adams proves at trial, by a preponderance of the evidence, that the Forest Service's appraisal of the Lynx Sale fails to comply with the agency's standard method in use

when the contract terminated, the Court should enter judgment in favor of the United States in the amount of $3,789,615, plus interest.[24]

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

J. CHRISTOPHER KOHN
Director

s/John W. Showalter, by/Richard P. Nockett
JOHN W. SHOWALTER
Assistant Director

s/Richard P. Nockett
RICHARD P. NOCKETT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L St., N.W. (8th Floor)
Washington, D.C. 20530
Tele: (202) 307-1134
Fax: (202) 307-0494

Attorneys for Defendant

Dated: February 11, 2005

[24] The issue of whether the United States is entitled to interest on its claim was litigated earlier and resolved in our favor. Seaboard Lumber Co. v. United States, 48 Fed. Cl. 814, 836-37 (2001) (holding that the Government is entitled to interest beginning January 1, 1984, at the rates established by the Contract Disputes Act), aff'd, 308 F.3d 1283 (Fed. Cir. 2002).

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 11th day of February 2005, I caused copies of the foregoing "DEFENDANT'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW IN MT. ADAMS VENEER CO. v. UNITED STATES, No. 91-984C" to be served upon the following individual by facsimile and by United States mail (first-class, postage prepaid):

DENNIS J. DUNPHY, Esq.
Schwabe, Williamson & Wyatt
1420 Fifth Avenue, Suite 3010
Seattle, Washington 98101-2393

s/Richard P. Nockett