IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| GATEWAY LUMBER CO., *et al.*<br>and MANKE LUMBER CO., *et al.*<br>(Mt. Adams Veneer Co.),<br><br>Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | Consolidated under lead case<br>Nos. 435-87C & 589-87C<br>(No. 91-984C)<br>(Judge Bruggink) |

**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

Pursuant to Appendix G, paragraph 11, of the Rules of the United States Court of Federal Claims, plaintiff respectfully submits the following Memorandum of Contentions of Fact and Law:

## CONTENTIONS OF FACT

### I. Background of Lynx Sale

The majority of facts pertinent to the Lynx timber sale background are not in dispute and are included in the Joint Statement of Fact submitted by the parties. The following is a brief summary of some of those facts.

In August 1979, the Forest Service advertised a timber sale located in the Randle Ranger District of the Gifford-Pinchot National Forest known as the "Lynx Sale." The Lynx Sale area spanned approximately 1,300 acres and contained an estimated 536 acres of timber for clearcutting. The government estimated the volume of the sale at 37,500 MBF,[1] not including

[1] "MBF" means "thousand board feet."

574 acres of pulp and cull material. 19,600 MBF of this timber was estimated to be Douglas Fir and another 16,400 MBF to be Western Hemlock and other coniferous species. The government estimated that the sale also included 1,600 MBF Western Red Cedar. These volumes would have kept a typical family-owned sawmill operational for six straight months. The Lynx Sale was so large that before it was offered the government contemplated whether Lynx should have been offered as two sales.

Bidding for the Lynx sale occurred on September 27, 1979. Mt. Adams Veneer Company ("Mt. Adams") was high bidder and was awarded the contract. The original duration of the contract was seven and a half years, which was later extended by agreement of the parties to June 30, 1989. The original contract rates were set by the final bid submitted by Mt. Adams. Those rates included $678.00/MBF for Douglas Fir and $500.00/MBF for Hemlock. The other two timber categories, Cedar and PAM ("Per Acre Material"), were not biddable and were offered at fixed rates as advertised. Provision A7 of the contract called for a scheduled rate redetermination on July 1, 1985.

Due to an unforeseen decline of the timber market in the early and mid 1980's, harvesting timber under the Lynx contract become economically unfeasible. The Lynx contract terminated on June 30, 1989.

## II. Lynx Contract Termination and the Government's Claim for Damages

Prior to the termination of Lynx, the Forest Service acquired private lands adjacent to the Lynx sale area through a land-exchange program. These exchanges primarily occurred in 1985 and 1986, but the Forest Service allowed for continued limited timber harvesting in some areas acquired from private ownership as late as 1988. Although the Forest Service presumably evaluated the environmental impact of the land exchanges, the Forest Service did not exercise its

contractual right to terminate the Lynx contract early for environmental reasons. It did so, however, with the knowledge that Mt. Adams was unable to log the sale at the prices bid.

After the Lynx sale terminated, the Forest Service conducted another environmental analysis. Citing that analysis, the Forest Service issued a written decision in June 1990 that it would not resell the timber covered by the Lynx contract in order to allow the streams and drainages in the planning area to recover from the extensive timber harvesting that had occurred over the previous 30 years. These facts had not changed in any substantial way since the land exchanges in 1985 and 1986, and not at all since 1988. After deciding not to resell the timber, the Forest Service proceeded to assess damages pursuant to the contractual damages provision of the contract, B9.4:

> B9.4 Failure to Cut. In [the] event of (a) termination for breach or (b) Purchaser's failure to cut designated timber on portions of Sale Area by Termination date, Forest Service shall appraise remaining Included Timber, unless termination is under B8.22. Such appraisal shall be made with the standard Forest Service method in use at the time of termination.
>
> Damage due the United States for Purchaser's failure to cut and remove such timber meeting Utilization Standards shall be the amount by which Current Contract Value[,] plus the cost of resale, less any effective Purchaser Credit remaining at time of terminations, exceeds the resale value at new Bid Rates. If there is no resale, damages due shall be determined by subtracting the value established by said appraisal from the difference between Current Contract Value and Effective Purchase Credit.

Generally, remaining timber that is left uncut at contract termination is offered for resale. As stated in B9.4, when this occurs the government is entitled to a measure of damages that is principally the difference between the current contract value and the resale value. If there is no resale, the damage calculation is functionally the same except that in a no resale situation, by definition there is no established market resale value to subtract from current contract value.

Therefore, B9.4 states that damages shall be determined by subtracting the reappraised value from the current contract value.

As stated by B9.4, this calculation must be made "with the standard Forest Service method in use at the time of termination." That standard method called for the addition of an "overbid" or "bid premium" to the reappraised value "to bring the appraised rates for biddable species more in line with local market conditions existing at the time the defaulted contract terminated." Defendant's Memorandum of Contentions of Fact and Law, p.9. The result is an appraised value that is a closer approximation of what a likely purchaser would have been paid for the timber had the sale been resold.

To determine reappraised value, the Forest Service used an appraisal summary dated June 1, 1990, using first quarter 1989 data as the base period. The calculation of the contracting officer was as follows:

Contract value of uncut timber at time of default:

| Species | Volume | Bid Rate | |
|---|---|---|---|
| DF | 19,100 | $678.00 | $12,949,800 |
| H&O | 15,800 | $500.00 | $7,900,000 |
| C | 1,400 | $220.35 | $308,490 |
| PAM | 536 | $1.83 | $981 |
| | | | $21,159,271 |
| Less cash on deposit (bid guarantee) | | | ($100,000) |

Less contract reappraised rate plus bid premium:

| Species | Volume | Reappraised Rate + Bid Premium | |
|---|---|---|---|
| DF | 19,100 | $426.35 + $215.27 | ($12,254,942) |
| H&O | 15,800 | $121.16 + $173.71 | ($4,658,946) |
| C | 1,400 | $171.12 | ($239,568) |
| PAM | 536 | $216.79 | ($116,200) |

To calculate the bid premium, the contracting officer selected four sales as "comparable": Polk 4 Salvage, Beech 4 Salvage, Polar 2, and Silver 7. Comparing the advertised rate to the bid



SEA/054368/70915/DJD/332681.1

rates of those sales, the contracting officer calculated a weighted average bid premium that was applied to the Lynx calculation on an absolute dollar-value basis. Because only "Douglas Fir" and "Hemlock & Other" were biddable species, only those species included a bid premium. The end result was a calculation of damages in the amount of $3,789,615.

## III. Forest Service Policies Relevant to Appraisals and Calculation of Damages

This Court previously denied the government's summary judgment motion, holding that disputed issues of material fact remained to be determined. Among these disputed issues were what policies and practices existed with respect to no-resale appraisals, selection of comparables, and calculation of a "bid premium." Forest Service documents and statements by Forest Service personnel provide the foundation for an analysis of these issues, consistent with this Court's order that "[o]nly objectively demonstrated policy and practice can form the correct plumb line for the reappraisal."

### A. Time for Decision to Resell

Once a contract expires uncompleted, Forest Service policy requires the government to decide whether to resell within a "reasonable time." Forest Service policy specified that this decision should ordinarily be made within six months.

### B. Provisions Giving General Guidance to Appraisals and Determinations of Damages

USFS Manual section 2424.3-Appraisal for Determination of Damages in Expired Contracts provides generally that:

> The general measure of such damage is the extent to which the resale value of remaining timber is less than the amount the purchaser would have paid had he completed the contract.

USFS Manual section 2433.54-Determination of Damages in Uncompleted Timber Sale Contract provides in part:

> Damage to the United States must be appraised with the utmost care and impartiality, and no item shall be included that cannot be supported

USFS Timber Sale Handbook section 47.1 provides in part:

> The general measure of such damage is the extent that the resale value of remaining timber is less than the amount the purchaser would have paid had the contract been completed. Timber sale contracts define the latter as the value at the stumpage rates in effect at termination, which is the current contract value.

C. <u>If Timber is Not Resold, a Bid Premium Must be Added to the Appraised Value at Termination.</u>

USFS Timber Sale Handbook section 47.1 footnotes the need to add an estimated bid premium as a step in the appraisal process in circumstances where a calculation of resale value is being made upon the termination of a contract with uncut volume remaining. This overbid requirement reflects the fact that bid prices on timber contracts typically were for significantly higher prices than the minimum advertised rate for the sale. USFS Timber Sale Handbook section 47.1 provides:

> Timber Not Reoffered For Sale. In this situation, add an anticipated overbid to the appraised value as discussed previously.

Similarly, the USFS Manual provides at section 2433.51-Action When Timber Sale Contract Has Expired Prior to Completion:

> When there is an overriding reason that precludes reoffering the remaining timber, the resale value is the appraised value at expiration, adjusted as appropriate to reflect transaction evidence.

A few sections later at 2433.54, the Forest Service Manual provides:

> If similar sales can be found, use the average bid premium for those sales and document what was done.



SEA/054368/70915/DJD/332681.1

Ms. Anderson, citing USFS Manual 2433.54 has testified on behalf of the Forest Service that:

> The second step in the standard Forest Service method of preparing a termination value appraisal was to add, if appropriate, an estimated bid premium to the advertised rates produced by the residual value appraisal method.... *** When there was no resale after a purchaser's default, the Forest Service typically added an estimated bid premium to the advertised rates because the agency recognized that its residual value appraisal method generally understated the actual selling value (or market value) of the timber.

D. <u>The Forest Service Must Make Adjustments for Differing Contract Terms to Reflect Changed Conditions.</u>

The USFS internal directive from the Director of Timber Sales, George Leonard, recently disclosed by Ms. Anderson, provides in part:

> Occasionally it may be desirable to reoffer the remaining timber, but under different contract provisions from those of the original sale. Under such circumstance, it is necessary to make two appraisals. The first is made under the assumption that the original contract provisions apply, and the second assumes changed provisions. Both appraisals will be made using standard methods in use at expiration. The difference between the two appraisals is the effect of the changed conditions on the value of the remaining timber. This difference, if it reduces the value of the remaining timber, will be used to reduce damages.

This directive is consistent with other USFS Manual provisions. The USFS Manual also calls for adjustments to be made for physical and quality differences when comparing two tracts of timber. Section 2421 states:

> Since no two tracts of timber are identical, it follows that the stumpage prices paid or to be paid for any two tracts cannot be directly compared without adjusting for the physical or quality differences between them.

The Lynx Contracting Officer has testified that the USFS policy regarding the determination of the bid premium/overbid is in the form of a general direction which directs the

C.O. to select sales that are "representative of the sale that you're concerned with…." He has testified that age of the timber; species composition; logability; and timber quality are all factors that establish comparability. All of these factors are consistent with the Forest Service policies specified above.

## IV. Differences in Timber between Lynx and "Comparable" Sales.

The underlying policy contained in the above-referenced provisions is that the contracting officer is to select "comparable" sales and to adjust the appraised value at termination to reflect what value the Forest Service would have obtained for the timber had it been offered for resale. Despite this policy, the sales selected by the contracting officer simply were not comparable to Lynx, and vary from the Lynx sale offering in a number of fundamental and material respects.

The value of the timber included in the Lynx sale is much higher than any of the sales used to calculate overbid. Bidding historically is more aggressive on sales of higher quality because the purchaser has more options in the marketplace for improving realization of lumber and plywood that are not available with the lower grades. The following are some of the most glaring differences between the "comparable" sales and Lynx:

### A. Total Volume

As stated in the introduction, the Lynx sale was one of the largest sales ever offered by the Forest Service in Washington State. The Lynx sale had an estimated 39,600 MBF of timber. The closest "comparable" sale was the Polar 2 sale which contained an estimated 9,300 MBF, less than 25% of the volume of Lynx.

B. PAM Volume

Per acre material (PAM) volume is an indicator of highly defective timber. The amount of PAM in the "comparable" sales was 19% of Polk 4 Salvage, 24% of Beech 4 Salvage, 14% for Polar 2 and 18% for Silver 7. In contrast, the Lynx sale had only 5% PAM.

C. Douglas Fir

The quality of the old-growth timber contained in the Lynx sale, especially the Douglas Fir, is another distinguishing feature of the sale:

| | |
|---|---|
| Lynx | 50% |
| Polk 4 Salvage | 37.5% |
| Beech 4 Salvage | 29% |
| Polar 2 | 38% |
| Silver 7 | 36% |

Another measure of quality is the percent of #3 Douglas Fir sawlogs, the lowest grade. The other "comparable" sales contained a much higher percentage of this smaller and lower quality log:

| | |
|---|---|
| Lynx | 15% |
| Polk 4 Salvage | 19% |
| Beech 4 Salvage | 19% |
| Polar 2 | 22% |
| Silver 7 | 17% |

The Lynx sale also included a large volume of Douglas Fir #1 and #2 peeler logs. An estimated twenty percent of the Douglas Fir in the Lynx Sale consisted of #1 peeler and #2 peeler logs. These #1 and #2 peelers are more valuable than lower-grade timber because they have a clear surface that is free of knots, and a minimum diameter of 30 inches at the small end. This allows the logs to be peeled to produce veneer and also to be used to produce lumber.

These are logs of extraordinary quality. They are also suitable for making lumber. The following are the percentages of #1 and #2 peelers in each of the sales:

| | |
|---|---|
| Lynx | 20% |
| Polk 4 Salvage | 1% |
| Beech 4 Salvage | 2% |
| Polar 2 | 7% |
| Silver 7 | 3% |

A knowledgeable and experienced bidder looking at the Lynx offering would be aware of the importance not just of the quality differences between grades, but also of the important range of quality differences within grades. Further, a knowledgeable and experienced bidder would know that the advertised rates, which are based on cruise data, reflect the middle of this range of quality by their very nature because they are based on average prices and index averages. The quality of the timber on the high-end of the Lynx sale far exceeded these averages.

D. Cedar

Cedar maintained a similar quality differential. This is represented by the presence of #2 Cedar sawlogs which are at least 20 inches in diameter and are superior to #3. Neither the Lynx sale, nor the "comparable" sales had any #1 Cedar, so the percentage of #2 is representative of the quality. The Lynx cedar is of superior quality and value by a large margin:

| | |
|---|---|
| Lynx | 36% |
| Polk 4 Salvage | 1% |
| Beech 4 Salvage | 12% |
| Polar 2 | 20% |
| Silver 7 | No Cedar Identified |

E. Salvage Sales

Two of the four sales selected by the contracting officer, Polk 4 Salvage and Beech 4 Salvage, were (as their name indicates) salvage sales. Salvage sales consist of significant volumes of dead or damaged timber subject to decay and deterioration. The Lynx sale, in

contrast, was a "green" sale—meaning that live trees predominated. A decision by a green sale purchaser as to when to harvest will not be affected by considerations of deterioration as in a salvage sale. Knowledgeable bidders do not approach a salvage sale in the same way as a green sale and would not consider these two different types of sales to be similar.

## V. Lynx v. Sales Selected as Comparable – Contract Differences

The price bid for the original Lynx sale was based not only on the high quality of the timber and its dual suitability for manufacturing into veneer and high-quality lumber, but was also based upon the terms under which that timber was offered. These include length of sale, logging requirements, rate requirements, logging costs, hauling costs, and harvest requirements to complete sales as offered, both in terms of calendar months and operating season months. The sales used to compute the overbid calculation were offered with vastly different terms from the terms offered on Lynx. These differences undermine any potential usefulness these sales have in coming up with an anticipated bid premium for Lynx.

### A. Time

No adjustment was made by the Contracting Officer to account for the extreme dissimilarity of the selected sales with respect to their very short duration as compared to Lynx. Lynx was ninety months, while the longest "similar" sale, Beech 4, had a duration less than half that length (43 months). A multi-year contract, of whatever volume, allows greater flexibility to the purchaser. Greater flexibility translates into greater value to a purchaser. In a single season sale, purchased shortly before the operating season commences, only those purchasers who can immediately use that timber and have the capacity to log it will bid. Prudent bidders would, thus, not exceed the immediate cash market price. In a multi-year contract, a purchaser can bid higher if needed to obtain the timber. Scheduling flexibility allows one to take advantage of the best

possible market during the term of the contract. As a result, multi-year contracts result in higher bids. The resale of Lynx in 1989 would have given the purchaser a seven and one-half year opportunity to maximize profits during a period of extreme market price increases due to timber shortages. Contract duration on green sales is one of the most important factors driving the price a knowledgeable timber purchaser is willing to pay.

B. Logging Requirements

The annual logging requirements ranged 2200 mbf per operating season to a maximum of 4250 mbf per operating season on the comparables. Lynx required 5470 mbf to be logged per operating season. Logging costs were not comparable.

C. Rates

Lynx was a flat rate sale with one scheduled rate redetermination. All comparables were SRA (stumpage rate adjustment sales) adjusted on a quarterly basis. An overbid would not be as high for an SRA sale as for a long-term fixed rate sale with a scheduled rate redetermination. To make alleged damages comparable, an appraisal would require that Mt. Adams be credited for all potential escalation during the eight year life of the sale, because in the bidding process of a fixed rate sale, the purchaser anticipates appreciation in values over the life of the sale.

D. Financial Requirements

There were numerous financial requirements on these "comparable sales," including cash down and mid-point payments, additional deposits for premium bid, midpoint payments, higher bonding limits, discount for early removal, etc. All these materially impacted competition, increased costs, and lowered the amounts bid.

The original Lynx sale downpayment was covered with a payment bond; there were no cash requirements until cutting began, which is a major difference between the sales used to

calculate overbid. This changed the contract from a pay-as-you-cut contract as with Lynx to pay-or-cut contract which requires strict levels of performance or payments of 50% of stumpage at mid-point if the timber had not been cut. In a sale the size of Lynx, these items can add significant costs as well as stretch the cash resources of an operator.

## STATEMENT OF ISSUES

I. Whether the Forest Service is entitled to damages if it is unable to establish the standard appraisal method in effect at the time of termination as called for by B9.4 of the Lynx contract.

II. Whether the Forest Service complied with the objective standard appraisal method and policies in effect at the time of termination as established by the Forest Service Manual, Appraisal Handbook, internal documents, and prior testimony.

III. Whether the Court should make an equitable adjustment to the damages claimed by the Forest Service due to the Forest Service's failure to comply with standard appraisal method and policies.

## CONTENTIONS OF LAW

### I. Applicable Standard

The Forest Service decided not to resell the timber covered by the Lynx contract and retained both the timber itself and the environmental benefit from its decision not to resell. Nonetheless, it is the law of this court that the Forest Service is entitled to enforce the contractually agreed upon measure of damages provided by B9.4. That measure of damages, however, is not exempt from review.

According to prior decisions of this Court, the government must demonstrate that that Contracting Officer's calculation adheres in all material respects to the Forest Service's standard

appraisal method and policy in effect at termination. "[C]ompliance with the standard appraisal method is the sole measure of its accuracy and reliability." *Hoskins Lumber Co. v. United States*, 1996 U.S. App. LEXIS 9612, at *4 (Fed. Cir. April 16, 1996); *Madigan v. Hobin Lumber Co.*, 986 F.2d 1401, 1405 (Fed. Cir. 1993).

The standard appraisal method, however, is not defined simply by the actions taken by the contracting officer; rather, standard method and policies must be defined by objective sources. Similarly, compliance with that method and policies must be shown by comparing the actual actions taken with those objective standards. In this case, when the policies and method contained in Forest Service's own documents are compared to the actions of the contracting officer, it becomes clear that the standard method and policy were not followed in calculating the damages owed by Mt. Adams under the Lynx contract.

## II. <u>The Forest Service cannot show what its standard method and policy was at the time of Lynx contract termination.</u>

The Lynx contract states at B9.4 that Mt. Adams is entitled to a damage reappraisal that is "made with the standard Forest Service method in use at the time of termination." The government, however, fails to cite to any objective authority for what constitutes the Forest Service's standard method and policy, let alone show that it has complied with those standards. Instead, the government argues that because the Forest Service went through a procedure that lines up with the face of B9.4, no further review is necessary. That argument must fail. As this Court previously noted in its order denying the government's motion for summary judgment, "Only objectively demonstrated policy and practice can form the correct plumb line for the reappraisal."

What constitutes the standard method and policy is clouded by disagreement among the Forest Service's own contracting officers. For instance, the bid premiums from the

"comparable" sales were applied to Lynx by using absolute dollar amounts adjusted for volume, rather than by adjusting on the percentage basis that the particular bid premium exceeded the appraised rate. This latter method is the standard Forest Service timber sale appraisal practice for adjusting basic market data on line #7 of the 2400-17 appraisal documents. Ms. Anderson has testified that a percentage increase approach is a practice within the US Forest Service equally acceptable to adding absolute dollars. Mr. Hofer contradicts her and argues that it is not.

The government's only showing of the standard method and policy are the conclusory statements of Ms. Anderson that the Contracting Officer performed the calculation called for by B9.4. However, the fact that a bid premium was included in the government's calculation, an element not found anywhere in B9.4, makes clear that the contractual damages provision is not a complete statement of the standard Forest Service method or policy by which the Contracting Officer's actions should be judged. Without an objective basis from which to judge the contracting officer's decision, the Court cannot evaluate the Forest Service's claim for damages and the government fails to meet its burden to establish damages due under the contract. This is particularly important where credible testimony will show that this contract would have sold for an amount at least as great as the bid received in 1979 had the timber been resold under the original terms and conditions.

## III. **The Contracting Officer's decision fails to comply with the standard appraisal method and policy set forth in the Forest Service's own internal documents.**

Notwithstanding the Forest Service's failure to objectively demonstrate its own standard appraisal method and policy, it is clear that the contracting officer ignored the directions that can be discerned from a review of Forest Service documents. The Forest Service Manual describes, in hierarchical fashion, standard appraisal policies, the elements of a basic appraisal, and the

need for adjustments in particular circumstances. This, and other sources, provide the following directives:

1) Damages must be appraised with the utmost care and impartiality and no item shall be included that cannot be supported.

2) If timber is not reoffered for sale, the appraised value of the timber is adjusted to reflect transaction evidence. If similar sales can be found, an average bid premium is to be used. Otherwise, an anticipated overbid must be added to the appraised value of the timber.

3) No two tracts of timber can be directly compared without adjusting for physical or quality differences between them.

4) The general measure of damages is designed to measure the amount the purchaser would have paid had the contract been completed.

The contracting officer failed to follow these directives. First, the contracting officer did follow forest service policy to exercise utmost care and impartiality in assessing damages on the Lynx contract. This failure permeates throughout the Forest Service's damage appraisal and overbid calculation.

The appraisal input database selected by the Contracting Officer ignores published data for the "as of" date of the appraisal, June 30, 1989. Despite being performed a year later when "publication lag" is not an issue, the appraisal employed the first quarter 1989 database and, for monthly data, March 1989. This selection is nowhere explained by him. An earlier Forest Service Lynx damages appraisal, prepared in April 1990, used third quarter and September 1989 data inputs in the appraisal. This approach would have better reflected the "as of" June 30, 1989 appraisal date due to the data lag issue mentioned above, but it was disregarded by the

Contracting Officer in favor of first quarter data. Had the Contracting Officer used September data, the government's damage claim would be reduced by approximately $400,000. This is the difference between the unadjusted appraisal value from the April 1990 appraisal and the June 1990 version.

Forest Service policy states that the general measure of damages be designed to measure the amount the purchaser would have paid had the contract been completed. If the contract had been completed, Mt. Adams would have qualified for and received the benefit of a scheduled rate redetermination in 1985. Despite the fact that a Forest Service employee had duly conducted a rate redetermination appraisal, which would have reduced the stumpage rate for a large portion of the contract volume and reduced the government's claim for damages, the contracting officer failed to apply it.

The contracting officer also failed to exercise the utmost care and impartiality in his bid premium calculation. No rational basis can be shown for the selection of the four comparable sales used to calculate an average bid premium, a breach of the Forest Service's own policy that no item of damages shall be included that cannot be supported. Both parties appear to agree that the Lynx sale was a fundamentally different sale from the comparables selected by the contracting officer. The government notes, "By [the time of Lynx termination], sales like the Lynx sale, particularly in terms of volume and duration, were relics of the past." Defendant's Memorandum of Contentions of Fact and Law, p.12, FN 16. This contracting officer, however, did not recognize this fact in his written decision. Instead, he simply lowered the definition of "similar" to such an extent that essentially any sale in the forest would have qualified as a comparable sale.

The government contends that the lack of similar sales from which the contracting officer could choose from insulates the contracting officer's selection of "comparable" sales from criticism. Under the government's analysis, the contracting officer could have picked any four sales with the same biddable species and "competitive" bidding to come up with an average overbid. The result is a contrived damage assessment that has no foundation in the standard forest service appraisal method or stated policy.

The drastic impact of the dissimilar sales on the damage calculation in this case is demonstrated by the contracting officer's selection of two "salvage" sales as "comparable." Salvage sales, by their very definition, contain large portions of dead and dying timber. Inclusion of the bid premiums from these sales had the effect of deflating the estimated bid premium for Lynx. Had these two sales simply been omitted from the damage calculation, damages due to the government would have been reduced by nearly $2 million.

The contracting officer's use of dissimilar sales was inappropriate in light of stated Forest Service policy. It is a logical conclusion that dissimilar sales should not be used to calculate and overbid based when the guidance provided calls for the use of "comparable" sales. This is reflected in the language of the Forest Service Manual itself, which allows the calculation of an average bid premium from comparable sales only "<u>if</u> similar sales can be found." FSM 2433.54. Nonetheless, the contracting officer in this case did a direct comparison of sales that had little in common with the Lynx sale.

If no sales are similar, the contracting officer should have resorted to other guidance provided by Forest Service policies. The most applicable provision calls for the addition of an "<u>anticipated</u> overbid" to the appraised value. Forest Service Handbook 47.1 (emphasis added). The handbook specifically directs the addition of an overbid that is <u>anticipated</u>. This provision

does not call for an "average" overbid, or simply an overbid "higher than most," yet these latter arguments are precisely the argument that the government puts forth to support the arbitrary figures reached by the contracting officer's decision.

An alternative to calculating an anticipated overbid would be to make adjusting for recognized differences in timber quantity/quality and contract terms between sales that occurred near the time of contract termination and the "relic of the past" that was the Lynx sale. Even if such adjustments would be "subjective, impracticable, or administratively inconvenient," as the government appears to argue, they do not excuse the contracting officer from complying with Forest Service policy. This is especially true where the contracting officer can give no explanation as to how the overbid calculation results in an "anticipated" overbid that is anything but arbitrary. Indeed, expert testimony will show that if the Lynx sale had been reoffered, a likely bidder would have paid significantly higher than reflected in the average bid premium calculated by the contracting officer.

The contracting officer selected comparable sales by looking only to the biddable species, without regard for actual comparability of timber quantity, quality, or contract terms. Such an analysis ignores the requirement that sales used to calculate an average bid premium be "similar," and also undermines the stated policy that the overbid be one that would actually be "anticipated" if the timber had been offered for resale. If the practices of the contracting officer did not follow the Forest Service's own written guidance, the only conclusion that follows is that he did not follow the standard appraisal method and policy in effect at the time of termination.

## CONCLUSION

The Forest Service cannot objectively establish its standard appraisal method in effect at the time of termination. In the absence of a demonstration of what this standard method is, the

Forest Service cannot show compliance with B9.4, which explicitly requires that the Forest Service "shall" conduct its appraisal in compliance with that method. Unless the Forest Service can show a sufficient objective basis as to what those standards were, its conclusory argument that it complied in all material respects should be rejected by the Court.

Assuming for the sake of argument that an objective showing can be made, the contracting officer's approach here cannot be reconciled with the standards and policies discernable from the Forest Service's own documentation and internal memoranda. All of the failures discussed above contradict the stated policy to exercise utmost care and impartiality and not include damages that cannot be supported. The result is a wholly contrived damage assessment for breach of the Lynx contract to which the Forest Service is not entitled. If any damages are found to be due to the Forest Service, the Court should enter a judgment reducing the damages owed to an amount that would have been assessed had the contracting officer conducted a damage calculation consistent with the Forest Service's own stated appraisal method and policy.

Dated this 15th day of February, 2005.

By: s/

Dennis J. Dunphy
SCHWABE, WILLIAMSON & WYATT, PC
1420 Fifth Avenue, Suite 3010
Seattle, WA 98101
Phone: (206) 622-1711
Fax: (206) 292-0460
Email: ddunphy@schwabe.com
Attorneys for Plaintiff

# CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of February, 2005, I caused to be served the foregoing Plaintiff's Memorandum of Contentions of Fact and Law, on the following party at the following address:

Richard P. Nockett
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
1100 L St., NW (8th Floor)
Washington, D.C. 20530
Phone: (202) 307-1134
Fax: (202) 307-0494

by:

- ☐ U.S. Postal Service, ordinary first class mail
- ☐ U.S. Postal Service, certified or registered mail,
- ☐ return receipt requested
- ☐ hand delivery
- X other (specify): Facsimile and Federal Express

By: s/______________________

Dennis J. Dunphy
SCHWABE, WILLIAMSON & WYATT, PC
1420 Fifth Avenue, Suite 3010
Seattle, WA 98101
Phone: (206) 622-1711
Fax: (206) 292-0460
Email: ddunphy@schwabe.com
Attorneys for Plaintiff